**KILPATRICK TOWNSEND &
STOCKTON LLP**
Lisa Pearson (LP 4916)
Robert Potter (RP 5757)
Olivia Harris (OH 1983)
1114 Avenue of the Americas
New York, New York 10036
Telephone: (212) 775-8700
Facsimile: (212) 775-8800

James W. Faris Jr. (admitted *pro hac vice*)
1100 Peachtree Street, Suite 2800
Atlanta, Georgia 30309
Telephone: (404) 815-6500
Facsimile: (404) 815-6555

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| COTY INC., COTY B.V., CALVIN KLEIN TRADEMARK TRUST, CALVIN KLEIN, INC., CALVIN KLEIN COSMETIC CORPORATION, VERA WANG LICENSING LLC, V.E.W., LTD., and ATE MY HEART INC., <br><br> Plaintiffs, <br><br> v. <br><br> EXCELL BRANDS, LLC, <br><br> Defendant. | 15-CV-7029 (JMF) (GWG) |

**PLAINTIFFS' PRETRIAL MEMORANDUM OF LAW**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................1

STATEMENT OF FACTS ........................................................................................2

ARGUMENT .........................................................................................................3

I.   DEFENDANT IS INFRINGING AND UNFAIRLY COMPETING WITH PLAINTIFFS' MARKS. ..................................................................................3

    A.   Plaintiffs' Marks Are Protectable. .........................................................4

    B.   Defendant's Diamond Collection Fragrances at Issue Create Numerous Types of Likely Confusion. ...................................................6

    C.   An Analysis of the Likelihood of Confusion Factors Demonstrates that Confusion Is Highly Likely. ..............................................................7

        1.   Plaintiffs' and Defendant's Products Are in Close Competitive Proximity. .........................................................................................8

        2.   Both Parties' Surveys Are Strong Evidence that Consumer Confusion Is Likely. .......................................................................9

        3.   The Extent of Defendant's Mimicry and Outright Copying Reveals the Breadth and Depth of Defendant's Infringement. ...............................12

    D.   Defendant Is Not Making Fair Use of Plaintiffs' Marks or Engaging in Lawful "Comparative Advertising." .................................................13

II.   THIS IS A CLASSIC CASE OF TRADEMARK DILUTION. ........................................17

III.   DEFENDANT'S "OUR VERSION OF" LEGEND CONVEYS A FALSE ADVERTISING CLAIM TO CONSUMERS. ..................................................20

IV.   DEFENDANT CANNOT PROVE ITS LACHES DEFENSE. .......................................23

V.   THE ESSENCE OF PLAINTIFFS' IRREPARABLE INJURY IS THEIR INABILITY TO CONTROL THE QUALITY OF GOODS BEARING THEIR MARKS. ....................................................................................................24

CONCLUSION ......................................................................................................25

i

## TABLE OF AUTHORITIES

**Cases**

*Beer Nuts, Inc. v. Clover Club Foods Co.*,
   711 F.2d 934 (10th Cir. 1983) ................................................................................. 17

*Boule v. Hutton*,
   328 F.3d 84 (2d Cir. 2003) ..................................................................................... 20

*Cartier, Inc. v. Deziner Wholesale, L.L.C.*,
   No. 98 Civ. 4947(RLC), 2000 WL 347171 (S.D.N.Y. Apr. 3, 2000) ........................ 13, 17, 21

*Charles of the Ritz Grp. Ltd. v. Quality King Distrib.*,
   636 F. Supp. 433 (S.D.N.Y. 1986) .......................................................................... 14

*Charles of the Ritz Grp. Ltd. v. Quality King Distrib.*,
   832 F.2d 1317 (2d Cir. 1987) ............................................................................... 8, 16

*Clinique Labs. v. Dep Corp.*,
   945 F. Supp. 547 (S.D.N.Y. 1996) ...................................................................... passim

*Conopco, Inc. v. Cosmair, Inc.*,
   49 F. Supp. 2d 242 (S.D.N.Y. 1999) ....................................................................... 4

*Deere & Co. v. MTD Prods., Inc.*,
   41 F.3d 39 (2d Cir. 1994) ....................................................................................... 18

*El Greco Leather Prods. Co. v. Shoe World, Inc.*,
   806 F.2d 392 (2d Cir. 1986) ................................................................................... 24

*Energybrands, Inc. v. Beverage Mktg. USA, Inc.*,
   02 Civ. 3227, 2002 WL 826814 (S.D.N.Y. May 1, 2002) ........................................ 12

*Essie Cosmetics, Ltd. v. Dae Do Int'l, Ltd.*,
   808 F. Supp. 952 (E.D.N.Y. 1992) ........................................................................... 6

*Estate of Ellington ex rel. Ellington v. Harbrew Imports Ltd.*,
   812 F. Supp. 2d 186 (E.D.N.Y. 2011) ..................................................................... 17

*Estate of P.D. Beckwith, Inc., v. Commissioner of Patents*,
   252 U.S. 538 (1920) ................................................................................................. 13

*Flushing Bank v. Green Dot Corp.*,
   138 F. Supp. 3d 561 (S.D.N.Y. 2015) ..................................................................... 10

*Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*,
   111 F.3d 993 (2d Cir. 1997) ..................................................................................... 5

*Gap, Inc. v. G.A.P. Adventures Inc.*,
   No. 07–CV–9614, 2011 WL 2946384 (S.D.N.Y. Jun. 24, 2011) ............................................ 17

*Gross v. Bare Escentuals Beauty*,
   641 F. Supp. 2d 175 (S.D.N.Y. 2008) ...................................................................... 23

*Gucci Am., Inc. v. Guess?, Inc.*,
   868 F. Supp. 2d 207 (S.D.N.Y. 2012) ............................................................... 3, 9, 23

*Hermès Int'l v. Lederer de Paris Fifth Ave., Inc.*,
   219 F.3d 104 (2d Cir. 2000) .......................................................................... 6

*Hormel Foods Corp. v. Jim Henson Prods., Inc.*,
   73 F.3d 497 (2d Cir. 1996) ......................................................................... 18

*Hypertherm, Inc. v. Precision Prods.*,
   832 F.2d 697 (1st Cir. 1987) ......................................................................... 17

*International Info. Sys. Sec. Certification Consortium, Inc. v. Security Univ., LLC*,
   823 F.3d 153 (2d Cir. 2016) ................................................................... 6, 14, 16

*Invicta Plastics Ltd. v. Mego Corp.*,
   523 F. Supp. 619 (S.D.N.Y. 1981) ................................................................... 13

*JR Tobacco of Am., Inc. v. Davidoff of Geneva (CT), Inc.*,
   957 F. Supp. 426 (S.D.N.Y. 1997) ................................................................... 22

*Kompan A.S. v. Park Structures, Inc.*,
   890 F. Supp. 1167 (N.D.N.Y. 1995) ................................................................... 6

*LeSportsac, Inc. v. K Mart Corp.*,
   754 F.2d 71 (2d Cir. 1985) ........................................................................... 6

*Lindy Pen Co. v. Bic Pen Corp.*,
   725 F.2d 1240 (9th Cir. 1984) ....................................................................... 16

*Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*,
   799 F.2d 867 (2d Cir. 1986) ....................................................................... 5, 9

*Lon Tai Shing Co. v. Koch + Lowy*,
   19 U.S.P.Q.2d (BNA) 1081 (S.D.N.Y. 1991) ........................................................ 12

*Mastercrafters Clock & Radio Co. v. Vacheron & Constantin-LeCoultre Watches, Inc.*,
   221 F.2d 464 (2d Cir. 1955) .......................................................................... 6

*Medisim Ltd. v. BestMed LLC*,
   910 F. Supp. 2d 591 (S.D.N.Y. 2012) ................................................................ 20

*Merck Eprova AG v. Brookstone Pharm., LLC*,
  920 F. Supp. 2d 404 (S.D.N.Y. 2013) ................................................................ 20

*Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge Co.*,
  316 U.S. 203 (1942) ................................................................................... 2, 7

*Mobil Oil Corp. v. Pegasus Petroleum Corp.*,
  818 F.2d 254 (2d Cir. 1987) ........................................................................ 24

*New Kids on the Block v. News Am. Publ'g, Inc.*,
  971 F.2d 302 (9th Cir. 1992) .................................................................. 13, 14

*Paddington Corp. v. Attiki Imps. & Dists., Inc.*,
  996 F.2d 577 (2d Cir. 1993) .......................................................................... 5

*Pebble Beach Co. v. Tour 18 I, Ltd.*,
  942 F. Supp. 1513 (S.D. Tex. 1996),
    *aff'd*, 155 F.3d 526 (5th Cir. 1998) ............................................................ 16

*Playboy Enters., Inc. v. Chuckleberry Pub'g, Inc.*,
  486 F. Supp. 414 (S.D.N.Y. 1980) ................................................................. 6

*Polaroid Corp. v. Polarad Electronics Corp.*,
  287 F.2d 492 (2d Cir.),
    *cert. denied*, 368 U.S. 820 (1961) ...................................................... 7, 15, 16

*Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*,
  800 F. Supp. 2d 515 (S.D.N.Y. 2011) ................................................. 3, 16, 24

*ProFitness Physical Therapy Ctr. v. Pro-Fit
  Orthopedic & Sports Physical Therapy P.C.*,
  314 F.3d 62 (2d Cir. 2002) .......................................................................... 23

*Rexall Sundown, Inc. v. Perrigo Co.*,
  651 F. Supp. 2d 9 (E.D.N.Y. 2009) .............................................................. 20

*RJR Foods, Inc. v. White Rock Corp.*,
  603 F.2d 1058 (2d Cir. 1979) ...................................................................... 12

*Ross Cosmetics Dist. Centers, Inc. v. United States*,
  34 U.S.P.Q. (BNA) 1758 (Ct. Int'l Trade 1994) ............................................ 16

*Sands, Taylor & Wood Co. v. Quaker Oats Co.*,
  978 F.2d 947 (7th Cir. 1992) ...................................................................... 16

*Saxony Products, Inc. v. Guerlain, Inc.*,
  513 F.2d 716 (9th Cir. 1975) ...................................................................... 15

iv

*Securitron Magnalock Corp. v. Schnabolk*,
  65 F.3d 256 (2d Cir. 1995) ................................................................................ 20

*Smith v. Chanel, Inc.*,
  402 F.2d 562 (9th Cir. 1968) ............................................................................. 15

*Strange Music, Inc. v. Strange Music, Inc.*,
  326 F. Supp. 2d 481 (S.D.N.Y. 2004) ........................................................... 17, 18

*The Procter & Gamble Co. v. Ultreo, Inc.*,
  574 F. Supp. 2d 339 (S.D.N.Y. 2008) ............................................................... 22

*THOIP v. Walt Disney Co.*,
  690 F. Supp. 2d 218 (S.D.N.Y. 2010) ................................................................. 9

*Tiffany & Co. v. Costco Wholesale Corp.*,
  127 F. Supp. 3d 241 (S.D.N.Y. 2015) .............................................................. 3, 17

*Time Warner Cable, Inc. v. DIRECTV, Inc.*,
  497 F.3d 144 (2d Cir. 2007) .............................................................................. 21

*TrafFix Devices, Inc. v. Mktg. Displays, Inc.*,
  532 U.S. 23 (2001) ............................................................................................ 16

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
  505 U.S. 763 (1992) ........................................................................................ 5, 24

*Union Carbide Corp. v. Ever-Ready, Inc.*,
  531 F.2d 366 (7th Cir.),
  *cert. denied*, 429 U.S. 830 (1976) ....................................................................... 9

*United States Shoe Corp. v. Brown Group, Inc.*,
  740 F. Supp. 196, 199 (S.D.N.Y. 1990) ............................................................ 14

*Visa Int'l Serv. Ass'n v. JSL Corp.*,
  610 F.3d 1088 (9th Cir. 2010) ........................................................................... 19

*Volkswagen Astiengesellschaft v. Uptown Motors*,
  No. 91 Civ. 3447, 1995 WL 605605 (S.D.N.Y. May 11, 1995) .......................... 12

*Wal-Mart Stores, Inc. v. Samara Bros., Inc.*,
  529 U.S. 205 (2000) ............................................................................................ 5

*Warner Bros. Ent'mt v. The Global Asylum, Inc.*,
  CV 12 - 9547 PSG (CWx), ECF No. 60 (C.D. Cal. Jan. 29, 2013) ..................... 10

*Zino Davidoff SA v. CVS Corp.*,
  571 F.3d 238 (2d Cir. 2009) .............................................................................. 24

**Statutes**

15 U.S.C. § 1114(1) .................................................................................................. 23

15 U.S.C. § 1115(a) ................................................................................................... 4

15 U.S.C. § 1115(b) ................................................................................................... 4

15 U.S.C. § 1115(b)(4) .............................................................................................. 14

15 U.S.C. § 1125(a) .................................................................................................. 23

15 U.S.C. § 1125(c)(2)(A) ........................................................................................ 17

15 U.S.C. § 1125(c)(2)(B) ........................................................................................ 18

15 U.S.C. § 1127 ................................................................................................... 3, 17

N.Y. GEN. BUS. LAW § 360-1 ................................................................................... 18

**Rules**

Fed. R. Civ. P. 30(b)(6) ............................................................................................. 22

**Other Authorities**

H.R. REP. NO. 109-23, at 4 (2005),
   *reprinted in* 2006 U.S.C.C.A.N. 1091, 1092 .......................................................... 18

*http://www.oxforddictionaries.com/us/definition/american_english/version* ............................... 21

J. THOMAS MCCARTHY,
   MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION (4th ed. 2016) ........................ passim

S. REP. NO. 1333, 79th Cong., 2d Sess., 3 (1946) ........................................................ 24

Plaintiffs Coty, Inc., Coty B.V., Calvin Klein Trademark Trust, Calvin Klein, Inc., Calvin Klein Cosmetic Corporation, Vera Wang Licensing LLC, V.E.W., Ltd., and Ate My Heart Inc. (collectively, "Plaintiffs") respectfully submit this Pretrial Memorandum of Law. The following short forms of citation are used herein: Plaintiffs' Trial Exhibit ("Pl. Ex."); Defendant's Trial Exhibit ("Def. Ex."); deposition testimony ("[deponent name] Dep. [page number]:[line number]-[page number]:[line number]"); Stipulated Facts ("SF ¶ [paragraph number]"); direct testimony witness statements ("[witness name] Direct ¶ [paragraph number").

## PRELIMINARY STATEMENT

Defendant Excell Brands, LLC ("Defendant") sells what it euphemistically calls "alternative fragrances"—popularly known as "knockoffs"—that have no brand identity of their own, but instead exploit the brand identities of Plaintiffs and other brand owners. Defendant admits that the Diamond Collection Fragrances at issue in this action are materially different than Plaintiffs' original branded fragrances ("Plaintiffs' Fragrances," itemized in Plaintiffs' Proposed Findings of Fact ("FF") ¶ 3) and employ cheaper ingredients and packaging components. Defendant nevertheless passes off its fragrances as the same as, or equivalent to, Plaintiffs' Fragrances by mimicking Plaintiffs' signature packaging and fragrance names and prominently featuring spurious copies of Plaintiffs' registered trademarks, in Plaintiffs' distinctive typefaces, on its look-alike packaging.

Defendant seeks to justify its wholesale misappropriation of Plaintiffs' source identifiers ("Plaintiffs' Marks," itemized in FF ¶ 4) by claiming that it is merely engaging in comparative advertising and that its fragrances bear supposedly disclamatory legends. Defendant's legends are purely pretextual. Defendant's replicas of Plaintiffs' registered marks are far more prominent than the allegedly disclamatory language ("Our Version of" and "not associated with the makers of") preceding them. Defendant itself has conceded that it is "*not* offering a version of the original fragrance." 30(b)(6) Ferullo Dep. 107:11-21 (emphasis added). And the high levels of confusion established by the consumer survey evidence confirm that Defendant's legends are not effective in negating the false and misleading impression that Defendant's Fragrances come from

the same source as Plaintiffs' original branded fragrances or have the same qualities and characteristics.

Defendant also concedes that it targeted Plaintiffs' brands precisely because they are widely recognized by consumers, who, upon seeing Defendant's spurious copies of Plaintiffs' Marks, "understand what they are looking at." *See* 30(b)(6) Ferullo Dep. 30:22-31:3, 32:2-33:7. In other words, Defendant targeted Plaintiff's brands because they have "the drawing power of . . . congenial symbol[s]." *See Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge Co.*, 316 U.S. 203, 205 (1942). Plaintiffs achieved this "drawing power" by spending many years and hundreds of millions of dollars to give each of their fragrances a unique brand identity in the minds of consumers. Plaintiffs' efforts have been wildly successful—and not simply in terms of sales. As a result of Plaintiffs' efforts, when consumers hear or see the mark "CK one," for example, not only do they think of Calvin Klein, but they also associate that brand and fragrance with a host of favorable memories and impressions. As importantly, they trust that products bearing that mark will have the same consistently high level of quality they have encountered in the past.

These mental associations translate into brand loyalty, or "goodwill," which the law recognizes and protects for the benefit of both consumers and brand owners. As the United States Supreme Court wrote in *Mishawaka Rubber*, "[t]he protection of trade-marks is the law's recognition of the psychological function of symbols." 316 U.S. at 205. Once a symbol functions to convey, "in the minds of potential customers, the desirability of the commodity upon which it appears . . . the trademark owner has something of value. If another poaches upon the commercial magnetism of the symbol he has created, the owner can obtain legal redress." *Id.* Here, Defendant is poaching on the commercial magnetism of the symbols that Plaintiffs have created. Plaintiffs seek legal redress.

## STATEMENT OF FACTS

Plaintiffs have filed separately their Proposed Findings of Fact and their Proposed Conclusions of Law ("CL"). Accordingly, Plaintiffs use this Pretrial Memorandum to highlight

the issues they presently believe will be of the greatest interest to the Court, and would be happy to provide supplemental briefing upon request.

ARGUMENT

## I.    DEFENDANT IS INFRINGING AND UNFAIRLY COMPETING WITH PLAINTIFFS' MARKS.

Courts analyze claims under sections 32(1) and 43(a) of the Lanham Act by using a "familiar two-prong test," asking "first . . . whether the plaintiff's mark is entitled to protection, and second . . . whether defendant's use of the mark is likely to cause consumer confusion as to the origin or sponsorship of the defendant's goods." *Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 237 (S.D.N.Y. 2012) (citations omitted); *see also U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 524 (S.D.N.Y. 2011); *Clinique Labs. v. Dep Corp.*, 945 F. Supp. 547, 550 (S.D.N.Y. 1996). A mark is entitled to protection if it is distinctive and (in the case of trade dress) nonfunctional. *Gucci*, 868 F. Supp. 2d at 238.

In this case, Plaintiffs easily satisfy both elements. First, Plaintiffs' Marks are entitled to protection because all of their trademarks are distinctive and their trade dresses are also nonfunctional.[1] Second, Defendant's use of Plaintiffs' Marks is highly likely to cause consumer confusion as to whether Defendant's fragrances are connected with Plaintiffs. Indeed, Defendant does not merely imitate Plaintiffs' Marks, but it deliberately marks its knockoff fragrances with spurious copies of Plaintiffs' registered marks and so is guilty of trademark counterfeiting. *See Tiffany & Co. v. Costco Wholesale Corp.*, 127 F. Supp. 3d 241, 255 (S.D.N.Y. 2015) (finding "Costco's use of the Tiffany mark . . . 'spurious' as a matter of law" and finding counterfeiting as a matter of law); 15 U.S.C. § 1116(d) (defining "counterfeit mark"); *id.* at § 1127 (defining "counterfeit").

---

[1] Defendant has withdrawn its defenses based on the doctrines of functionality and aesthetic functionality, among others. Proposed Joint Pretrial Order ("JPO") at 4.

3

## A.      Plaintiffs' Marks Are Protectable.

Plaintiffs are seeking to enforce their exclusive rights in 28 registered trademarks used to identify their fragrance products, 21 of which are the subject of incontestable registrations. *See* FF ¶ 126. Pursuant to section 33(b) of the Lanham Act, 15 U.S.C. § 1115(b), Plaintiffs' incontestable registrations are *conclusive evidence* of the validity of, Plaintiffs' ownership of, and Plaintiffs' exclusive right to use the subject marks and dresses unless Defendant can establish one of its two remaining affirmative defenses listed in section 33(b): fair use and laches. (As shown in Points I(D) and IV below, it cannot.) As for the seven registered marks owned by Plaintiffs that are not yet incontestable,[2] Defendant has not introduced any evidence to rebut the presumptions afforded by section 33(a) of the Lanham Act, 15 U.S.C. § 1115(a), including the presumption of distinctiveness. Plaintiffs' registered marks are protectable.[3]

Plaintiffs also seek to enforce their rights in two unregistered word marks and 13 unregistered trade dresses used to identify their fragrance products.[4] The two unregistered word marks, LADY GAGA and LADY GAGA FAME, which are the subject of pending federal trademark applications (Pl. Exs. 23, 24), obviously identify the famous entertainer Lady Gaga as the source of the products and services bearing the marks. Both marks function as inherently distinctive source identifiers, and in addition, both marks have achieved a strong secondary

---

[2] *See* Pl. Exs. 11, 18, 22, 25, 26, 30, 31.

[3] Defendant has indicated its plans to rely upon *Conopco, Inc. v. Cosmair, Inc.,* 49 F. Supp. 2d 242 (S.D.N.Y. 1999), in which Calvin Klein's former fragrance licensee challenged the trade dress of the newly launched Ralph Lauren Romance fragrance, to argue that Calvin Klein's registered Eternity Bottle Design is not distinctive. Obviously, that case was decided on an entirely different factual record than that before this Court, and the Eternity Bottle Design trade dress has acquired considerably more secondary meaning as a source identifier by reason of the extensive advertising, promotion, media coverage and sales of this perennially popular fragrance over the seventeen years since *Conopco* was decided. Moreover, in *Conopco,* the defendant prominently displayed its ROMANCE trademark "on the bottle top, box, and related advertising and point of sale displays" and did not copy the Eternity bottle as closely as Defendant has done here. *See id.* at 250-51 (finding, *inter alia*, that "[t]he ETERNITY bottle is tall and thin, with a curved 'T' shaped silver cap" while "[t]he ROMANCE bottle is short and squat, and its silver-colored cap is flat and square"). Plaintiffs clearly have established secondary meaning in the registered ETERNITY Bottle Design (as well as their other marks) on the present record.

[4] *See* Pl. Exs. 1 (depicting and describing Plaintiffs' unregistered trade dresses), 23 (App. Ser. No. 85,115,004 to register LADY GAGA) and 24 (App. Ser. No. 85/282,752 to register LADY GAGA FAME).

meaning, given the fame of Lady Gaga and the extent of advertising, promotion, and sales under the marks. *See* 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 15:48 (4th ed. 2016) [hereinafter "McCarthy"] (discussing factors used to prove secondary meaning). The United States Patent and Trademark Office already has registered three other LADY GAGA marks on the Principal Register (*see* Pl. Exs. 20-22), which further confirms the distinctiveness of the LADY GAGA marks. *See Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 871 (2d Cir. 1986) ("registered trademarks are presumed to be distinctive and should be afforded the utmost protection").

As for Plaintiffs' 13 unregistered trade dresses (*see* Pl. Ex. 1), "'[t]he "trade dress" of a product is essentially its total image and overall appearance.' It 'involves the total image of a product and may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques.'" *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 764 n.1 (1992) (citation omitted)). Product packaging trade dress is almost always found inherently distinctive, as "the varieties of labels and packaging available to . . . manufacturers are virtually unlimited." *Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 1000 (2d Cir. 1997).[5] This is true even if the individual elements of a product's trade dress, taken separately, seem simple or straightforward. As the Second Circuit Court of Appeals wrote in *Paddington*, 996 F.2d at 584, "it is the combination of elements and the total impression that the dress gives to the observer that should be the focus of a court's analysis of distinctiveness." *Id.* at 584.

Plaintiffs' unregistered trade dresses consist of 13 highly detailed, clearly articulated fragrance packaging designs. As no fragrance manufacturer has a competitive need to combine shapes, colors, and typefaces in precisely the ways that Plaintiffs have, Plaintiffs' unregistered trade dresses are both inherently distinctive and nonfunctional. *See Paddington*, 996 F.2d at 583.

---

[5] *See also Paddington Corp. v. Attiki Imps. & Dists., Inc.*, 996 F.2d 577, 583 (2d Cir. 1993) ("Since the choices that a producer has for packaging its products are . . . almost unlimited, typically a trade dress will be arbitrary or fanciful and thus inherently distinctive . . . .") (citations omitted); *see generally Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 212 (2000).

Even if they were not inherently distinctive, Plaintiffs clearly have established secondary meaning in their trade dresses by introducing evidence of their sales success, advertising expenditures, and unsolicited media coverage. *See* FF ¶ 32-74. They also have established Defendant's "[i]ntentional copying," which "is persuasive evidence of secondary meaning." *Essie Cosmetics, Ltd. v. Dae Do Int'l, Ltd.*, 808 F. Supp. 952, 958 (E.D.N.Y. 1992) (citing *LeSportsac, Inc. v. K Mart Corp.,* 754 F.2d 71, 78 (2d Cir. 1985)) (other citations omitted).[6]

### B.   Defendant's Diamond Collection Fragrances at Issue Create Numerous Types of Likely Confusion.

As the Second Circuit Court of Appeals recently reaffirmed, "the Lanham Act protects against numerous types of confusion, including confusion regarding affiliation or sponsorship" in addition to confusion about source. *International Info. Sys. Sec. Certification Consortium, Inc.* v. *Security Univ., LLC*, 823 F.3d 153, 161 (2d Cir. 2016) (citing cases). Thus, "courts . . . must consider confusion regarding affiliation, sponsorship, or endorsement by the mark holder." *Id.* at 169. Further, courts recognize as actionable not only a likelihood of confusion arising at the point of sale, but also "confusion that creates initial customer interest, even if no final sale is completed as a result" as well as "post-sale" confusion that occurs after a sale is completed.[7] *Clinique*, 945 F. Supp. at 551 (citing cases).

Finally, as the Court explained in *Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc.,* 486 F. Supp. 414, 428 (S.D.N.Y. 1980),

---

[6] *See also Clinique*, 945 F. Supp. at 559 ("[E]ven were evidence of secondary meaning required, Clinique has presented evidence of sales success, advertising expenditures, unsolicited advertising, and defendant's conscious imitation of plaintiff's trade dress and trademark to support such a finding.").

[7] "Initial-interest" confusion occurs when a purchaser assumes "either that [Defendant's] product is made by [Plaintiffs] or that [Plaintiffs] sponsor[ ] [Defendant's] line," even if this confusion is dispelled by the time of purchase. *Kompan A.S. v. Park Structures, Inc.*, 890 F. Supp. 1167, 1180 (N.D.N.Y. 1995). "Post-sale" confusion occurs when a buyer "purchases a knockoff and passes it off to the public as the genuine article, thereby confusing the viewing public and achieving the status of owing the genuine article at a knockoff price." *Hermès Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 109 (2d Cir. 2000); *see also Mastercrafters Clock & Radio Co. v. Vacheron & Constantin-LeCoultre Watches, Inc.,* 221 F.2d 464, 466 (2d Cir. 1955).

> [t]here is a third, and perhaps most significant, kind of confusion which is likely to work to plaintiff's detriment[,] that is, defendant['s] ability to gain a foothold in plaintiff's market by exploiting subliminal or conscious association with plaintiff's well-known name. Whereas the average consumer might be less motivated to pick up PLAYMEN if it were named, for example, ADONIS, he is more likely to take notice of PLAYMEN on the newsstand because of an association, if not outright confusion, with the PLAYBOY mark.

This kind of detrimental confusion arises because "advertising and trademarks rely on impressions. The consumer does not memorize the mark. He has a feeling about it from past exposure. That feeling may be vague, subliminal it is said, but it comes to consciousness when the article is seen with the trademark affixed." *Id.* (citation omitted).

Defendant's Diamond Collection Fragrances at issue create a likelihood that the public will be confused in all of the foregoing respects, as discussed more fully below.

### C.    An Analysis of the Likelihood of Confusion Factors Demonstrates that Confusion Is Highly Likely.

In *Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492 (2d Cir.), *cert. denied,* 368 U.S. 820 (1961), Judge Friendly articulated a "now-familiar, nonexclusive list of eight factors" to guide courts in evaluating likelihood of confusion. *Clinique,* 945 F. Supp. at 551. Plaintiffs address all of the pertinent factors in the Proposed Findings of Fact and Conclusions of Law, and highlight just of few of them here.

Given the multiplicity of factors used to analyze Plaintiffs' claims, as well as the sheer number of Plaintiffs, claims, marks, and products at issue, there is a risk of missing the forest for the trees. Perhaps the best way to see the big picture is simply to compare Plaintiffs' Fragrances to the corresponding knockoffs in Defendant's Diamond Collection line. As shown in Plaintiffs' Exhibit 1, Defendant's entire marketing strategy was to ride on Plaintiffs' coat-tails by making its Diamond Collection products look as close to Plaintiffs' Fragrances as possible without making exact duplicates (which would have been too expensive). Defendant intentionally used Plaintiffs' Marks as a lure to attract consumers—or to quote *Mishawaka Rubber*, "poach[ed ] upon the commercial magnetism of the symbol[s]" that Plaintiffs have spent so much time, money and effort to create. *See* 316 U.S. at 205. As for Defendant's own brand—"Diamond Collection Luxurious Fragrances"—not only is the name misleading (because it connotes a

curated collection of the best luxury fragrances, which Defendant's fragrances are not), but Defendant does nothing to advertise or promote it; consumers are not familiar with it; and, regardless, consumers are not likely to see it because Defendant relegates its ostensible house mark to the top of its box. Defendant's own expert testified that Defendant's products are essentially unbranded. *See* Keegan Dep. 49:2-9, 96:2-97:11.

### 1.    Plaintiffs' and Defendant's Products Are in Close Competitive Proximity.

Defendant has alleged that there are two separate and distinct fragrance markets—in essence, "'mass' and 'class'" (*see Clinique*, 945 F. Supp. at 555)—and that Defendant occupies the first market, while Plaintiffs occupy the second. As Defendant itself well knows, the fragrance market is hardly that tidy.[8] As the Second Circuit Court of Appeals noted nearly thirty years ago *in 1987*, "some question remains whether two distinct fragrance markets actually exist." *Charles of the Ritz Grp. Ltd. v. Quality King Distrib.,* 832 F.2d 1317, 1322 (2d Cir. 1987) (citation omitted). The Court found it unnecessary to answer the question because in that case, the barrier, if any, between the products' markets was "sufficiently porous to allow Charles of the Ritz passage with little difficulty." *Id.* This is even more true today:  With the increase in diverted and counterfeit goods—as well as the evolution of internet and discount retail channels—the barriers have come tumbling down. *See* Conklin Direct ¶¶ 19-28. Further, given the prevalence of brand and line extensions today, consumers who encounter Defendant's Diamond Collection Fragrances might well assume that Plaintiffs have expanded their

---

[8] Defendant's President Wayne Hamerling and several of its employees previously worked for a wholesale fragrance distributor named MD Distributors. FF ¶ 143(e). MD Distributors is an example of one of the middlemen in the fragrance industry that, although not a direct customer of Coty, nevertheless sold counterfeit, decoded gray market and knockoff Coty fragrances, including Calvin Klein fragrances, before it was sued by the Calvin Klein Plaintiffs and Zino Davidoff SA (another Coty licensor) and this Court ultimately entered a consent judgment enjoining it from doing so (Pl. Ex. 156). Conklin Direct ¶ 24. Given that Defendant's president and employees worked for MD Distributors during the pendency of that lawsuit, Defendant is well aware that the fragrance market is porous and various vendors sell both "mass" and "class" fragrances (or infringing copies of "class" fragrances) to the same customers.

diversified product lines with new, less expensive branded offerings that are meant to be sold in different retail outlets. *See id.* ¶ 34.

### 2. Both Parties' Surveys Are Strong Evidence that Consumer Confusion Is Likely.

"[I]t is black letter law that actual confusion need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion . . . ." *Lois Sportswear*, 799 F.2d at 875; *see also* 4 MCCARTHY § 23:12. However, circumstantial evidence of actual confusion is frequently introduced in the form of consumer surveys, administered by survey experts. *See Gucci*, 831 F. Supp. 2d at 738 (citations omitted); *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 230 (S.D.N.Y. 2010) (citation omitted). Both parties have introduced such surveys here. What makes this such an unusual case is that *both parties' surveys* are persuasive evidence that confusion is likely.

Plaintiffs' expert, Dr. Michael Rappeport, has worked in market and survey research for more than 40 years; made more than 200 appearances as an expert witness (including in trademark cases); and written extensively on the subject of survey methodology. *See* Pl. Ex. 161-1 Appendix E. Dr. Rappeport set out to test whether "[c]onsumers who come into contact with Excell's packaging will be likely to think that the product emanates from the source of the original branded fragrance Excell's product purports to be a 'version of'" (Pl. Ex. 161-1 at 2)—*i.e.*, whether there exists a likelihood of confusion, the "keystone" of trademark infringement.[9] 4 MCCARTHY § 23:1. After conducting a mall intercept survey in the *Eveready* format,[10] which is a "standard and widely accepted" format (6 MCCARTHY § 32:174), Dr. Rappeport found that a whopping 61% of respondents, on average, identified Calvin Klein as the source of Defendant's fragrances—56% for Defendant's Possession fragrance and 67% for its Serenity fragrance. *See*

---

[9] Dr. Rappeport also conducted a survey to test Plaintiffs' false advertising claim, discussed in Part III, *infra*.

[10] This format is the well-established survey design approved in *Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366 (7th Cir.), *cert. denied*, 429 U.S. 830 (1976), and countless subsequent cases. *See* CL ¶ 88 (citing authorities).

Pl. Ex. 161-1 at 13. Significantly, these responses were entirely "unaided"—that is, neither the respondents nor anyone at the interviewing services were shown the genuine Calvin Klein Obsession or Eternity fragrances. Rappeport Direct ¶ 9. After filtering out the "noise" from his control survey,[11] Dr. Rappeport concluded that "net of noise,[12] an average of 54% of the respondents misidentified the source of the Excell products as Calvin Klein. Pl. Ex. 161-1 at 13. Not surprisingly, "survey percentages demonstrating confusion levels over 50% are almost always viewed by courts as persuasive evidence of likely confusion," as they should be here. *See* 6 McCarthy § 32:185.

Defendant's expert, Mark Keegan, has significantly less experience than Dr. Rappeport; as Judge Forrest wrote in 2015, "[t]he Court does not find that Keegan's background in surveys is sufficiently deep or tested to provide a reliable basis for his criticisms."[13] *Flushing Bank v. Green Dot Corp.*, 138 F. Supp. 3d 561, 582 n.16 (S.D.N.Y. 2015). Nonetheless, Mr. Keegan criticized Dr. Rappeport's survey,[14] then sought to "correct" it with an internet survey using his

---

[11] As Professor McCarthy has explained,

> "Noise" could consist of respondents answering with their preexisting views, rather than focusing on the survey stimulus. Some respondents may be "yes" people who readily agree with any assertion made in a survey statement or question. In addition, there will always be some interviewees who quickly guess in a response because they are bored or hurried. These kinds of responses contribute to background noise and static in the numerical results. These must be filtered out though control questions.

6 McCarthy § 32:187.

[12] "The net rate of confusion is the raw confusion rate minus the rate produced by the control question," the latter of which is known as "noise." 6 McCarthy § 32:187.

[13] *See also Warner Bros. Ent'mt v. The Global Asylum, Inc.*, CV 12 - 9547 PSG (CWx), ECF No. 60, at 10 (C.D. Cal. Jan. 29, 2013) ("The education and experience outlined in Keegan's biography is insufficient to establish that he is an expert in the field of consumer surveys. The biography provides no indication that he has any special training or experience in crafting or analyzing consumer perception surveys; in fact, the biography does not suggest that he has any experience or training in crafting surveys of any kind.").

[14] Most of Mr. Keegan's criticisms of Dr. Rappeport are variations on a single theme—*i.e.*, his assertion that "there is a complete separation of markets between Coty's and Excell's products," and therefore that Excell's customers "are highly unlikely to ever purchase a Coty [p]roduct." Keegan Report ¶¶ 17-18. This assertion is both unsupported and unsupportable. *See* FF ¶¶ 137-50; CL ¶¶ 66-75.

own universe and his own stimuli. After tabulating his data, Mr. Keegan reported that 19.5% of respondents in his survey identified Calvin Klein as the source of Defendant's Possession fragrance, while 15.5% of those respondents identified Calvin Klein as the source of Defendant's Serenity fragrance.

Mr. Keegan's survey was flawed in several respects. In an apparent attempt to avoid respondents who were familiar with Plaintiffs' brands, Mr. Keegan selected a universe that was too narrow, consisting exclusively of respondents who recently had shopped at a discount store (*e.g.*, Dollar General), flea market, rummage sale, or bazaar. *See* Keegan Report ("Keegan Rep.") Ex. 4. Mr. Keegan's stimuli were also impermissibly leading. For example, Mr. Keegan unduly emphasized the legends on Defendant's boxes by displaying them flattened out so that respondents saw all of the faces of the packaging at once. FF ¶ 164. Mr. Keegan also asked respondents to assume that Defendant's product was being offered for sale at $4.99, which is on the lower end of the range at which Defendant's perfumes are in fact sold in the marketplace. *Id.*; *see* Keegan Dep. 63:2-65:14 & Ex. 89 (showing prices ranging from $2.99 to $56.98 for Defendant's Diamond Collection Fragrances on Amazon.com).

In addition, Mr. Keegan made a number of coding errors, including counting as "not confused" six respondents who clearly *were* confused as to whether Defendant's fragrances were made by Calvin Klein—judging by responses such as "It's made by Calvin Klein, I like it"; "What a bargain for a Calvin Klein product"; and "Just the fact that it was made by Calvin Klein is worth the $4.99." Rappeport Direct ¶ 44. Further, Mr. Keegan's internet format was more susceptible to respondents providing "garbage" answers just to finish the survey (and claim their incentive), making it particularly important for Mr. Keegan to exclude unreliable responses. *Id.* ¶¶ 43, 46. Instead, Mr. Keegan *included* those responses—such as "very good for me," "Sparkly," and "Bench"—in his reported "Total," thus inflating the denominator and, in turn, understating the percentage of respondents who were confused as to the source of Defendant's fragrances. *Id.* ¶ 46. By Dr. Rappeport's calculations, a total of 82 respondents (13% of all respondents) in Mr. Keegan's confusion study provided unreliable responses and therefore

11

should have been excluded from the data. *Id.* ¶ 46.

In assessing Mr. Keegan's survey, Dr. Rappeport was able to correct for Mr. Keegan's coding errors by including the six confused respondents and excluding the 82 unreliable ones. He then recalculated the results and found that, net of noise, 25% of respondents in Mr. Keegan's internet survey mistakenly identified Calvin Klein as the source of the Defendant's Possession fragrance, and 20% of respondents mistakenly identified Calvin Klein as the source of the Defendant's Serenity product. *Id.* ¶ 47. These results are more than sufficient to a finding of likely confusion,[15] and would no doubt be even higher had Mr. Keegan selected a proper universe and employed non-leading stimuli. Taken together with Dr. Rappeport's own survey results, they constitute strong corroborating evidence that confusion is likely. In sum, *both parties' surveys* are persuasive circumstantial evidence that Defendant's purported "disclaimers" are not mitigating confusion, but exacerbating it.

### 3.   The Extent of Defendant's Mimicry and Outright Copying Reveals the Breadth and Depth of Defendant's Infringement.

In an effort to distract the Court, Defendant is likely to focus on some individual trees, and to argue that certain isolated individual elements of the parties' marks and dress are not confusingly similar. This ignores the forest:  the striking similarity in overall look and feel of the parties' respective products. "To the average buyer, the points of similarity are more important than minor points of difference." 4 MCCARTHY § 23:41 (discussing the "anti-dissection rule"). As the United States Supreme Court has instructed, "[t]he commercial impression of a trade-mark is derived from it as a whole, not from its elements separated and considered in detail. For

---

[15] *See RJR Foods, Inc. v. White Rock Corp.*, 603 F.2d 1058, 1061 (2d Cir. 1979) (affirming the district court's reliance on the results of a "consumer study showing a fifteen to twenty percent rate of product confusion"); *Energybrands, Inc. v. Beverage Mktg. USA, Inc.,* 02 Civ. 3227, 2002 WL 826814, at *2 (S.D.N.Y. May 1, 2002) (finding 17% net confusion sufficient to show actual confusion); *Volkswagen Astiengesellschaft v. Uptown Motors,* No. 91 Civ. 3447, 1995 WL 605605, at *5 (S.D.N.Y. May 11, 1995) (finding 17.2% and 15.8% net confusion sufficient to show actual confusion); *Lon Tai Shing Co. v. Koch + Lowy*, 19 U.S.P.Q.2d (BNA) 1081, 1097 (S.D.N.Y. 1991) (finding that 18% "is within the range of cognizable confusion recognized in this circuit" and supports a finding of likely confusion) (citations omitted); *see also* 6 MCCARTHY § 32:188 ("Where other evidence is supportive, courts have found a likelihood of confusion when survey results are between 10% and 20%.") (citation omitted).

this reason it should be considered in its entirety . . . ." *Estate of P.D. Beckwith, Inc., v. Commissioner of Patents*, 252 U.S. 538, 545-56 (1920). Further, courts in this Circuit have held that the use of a *combination* of branding indicia exacerbates the potential for confusion that the use of any one mark alone might create. *See Cartier, Inc. v. Deziner Wholesale, L.L.C.*, No. 98 Civ. 4947(RLC), 2000 WL 347171, at *2, *4 (S.D.N.Y. Apr. 3, 2000); *Invicta Plastics Ltd. v. Mego Corp.*, 523 F. Supp. 619, 622-23 (S.D.N.Y. 1981).

In this case, as in *Clinique*, Defendant markets exactly the same type of product that Plaintiffs do (*i.e.*, fragrance), and Defendant's "line—visually and functionally—attempts to look as much like [Plaintiffs'] as possible . . . ." 945 F. Supp. at 551. Worse, unlike the infringer in *Clinique*, who "stopp[ed] just short of using Clinique's actual marks on the products," *id.*, Defendant is prominently using counterfeits of Plaintiffs' actual marks, in Plaintiffs' distinctive presentations, as part of the "Our Version of" legend on the face of its boxes and in the "not associated with" legend on the back of its boxes—both of which display Plaintiffs' Marks in much larger type than the supposed "disclaimers." Defendant also is using product names that were designed specifically to evoke the names of Plaintiffs' original products (*e.g.*, Serenity for Eternity, Jump! for Joop!, etc.). Given these (very many) similarities, Plaintiffs have made a persuasive case of likely confusion.

### D.   Defendant Is Not Making Fair Use of Plaintiffs' Marks or Engaging in Lawful "Comparative Advertising."

Defendant asserts the affirmative defense of "fair use" (ECF No. 71 at 10) and characterizes its "Our Version of" legend as "comparative advertising." SF ¶ 27.

There are two "fair use" doctrines in trademark law:  "classic" or descriptive fair use, and nominative use. *See generally New Kids on the Block v. News Am. Publ'g, Inc.*, 971 F.2d 302 (9th Cir. 1992). While both doctrines are animated by the same First Amendment concerns, the conduct they describe is quite different. The first doctrine, descriptive fair use, is an affirmative defense found in section 33(b) of the Lanham Act under which the allegedly infringing use "is a use, otherwise than as a mark, . . . of a term or device which is descriptive of and used fairly and

13

in good faith *only to describe the goods or services of such party*, or their geographic origin . . . ." 15 U.S.C. § 1115(b)(4) (emphasis added). By giving the defendant the ability to describe its own product fairly by using the ordinary elements of speech, the fair use defense "ensure[s] that the according of monopoly trademark rights over descriptive marks" will not "deprive society of the use of those terms *in their descriptive sense* in commercial communication." *United States Shoe Corp. v. Brown Grp., Inc.*, 740 F. Supp. 196, 199 (S.D.N.Y. 1990) (emphasis added). Here, Defendant is not using Plaintiffs' Marks in a descriptive sense, to describe the qualities or characteristics of Defendant's own fragrances (e.g., "You will feel like a princess using our fragrances").

Instead, Defendant uses Plaintiffs' Marks as trademarks signifying Plaintiffs' branded fragrances (e.g., "Our Version of Vera Wang Princess"). *See* CL ¶ 141. Defendant thus apparently means to invoke the concept of nominative fair use when it defends its "Our Version of" legend as "comparative advertising . . . intended to invite consumers to compare Defendant's fragrance to the name brand fragrance mentioned in the legend." SF ¶ 27. A "nominative" use does not describe a product, in the English language sense, but instead uses "'another's trademark to identify, not the defendant's goods or services, but the *plaintiff's goods or services.*'" *International Info. Sys.*, 823 F.3d at 165 (quoting 4 MCCARTHY § 23:11) (emphasis added); *see also New Kids*, 971 F.2d at 308 (nominative use occurs when "the defendant uses a trademark to describe the plaintiff's product, rather than its own . . . .").

Confusing and fair nominative uses reside on a continuum, from infringing to not infringing. On the infringing side, for example, the Court in *Charles of the Ritz Group Ltd. v. Quality King Distrib.,* 636 F. Supp. 433 (S.D.N.Y. 1986), found infringement where the defendant marketed "Omni," a knockoff of the famous "Opium" fragrance, using the tagline, "If you like Opium you'll love Omni" along with a "disclaimer" displaying the plaintiff's mark more prominently than the disclamatory language. *Id.* at 435-37. That disclaimer was not visible to the consumer until the box was opened, and "[t]he mark of OMNI's manufacturer, DEBORAH, appear[ed] on the back of the box and on the boxtop under the tab," such that

14

"neither mark [was] readily visible to the consumer when the product [was] viewed at eye level in defendant's point-of-sale display." *Id.*[16]

On the fair side, in *Smith v. Chanel, Inc.*, 402 F.2d 562 (9th Cir. 1968), the Ninth Circuit held that the appellant could lawfully use the Chanel mark in his advertising solely to identify the unpatented formula he copied.[17] *Id.* at 563. In that case, unlike this one, "Appellants' product was packaged differently from appellees', and the only words appearing on the outside of appellants' packages were 'Second Chance Perfume by Ta'Ron.'" *Id.* at 563 n.4. The Court held that "such advertising may not be enjoined . . . *so long as it does not contain misrepresentations or create a reasonable likelihood that purchasers will be confused* as to the source, identity, or sponsorship of the advertiser's product." *Id.* at 563 (emphasis added).[18] In other words, a nominative use is only "fair use" if it does not create source or sponsorship confusion and sufficiently informs the public as to the lack of connection between the parties and their products. Where, as here, there is compelling evidence of likelihood of confusion, this is a red flag that the use is not merely nominative or fair but is confusing, and thus infringing.

Recognizing this relationship, the Second Circuit Court of Appeals recently instructed courts in nominative use cases to start by "discussing each of the *Polaroid* factors" and then to consider:

---

[16] *See also Clinique*, 945 F. Supp. at 551, 556-58 (finding infringement where Dep's advertisement featured "a large image of three Basique products . . . sitting in water" reflected in which were "the corresponding Clinique products, each aligned with its Basique counterpart"; copy below the image, "[i]n much smaller type, reading, in part, "Compare new Basique to Clinique. . . ."; and copy on "the bottom of the advertisement, . . . in extremely small type," stating, "Basique is not affiliated with Clinique Laboratories, Inc.," and where "Dep failed to sustain its "heavy burden" of proving that its "disclaimers and advertising would dispel consumer confusion").

[17] In contrast with this case, Chanel "conceded . . . that appellants 'have the right to copy, if they can, the unpatented formula of appellees' product'" and assumed, "for the purposes of these proceedings, . . . that 'the products manufactured and advertised by (appellants) are in fact equivalents of those products manufactured by appellees.'" *Id.* at 563.

[18] *See also Saxony Products, Inc. v. Guerlain, Inc.*, 513 F.2d 716, 718 (9th Cir. 1975) ("only the Saxony name appears on the labels of the boxes or bottles in which Saxony's products are sold.").

> (1) whether the use of the plaintiff's mark is necessary to describe both the plaintiff's product or service and the defendant's product or service, that is, whether the product or service is not readily identifiable without use of the mark; (2) whether the defendant uses only so much of the plaintiff's mark as is necessary to identify the product or service; and (3) whether the defendant did anything that would, in conjunction with the mark, suggest sponsorship or endorsement by the plaintiff holder, that is, whether the defendant's conduct or language reflects the true or accurate relationship between plaintiff's and defendant's products or services.

*International Info. Sys.*, 823 F.3d at 168. As this passage makes clear, Defendant's use here is not nominative fair use for at least three reasons:  First, as shown above, both parties' surveys demonstrate a strong likelihood of confusion, which is confirmed by an analysis of the other *Polaroid* factors. *See* CL ¶¶ 36-134. Second, Defendant makes far more extensive use of Plaintiffs' Marks than would be necessary to identify Plaintiffs' Fragrances, even going so far as to use Plaintiffs' Marks rather than its own product names to identify its knockoffs in its "Look Books." FF ¶¶ 106-07. Third, Defendant is using counterfeits of Plaintiffs' registered marks and mimicking Plaintiffs' product names *and* trade dresses in a deliberate attempt to suggest a "relationship between [P]laintiff['s'] and [D]efendant's products" that does not exist. *See International Info. Sys.*, 823 F.3d at 168; FF ¶¶ 112-16.

In sum, Defendant is not legitimately inviting a comparison between interchangeable products, but is using Plaintiffs' Marks in an attempt to mislead consumers into believing that Defendant's knockoffs are associated with Plaintiffs' celebrity and designer brands.[19] These are not fair or nominative uses, but "attention-getting" uses that clearly fall on the infringing side of the continuum.[20] Under the pretext of inviting a comparison to Plaintiffs' Fragrances, Defendant

---

[19] *See Charles of the Ritz,* 832 F.2d at 1324; *U.S. Polo Ass'n,* 800 F. Supp. 2d at 529; *Ross Cosmetics Distribution Centers, Inc. v. United States*, 34 U.S.P.Q. (BNA) 1758, 1761, 1765 (Ct. Int'l Trade 1994).

[20] *See Pebble Beach Co. v. Tour 18 I, Ltd.,* 942 F. Supp. 1513, 1534, 1553 (S.D. Tex. 1996) (finding no nominative use "[a]s a matter of law" because of defendant's "frequent[ ] and prominent[ ]" use of plaintiffs' marks "in its brochures, scorecards, and other written materials," including in the names of the selections on its restaurant menu), *aff'd,* 155 F.3d 526 (5th Cir. 1998), *abrogated on other grounds by TrafFix Devices, Inc. v. Mktg. Displays, Inc.,* 532 U.S. 23, 28–29 (2001); *see also Sands, Taylor & Wood Co. v. Quaker Oats Co.,* 978 F.2d 947, 953–54 (7th Cir. 1992) (prominent use of plaintiffs' mark as attention-getting device was not descriptive use but was trademark use); *Lindy Pen Co. v. Bic Pen Corp.,* 725 F.2d 1240, 1248 (9th Cir. 1984) (defendant's use of plaintiff's exact mark on its goods was trademark use, not fair use within comparative advertising); *Beer Nuts, Inc. v. Clover Club Foods Co.,* 711 F.2d 934, 938

intentionally placed counterfeits of Plaintiffs' registered marks, in Plaintiffs' distinctive design presentations, front and center on its own packaging. These marks are "spurious mark[s] which [are] identical with, or substantially indistinguishable from, [Plaintiffs'] registered mark[s]" (15 U.S.C. § 1127), making Defendant's invitation to "compare" a thinly disguised act of trademark infringement in the first degree, to wit, trademark counterfeiting. *See Tiffany & Co.*, 127 F. Supp. 3d at 255.

## II.     THIS IS A CLASSIC CASE OF TRADEMARK DILUTION.

To establish a claim for trademark dilution under section 43(c) of the Lanham Act, a plaintiff must prove that: "(1) its mark is famous; (2) the defendant's use of the mark is made in commerce; (3) the defendant used the mark after the mark was famous; and (4) the defendant's use of the mark is likely to dilute the quality of the mark by blurring or tarnishment." *Estate of Ellington ex rel. Ellington v. Harbrew Imports Ltd.*, 812 F. Supp. 2d 186, 193 (E.D.N.Y. 2011) (citing *Gap, Inc. v. G.A.P. Adventures Inc.,* No. 07–CV–9614, 2011 WL 2946384, at *16 (S.D.N.Y. Jun. 24, 2011)). Under section 43(c), a mark is "famous," for federal dilution purposes, "if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A). Fame is not a requirement of the New York antidilution statute, N.Y. GEN. BUS. LAW § 360-1. Thus, to succeed on a dilution claim under New York law, a plaintiff "must prove (1) that the trademark is truly distinctive or has acquired secondary meaning, and (2) a likelihood of dilution either as a result of 'blurring' or 'tarnishment.'" *Strange Music, Inc. v. Strange Music, Inc.,* 326 F. Supp. 2d 481, 496 (S.D.N.Y. 2004) (citation omitted).

---

(10th Cir. 1983) (no fair use where defendant used "Brew Nuts" as a "secondary trademark" along with its own brand name on packaging); *Hypertherm, Inc. v. Precision Prods.,* 832 F.2d 697, 701 (1st Cir. 1987) (company that replicated plaintiff's replacement parts and used plaintiffs' service marks in advertisements went beyond permissible uses of another's mark for comparative advertising); *Cartier*, 2000 WL 347171, at *4 ("Deziner's label still violates § 1125(a)(1)(A) because the label improperly triggers customers' interest in Deziner's product by capitalizing on the goodwill associated with the Cartier name, and this kind of advertising strategy violates the Lanham Act.").

The law recognizes two kinds of dilution:  Dilution by "blurring" refers to an association that gradually diminishes a famous mark's "ability . . . to clearly and unmistakably distinguish one source through unauthorized use." *Hormel Foods Corp. v. Jim Henson Prods., Inc.,* 73 F.3d 497, 506 (2d Cir. 1996). Such "dilution occurs when the unauthorized use of a famous mark reduces the public's perception that the mark signifies something unique, singular, or particular." H.R. REP. NO. 109-23, at 4 (2005), *reprinted in* 2006 U.S.C.C.A.N. 1091, 1092. Section 43(c) provides courts with a list of factors to aid in determining whether dilution by blurring is likely. *See* 15 U.S.C. § 1125(c)(2)(B). As for dilution by "tarnishment," while it also involves a harmful association, it

> generally arises when the plaintiff's trademark is linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context likely to evoke unflattering thoughts about the owner's product. In such situations, the trademark's reputation and commercial value might be diminished because *the public will associate the lack of quality or lack of prestige in the defendant's goods with the plaintiff's unrelated goods*, or because the defendant's use reduces the trademark's reputation and standing in the eyes of consumers as a wholesome identifier of the owner's products or services.

*Deere & Co. v. MTD Prods., Inc.,* 41 F.3d 39, 43 (2d Cir. 1994) (emphasis added) (citations omitted). "The sine qua non of tarnishment is a finding that plaintiff's mark will suffer negative associations through defendant's use." *Hormel,* 73 F.3d at 507.

Plaintiffs claim that Defendant's use of the registered CALVIN KLEIN, VERA WANG, and LADY GAGA marks violates section 43(c),[21] and the evidence supports those claims as to both types of dilution. First, regarding the element of fame, Calvin Klein and Vera Wang are famous fashion designers, and Lady Gaga is a famous entertainer; indeed, Defendant has conceded (as it must) that Calvin Klein, Lady Gaga and Vera Wang are famous names. SF ¶¶ 16-18. Those famous names also are famous marks—a term that, by its statutory definition, includes

---

[21] Plaintiffs also claim that Defendant's use of Plaintiffs' Marks, more broadly, violates the New York antidilution statute, N.Y. GEN. BUS. LAW § 360-1, which requires, in lieu of fame, proof that "the trademark is truly distinctive or has acquired secondary meaning . . . ." *Strange Music, Inc.,* 326 F. Supp. 2d at 496 (citation omitted). As shown above and in Plaintiffs' Proposed Findings and Conclusions, Plaintiffs' Marks are "truly distinctive," and accordingly Defendant has diluted all of Plaintiffs' Marks under New York law.

names. *See id.* at § 1127. Plaintiffs' CALVIN KLEIN, VERA WANG, and LADY GAGA marks are indisputably famous for their "core" goods and services (*e.g.*, CALVIN KLEIN and VERA WANG apparel and LADY GAGA entertainment services), and they also have become famous for fragrances (*e.g.*, CALVIN KLEIN ETERNITY, VERA WANG PRINCESS, and LADY GAGA FAME). FF ¶¶ 34, 35, 44, 54, 55. This latter fame is precisely why Defendant chose to use the CALVIN KLEIN, VERA WANG, and LADY GAGA marks on its Diamond Collection Fragrances:  The marks are widely recognized by the general consuming public as source identifiers for prestige fragrances. *See id.* Plaintiffs have introduced ample evidence to support this proposition, including extensive sales of branded goods and services, advertising and promotion, industry accolades, and unsolicited publicity. *See* FF ¶ 32-74.

Second, regarding the element of likely dilution, Plaintiffs have demonstrated that Defendant's use is likely to blur Plaintiffs' CALVIN KLEIN, VERA WANG, and LADY GAGA marks by causing "consumers [to] form new and different associations with the [famous brands]," thus "whittling away" those brands' distinctiveness and value. *See Visa Int'l Serv. Ass'n v. JSL Corp.*, 610 F.3d 1088, 1090 (9th Cir. 2010). Specifically: (1) Plaintiffs' Marks are highly distinctive; (2) Plaintiffs are engaging in substantially exclusive use of their Marks; (3) Plaintiffs' Marks are truly renowned and widely recognized; (4) Defendant is using the registered CALVIN KLEIN, VERA WANG, and LADY GAGA marks, not merely variants of them, on one of the same product lines offered by Plaintiffs; (5) Defendant intentionally set out to create associations between its knockoffs and Plaintiffs' Marks, as evidenced by its extensive copying of the source identifiers that differentiate Plaintiffs' Fragrances in the marketplace; (6) consumers actually associate Defendant's knockoffs with Plaintiffs, their marks, and their branded fragrances, giving Defendant the benefit of a halo effect to which it is not entitled; and (7) Defendant targets consumers for whom English is a second language, thus reducing the efficacy, if any, of its purported "disclaimers." This is a textbook case of dilution by blurring.

Finally, Plaintiffs have introduced ample evidence of likely tarnishment as well: Defendant's perfumes are made with synthetic oils to save money. They have a high

concentration of water and alcohol, and so do not last as long as Plaintiffs' genuine fragrances. Defendants' packaging is cheap. Its perfumes are sold at discount outlets like Dollar General, and others, into which Plaintiffs do not choose to place their prestige products. Of most concern, Defendant exercises no meaningful quality control, and its products present potential health and safety risks. Clearly, Defendant's products are "of shoddy quality" relative to Plaintiffs' products. What is more, the U.S. Attorney's Office is prosecuting Defendant's principals and employees for using Defendant's sales of Diamond Collection Fragrances to launder money for Latin American drug cartels, and its former General Counsel has already pleaded guilty in the criminal case against him. The Court may properly infer from the invocation of the Fifth Amendment by Defendant's officers, directors and employees that Defendant's "alternatives" to Plaintiffs' Fragrances were among those used in this money laundering scheme. This is a textbook case of dilution by tarnishment.

## III.  DEFENDANT'S "OUR VERSION OF" LEGEND CONVEYS A FALSE ADVERTISING CLAIM TO CONSUMERS.

To establish a claim of false advertising, a plaintiff must prove the following elements: (1) "the defendant has made a false or misleading statement;" (2) "the false or misleading statement has actually deceived or has the capacity to deceive a substantial portion of the intended audience;" (3) "the deception is material in that it is likely to influence purchasing decisions;" (4) "there is a likelihood of injury to plaintiff, such as declining sales or loss of goodwill;" and (5) "the goods traveled in interstate commerce." *Rexall Sundown, Inc. v. Perrigo Co.*, 651 F. Supp. 2d 9, 20 (E.D.N.Y. 2009).[22]

---

[22] Similarly, to establish a violation of section 349 of the New York General Business Law, a plaintiff must prove, "first, [that] the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act." *Medisim Ltd. v. BestMed LLC*, 910 F. Supp. 2d 591, 608 (S.D.N.Y. 2012) (citation omitted). "Injury or harm that satisfies this standard includes 'potential danger to the public health or safety.'" *Merck Eprova AG v. Brookstone Pharmaceuticals, LLC*, 920 F. Supp. 2d 404, 425-26 (S.D.N.Y. 2013) (quoting *Gucci Am. v. Duty Free Apparel, Ltd.*, 277 F. Supp. 2d 269, 273 (S.D.N.Y. 2003). Section 349 . . . allows recovery not only by consumers, but also by competitors if there is 'some harm to the public at large.'" *Boule v. Hutton*, 328 F.3d 84, 94 (2d Cir. 2003) (quoting *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995)).

A claim of false advertising may proceed under one or both of the following theories: "that the challenged advertisement is literally false, *i.e.,* false on its face"; or "that the advertisement, while not literally false, is nevertheless likely to mislead or confuse consumers." *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 153 (2d Cir. 2007). To determine whether an advertising claim is literally false, a court "must analyze the message conveyed in full context," *i.e.,* it "must consider the advertisement in its entirety and not . . . engage in disputatious dissection." *Id.* at 112 n.19. If the words or images, considered in context, necessarily convey a false message, the advertisement is literally false and no extrinsic evidence of consumer confusion is required.

Defendant contends that its "Our Version of" legends are "comparative advertising" and are "intended to invite consumers to compare Defendant's fragrance to the name brand fragrance mentioned in the legend." SF ¶ 27. Such "'[c]ompare to' statements, depending on their wording and context, may convey more than a general invitation to compare and, instead, convey a specific assertion of measurable fact, such as the same ingredients or efficacy." *Rexall*, 651 F. Supp. 2d at 20; *see id.* at 22 (holding that the "compare to" statements, "when considered in context, could be understood as messages of equivalence as to formulation and efficacy of the products") (citing cases).[23] Defendant's "Our Version of" legend makes just such an assertion: By using the word "version," Defendant is fundamentally claiming that its fragrances are "the same type of thing" as Plaintiffs' Fragrances—varying slightly, perhaps, but maintaining the same essential character in terms of quality and longevity of scent, like Plaintiffs' own authorized flankers to their pillar fragrances.[24] *See* FF ¶¶ 202-09.

---

[23] *See Cartier*, 2000 WL 347171, at *4 & n.4 (holding "general claims of equivalence or similarity" to be both literally false and misleading where Deziner's disclaimers invited consumers to "compare" its sunglasses to Cartier's sunglasses in "price along with . . . style").

[24] *See http://www.oxforddictionaries.com/us/definition/american_english/version* (defining "version" as "[a] particular form of something differing in certain respects from an earlier form or other forms of the same type of thing") (last visited on January 4, 2017).

Despite this claim, however, Defendant has not "'truthfully and faithfully copied the original'"; in fact, it did not even try to do so. *See* FF ¶¶ 183-87. Instead, Defendant admits that its perfumes are substantially different from the Plaintiffs' Fragrances in quality, composition, and longevity of scent on the skin. *See id.* Not surprisingly, Defendant's Rule 30(b)(6) representative conceded that it is "*not* offering a version of the original fragrance" and is "*not* trying to say that it [the Diamond Collection alternative designer fragrance] is a version of the original fragrance." 30(b)(6) Ferullo Dep. 107:11-21 (emphasis added). Thus, because Defendant's "Our Version of" legends necessarily convey a false message, those advertising claims are literally false. *See JR Tobacco of Am., Inc. v. Davidoff of Geneva (CT), Inc.*, 957 F. Supp. 426, 434-35 (S.D.N.Y. 1997) (finding literal falsity where, despite advertising claims to the contrary, defendant made no effort to duplicate the origin or taste of plaintiff's cigars) (citations omitted).

Even if the Court were to accept Defendant's argument that its "Our Version of" legend is not literally false because it is susceptible to more than one interpretation, that advertising claim nevertheless is likely to mislead or confuse consumers. In addition to testing for likely confusion, Plaintiffs' expert, Dr. Rappeport, tested whether "[c]onsumers who see the 'Our version of' legend in context on Excell's packaging will construe that language to mean that the Excell product is either the same as or equivalent to the original branded fragrance referenced in the legend in terms of quantifiable characteristics," namely, formulation and longevity of scent. *See* Pl. Ex. 161-1 at 2. Dr. Rappeport found that net of noise, 20% of respondents believed Defendant's "Our Version of" legends to communicate the message that Defendant's fragrances are substantially equivalent to Plaintiffs' Fragrances. *Id.* at 15-16. Given this percentage, Plaintiffs' survey is persuasive evidence of the implicit falsity of Defendant's advertising claim in this Circuit. *See The Procter & Gamble Co. v. Ultreo, Inc.,* 574 F. Supp. 2d 339, 345 (S.D.N.Y. 2008) ("Cases have held that 20% constitutes a substantial percentage of consumers.") (citations omitted).

22

## IV.   DEFENDANT CANNOT PROVE ITS LACHES DEFENSE.

Plaintiffs filed suit within the six year statute of limitations for their infringement, unfair competition, and false advertising claims under sections 32(1) and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114(1), 1125(a), and their unfair competition claims under the New York common law.[25] *See* FF ¶ 238. Thus, to sustain its laches defense, Defendant must prove:  first, that "the [plaintiff] inexcusably delayed in bringing the claim"; and second, that "the defendant was prejudiced by the plaintiff's delay." *Gross v. Bare Escentuals Beauty*, 641 F. Supp. 2d 175, 196 (S.D.N.Y. 2008). Given the "presumption against laches where the lawsuit was initiated within the applicable statute of limitations," this is a heavy burden. *See id.* at 196.

Defendant cannot sustain it for multiple reasons:  First, Plaintiffs have not inexcusably delayed. *See* Conklin Direct ¶¶ 35-39; 6 MCCARTHY § 31:19 ("Laches is not measured from [D]efendant's first unpermitted use of the contested mark. Laches is measured from the date when there was an infringing use sufficient to require legal protest and possible lawsuit."); *see also ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic & Sports Physical Therapy P.C.*, 314 F.3d 62, 68 (2d Cir. 2002). Second, Defendant is an intentional infringer, and as "the Second Circuit [Court of Appeals] has made clear . . . regardless of the length of the senior user's delay, laches cannot be a defense to intentional infringement, as it is an equitable defense and the defendant asserting it must come to court with clean hands." *Gucci*, 868 F. Supp. 2d at 244 (citation omitted). Finally, "equity requires that the prejudice be substantial before [this] defense[ ] can prevail," *Gucci*, 868 F. Supp. 2d at 256, and Defendant has not suffered any prejudice whatsoever, as it did not stop selling any of its infringing products even after this lawsuit was commenced. FF ¶¶ 122-24, 238. Accordingly, Defendant's laches defense fails.

---

[25] Plaintiffs timely filed their other claims as well. *See* CL ¶¶ 211-16.

**V.     THE ESSENCE OF PLAINTIFFS' IRREPARABLE INJURY IS THEIR
INABILITY TO CONTROL THE QUALITY OF GOODS BEARING THEIR
MARKS.**

The law is clear that "'a senior user may sue to protect his reputation even where the

infringer's goods are of top quality.'" *U.S. Polo Ass'n*, 800 F. Supp. 2d at 537 (quoting *Mobil Oil

Corp. v. Pegasus Petroleum Corp.,* 818 F.2d 254, 259, 260 (2d Cir. 1987)). "A senior user 'is not

required to put its reputation in [a junior user's] hands, no matter how capable those hands may

be.'" *U.S. Polo Ass'n*, 800 F. Supp. 2d at 537 (citation omitted). As the Second Circuit Court of

Appeals observed in *Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238 (2d Cir. 2009):

> "One of the most valuable and important protections afforded by the Lanham Act
> is the right to control the quality of the goods manufactured and sold under the
> holder's trademark." In attaching its mark to its goods over time, a holder assures
> consumers that the goods conform to the mark holder's quality standards.
> Reputation for quality, whether good or bad, becomes associated with a mark in
> the minds of consumers. Many consumers are willing to pay more to buy goods
> bearing a mark which experience has taught the consumer represents an assurance
> of high quality.

*Id.* at 243-44 (quoting *El Greco Leather Prods. Co. v. Shoe World, Inc.,* 806 F.2d 392, 395 (2d

Cir. 1986)); *see also* 1 MᴄCᴀʀᴛʜʏ § 2:4. This reputation for quality translates into goodwill,

which "can be defined as the intangible value of a business beyond the value of its physical

assets." 1 MᴄCᴀʀᴛʜʏ § 2:19.

Trademark law "serves to protect both consumers from deception and confusion over

trade symbols *and* to protect the plaintiff's infringed trademark as property. Both Congress and

the Supreme Court in modern times have stressed that trademark has these two goals." 1

MᴄCᴀʀᴛʜʏ § 2:2 (emphasis in original). In other words, in addition to protecting the consumer

loyalty and resulting brand equity that Plaintiffs have invested so heavily to create, a verdict

against Defendant would "protect the public so it may be confident that, in purchasing a product

bearing a particular trade-mark which it favorably knows, it will get the product which it asks for

and wants to get." S. Rᴇᴘ. Nᴏ. 1333, 79th Cong., 2d Sess., 3 (1946) (quoted in *Two Pesos*, 505

U.S. at 782 n.15 (Stevens, concurring)). The great weight of evidence in this case establishes that

Defendant's use is likely to cause "deception and confusion" *and* to diminish, dilute and tarnish

Plaintiffs' distinctive marks "as property." *See* Conklin Decl. ¶¶ 44-51. The relief Plaintiffs seek therefore advances the twin goals of the trademark law.

## CONCLUSION

In this case, and in the entire conduct of its business, Defendant has made no effort to conceal its contempt for Plaintiffs' trademark rights, the public's health and safety, and the rule of law. It is not enough for Defendant to declare it is going out of business, without an injunction preventing its principals from resuming their unlawful activities in the future, accounting for its past sales (which continued well after this action was filed), and the other relief Plaintiffs request, including the enhanced monetary awards authorized by section 35(b) of the Lanham Act, 15 U.S.C. § 1117(b), for Defendant's uses of counterfeit marks. For these and the foregoing reasons, Plaintiffs respectfully request that the Court enter judgment for Plaintiffs on all claims and defenses.

DATED: January 9, 2017                 Respectfully submitted,

KILPATRICK TOWNSEND & STOCKTON LLP

By: */s/ Lisa Pearson*

Lisa Pearson (LP 4916)
Robert Potter (RP 5757)
Olivia Harris (OH 1983)
1114 Avenue of the Americas
New York, New York 10036
Telephone: (212) 775-8700
Facsimile: (212) 775-8800
lpearson@kilpatricktownsend.com
rpotter@kilpatricktownsend.com
oharris@kilpatricktownsend.com

James W. Faris Jr. (admitted *pro hac vice*)
1100 Peachtree Street, Suite 2800
Atlanta, Georgia 30309
Telephone: (404) 815-6500
Facsimile: (404) 815-6555
jfaris@kilp4atricktownsend.com

*Attorneys for Plaintiffs*

25