**KILPATRICK TOWNSEND &
STOCKTON LLP**
Lisa Pearson (LP 4916)
Robert Potter (RP 5757)
Olivia Harris (OH 1983)
1114 Avenue of the Americas
New York, New York 10036
Telephone: (212) 775-8700
Facsimile: (212) 775-8800

James W. Faris Jr. (admitted *pro hac vice*)
1100 Peachtree Street, Suite 2800
Atlanta, Georgia 30309
Telephone: (404) 815-6500
Facsimile: (404) 815-6555

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| COTY INC., COTY B.V., CALVIN KLEIN TRADEMARK TRUST, CALVIN KLEIN, INC., CALVIN KLEIN COSMETIC CORPORATION, VERA WANG LICENSING LLC, V.E.W., LTD., and ATE MY HEART INC., <br><br>               Plaintiffs, <br><br>     v. <br><br> EXCELL BRANDS, LLC, <br><br>               Defendant. | 15-CV-7029 (JMF) (GWG) |

## PLAINTIFFS' PROPOSED CONCLUSIONS OF LAW

Pursuant to Rule 26(a)(3) of the Federal Rules of Civil Procedure, Plaintiffs Coty, Inc.,

Coty B.V., Calvin Klein Trademark Trust, Calvin Klein, Inc., Calvin Klein Cosmetic

Corporation, Vera Wang Licensing LLC, V.E.W., Ltd., and Ate My Heart Inc. (collectively,

"Plaintiffs") respectfully submit these Proposed Conclusions of Law. The following short forms

of citation are used herein: Plaintiffs' Trial Exhibit ("Pl. Ex."); Defendant's Trial Exhibit ("Def. Ex."); deposition testimony ("[deponent name] Dep. [page number]:[line number]-[page number]:[line number]"); Stipulated Facts ("SF ¶ [paragraph number]"); direct testimony witness statements ("[witness name] Direct ¶ [paragraph number]").

## I.   DEFENDANT IS INFRINGING AND UNFAIRLY COMPETING WITH PLAINTIFFS' TRADEMARKS AND TRADE DRESSES.

1.      As the United States Supreme Court held in *Mishawaka Rubber & Woolen Manufacturing Co. v. S. S. Kresge Co.*, 316 U.S. 203, 205 (1942):

> The protection of trade-marks is the law's recognition of the psychological function of symbols. If it is true that we live by symbols, it is no less true that we purchase goods by them. A trade-mark is a merchandising short-cut which induces a purchaser to select what he wants, or what he has been led to believe he wants. The owner of a mark exploits this human propensity by making every effort to impregnate the atmosphere of the market with the drawing power of a congenial symbol. Whatever the means employed, the aim is the same—to convey through the mark, in the minds of potential customers, the desirability of the commodity upon which it appears. Once this is attained, the trademark owner has something of value. If another poaches upon the commercial magnetism of the symbol he has created, the owner can obtain legal redress.

Plaintiffs seek such redress here.

2.      Section 32(1) of the Lanham Act, which governs infringement of federally-registered marks, provides that

> [a]ny person who shall, without the consent of the registrant—(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . shall be liable in a civil action by the registrant for the remedies hereinafter provided.

15 U.S.C. § 1114(1).

3.      Section 45 of the Lanham Act defines a "trademark" as

> any word, name, symbol, or device, or any combination thereof . . . used by a person . . . to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown.

*Id.* at § 1127. Names and trade dresses therefore fall within the statutory definition because they are capable of functioning as indicators of source.

4.      Section 45 defines a "counterfeit" mark as "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." *Id.*

5.      With respect to unregistered marks, Section 43(a) provides that:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof . . . which—

(a)     is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . .

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

*Id.* at § 1125(a). This section provides owners of "unregistered marks and other indicia of origin, including trade dress and trade names," with a federal cause of action for unfair competition. *Clinique Labs. v. Dep Corp.*, 945 F. Supp. 547, 550 (S.D.N.Y. 1996) (citations omitted).

6.      The "'standards for Section 43(a) claims of the Lanham Act and unfair competition claims under New York Law are almost indistinguishable.' The only additional element that must be shown to establish a claim for unfair competition under the common law is bad faith." *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 538 (S.D.N.Y. 2011) (citations omitted); *see also Twentieth Century Fox Film Corp. v. Marvel Enters., Inc.*, 155 F. Supp. 2d 1, 25 (S.D.N.Y. 2001) (noting that standards for Lanham Act claims and a claim for unfair competition under New York law are substantively similar).

7.      Courts analyze claims under Sections 32(1) and 43(a) by using a "familiar two-prong test," asking "first … whether the plaintiff's mark is entitled to protection, and second … whether defendant's use of the mark is likely to cause consumer confusion as to the origin or sponsorship of the defendant's goods." *Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 237 (S.D.N.Y. 2012) (citations omitted); *see also U.S. Polo Ass'n*, 800 F. Supp. 2d at 524; *Clinique*, 945 F. Supp. at 550.

8.      A mark is entitled to protection if it is distinctive and (in the case of trade dress) nonfunctional. *Gucci*, 868 F. Supp. 2d at 238.

9.     In this case, Plaintiffs easily satisfy both elements. First, Plaintiffs' Marks (*see* Proposed Findings of Fact ("FF") ¶ 4) are entitled to protection because their trademarks are distinctive and their trade dresses are distinctive and nonfunctional. Second, Defendant's use of Plaintiffs' Marks is highly likely to cause consumer confusion as to whether Defendant's Diamond Collection Fragrances are connected with Plaintiffs.

### A.    Plaintiff's Registered Trademarks and Trade Dresses Are Protectable.

10.    Section 33(a) of the Lanham Act provides that:

> [a]ny registration . . . of a mark registered on the principal register . . . and owned by a party to an action shall be admissible in evidence and shall be prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the registration . . . .

15 U.S.C. § 1115(a).

11.    Thus, a federal registration shifts the burden to the defendant to rebut this presumption of protectability. *U.S. Polo Ass'n*, 800 F. Supp. 2d at 526, 527-28. This is a heavy burden on the defendant:  "[R]egistered trademarks are presumed to be distinctive and should be afforded the utmost protection." *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 871 (2d Cir. 1986).

12.    Further, Section 15 of the Lanham Act provides that "the right of the [trademark] owner to use [its] registered mark in commerce for the goods or services on or in connection with which such registered mark has been in continuous use for five consecutive years subsequent to the date of such registration and is still in use in commerce, *shall be incontestable*," provided that the owner files an affidavit attesting that:  (1) "there has been no final decision adverse to the owner's claim of ownership" or "to the owner's right to register the same"; and (2) "there is no proceeding involving said rights pending in the United States Patent and Trademark Office or in a court and not finally disposed of . . . ." 15 U.S.C. § 1065 (emphasis added).

13.     Where a federal registration has become incontestable, that "registration shall be *conclusive evidence* of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce," subject only to a short list of affirmative defenses under Section 33(b). *See id.* at § 1115(b) (emphasis added).

14.     Plaintiffs are seeking to enforce their exclusive rights in 28 registered trademarks and trade dresses used to identify their fragrance products, 21 of which are the subject of incontestable registrations.[1] Plaintiffs' incontestable registrations are *conclusive evidence* of the validity of, Plaintiffs' ownership of, and Plaintiffs' exclusive right to use the subject marks and dresses unless Defendant can establish one of its two remaining affirmative defenses listed in Section 33(b): fair use and laches. *See* ECF No. 71 at 10.

15.     In its original Answer and Affirmative Defenses (ECF No. 17), Defendant asserted additional section 33(b) defenses, but it since has withdrawn them.

16.     As set forth in Paragraphs 135 through 149 and 217 through 222 below, Defendant cannot prove its entitlement to either of the foregoing defenses.

17.     As for the seven registered marks owned by Plaintiffs that are not yet incontestable,[2] Defendant has not produced any evidence to rebut the presumptions afforded by

---

[1] Plaintiffs' incontestable registrations are:  OBSESSION (Reg. No. 0,407,245), CALVIN KLEIN (Reg. No. 1,086,041), CALVIN KLEIN (Reg. No. 1,226,396), OBSESSION (Reg. No. 1,347,076), OBSESSION (Stylized) (Reg. No. 1,435,231), ETERNITY (Stylized) (Reg. No. 1,608,723), ETERNITY Bottle Design (Reg. No. 1,608,753), CK ONE (Stylized) (Reg. No. 1,946,318), CK ONE CALVIN KLEIN & Design (Reg. No. 1,969,912), CK (Stylized) (Reg. No. 2,064,064), CK (Stylized) (Reg. No. 2,234,623), CK FREE (Stylized) (Reg. No. 3,756,039); CK ONE (Reg. No. 3,916,700), EUPHORIA BLOSSOM (Reg. No. 3,455,523), EUPHORIA (Reg. No. 3,786,226), IN2U (Reg. No. 3,804,964), VERA WANG (Reg. No. 1,797,058), VERA WANG & Design (Reg. No. 3,110,991), VERA WANG PRINCESS (Reg. No. 3,184,309), LADY GAGA (Reg. No. 3,695,038), and LADY GAGA (Reg. No. 3,695,129). *See* Pl. Exs. 3-10, 12-17, 19-21, 27-19, 33.

[2] Plaintiffs' registered marks that are not yet incontestable are:  JOOP! (Reg. No. 4,520,669), JOOP! HOMME WILD (Reg. No. 4,682,626), CK ONE SHOCK (Reg. No. 4,126,963), DARK OBSESSION (Reg. No. 4,426,346), DOWN TOWN CALVIN KLEIN (Reg. No. 4,558,645); VERA WANG LOVESTRUCK (Reg. No 4,032,409), and LADY GAGA (Reg. No. 3,960,468). *See* Pl. Exs. 11, 18, 22, 25, 26, 30, 31.

Section 33(a) of the Lanham Act, 15 U.S.C. § 1115(a), including the presumption of distinctiveness. Plaintiffs' registered marks are protectable.

**B.    Plaintiff's Unregistered Trademarks and Trade Dresses Are Protectable.**

18.    In addition to the registered marks discussed above, Plaintiffs seek to enforce their rights in two unregistered marks and 13 unregistered trade dresses used to identify their fragrance products.[3] In the absence of a federal registration, courts assess the protectability of marks by using Judge Friendly's spectrum of distinctiveness, *see Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir. 1976), which "has become the governing law of trademark classification" in this Circuit and elsewhere. *Lois Sportswear*, 799 F.2d at 871. "Arrayed in an ascending order which roughly reflects their eligibility to trademark status and the degree of protection accorded, these classes are (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful." *Abercrombie & Fitch*, 537 F.2d at 9.

19.    "Suggestive and arbitrary or fanciful marks are considered to be inherently distinctive, and therefore always satisfy the first [protectability] prong of the test for . . . trademark protection." *Paddington Corp. v. Attiki Imps. & Dists., Inc.*, 996 F.2d 577, 583 (2d Cir. 1993) (citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992)). "A term is suggestive if it requires imagination, thought and perception to reach a conclusion as to the nature of goods." *Abercrombie & Fitch*, 537 F.2d at 11. "[T]he term 'fanciful', as a classifying concept, is usually applied to words invented solely for their use as trademarks. When the same legal consequences attach to a common word, i.e., when it is applied in an unfamiliar way, the use is called 'arbitrary.'" *Id.* at 11 n.12. As for descriptive marks—those that "forthwith convey[ ] an immediate idea of the ingredients, qualities or characteristics of the goods"—they are protectable upon a showing of secondary meaning. *Id.* at 11. Generic terms are never protectable. *Id.* at 9; *see also id.* ("A generic term is one that refers, or has come to be understood as referring, to the genus of which the particular product is a species.").

---

[3] *See* Pl. Exs. 1 (unregistered trade dresses), 23 (App. Ser. No. 85,115,004 to register LADY GAGA) and 24 (App. Ser. No. 85/282,752 to register LADY GAGA FAME).

20.     A mark achieves a secondary meaning when "the consuming public primarily associates the term with a particular source." *Estee Lauder Inc. v. The Gap, Inc.*, 108 F.3d 1503, 1509 (2d Cir. 1997) (citations omitted); *see also Arrow Fastener Co. v. Stanley Works,* 59 F.3d 384, 390 (2d Cir. 1995) (secondary meaning attaches when "the [term] and the business have become synonymous in the mind of the public") (internal quotation marks omitted)).

21.     A trademark owner proves secondary meaning by introducing the following types of evidence: "(1) advertising expenditures; (2) consumer studies linking the name to a source; (3) sales success; (4) unsolicited media coverage; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the mark's use." *Stern's Miracle-Gro Prods., Inc. v. Shark Products, Inc.*, 823 F. Supp. 1077, 1084 (S.D.N.Y. 1993) (citations omitted).

22.     No single category is determinative, although "[i]ntentional copying is persuasive evidence of secondary meaning." *Essie Cosmetics, Ltd. v. Dae Do Int'l, Ltd.*, 808 F. Supp. 952, 958 (E.D.N.Y. 1992) (citing *LeSportsac, Inc. v. K Mart Corp.,* 754 F.2d 71, 78 (2d Cir. 1985)) (other citations omitted).

23.     The two unregistered trademarks at issue, LADY GAGA and LADY GAGA FAME, which are the subject of pending federal trademark applications (*see* Pl. Exs. 23, 24), obviously identify the famous entertainer Lady Gaga as the source of the products and services bearing the marks.

24.     Both marks function as inherently distinctive source identifiers, and in addition, both marks have achieved a strong secondary meaning, given the fame of Lady Gaga and the extent of advertising, promotion, and sales under the marks. *See* 2 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 15:48 (4th ed. 2016) [hereinafter "MCCARTHY"] ("The easiest and least expensive manner of proving secondary meaning is to introduce evidence of the amount and nature of advertising of the mark; the length of time the mark has been in use; and the amount of goods or services sold under the mark."). Given the abundant evidence of secondary meaning, Ate My Heart Inc.'s unregistered trademarks clearly are protectable.

25.     The United States Patent and Trademark Office already has registered three other LADY GAGA marks on the Principal Register (*see* Pl. Exs. 20-22), which also confirms the distinctiveness of the LADY GAGA marks. *See Lois Sportswear*, 799 F.2d at 871 ("registered trademarks are presumed to be distinctive and should be afforded the utmost protection").

26.     Plaintiffs also seek to enforce their rights in the 13 unregistered trade dresses depicted and described in Plaintiffs' Exhibit 1. "'The "trade dress" of a product is essentially its total image and overall appearance.' It 'involves the total image of a product and may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques.'" *Two Pesos*, 505 U.S. at 764 n.1 (quoting *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 980 (11th Cir. 1983)).

27.     Product packaging trade dress is almost always found inherently distinctive, as "the varieties of labels and packaging available to . . . manufacturers are virtually unlimited." *Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.,* 111 F.3d 993, 1000 (2d Cir. 1997). *See also Paddington*, 996 F.2d at 583 ("Since the choices that a producer has for packaging its products are . . . almost unlimited, typically a trade dress will be arbitrary or fanciful and thus inherently distinctive . . . .") (citations omitted). *See generally Wal-Mart Stores, Inc. v. Samara Brothers, Inc.*, 529 U.S. 205, 212 (2000) ("The attribution of inherent distinctiveness to certain categories of word marks and product packaging derives from the fact that the very purpose of attaching a particular word to a product, or encasing it in a distinctive packaging, is most often to identify the source of the product. Although the words and packaging can serve subsidiary functions—a suggestive word mark (such as 'Tide' for laundry detergent), for instance, may invoke positive connotations in the consumer's mind, and a garish form of packaging (such as Tide's squat, brightly decorated plastic bottles for its liquid laundry detergent) may attract an otherwise indifferent consumer's attention on a crowded store shelf—their predominant function remains source identification. Consumers are therefore predisposed to regard those symbols as indication[s] of the producer, which is why such symbols 'almost *automatically* tell a customer

8

that they refer to a brand,' … and 'immediately … signal a brand or a product "source" ' " . . . .)
(internal citations omitted) (emphasis in original).

28.     Further, while each element of a given trade dress, in isolation, may not be
inherently distinctive, "it is the combination of elements and the total impression that the dress
gives to the observer that should be the focus of a court's analysis of distinctiveness."
*Paddington*, 996 F.2d at 584. This is true even if the individual elements of a product's trade
dress, taken separately, seem simple or straightforward. As the Second Circuit Court of Appeals
wrote in *Paddington*, finding the "No. 12 Ouzo bottle" to be inherently distinctive , "[o]ne could
no more deny protection to a trade dress for using commonly used elements than one could deny
protection to a trademark because it consisted of a combination of commonly used letters of the
alphabet." *Id.*

29.     Where, as here, manufacturers in an industry have a "virtually unlimited" variety
of packaging options from which to choose, any one packaging design is likely to be
nonfunctional as well as inherently distinctive. While fragrance bottles need to carry fluid, and
fragrance boxes need to contain the bottles, this does not render them "functional," in trademark
terms, and thus ineligible for protection. *See Essie Cosmetics*, 808 F. Supp. at 958 ("[A] bottle
can have an infinite variety of forms and designs and still *function* to hold liquid. No one form is
*necessary* or appears to be superior.") (citation and internal quotation marks omitted) (emphasis
in original).

30.     While trade dress may be deemed "aesthetically functional" if granting trademark
protection in "an ornamental feature . . . would significantly hinder competition by limiting the
range of adequate alternative designs," *Gucci*, 868 F. Supp. 2d at 245-46, where (as here) the
range of designs is broad, any given product packaging design, *considered as a whole*, is
extremely likely to be nonfunctional as well as inherently distinctive. *See LeSportsac,* 754 F.2d
at 78 ("LeSportsac does not claim a trademark in all lightweight nylon bags using hollow zipper
pulls or carpet tape trim. It claims as its mark the particular combination and arrangement of
design elements that identify its bags and distinguish them from other bags.") (affirming district

court finding of nonfunctionality) (citation omitted); *Clinique*, 945 F. Supp. at 559 n.15 (where plaintiff did not claim exclusive rights in the shape of its bottle, finding the packaging as a whole to be nonfunctional because "the functionality of certain elements of trade dress does not render the totality of elements ineligible for protection"); *see also In re Morton-Norwich Prods., Inc.*, 671 F.2d 1332, 1342 (C.C.P.A. 1982) (shape of plastic container for spray products not essential to its purpose as a sprayer and therefore nonfunctional).

31.     Plaintiffs' unregistered trade dresses consist of 13 highly detailed, clearly articulated fragrance packaging designs. *See* Pl. Ex. 1. As no fragrance manufacturer has a competitive need to combine shapes, colors, and typefaces in precisely the ways that Plaintiffs have, Plaintiffs' unregistered trade dresses are both inherently distinctive and nonfunctional. *See Paddington*, 996 F.2d at 583 (noting that the universe of packaging options was "almost unlimited," finding trade dress to be either "arbitrary or fanciful and thus inherently distinctive").

32.     "If the same function can be performed by a bottle and cap of a different shape with no substantial sacrifice, there is no need to copy trade dress," as Defendant has done. *See Essie Cosmetics*, 808 F. Supp. at 958 (citation omitted).

33.     Defendant no longer asserts defenses based on the doctrines of functionality and aesthetic functionality. *See* Proposed Joint Pretrial Order ("JPO") at 4.

34.     Plaintiffs clearly have established secondary meaning in their trade dresses by introducing evidence of their sales success, advertising expenditures, and unsolicited media coverage. FF ¶¶ 32-74. They also have established Defendant's "[i]ntentional copying," which "is persuasive evidence of secondary meaning." *Essie Cosmetics*, 808 F. Supp. at 958 (citations omitted); *see also Clinique*, 945 F. Supp. at 559 ("[E]ven were evidence of secondary meaning required, Clinique has presented evidence of sales success, advertising expenditures, unsolicited advertising, and defendant's conscious imitation of plaintiff's trade dress and trademark to support such a finding."). Thus, the record in this case is far more fully developed and evolved than that in the 17-year-old case of *Conopco, Inc. v. Cosmair, Inc.*, 49 F. Supp. 2d 242 (S.D.N.Y.

10

1999); here, Plaintiffs have established that the registered ETERNITY Bottle Design has acquired substantial secondary meaning as a source identifier.

35.     Plaintiffs' unregistered trademarks and trade dresses are protectable source identifiers under Section 43(a) of the Lanham Act.

**C.     Defendant's Use of Plaintiffs' Marks Is Likely to Cause Confusion.**

36.     The issue of likelihood of confusion presents mixed questions of law and fact. *See Paddington*, 996 F.2d at 584-85 ("In reviewing a district court's evaluation of the likelihood-of-confusion issue, we review the determination of each individual *Polaroid* factor under a clearly erroneous standard, but the ultimate evaluation of likelihood of confusion, which is based on a weighing of the factors, we review *de novo*.").

37.     In *Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492 (2d Cir.), *cert. denied*, 368 U.S. 820 (1961), Judge Friendly articulated a "now-familiar, nonexclusive list of eight factors" to guide courts in evaluating likelihood of confusion. *Clinique*, 945 F. Supp. at 551. Those factors are:

> (1) the strength of the plaintiff's mark; (2) the degree of similarity between the plaintiff's and defendant's marks; (3) the competitive proximity of the products; (4) the existence of actual confusion; (5) the likelihood that the plaintiff will "bridge the gap"; (6) the defendant's intent in adopting the mark; (7) the quality of the defendant's product; and (8) the sophistication of purchasers.

*Polaroid,* 287 F.2d at 495.

38.     "[T]he evaluation of the *Polaroid* factors is not a mechanical process 'where the party with the greatest number of factors weighing in its favor wins.' Rather, a court should focus on the ultimate question of whether consumers are likely to be confused." *Paddington*, 996 F.2d at 584 (citations omitted). No single factor is determinative. *Clinique*, 945 F. Supp. at 551 (citation omitted).

39.     As for what types of confusion are actionable, "the Lanham Act protects against numerous types of confusion, including confusion regarding affiliation or sponsorship" in addition to confusion about source. *International Info. Sys. Sec. Certification Consortium, Inc.* v. *Security Univ., LLC*, 823 F.3d 153, 161 (2d Cir. 2016) (citing cases). Thus, "courts . . . must

11

consider confusion regarding affiliation, sponsorship, or endorsement by the mark holder." *Id.* at 169.

40.     Furthermore, courts may find that infringement has occurred based not only on a likelihood of confusion that arises at the point of sale, but also "confusion that creates initial customer interest, even if no final sale is completed as a result" as well as "post-sale" confusion that occurs after a sale is completed. *Clinique*, 945 F. Supp. at 551 (citing cases).

41.     "Initial-interest" confusion occurs when a purchaser assumes, at least initially, "either that [Defendant's] product is made by [Plaintiffs] or that [Plaintiffs] sponsor[ ] [Defendant's] line." *Kompan A.S. v. Park Structures, Inc.*, 890 F. Supp. 1167, 1180 (N.D.N.Y. 1995). Even if this confusion is dispelled by the time of purchase, the trademark injury has already occurred:

> Misled into an initial interest, a potential Steinway buyer may satisfy himself that [defendant's] less expensive Grotrian-Steinweg is at least as good, if not better, than a Steinway. . . . This confusion, or mistaken belief as to the companies' interrelationships, can destroy the value of the trademark which is intended to point to only one company. *Thus, the mere fact that purchasers may be sophisticated or discriminating is not sufficient to preclude the likelihood of confusion.*

*Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 365 F. Supp. 707, 717 (S.D.N.Y. 1973) (finding likelihood of confusion) (emphasis added), *aff'd*, 523 F.2d 1331 (2d Cir. 1975); *see also Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 260 (2d Cir. 1987) ("Such initial confusion works a sufficient trademark injury.") (citation omitted).

42.     As regards "post-sale" confusion, the wrong occurs when a buyer "purchases a knockoff and passes it off to the public as the genuine article, thereby confusing the viewing public and achieving the status of owing the genuine article at a knockoff price." *Hermès Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 109 (2d Cir. 2000); *see also Mastercrafters Clock & Radio Co. v. Vacheron & Constantin-LeCoultre Watches, Inc.*, 221 F.2d 464, 466 (2d Cir. 1955) ("Plaintiff's wrong thus consisted of the fact that such a visitor would be likely to assume that the clock was an Atmos clock.").

43.     Finally, as the Court explained in *Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc.*, 486 F. Supp. 414 (S.D.N.Y. 1980),

> [t]here is a third, and perhaps most significant, kind of confusion which is likely to work to plaintiff's detriment[,] that is, defendant['s] ability to gain a foothold in plaintiff's market by exploiting subliminal or conscious association with plaintiff's well-known name. Whereas the average consumer might be less motivated to pick up PLAYMEN if it were named, for example, ADONIS, he is more likely to take notice of PLAYMEN on the newsstand because of an association, if not outright confusion, with the PLAYBOY mark.

*Id.* at 428. "[A]dvertising and trademarks rely on impressions. The consumer does not memorize the mark. He has a feeling about it from past exposure. That feeling may be vague, subliminal it is said, but it comes to consciousness when the article is seen with the trademark affixed." *Id.* (quoting *Londontown Mfg. Co. v. Cable Raincoat Co.*, 371 F. Supp. 1114, 1118 (S.D.N.Y. 1974)); *see id.* at 429 ("Likelihood of subliminal association may be inferred from defendants' apparent intent in using the PLAYMEN mark:  to capitalize on the special attention a new magazine would obtain because its name, having no other meaning, conjures up the PLAYBOY name and all it represents.").

44.     At the outset, before delving into a detailed analysis of the *Polaroid* factors, it merits emphasis that in this case, as in *Clinique Laboratories, Inc. v. Dep Corp.*, 945 F. Supp. 547 (S.D.N.Y. 1996), Defendant markets exactly the same products Plaintiffs do (*i.e.*, fragrance), and its "line—visually and functionally—attempts to look as much like [Plaintiffs'] as possible . . . ." *Id.* at 551.

45.     Worse, unlike the infringer in *Clinique*, who "stopp[ed] just short of using Clinique's actual marks on the products," *id.*, Defendant is prominently using counterfeits of Plaintiffs' actual marks, in Plaintiffs' distinctive presentations, as part of the "Our Version of" legend on the face of its boxes and in the "not associated with" legend on the back of its boxes, both of which display Plaintiffs' Marks in much larger type than the remaining language of the legends. It also is using product names that evoke the names of the original products (*e.g.*, Serenity for Eternity, Jump! for Joop!, etc.).

13

46.     Thus, on each of the accused products, Defendant uses several different marks and variants of marks associated with Plaintiffs' products, including the spurious copies of Plaintiffs' Marks in the legends, similar trade dress and similar product names. Courts in this Circuit have held that the use of a *combination* of branding indicia exacerbates the potential for confusion that the use of any one mark alone might create. *See Cartier, Inc. v. Deziner Wholesale, L.L.C.*, No. 98 Civ. 4947(RLC), 2000 WL 347171, at \*2, \*4 (S.D.N.Y. Apr. 3, 2000) (where "[t]he largest element on the Deziner box label [was] the Cartier name, which appear[ed] in 1 inch bold type," above which the name "'Deziner Alternatives' appear[ed] in capital letters in 1/8 inch standard type"; "[s]mall [1/16 inch] italicized copy" reading "'compare our prices' . . . direct[ed] the reader to compare Deziner Alternatives's sunglass prices with Cartier's sunglass prices"; and "[a]t the bottom of the label" in 1/16 inch type was the disclaimer, "'In no way do we [Deziner] represent the abovementioned company [Cartier]. We simply ask the consumer to compare the price along with the style to the above mentioned name brands. We do not represent our sunglasses to be original nor do we represent that they are exact copies," holding that confusion is likely "when a company packages its product in a wrapper that more centrally displays a competitor's name, or repeatedly mentions a competitor's name, with the effect of making its competitor's mark the most dominant feature on the package"); *Invicta Plastics Ltd. v. Mego Corp.*, 523 F. Supp. 619, 622-23 (S.D.N.Y. 1981) (where the defendant "used the [plaintiff's] name MASTERMIND repeatedly over the [defendant's] SIXTH SENSE package," finding that notwithstanding the defendant's "disclaimers," "[f]or some members of the buying public, a glance at the SIXTH SENSE box would leave them confused as to who made either SIXTH SENSE or MASTERMIND"). *See also id.* at 623 ("The fact that MASTERMIND was used as part of a true statement by [the defendant] does not save it from being confusing. Truthful references to the trademark of another are permissible as long as the 'unauthorized' reference does not cause confusion as to the source. . . .").

### 1.       Plaintiffs' Marks Are Strong.

47.     The strength of a mark is measured by "the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source." *McGregor–Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1131 (2d Cir. 1979); *see also Paddington*, 996 F.2d at 585. *Clinique*, 945 F. Supp. at 551.

48.     Courts in this Circuit conduct a "two-staged" inquiry:  First, the mark is analyzed as a word or phrase in the abstract, without regard to its actual public acceptance. Then, the mark is tested for "its 'origin-indicating' quality, in the eyes of the purchasing public." *Playboy*, 486 F. Supp. at 420 (S.D.N.Y. 1980) (quoting *McGregor–Doniger,* 599 F.2d at 1131).

49.     A mark's conceptual strength is determined by its place on the spectrum of distinctiveness discussed in Paragraph 18 above, *see Abercrombie & Fitch*, 537 F.2d at 9, with inherently distinctive marks being the strongest. *Paddington*, 996 F.2d at 585 ("strength may result solely from the mark's inherent distinctiveness . . . whether or not the consumer is familiar with the mark or knows the source").

50.     A mark's commercial strength flows from the extent of its secondary meaning in the relevant marketplace. *See Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1044 (2d Cir. 1992) ("The strength of a mark should be examined in its commercial context.").

51.     In this case, Plaintiffs' Marks are strong both conceptually and commercially. As set forth in Paragraphs 10 through 35 above, Plaintiffs' Marks are inherently distinctive, which makes them conceptually strong. *See Paddington*, 996 F.2d at 585 ("strength may result solely from the mark's inherent distinctiveness . . . whether or not the consumer is familiar with the mark or knows the source").

52.     In commercial terms, Plaintiffs' Marks are among the strongest and most recognizable in the fragrance industry:  Plaintiffs are making substantially exclusive and extensive use of their marks; their advertising expenditures have resulted in truly iconic advertising campaigns and an enviable degree of consumer awareness; these efforts have translated into hundreds of millions of dollars in sales; and the fragrances bearing the brands

15

("Plaintiffs' Fragrances," *see* FF ¶ 3) have won numerous industry awards. FF ¶ 32-74. *See Bristol-Myers Squibb*, 973 F.2d at 1044 ("The strength of a mark should be examined in its commercial context."). Indeed, the reason why Defendant chose to create its versions of Plaintiffs' Fragrances is precisely because its target consumers recognize Plaintiffs' Marks.

53.     Because Plaintiffs' Marks are conceptually and commercially strong, the first factor strongly favors Plaintiffs.

### 2.     Plaintiffs' and Defendant's Marks Are Similar.

54.     "Marks are considered 'similar' when they are similar in appearance, sound and meaning." *Clinique*, 945 F. Supp. at 552 (citation omitted).

55.     Several rules have evolved to guide analysis of this factor. First, "[t]he relevant inquiry is the impression the mark as a whole creates on the average reasonably prudent buyer, and not the individual details of the mark." *Id.* at 553 (citations omitted).

56.     The same rule holds for the packaging trade dresses at issue. The question is whether the parties' packaging creates the "'same overall impression when viewed separately.'" *Home Shopping Club, Inc. v. Charles of the Ritz Group, Inc.*, 820 F. Supp. 763, 769 (S.D.N.Y. 1993) (citations omitted). *See also Paddington*, 996 F.2d at 586 ("More significant than the striking similarities in various details are the dresses' similarity in overall appearance. . . . In light of the marked similarity between the two bottles, the district court's determination that they were not similar was clearly erroneous."). Notably, "[e]ven different labels on nearly identical bottles may cause confusion." *Essie Cosmetics*, 808 F. Supp. at 959 (citing *Source Perrier S.A. v. Waters of Saratoga Springs, Inc.*, 217 U.S.P.Q. (BNA) 617, 620 (S.D.N.Y. 1982)).

57.     Second, when comparing the parties' marks, "'the correct test is whether a consumer who is somewhat familiar with the plaintiff's mark would likely be confused *when presented with defendant's mark alone*.'" *Clinique*, 945 F. Supp. at 552 (emphasis added) (citations omitted). "Side by side comparison is not the appropriate test"—and indeed, constitutes reversible error—because it risks giving too much weight to insignificant differences. *Id.* (citations omitted); *see also Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108,

16

117 (2d Cir. 2006) (reversing and remanding because "The district court erred [when it] it based its determination that confusion between the Vuitton and Dooney & Bourke marks was unlikely at least in part on an overemphasized side-by-side comparison."); *Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 539 (2d Cir. 2005) (reversing because, given marketplace conditions, "a focus on the likely effect of simultaneous viewing on consumers was legally erroneous" and instructing the district court, on remand, to "give particular weight to any evidence . . . addressing the overall impression that consumers are likely to have of the handbags when they are viewed sequentially, and in different settings, rather than simultaneously").

58.     Instead, the proper question in this case is what "the ordinary consumer would perceive when looking at [the defendant's] products in isolation" (*Clinique*, 945 F. Supp. at 552 (citations omitted)), which, in turn, requires the factfinder to compare the products by "serial viewing." *Malletier*, 426 F.3d at 537.

59.     This is particularly true where, as here, the plaintiff alleges initial-interest and post-sale confusion. *Id.*

60.     Finally, a defendant may not avoid a finding of similarity by adding "subordinate matter" to infringing mark or packaging—even if that subordinate matter is its own house mark. *U.S. Polo Ass'n*, 800 F. Supp. 2d at 529; *see id.* ("USPA's addition of the words 'U.S.' 'ASSN.' and '1890' does not change the emphasis on 'POLO' as the operative part of the word mark, or the likelihood of confusion when used in conjunction with the Double Horsemen logo."); *Essie Cosmetics*, 808 F. Supp. at 959 ("the mere addition of a second mark . . . may 'not dissipate the confusion engendered though the use of the infringing mark'") (citation omitted); *see also A.T. Cross Co. v. Jonathan Bradley Pens, Inc.,* 470 F.2d 689, 692 (2d Cir. 1972) (addition of "by Bradley" did not prevent confusion between CROSS pens and LACROSS BY BRADLEY pens); *Rodgers v. Wright,* 544 F. Supp. 2d 302, 311 (S.D.N.Y. 2008) (FIRST LADIES OF CHIC confusingly similar to CHIC); *American Express Co. v. American Express Limousine Serv.,* 772 F. Supp. 729, 733 (E.D.N.Y. 1991) (addition of LIMOUSINE SERVICES to AMERICAN EXPRESS mark *enhanced* rather than dispelled confusion).

17

61.     In this case, Defendant is mimicking Plaintiffs' house marks, product marks, and packaging. "As Judge Friendly has noted, the Second Circuit 'does not look with much favor on the businessman who, out of a wealth of words available, chooses as a trademark one which comes as close as he dares to a well-known mark on the identical product.'" *Playboy*, 486 F. Supp. at 421-22 (quoting *A.T. Cross Co. v. Jonathan Bradley Pens, Inc.*, 470 F.2d 689, 692 (2d Cir. 1972)); *see id.* ("In terms of both appearance and suggestion, PLAYMEN is about as close a mark to PLAYBOY as can be conceived without outright duplication."). The addition of Defendant's house mark—"Diamond Collection Luxurious Fragrances"—does not dispel the likelihood of confusion because Defendant does not advertise or promote its house mark; consumers are not familiar with it; and, regardless, consumers are not likely to see it, as Defendant places it on the top of the box. Defendant's own expert testified that Defendant's products are essentially unbranded. *See* Keegan Dep. 49:2-9, 96:2-97:11.

62.     Further, Defendant cannot seek to justify its mimicry of Plaintiffs' Marks by pointing to its "Our Version of" and "not associated with" legends. With the first legend, Defendant—under the pretext of inviting a comparison to Plaintiffs' Fragrances—intentionally places counterfeits of Plaintiffs' registered marks, in Plaintiffs' distinctive design presentations, on the front of its own packaging. These marks are "spurious mark[s] which [are] identical with, or substantially indistinguishable from, [Plaintiffs'] registered mark[s]" (15 U.S.C. § 1127), making Defendant's invitation to "compare" an act of counterfeiting in disguise. *See Tiffany & Co. v. Costco Wholesale Corp.*, 127 F. Supp. 3d 241, 255 (S.D.N.Y. 2015) (where Costco advertised its solitaire diamond rings set with six prongs as "Tiffany" rings, finding "Costco's use of the Tiffany mark . . . 'spurious' as a matter of law" and finding counterfeiting as a matter of law); *see also* Paragraphs 135 through 149 below.

63.     With the second ("not associated with") legend, Defendant actually *reinforces* the association between the parties' fragrances because Defendant's supposedly "disclamatory" text is dwarfed by its presentation of Plaintiffs' registered marks. *See also* Paragraphs 150 through 156 below.

18

64.     In sum, the parties' marks and packaging "convey the same impression." *Paddington*, 996 F.2d at 586 (Given that "[e]ach label's lettering style, layout, and coloration, taken together, convey the same impression," and "[i]n light of the marked similarity between the two bottles, the district court's determination that they were not similar was clearly erroneous."); *Clinique*, 945 F. Supp. at 560 ("The similarities of the products carry through to similarities in the boxes in which they are packaged."); *Home Shopping Club*, 820 F. Supp. at 769 ("the close similarities between the ESSENCE OF TIME and TIMELESS ESSENCE marks . . . create the same overall impression when viewed separately.").

65.     The similarity of the marks factor strongly favors Plaintiffs.

> ### 3.     Plaintiffs' and Defendant's Products Are in Close Competitive Proximity.

66.     This factor relates to whether the parties are selling similar products in overlapping markets to overlapping groups of consumers. "If the products serve the same purposes, fall within the same class, or are used for similar purposes, the likelihood of confusion is greater." *Nikon Inc. v. Ikon Corp.*, 987 F.2d 91, 95 (2d Cir. 1993) (citation omitted).

67.     In this case, both Plaintiffs and Defendant are selling fragrances, so the products at issue are identical in categorical terms, albeit not in their quality or characteristics. *See Home Shopping Club*, 820 F. Supp. at 773 ("'sometimes goods are so closely related that confusion is likely even though they are distributed to different customers through mutually exclusive channels of trade'") (quoting 3A CALLMAN, THE LAW OF UNFAIR COMPETITION, TRADEMARKS AND MONOPOLIES 435-36 (4th ed. 1992)).

68.     In an attempt to negate this obvious proximity, Defendant has alleged that there are two separate and distinct fragrance markets—in essence, "'mass' and 'class'" (*see Clinique*, 945 F. Supp. at 555)—and that Defendant occupies the first market, while Plaintiffs occupy the second. The fragrance market is hardly that tidy. As the Second Circuit Court of Appeals noted nearly thirty years ago *in 1987*, "some question remains whether two distinct fragrance markets actually exist." *Charles of the Ritz*, 832 F.2d at 1322 (citation omitted); *see also id.* (declining to

answer the question "since the barrier between the two [allegedly distinct markets] is sufficiently porous to allow Charles of the Ritz passage with little difficulty"). Today, with the increase in diverted and counterfeit goods—as well as the evolution of internet and discount retail channels—the barriers have come tumbling down.

69.     As the Second Circuit Court of Appeals observed in *Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238, 241 (2d Cir. 2009), involving the sale of counterfeits and infringing copies bearing the DAVIDOFF COOL WATER mark, another Coty prestige fragrance brand: "Though not an authorized retailer, CVS is nonetheless able to secure stock of COOL WATER from outside of Davidoff's normal distribution channels." Because there is an active gray and black market in the fragrance industry, the goods at issue, along with other replicas of Plaintiffs' Fragrances, show up on the very same internet sites, such as amazon.com and ebay.com; in the very same pharmacies and discount stores, such as CVS and Dollar General; and at mom and pop stores and flea markets as well.

70.     Moreover, consumers today shop across channels and tiers of distribution. They shop online as well as in stores. *See Juicy Couture, Inc. v. Bella Int'l Ltd.*, 930 F. Supp. 2d 489, 501 (S.D.N.Y. 2013) (finding that "the parties' products are in close competitive proximity" where "a substantial percentage of Plaintiff's sales in the United States are through brick and mortar stores," yet "Defendants' products are available online to United States consumers"). They "cross-shop," buying some products in upscale outlets and others in discount stores. *See Clinique*, 945 F. Supp. at 554 (defining "cross-shopping" as "when the relevant class of consumers shop in both department stores and mass market discount outlets").

71.     Of course, even if the market were not so porous, consumers might well assume that Plaintiffs have expanded their diversified product lines with new, less expensive brand or line extensions to be sold in different retail outlets. As the Second Circuit Court of Appeals wrote in *Lois Sportswear*,

> a consumer observing appellee's striking stitching pattern on appellants' designer
> jeans might assume that appellee had chosen to enter that market segment using a
> subsidiary corporation, or that appellee had allowed appellants' designers to use

> appellee's trademark as a means of reaping some profits from the designer jeans
> fad without a full commitment to that market segment.

*Lois Sportswear*, 799 F.2d at 874; *see also id.* at 876-77 (holding "that the Lanham Act

forecloses one jeans manufacturer from using another jeans manufacturer's distinctive back

pocket stitching pattern trademark when the evidence is *undisputed* that the trademark stitching

pattern is intimately associated with its owner and the infringing use likely will cause confusion

as to the source of the jeans and an unfair shift of goodwill") (emphasis in original).

72.     Because brand extension, line extension, and licensing are so common, with the

result that products bearing the same mark (like Calvin Klein, Vera Wang, Lady Gaga, or Joop!)

show up in disparate retail outlets and channels of trade, any "differences in methods of

display"—*e.g.*, unlocked shelving vs. locked display cases—"do not eliminate 'the likelihood

that customers may be confused as to the *source* of the products, rather than as to the products

themselves.'" *Charles of the Ritz*, 832 F.2d at 1322 (citations omitted).

73.     Here, as in *Lois Sportswear*, "there is significant evidence in the record of an

overlap of market segments," and even if there were not,

> such a finding would not switch this factor to [Defendant's] side of the scale. We
> are trying to determine if it is likely that consumers mistakenly will assume either
> that [Defendant's fragrances] somehow are associated with [Plaintiffs] or are
> made by [Plaintiffs]. The fact that [Defendant's fragrances] arguably are in a
> different market segment makes this type of confusion *more likely*.

*See* 799 F.2d at 874.

74.     Further, Plaintiffs allege likely confusion not only at, but also before and after, the

point of sale. As to the first, "initial-interest" confusion, a consumer might believe, as an initial

matter, that one of Defendant's fragrances is associated with one of Plaintiffs, and "[m]otivated

by this mistaken notion—*[Plaintiffs'] goodwill*—the consumer might then buy [Defendant's

fragrance] even after discovering his error." *Lois Sportswear*, 799 F.2d at 874 (emphasis added).

As to the second, "to the extent that distinct channels of trade between [the parties'] products

exist, those channels have little or no bearing on post-sale confusion . . . ." *Clinique*, 945 F.

Supp. at 554.

21

75.     In light of the close competitive proximity of Plaintiffs' Fragrances and Defendant's "alternatives" to those fragrances, and the overlapping channels of trade through which they travel, the third factor also weighs in favor of Plaintiffs.

### 4.     There is Ample Circumstantial Evidence of Actual Confusion.

76.     Proof of actual confusion in trademark cases is elusive and hard to adduce. As Professor McCarthy has explained, "[d]irect evidence of actual confusion can come only from such sources as misdirected phone calls or letters or even from that rarest of evidence, the testimony of someone willing to testify that they were once a confused customer." 6 MCCARTHY § 32:184. Thus, "it is black letter law that actual confusion need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion . . . ." *Lois Sportswear*, 799 F.2d at 875; *see also* 4 MCCARTHY § 23:12.

77.     Where parties introduce evidence of actual confusion, they "frequently use consumer surveys," administered by survey experts, "to demonstrate or refute a likelihood of consumer confusion." *Gucci Am., Inc. v. Guess?, Inc.*, 831 F. Supp. 2d 723, 738 (S.D.N.Y. 2011) (citations omitted); *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 230 (S.D.N.Y. 2010) (citation omitted).

78.     While in this case the likelihood of confusion factors weigh heavily in Plaintiffs' favor even in the absence of evidence of actual confusion, Plaintiffs have introduced a confusion survey here, not only as circumstantial evidence of actual confusion but also to demonstrate that Defendant cannot discharge its burden of proving the efficacy of its purported "disclaimers." *See* Paragraphs 150 through 156 below.

### a.     The Rappeport Report

79.     In a report entitled "Consumers' Perceptions of Fragrance Packaging," Plaintiffs' survey expert, Dr. Michael Rappeport, conducted a study (the "Rappeport Report") to test two hypotheses:  first, that "[c]onsumers who come into contact with Excell's packaging will be likely to think that the product emanates from the source of the original branded fragrance Excell's product purports to be a 'version of'" (the "Confusion Survey"); and second, that

"[c]onsumers who see the 'Our version of' legend in context on Excell's packaging will construe that language to mean that the Excell product is either the same as or equivalent to the original branded fragrance referenced in the legend in terms of quantifiable characteristics," namely, formulation and longevity of scent (the "False Advertising Survey"). Pl. Ex. 161-1 at 2. (The False Advertising Survey is discussed in Paragraphs 195 through 199 below.)

80.     Properly designed trademark confusion surveys include controls to filter out "noise" and measure a net rate of confusion. Shari Seidman Diamond, "Reference Guide on Survey Research," *in* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 359, 398-99 (Federal Judicial Center, 3d ed. 2011) [hereinafter "Diamond, 'Reference Guide'"]. "The net rate of confusion is the raw confusion rate minus the rate produced by the control question," the latter of which is known as "noise." 6 MCCARTHY § 32:187. As Professor McCarthy has explained,

> "Noise" could consist of respondents answering with their preexisting views, rather than focusing on the survey stimulus. Some respondents may be "yes" people who readily agree with any assertion made in a survey statement or question. In addition, there will always be some interviewees who quickly guess in a response because they are bored or hurried. These kinds of responses contribute to background noise and static in the numerical results. These must be filtered out though control questions.

*Id.*

81.     Using standard, approved survey techniques, Dr. Rappeport found that in response to the Confusion Survey, 61% of respondents, on average, identified Calvin Klein as the source of the two different Diamond Collection fragrances he tested—56% for Defendant's POSSESSION fragrance and 67% for its SERENITY fragrance. Pl. Ex. 161-1 at 13. After filtering out the noise from his control survey, Dr. Rappeport concluded that net of noise, an average of 54% of the respondents misidentified the source of the Excell products as Calvin Klein. *Id.* "[S]urvey percentages demonstrating confusion levels over 50% are almost always viewed by courts as persuasive evidence of likely confusion," and the Court views Dr. Rappeport's survey percentages as persuasive evidence of likely confusion here. *See* 6 MCCARTHY § 32:185.

82.    Federal Rule of Evidence 702 governs the admissibility of expert testimony, including survey reports. That rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.

83.    Under Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the district court bears the responsibility of determining whether the proposed expert testimony "both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597; *see also Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147–49 (1999).

84.    Courts consider a number of criteria

> [t]o assess the validity and reliability of a survey, . . . including whether:  (1) the proper universe was examined and the representative sample was drawn from that universe; (2) the survey's methodology and execution were in accordance with generally accepted standards of objective procedure and statistics in the field of such surveys; (3) the questions were [not] leading or suggestive; (4) the data gathered were accurately reported; and (5) persons conducting the survey were recognized experts.

*THOIP*, 690 F. Supp. 2d at 230-31 (citations omitted); *see generally* Diamond, "Reference Guide" (discussing criteria relevant to admissibility and weight).

85.    The Rappeport Report easily satisfies these criteria.

86.    As to the first criterion, "[t]he universe is that segment of the population whose characteristics are relevant to the mental associations at issue," 6 MCCARTHY § 32:47, which in this case is "people who are likely to be actual or potential users of . . . fragrance products." Pl. Ex. 161-1 at 3. Dr. Rappeport examined a universe of respondents consisting of a random selection, in mall locations across the country, of "people 18 years old and older who have purchased a fragrance product for themselves, or for someone else, in the past six months." *Id.* at 3-4. This universe was proper; Dr. Rappeport's respondents were precisely that segment of the population whose "mental associations" are of interest here. *See* 6 MCCARTHY § 32:47; *id.* at

24

§ 32:163 ("One reason why intercept surveys are usually performed in shopping malls is that the modern shopping mall is the quintessential place to find gathered those who are 'in a buying mood.'").

87.     As to the second and third criteria, Dr. Rappeport's methodology and execution were perfectly in keeping with the standards of the statistical profession, and his questions were patterned on a standard survey format that has been generally accepted by the courts.

88.     First, Dr. Rappeport used an *Eveready* survey format (*see Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366 (7th Cir.), *cert. denied*, 429 U.S. 830 (1976)), which Professor McCarthy has described as "a standard and widely accepted format to prove the likelihood or non-likelihood of confusion." 6 MCCARTHY § 32:174; *see also U.S. Polo Ass'n*, 800 F. Supp. 2d at 535 (survey questions held not improperly leading because "[t]hat form and sequence of questioning has become standard methodology in trademark infringement surveys, . . . following the methodology used in [*Ever-Ready*]"); *Kargo Global, Inc. v. Advance Magazine Pubs.*, No. 06 Civ. 550(JFK). 2007 WL 2258688, at *8 (S.D.N.Y. Aug. 6, 2007) ("A survey that utilizes the 'Eveready' format, by displaying only a single party's mark and attempting to discern whether respondents are confused as to the source of the mark, 'is much more reliable because it more accurately approximates actual market conditions' by ensuring that respondents are not made 'artificially aware' of the other party's trademark."); Jerre B. Swann, *Likelihood of Confusion Studies and the Straitened Scope of Squirt*, 98 TRADEMARK REP. 739, 739 (2008) (describing the Eveready format as "the gold standard in cases involving strong marks, *i.e.,* in cases where the senior mark is highly accessible (*internally available*) in memory") (emphasis in original) [hereinafter "Swann"].

89.     Second, respondents were able to view and handle the actual boxes containing Defendant's Diamond Collection fragrances, which enabled them to interact with the product as they would in a store. *See Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 634 (S.D.N.Y. 2007) (where "respondents were invited to view the bag placed before them at 'close viewing range' for as long as they wished," finding that "such a methodology does approach

market conditions, as it can be expected that consumers will investigate an expensive bag closely before purchasing it").

90.     Third, Dr. Rappeport's source question—"As far as you can tell, what company puts out this product?" (Pl. Ex. 161-1 at 8)—was open-ended, as in *Eveready*, and therefore not leading because it did nothing to suggest Calvin Klein (or any other company) as the "right" answer. *See Union Carbide*, 531 F.2d at 385 n.11 (form of questions in original *Eveready* survey); Swann, 98 TRADEMARK REP. at 741.

91.     Finally, Dr. Rappeport included a robust control that was designed to exclude as many of the accused indicia as possible without creating a totally new package. As Dr. Rappeport wrote, given

> the combination of factors that Plaintiffs claim creates a likelihood of confusion, i.e., the Excell products have similar product names, similar packaging, and use the stylized presentation of the marks that appear on the original Calvin Klein fragrance . . . . an appropriate control in both of these surveys would be an Excell product that does not include any reference to Calvin Klein and reduces the similarity in the packaging by changing the color.

Pl. Ex. 161-1 at 5. This was entirely proper.

92.     A control "should share as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed." *See* Shari Seidman Diamond, "Control Foundations," in TRADEMARK AND DECEPTIVE ADVERTISING SURVEYS 210-12 (Shari Seidman Diamond and Jerre B. Swann, eds., 2012). According to Dr. Rappeport, creating controls was challenging in this case because so many elements of Defendant's packaging infringe Plaintiffs' trademarks and trade dress. *See* Rappeport Direct ¶ 23. Dr. Rappeport came up with a conservative compromise:  He chose two fragrances (Possession and Serenity) with product names that, while similar, are arguably in themselves not confusingly similar to Calvin Klein's registered product marks, changing the color of their boxes to remove that confusingly similar element of their trade dress. *Id.* at ¶¶ 23-24. To the extent that the similarities in the product names and other elements of the packaging design of his controls (such as the layout and fonts) still evoked the original branded fragrances, that would redound to

Defendant's benefit in Dr. Rappeport's survey design by inflating the level of confusion in the control cell. *Id.* at ¶ 24.

93.     As to the fourth criterion, Dr. Rappeport accurately reported his findings, excluded unreliable responses (Pl. Ex. 161-1 at 11 n.13 & 15 n.17), and used an independent interviewing service to formally validate the balance of his interviewers' work. *Id.* at 7. These practices are in keeping with proper survey methodologies. *See* Diamond, "Reference Guide," at 412-13.

94.     Finally, as to the fifth criterion, Dr. Rappeport is a recognized expert in the specific field of trademark survey design and execution, having worked in market and survey research for more than 40 years; having made more than 200 appearances as an expert witness (including in trademark cases); having testified before "a range of public boards, agencies, and regulatory bodies"; and having written extensively on the subject of survey methodology. Pl. Ex. 161-1 Appendix E; *see, e.g.*, Michael Rappeport, *Design Issues for Controls*, in TRADEMARK AND DECEPTIVE ADVERTISING SURVEYS 217 (Shari Seidman Diamond and Jerre B. Swann, eds., 2012).

95.     In sum, having selected a proper universe of respondents and randomly selecting them for interviews, Dr. Rappeport first enabled those respondents to interact with Defendant's Diamond Collection fragrances as they would in a store, then used the "standard and widely accepted" *Eveready* survey format to determine whether respondents were likely to believe that Calvin Klein was the source of two different Diamond Collection fragrances that Dr. Rappeport tested. *See* 6 MCCARTHY § 32:174 (discussing *Eveready* format). After excluding unreliable responses and filtering out the noise using his robust control survey, Dr. Rappeport concluded that an average of 54% of the respondents misidentified the source of Defendant's products as Calvin Klein, which is "strong circumstantial evidence" of likely confusion. *Phillips-Van Heusen Corp. v. Calvin Clothing Co., Inc.*, 444 F. Supp. 2d 250, 253, 256-57 (S.D.N.Y. 2006) (in case involving "indisputably strong" CALVIN KLEIN mark, likelihood of confusion survey "provide[d] strong circumstantial evidence" of likely confusion in showing "net confusion levels

ranging from 23% to 59%") (citations omitted). *See RJR Foods, Inc. v. White Rock Corp.*, 603 F.2d 1058, 1061 (2d Cir. 1979) (affirming the district court's reliance on the results of a "consumer study showing a fifteen to twenty percent rate of product confusion"); *Grotrian-Steinweg*, 365 F. Supp. at 716 (holding surveys demonstrating "that 7.7% of [respondents] perceived a business connection between the two companies and 8.5% confused the names" to be "strong evidence of the likelihood of confusion which the Lanham Act was designed to prohibit"); *see also* 6 MCCARTHY § 32:188 ("Where other evidence is supportive, courts have found a likelihood of confusion when survey results are between 10% and 20%.") (citation omitted).

96.     Because the Rappeport Report is both valid and reliable, the Court gives this conclusion significant weight.

### b.     The Keegan Report

97.     In an attempt to avoid Dr. Rappeport's finding that 54% of respondents were confused as to source, Defendant introduced into evidence the Expert Report of Mark Keegan ("Keegan Report" or "Keegan Rep."). The Court finds Mr. Keegan's credentials as a survey expert to be thin, and thus his critiques of more experienced survey experts like Dr. Rappeport are entitled to little (if any) weight. *See Flushing Bank v. Green Dot Corp.*, 138 F. Supp. 3d 561, 582 n.16 (S.D.N.Y. 2015) ("The Court does not find that Keegan's background in surveys is sufficiently deep or tested to provide a reliable basis for his criticisms. The Court is troubled by what appears to be a large amount of 'cutting and pasting' between a prior report and this report, potentially reflecting off-the-shelf criticism."); *Warner Bros. Ent'mt v. The Global Asylum, Inc.*, No. CV 12 - 9547 PSG (CWx), ), 2013 WL 12114836, at *7 (C.D. Cal. Jan. 29, 2013) ("The education and experience outlined in Keegan's biography is insufficient to establish that he is an expert in the field of consumer surveys. The biography provides no indication that he has any special training or experience in crafting or analyzing consumer perception surveys; in fact, the biography does not suggest that he has any experience or training in crafting surveys of any kind.").

98.     Most of Mr. Keegan's criticisms of Dr. Rappeport are variations on a single theme—*i.e.*, Mr. Keegan's assertion that "there is a complete separation of markets between Coty's and Excell's products," and therefore that Excell's customers "are highly unlikely to ever purchase a Coty [p]roduct." Keegan Rep. ¶¶ 17-18; *see also* Keegan Dep. 40:7-14 ("The Excell products in this case are sold in an entirely different channel and at different end of the price spectrum than the Coty products. So there's no, there's little opportunity for substitution and there is no overlap between the customer segments for the two products."); FF ¶ 162. Mr. Keegan is not qualified to testify as an expert in the fragrance industry, and this assertion is unsupported by the factual evidence. *See* FF ¶ 162.

99.     Further, the record does not support Mr. Keegan's fundamental premise, that the parties' "respective target customers occupy polar extremes of the fragrance market . . . ." Keegan Rep. ¶ 17. Poles, by definition, cannot meet; the parties' fragrances can and do. Fragrance purchasers are far more physically and economically mobile than Mr. Keegan allows. In fact, Mr. Keegan's own survey demonstrates that "cross-shopping" is the norm, not the exception. *See* Keegan Rep. Ex. 4 (of a universe of respondents who shopped at discount stores and/or flea markets, rummage sales, or bazaars, 63.1% also shopped at department stores and 92.2% also shopped at "big box" retail stores).

100.    As Mr. Keegan acknowledged during his deposition, when these "cross-shopping" consumers go from one retail location to another, they take their brand awareness with them. Keegan Dep. 188:15-23, 198:16-23; Pl. Ex. 237 at 447; Pl. Ex. 238 at 275. For example, a female shopper's "brand knowledge" about Calvin Klein Eternity—her stored "thoughts, feelings, images, experiences, [and] beliefs" about that brand—are resident in her mind when, in a Dollar General store, she encounters Defendant's Serenity perfume. *See* Pl. Ex. 238 at 277. If she is confused as to source, then this encounter with an inferior product in a downscale environment will negatively affect her regard for Calvin Klein and its genuine products. The resulting harm to brand equity is precisely the harm that the Lanham Act was intended to prevent and remedy:

> The purpose underlying any trade-mark statute is twofold. One is to protect the public so it may be confident that, in purchasing a product bearing a particular trade-mark which it favorably knows, it will get the product which it asks for and wants to get. Secondly, where the owner of a trade-mark has spent energy, time, and money in presenting to the public the product, he is protected in his investment from its misappropriation by pirates and cheats. This is the well-established rule of law protecting both the public and the trade-mark owner.

S. REP. NO. 1333, 79th Cong., 2d Sess., 3 (1946) (quoted in *Two Pesos*, 505 U.S. at 782 n.15

(Stevens, concurring)).

101.    Finally, Mr. Keegan's market segmentation theory does not account for initial-interest and post-sale confusion, both of which are actionable. *See Mobil Oil*, 818 F.2d at 259 ("Judge MacMahon found a likelihood of confusion not in the fact that a third party would do business with Pegasus Petroleum believing it related to Mobil, but rather in the likelihood that Pegasus Petroleum would gain crucial credibility during the initial phases of a deal. . . . The absence of misdirected phone calls and [other evidence of confusion at the point of sale] are other matters."); *Lois Sportswear*, 631 F. Supp. at 745 ("In any event, the marks must also be assessed for confusing similarity in a post-sale situation where many of the identifying factors will not be present.").

102.    Mr. Keegan also argues that because "[e]ach Excell product is unique and presents consumers with a value proposition specific to each product . . . . [t]he Rappeport Study can therefore only be potentially informative regarding the Diamond Collection Possession and Diamond Collection Serenity products that it tested." Keegan Rep. ¶¶ 49-50. The law does not support Mr. Keegan's cost-prohibitive approach to confusion surveys in cases involving multiple accused products in the same product line. In the case of *adidas-America, Inc. v. Payless Shoesource, Inc.*, 546 F. Supp. 2d 1029 (D. Or. 2008), Payless argued that because adidas's expert, Dr. Ford, "did not conduct a likelihood of confusion survey for each of the accused shoes lots at issue," the Court should strike his expert reports "with respect to all of the unreviewed shoes." *Id.* at 1044. The court disagreed, writing that regardless of when the accused shoes were made of issue, "all of Payless' accused shoes, including those which Dr. Ford actually surveyed, share a common and prominent feature (*i.e.,* two- or four-parallel, equidistant and diagonal

30

stripes that allegedly infringe the Three-Stripe Mark).” *Id.* at 1045. Thus, because the surveyed products and the subsequently accused products shared “common and prominent features,” Adidas did not need to “create new likelihood of confusion surveys for each newly accused product.” *Id.* Likewise in this case, given the “common and prominent features” across Defendant’s product line, Plaintiffs did not need to conduct a survey for each of Defendant’s Diamond Collection Fragrances in order to introduce persuasive evidence of likely confusion.

103.    In addition to criticizing the Rappeport Report, Mr. Keegan also “corrected” Dr. Rappeport’s *Eveready* survey design and ran his own survey, using his own universe of respondents and his own stimuli. Mr. Keegan’s universe consisted exclusively of respondents who recently had shopped at a “Discount store (e.g., Dollar General, Family Dollar)” and/or a “Flea market / rummage sale / bazaar” (*see* Keegan Rep. Ex. 4), in an apparent effort to decrease the number of respondents who were familiar with prestige fragrance brands. *See* Keegan Rep. Ex. 4. The Court finds this universe to be too narrow because it excluded entire groups of consumers whose members are likely to come into contact with Defendant’s Diamond Collection Fragrances through the many other brick and mortar and e-commerce retail channels through which they are sold. *See King-Size, Inc. v. Frank’s King Size Clothes, Inc.*, 547 F. Supp. 1148, 1158 (S.D. Tex. 1982) (“Defendants’ universe which is composed of men who are 6’2 in height or over is far too narrow to give a fair indication of whether the consumers of wearing apparel for large size men do not associate the term ‘king size’ with plaintiffs.”).

104.    As regards Mr. Keegan’s stimuli, the Court finds them to be impermissibly leading because they directed respondents to focus on Defendant’s products in ways that most shoppers never do. First, Mr. Keegan directed respondents to view (and, if desired, to view in a larger format) flattened boxes showing each exterior panel of Defendant’s fragrance cartons (*see* Keegan Rep. Ex. 3), despite later acknowledging in his deposition that fragrances typically are stocked on shelves, and unless you pick up a fragrance, the facing side of the box is “all you’re going to be able to see.” Keegan Dep. 95:2-16. Second, Mr. Keegan asked respondents to assume that Defendant’s product was being offered at a price ($4.99) residing on the lower end of the

range in which Defendant's perfumes may be purchased. *See* Keegan Dep. 63:2-65:14 & Ex. 89
(showing prices ranging from $2.99 to $56.98 for Defendant's Diamond Collection Fragrances
on Amazon.com). Further, Mr. Keegan did not change the color of Defendant's packaging for his
control stimuli, which means that his "control" percentage likely includes confusion triggered by
that trade dress feature as well as by noise—and thus yields a net confusion percentage that is
almost certainly too low. *See* Keegan Rep. Ex. 3.

      105.    Finally, Mr. Keegan made coding errors in tabulating his data, including by
failing to count as "confused" a number of respondents who clearly were confused as to whether
Defendant's Diamond Collection Fragrances were made by Calvin Klein. *See* Rappeport Direct
¶¶ 44-45. In addition, unlike Dr. Rappeport, Mr. Keegan did not exclude unreliable responses
from his survey results, but included them in his reported "Total"—thus inflating the
denominator and, in turn, understating the percentage of respondents who were either confused
as to the source of Defendant's products or believed Defendant's packaging to convey a
misleading claim. *See id.* ¶¶ 46-47. These errors significantly undermine the reliability of Mr.
Keegan's survey results. *See THOIP v. Walt Disney Co.*, 788 F. Supp. 2d 168, 182 (S.D.N.Y.
2011) (noting that THOIP's expert improperly coded survey responses, and as a result, "inflated
his 'confusion' rates by counting respondents as confused even if their responses were not
necessarily indicative of reverse confusion"); *Malletier*, 525 F. Supp. 2d at 569, 628 (criticizing
coding errors that resulted in an overstatement of both confusion and dilution).

      106.    Despite these significant flaws, Mr. Keegan nonetheless reported that 19.5% of
respondents identified Calvin Klein as the source of Defendant's Possession fragrance, while
15.5% of those respondents identified Calvin Klein as the source of Defendant's Serenity
fragrance. Keegan Rep. at 15. Even these percentages support Plaintiffs' claim that confusion is
likely. As Dr. Rappeport testified, however, absent the errors discussed in Paragraph 105 above,
Mr. Keegan would have reported that net of noise, 25% of respondents mistakenly identified
Calvin Klein as the source of Defendant's Possession product; and 20% of respondents
mistakenly identified Calvin Klein as the source of Defendant's Serenity product. *See* Rappeport

Direct ¶ 47. These results constitute persuasive evidence of likely confusion, thus confirming Dr. Rappeport's conclusions. *See RJR Foods, Inc. v. White Rock Corp.*, 603 F.2d 1058, 1061 (2d Cir. 1979) (affirming the district court's reliance on the results of a "consumer study showing a fifteen to twenty percent rate of product confusion"); *Energybrands, Inc. v. Beverage Mktg. USA, Inc.*, No. 02 Civ. 3227 (JSR), 2002 WL 826814, at *2 (S.D.N.Y. May 1, 2002) (finding 17% net confusion sufficient to show actual confusion); *Volkswagen Astiengesellschaft v. Uptown Motors*, No. 91 Civ. 3447 (DLC), 1995 WL 605605, at *5 (S.D.N.Y. May 11, 1995) (finding 17.2% and 15.8% net confusion sufficient to show actual confusion); *Lon Tai Shing Co. v. Koch + Lowy*, 19 U.S.P.Q.2d (BNA) 1081, 1097 (S.D.N.Y. 1991) (finding that 18% "is within the range of cognizable confusion recognized in this circuit" and supports a finding of likely confusion) (citations omitted); *see also* 6 McCarthy § 32:188 ("Where other evidence is supportive, courts have found a likelihood of confusion when survey results are between 10% and 20%.") (citation omitted).

107.    In sum, the survey evidence submitted by both parties confirms that confusion is highly likely. This factor strongly favors Plaintiffs.

### 5.    There Is No "Gap" To Be Bridged.

108.    Where, as here, there is no meaningful distinction either between the types of products at issue or the markets in which those products are sold, there is no "gap" to be bridged. *See Clinique*, 945 F. Supp. at 555 ("the 'mass' and 'class' markets are not truly distinct, and no gap is left to be bridged"); *Home Shopping Club*, 820 F. Supp. at 771 ("Where, as here, the products are virtually identical, questions of bridging the gap do not arise.").

109.    The fact that there is no gap to bridge between the goods at issue also favors Plaintiffs.

### 6.    Defendant Acted in Bad Faith and Intended to Appropriate Plaintiffs' Goodwill.

110.    Where a party "acts in bad faith and intentionally copies a trademark or trade dress, a presumption arises" that the copier not only intended to cause confusion, but succeeded.

*Paddington,* 996 F.2d at 586–87 (citation omitted); *Charles of the Ritz*, 832 F.2d at 1322; *see Playboy,* 486 F. Supp. at 429 ("Likelihood of subliminal association may be inferred from defendants' apparent intent in using the PLAYMEN mark:  to capitalize on the special attention a new magazine would obtain because its name, having no other meaning, conjures up the PLAYBOY name and all it represents.").

111.    Bad faith may be inferred if the defendant, with knowledge of the plaintiff, adopted marks or packaging that are similar to the plaintiff's. This is so because "the second comer has a duty to so name and dress his product so as to avoid all likelihood of consumers confusing it with the product of the first comer." *Perfect Fit Industries, Inc. v. Acme Quilting Co.*, 618 F.2d 950, 953 (2d Cir. 1980), *cert. denied*, 459 U.S. 832 (1982).

112.    For the purpose of this factor, either "actual or constructive knowledge" will suffice. Constructive knowledge exists where, as here, the trademarks at issue are federally registered. *See Gucci Am., Inc. v. Guess?, Inc.*, 843 F. Supp. 2d 412, 424 & n.74 (S.D.N.Y. 2012) ("Because Gucci had registered all three marks, Guess is charged with constructive knowledge of each mark as of the date of registration and may not rely on lack of actual knowledge as a defense.") (citing *Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 362 (2d Cir. 1959)).

113.    Further, "[i]ntentional copying . . . does not require *identical* copying." *Paddington*, 996 F.2d at 586–87 (emphasis added) (citation omitted). By the Lanham Act's terms, a defendant need only use in commerce "any reproduction, counterfeit, copy, or colorable imitation of a registered mark . . . likely to cause confusion, or to cause mistake, or to deceive" (15 U.S.C. §§ 1114(1)(a)) or "any word, term, name, symbol, or device, or any combination thereof . . . which . . . is likely to cause confusion, or to cause mistake, or to deceive . . . ." *Id.* at § 1125(a).

114.    In this case, Defendant obviously was aware of Plaintiffs and their fragrances because Defendant expressly references Plaintiffs' Fragrances in each of its "Our Version of" legends. It does so precisely because Plaintiffs' original branded fragrances are readily

34

recognized by Defendant's customers and target customers, being both popular and associated with famous designers or celebrities such as Calvin Klein, Vera Wang, and Lady Gaga. FF ¶¶ 83-101; SF ¶ 27. This mimicry is basically undisputed.

115.    Defendant also acts in reckless disregard of the legal risks associated with its mimicry. Defendant performs no trademark or trade dress clearance. FF ¶¶ 112, 237. Further, since Defendant's founding, it has received a slew of demand letters from other brand owners complaining about its infringements of their rights, and it has even been sued for infringement. FF ¶¶ 170-180. Yet instead of modifying its business model, it treats such claims as a cost of doing business, agreeing to modify or discontinue the offending product only after reaping its profits and rarely paying a material amount in settlement. *Id.* The Court may infer bad faith from this conduct as well. Defendant knew that it was flouting the law. It was only a matter of time before someone sought judicial relief instead of settling its claims out of court.

116.    Defendant also flouted the criminal law. Certain of Defendant's principals and employees are under federal criminal indictment in New Jersey on charges of money laundering, *i.e.*, exchanging the cash proceeds of narcotics transactions for "clean goods," namely, Defendant's fragrance products at issue (among others). *See* FF ¶¶ 223-229; Pl. Exs. 170-71. At their depositions, when asked whether they intended to trade off Plaintiffs' goodwill, Defendant's principals and employees invoked the Fifth Amendment and refused to testify. *See* FF ¶¶ 223-229. It is clear from the record, however, that Defendant knew it was using Plaintiffs' registered trademarks on its alternative fragrances and in its product catalogs. FF ¶¶ 112-16.

117.    **"**[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them." *Baxter v. Palmigiano*, 425 U.S. 308, 318, (1976). Thus, litigants, when deprived of key facts though assertion of the Fifth Amendment, may "comment upon the claim of privilege in the hope of persuading the trier of fact to draw a negative inference." *United States v. Certain Real Prop. & Premises Known as 4003-4005 5th Ave., Brooklyn, N.Y.*, 55 F.3d 78, 82-83 (2d Cir. 1995); *see also LiButti v. United States*, 178 F.3d 114, 120 (2d Cir. 1999) (noting that it is permissible to

give an adverse inference "significant weight," as "silence when one would be expected to speak is a powerful persuader"). As a consequence, "[a] defendant in a civil proceeding who invokes the Fifth Amendment as a result of an overlapping criminal investigation or proceeding risks the adverse inference arising from [his or her] assertion of the privilege" *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 97-98 (2d Cir. 2012) (internal quotations omitted).

118.     Given the refusal of Defendant's principals and employees to testify in this case, the Court may properly make a host of adverse inferences—the *least* among them being that Defendant has acted in bad faith. While it is unnecessary to rely upon adverse inferences to conclude that Defendant acted in bad faith, the Court hereby draws the inference, based upon the invocation of the Fifth Amendment by Defendant's President, General Counsel and Wholesale Sales Manager, that Defendant intentionally used Plaintiffs' Marks and close variants thereof in a deliberate effort to create confusion as to the source of its products and to mislead consumers. *See* FF ¶¶ 181, 223-228.

119.     The similarities between the parties' marks and packaging are so striking as to compel the conclusion that Defendant "intentionally adopted the overall image, style, and appearance of [Plaintiffs' Fragrances] and . . . trade dress." 832 F.2d at 1322. As in *Clinique*, "[t]he overall appearance of the two lines of products is too similar even to entertain the idea that [Defendant] did not mimic [Plaintiffs'] mark[s] and dress[es]." 945 F. Supp. at 555; *see also Paddington*, 996 F.2d at 586-87 ("Where such prior knowledge is accompanied by similarities so strong that it seems plain that deliberate copying has occurred, we have upheld findings of bad faith.").

120.     In short, as in *Essie Cosmetics*, Defendant had the freedom to select any marks and packaging that it could imagine, and yet it just happened to select marks and create labels, bottles, and cartons that were strikingly similar to Plaintiffs' trademarks and trade dress. 808 F. Supp. at 960. As a result, "[i]t is evident that defendants engaged in intentional copying in an attempt to cash in on plaintiff's success. . . . [and] trade on [Plaintiffs'] good will and recognition." *Id.*

36

121.    The bad faith factor weighs strongly in Plaintiffs' favor.

122.    In addition, the evidence adduced under this factor proves the bad faith element of Plaintiffs' claim for unfair competition under New York common law. *See L'Oréal USA, Inc. v. Trend Beauty Corp.*, No. 11 Civ. 4187(RA), 2013 WL 4400532, at *21 (S.D.N.Y. Aug. 15, 2013) (citation omitted).

123.    The evidence adduced under this factor also supports Plaintiffs' claims for trademark dilution under both federal and state law by demonstrating that Defendant "intended to create an association with [Plaintiffs'] famous mark[s]" (*see* 15 U.S.C. § 1125(c)(2)(B)(v)) and that Defendant acted with "predatory intent." *See Deere & Co. v. MTD Prods., Inc.*, 41 F.3d 39, 43 n.8 (2d Cir. 1994) (citing *Mead Data Cent., Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 875 F.2d 1026, 1035 (2d Cir. 1989) (Sweet, J., concurring)).

### 7.    Defendant's Products Are of Inferior Quality.

124.    "A senior user 'is not required to put its reputation in [a junior user's] hands, no matter how capable those hands may be.'" *U.S. Polo Ass'n*, 800 F. Supp. 2d at 537 (citation omitted); *see also id.* (observing that "'a senior user may sue to protect his reputation even where the infringer's goods are of top quality'") (citation omitted). Thus, "it is the loss of control over quality that is the real gravamen of this factor." *Id.*; *see also Davidoff*, 571 F.3d at 243 ("Where the alleged infringer has interfered with the trademark holder's ability to control quality, the trademark holder's claim is not defeated because of failure to show that the goods sold were defective. That is because the interference with the trademark holder's legitimate steps to control quality unreasonably subjects the trademark holder to the risk of injury to the reputation of its mark.").

125.    In this case, Defendant's Diamond Collection fragrances are markedly inferior to Plaintiffs' Fragrances in every respect, including quality, composition, and longevity of scent— characteristics that are not readily apparent to the average consumer at the point of purchase. Defendant concedes that its fragrances use different formulations, have a lower percentage of essential oils and contain cheaper ingredients and packaging components than Plaintiffs'

Fragrances. FF ¶¶ 183-87. Further, Coty's testing confirms that the parties' fragrances have different formulations; that Defendant's fragrances use different (and cheaper) essential oils; that the parties' fragrances smell different; that Plaintiffs' Fragrances have a significantly higher percentage of oil than the corresponding knockoff sold by Defendant; that the percentages of oil in Defendant's fragrances are low, with most containing between 3% and 4% oil, and none exceeding 5% (*see* Pl. Ex. 152-5); and that being lower in essential oils, relative to evaporative substances (alcohol and water), Defendant's fragrances will not last as long on the skin as Plaintiffs' Fragrances do. Massaro Direct ¶¶ 6-7.

126.     Further, Coty's testing revealed that 12 of the 15 of Defendant's Diamond Collection Fragrances at issue contain diethylhexyl phthalate ("DEHP")—a known carcinogen and endocrine disruptor—in amounts exceeding the level that the Scientific Committee of Cosmetic Products has determined to be safe. Massaro Direct ¶¶ 9-11. A California statute, the "Safe Drinking Water and Toxic Enforcement Act of 1986" (better known as "Prop 65") requires a warning label to be placed on all consumer products containing any of a list of chemicals "known to the state to cause cancer or reproductive toxicity." Cal. Health & Safety Code §§ 25249.6; 25249.11(f); *see also* Massaro Direct ¶ 11. DEHP has been on that list since 1988. Massaro Direct ¶ 11. In addition, the levels of volatile organic compounds ("VOCs") in certain of Defendant's tested fragrances exceed California's environmental regulations. *See* Cal. Code Regs. tit. 17, §§ 94508 and 94509; Massaro Direct ¶¶ 12-13.

127.     None of Plaintiffs' Fragrances at issue contain DEHP, and none exceed California's standards governing VOCs. Massaro Direct ¶¶ 10, 13.

128.     These facts highlight the extent to which Defendant's confusingly similar uses jeopardize Plaintiffs' valuable goodwill, threaten public health and safety, and dupe the public. *See, e.g.*, *Cartier*, 2000 WL 347171, at *6 ("[I]t is also likely that these sophisticated, brand conscious consumers will lose interest in the Cartier name as they see the number of inferior products in the market bearing the Cartier name grow.")

129.    In view of the lower quality of Defendant's fragrances and Plaintiffs' inability to control the quality of Defendant's products, this factor favors Plaintiffs.

### 8.    Defendant Targets Casual Purchasers Who Are Relatively Unsophisticated.

130.    Defendant targets a range of vulnerable consumers, including consumers for whom English is a second language. FF ¶¶ 193-94. Those consumers are likely to be more susceptible to Defendant's deliberate attempt to associate its perfumes with Plaintiffs' celebrity and designer fragrances. *See Toy Mfrs. of Am., Inc. v. Helmsley-Spear, Inc.*, 960 F. Supp. 673, 682 (S.D.N.Y. 1997) (finding it "noteworthy that many attendees are from foreign countries and are not native English speakers," but finding the sophistication of purchasers factor "irrelevant" given strong evidence of likely confusion adduced in support of the other factors).

131.    In addition, Defendant concedes that the retail purchasers of its fragrances "typically . . . happen upon [Defendant's products], see value and make a purchase." FF ¶ 195; Keegan Dep. 96:15-18; *see also* Keegan Rep. ¶ 16; Keegan Dep. 99:5-16. Low-priced items bought on impulse heighten the likelihood of confusion. *Home Shopping Club*, 820 F. Supp. at 773; *see also Nikon*, 803 F. Supp. at 920 ("Average consumers of Ikon's 110 and low-priced 35 mm cameras are unsophisticated. Many of these cameras are purchased on impulse, perhaps by children or parents purchasing for children.").

132.    Here, even sophisticated consumers stand to be duped by Defendant because "'even sophisticated buyers are not always careful buyers, and their very awareness of status brand names and designs may make them more vulnerable to confusion'"—particularly where (as here) "the products and marks are very similar or identical . . . ." *Clinique*, 945 F. Supp. at 556 (citations omitted). This is particularly true given Plaintiffs' and fragrance industry practice of extending fragrance lines using "flankers"—*i.e.*, authorized "versions" of the original, anchor fragrances—which feature product names and packaging that are similar (but not identical) to the pillar fragrances they flank. FF ¶¶ 202-09.

133.    The sophistication of consumers factor favors Plaintiffs.

### 9.    The Balance of Factors Favors Plaintiffs.

134.    The balance of the foregoing factors conclusively demonstrates that confusion is exceedingly likely. As in *Charles of the Ritz*, 832 F.2d at 1323—another fragrance knockoff case—even if "disparity in quality and price" as between Plaintiffs' and Defendant's fragrances may mitigate some consumer confusion *at the point of sale*, "the other factors overwhelmingly override these concerns . . . ." Plaintiffs' Marks are strong, both conceptually and commercially. Defendant's marks and packaging are strikingly similar to Plaintiffs'. The fragrance market is porous, and the trade channels of the parties frequently overlap or converge. Both parties' surveys demonstrate extensive actual confusion. Defendant is acting in manifest bad faith, both in mimicking Plaintiffs' Marks and in using pretextual legends that contain counterfeits of Plaintiffs' Marks. *See id.* (finding likelihood of confusion based on similar analysis). In sum, Plaintiffs have made a very strong case of likely confusion.

### 10.    Defendant's "Our Version Of" Legends Are Not Fair Uses.

135.    Defendant has asserted the defense of fair use in an effort to excuse its uses of Plaintiffs' Marks. *See* ECF No. 71 at 10. That defense fails.

136.    There are two "fair use" doctrines in trademark law:  "classic" or descriptive fair use; and nominative use. *See generally New Kids on the Block v. News Am. Publ'g, Inc.*, 971 F.2d 302 (9th Cir. 1992). While both doctrines are animated by the same First Amendment concerns, the conduct they describe is quite different.

137.    The first doctrine, descriptive fair use, is an affirmative defense found in Section 33(b) of the Lanham Act:

> [C]onclusive evidence of the right to use the registered mark shall . . . be subject to the . . . defense[ ] . . . [t]hat the use of the name, term, or device charged to be an infringement is a use, otherwise than as a mark, . . . of a term or device which is descriptive of and used fairly and in good faith *only to describe the goods or services of such party*, or their geographic origin . . . .

15 U.S.C. § 1115(b)(4) (emphasis added). In *United States Shoe Corp. v. Brown Group, Inc.*, 740 F. Supp. 196 (S.D.N.Y. 1990), for example, the plaintiff alleged that the defendant infringed its exclusive rights in the slogan "Looks Like A Pump, Feels Like A Sneaker," by publishing a print

advertisement containing, in small print, the phrase, "And when we say it feels like a sneaker, we're not just stringing you along." *Id.* at 197. The court held that the defendant's use fell "squarely within . . . Section 33(b)(4) of the Lanham Act" because the defendant used the phrase "feels like a sneaker" descriptively, "claiming a virtue of [defendant's own] product"—namely, that the shoe "was designed specifically to incorporate the comfort of athletic shoes." *Id.* at 198-99. By giving the defendant the ability to fairly describe its own product by using the ordinary elements of speech, the fair use defense "ensure[s] that the according of monopoly trademark rights over descriptive marks" will not "deprive society of the use of those terms *in their descriptive sense* in commercial communication." *Id.* at 199 (emphasis added).

138.    In contrast, a "nominative" use does not describe a product, in the English language sense, but instead uses "'another's trademark to identify, not the defendant's goods or services, but the *plaintiff's goods or services*.'" *International Info. Sys.*, 823 F.3d at 165 (quoting 4 MCCARTHY § 23:11) (emphasis added); *see also New Kids*, 971 F.2d at 308 (nominative use occurs when "the defendant uses a trademark to describe the plaintiff's product, rather than its own . . . .").

139.    In other words, with a nominative use, a defendant "names" the plaintiff's product by using the plaintiff's trademark, often for the purpose of engaging in comparative advertising. In *New Kids on the Block v. News America Publishing, Inc.*, 971 F.2d 302 (9th Cir. 1992), for example, the defendant newspapers conducted telephone polls asking readers which member of the boy band, New Kids on the Block, was their favorite. Readers "were directed to a 900 number to register their votes; each call cost 95 cents per minute." *Id.* at 304. The band, which had its own authorized 900 numbers, sued for multiple violations of the Lanham Act. *Id.* Avoiding the constitutional question, the Ninth Circuit Court of Appeals held that the newspapers were entitled to name the New Kids so long as the band was "not readily identifiable without use of the trademark"; the newspapers used "only so much of the mark or marks . . . as is reasonably necessary" to identify the band; and the newspaper had done "nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder." *Id.* at

308. A truly nominative use does not create source or sponsorship confusion because it sufficiently informs the public as to the lack of connection between the parties and their products. Thus, a strong likelihood of confusion (as exists in this case) is a red flag that the use claimed to be "fair" is not nominative at all, but infringing.

140.    Recognizing this relationship, the Second Circuit Court of Appeals recently instructed courts in nominative use cases to start by "discussing each of the *Polaroid* factors" and then to consider:

> (1) whether the use of the plaintiff's mark is necessary to describe both the plaintiff's product or service and the defendant's product or service, that is, whether the product or service is not readily identifiable without use of the mark; (2) whether the defendant uses only so much of the plaintiff's mark as is necessary to identify the product or service; and (3) whether the defendant did anything that would, in conjunction with the mark, suggest sponsorship or endorsement by the plaintiff holder, that is, whether the defendant's conduct or language reflects the true or accurate relationship between plaintiff's and defendant's products or services.

*International Info. Sys.*, 823 F.3d at 168. These factors appear to describe a slightly narrower defense than the one articulated by the Ninth Circuit in *New Kids*. Regardless, if a soft drink competitor in the Ninth Circuit "would not be entitled to use Coca-Cola's distinctive lettering" in "compar[ing] its product to Coca-Cola or Coke" (*New Kids*, 971 F.2d at 308 n.7 (citations omitted)), then a seller of knockoffs of Plaintiffs' Fragrances in this Circuit is not entitled to use Plaintiffs' distinctive lettering in purportedly "comparing" its perfumes to the real things.

141.    Defendant's use of Plaintiffs' trademarks, in Plaintiffs' typefaces, as part of its "Our Version of" legends is not a "classic" fair use case because Defendant is not using Plaintiffs' Marks in a descriptive sense, to describe the qualities or characteristics of Defendant's own fragrances—*e.g.*, "You will feel like a princess using our fragrances." Instead, as shown below, Defendant is using Plaintiffs' Marks in a *trademark sense* to refer to Plaintiffs' branded fragrances—*e.g.*, "Our Version of Vera Wang Princess."



*See* FF ¶ 96; *see also International Info. Sys.*, 823 F.3d at 167.

142.    To the extent Defendant is attempting to claim a nominative use, it cannot

succeed for at least three reasons:  First, as set forth in Paragraphs 36 through 134, above, an

analysis of the *Polaroid* factors shows a strong likelihood of confusion. Second, Defendant

makes far more extensive use of Plaintiffs' trademarks than would be necessary to identify

Plaintiffs' products, even going so far as to use Plaintiffs' Marks rather than its own product

names to identify its knockoffs in its "Look Books." FF ¶¶ 106-07. Third, Defendant is using

counterfeits of Plaintiffs' trademarks and mimicking their product names and trade dresses in a

deliberate attempt to suggest a "relationship between [P]laintiff[s'] and [D]efendant's products"

that does not exist. *See International Info. Sys.*, 823 F.3d at 168; FF ¶¶ 112-16.

143.    If Defendant had wished merely to invite a comparison between Plaintiffs'

Fragrances and its own, it would not have adopted confusingly similar product marks to identify

its products; it would not have crafted packaging that so closely resembles Plaintiffs' packaging,

down to the colors, typefaces, and layouts; and, in the *coup de grace*, it would not have invited

"comparisons" to Plaintiffs' Fragrances by placing counterfeits of Plaintiffs' Marks, in Plaintiffs'

typefaces, in much larger type than the remainder of the text. Because "common sense

dictates . . . that in designing copy, the designer puts the main message in the largest type,"

*Clinique*, 945 F. Supp. at 557, Defendant would only make Plaintiffs' Marks its "main message"

if it were deliberately using Plaintiffs' Marks to call attention to its fragrances—thus *creating*

confusion among consumers. *See Cartier*, 2000 WL 347171, at *4 ("The huge disparities in text

size make the reader fixate on the Cartier name, rather than on Deziner's mark. Even when

Deziner's mark is noticed, the bold and central placement of the Cartier name on the label still gives the impression that Deziner sunglasses are somehow affiliated with Cartier.") (citations omitted).

144.    Defendant is not making mere "nominative" uses, but rather what some courts have termed "attention-getting" uses. *See Pebble Beach Co. v. Tour 18 I, Ltd.*, 942 F. Supp. 1513, 1534, 1553-54 (S.D. Tex. 1996) (finding no nominative use "[a]s a matter of law" because of defendant's "frequent[ ] and prominent[ ]" use of plaintiffs' marks "in its brochures, scorecards, and other written materials," including in the names of the selections on its restaurant menu), *aff'd*, 155 F.3d 526 (5th Cir. 1998), *abrogated on other grounds by TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 28–29 (2001); *see also Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 953–54 (7th Cir. 1992) (prominent use of plaintiffs' mark as attention-getting device was not descriptive use but was trademark use); *Lindy Pen Co. v. Bic Pen Corp.*, 725 F.2d 1240, 1248 (9th Cir. 1984) (defendant's use of plaintiff's exact mark on its goods was trademark use, not fair use within comparative advertising); *Beer Nuts, Inc. v. Clover Club Foods Co.,* 711 F.2d 934, 938 (10th Cir. 1983) (no fair use where defendant used "Brew Nuts" as a "secondary trademark" along with its own brand name on packaging); *Hypertherm, Inc. v. Precision Prods., Inc.*, 832 F.2d 697, 701 (1st Cir. 1987) (company that replicated plaintiff's replacement parts and used plaintiffs' service marks in advertisements went beyond permissible uses of another's mark for comparative advertising); *Cartier*, 2000 WL 347171, at *4 ("Deziner's label still violates § 1125(a)(1)(A) because the label improperly triggers customers' interest in Deziner's product by capitalizing on the goodwill associated with the Cartier name, and this kind of advertising strategy violates the Lanham Act.").

145.    In a true disclaimer or comparative advertisement, there is no need to use "spurious marks" that are counterfeit marks as defined by the Lanham Act. *See* 15 U.S.C. §§ 1114(1)(a), 1116(d)(1)(B), 1117(b)-(c), 1127; *Tiffany & Co.*, 127 F. Supp. 3d at 255 (where Costco advertised its solitaire diamond rings set with six prongs as "Tiffany" rings, holding that

"Costco's use of the Tiffany mark may be considered 'spurious' as a matter of law" and counterfeiting as a matter of law).

146.    The ways in which Defendant is using Plaintiffs' Marks go far beyond what some of the other alternative fragrance manufacturers have deemed sufficient to compare their products with the original fragrances they seek to emulate. *See, e.g.*, *Saxony Prods., Inc. v. Guerlain, Inc.*, 513 F.2d 716, 718 (9th Cir. 1975) ("only the Saxony name appears on the labels of the boxes or bottles in which Saxony's products are sold."); *Smith v. Chanel, Inc.*, 402 F.2d 562, 563 n.4 (9th Cir. 1968) ("Appellants' product was packaged differently from appellees', and the only words appearing on the outside of appellants' packages were 'Second Chance Perfume by Ta'Ron.'")

147.    Here, Defendant is not inviting a comparison, but is using Plaintiffs' Marks in an attempt to mislead consumers into believing that Defendant's knockoff perfumes are associated with Plaintiffs' celebrity and designer brands. *See Charles of the Ritz Grp. Ltd. v. Quality King Distrib.*, 832 F.2d 1317, 1324 (2d Cir. 1987) ("In this case of substantial confusion, however, the district court judge was well within his discretion in requiring that the disclaimer be prominent and also indicate that the two companies were competitors, rather than allowing the current ambiguous wording 'not related to.'"); *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 529 (S.D.N.Y. 2011) (holding that "the addition of 'U.S.' 'ASSN.' and '1980'" did not "defeat a finding of confusing similarity" because "[i]t is the general rule that one may not 'avoid a likelihood of confusion by the addition [to the senior user's mark] of descriptive or otherwise subordinate matter"); *Clinique Labs. v. Dep Corp.*, 945 F. Supp. 547, 551, 556-58 (S.D.N.Y. 1996) (finding infringement where Dep's advertisement featured "a large image of three Basique products . . . sitting in water" reflected in which were "the corresponding Clinique products, each aligned with its Basique counterpart"; copy below the image, "[i]n much smaller type," reading, in part, "Compare new Basique to Clinique. . . ."; and copy on "the bottom of the advertisement, . . . in extremely small type," stating, "Basique is not affiliated with Clinique Laboratories, Inc.," and where Dep failed to sustain its "heavy burden" of proving that its

"disclaimers and advertising would dispel consumer confusion"); *Charles of the Ritz Grp. Ltd. v. Quality King Distribs., Inc.*, 636 F. Supp. 433, 435-37 (S.D.N.Y. 1986) (finding infringement where the defendant marketed "Omni," a knockoff of the famous "Opium" fragrance, using the tagline, "If you like Opium you'll love Omni" along with a "disclaimer" displaying the plaintiff's mark more prominently than the disclamatory language, which was not visible to the consumer until the box was opened; and where "[t]he mark of OMNI's manufacturer, DEBORAH, appear[ed] on the back of the box and on the boxtop under the tab," such that "neither mark [was] readily visible to the consumer when the product [was] viewed at eye level in defendant's point-of-sale display"); *Ross Cosmetics Distribution Centers, Inc. v. United States*, 34 U.S.P.Q. (BNA) 1758, 1761, 1765 (Ct. Int'l Trade 1994) (holding that the disclaimer "could be easily overlooked by consumers and therefore is insufficient to dispel the likelihood of confusion" where imitator's fragrance boxes stated in large type at the top of the front panel, "Compare to [the famous brand you will switch to [our brand]]," and a disclaimer in smaller type appeared at the bottom of the front panel).

148.     The facts of this case thus are similar to those in *Charles of the Ritz*, in which the defendant marketed "Omni," a knockoff of the famous "Opium" fragrance, using the tagline, "If you like Opium you'll love Omni." 636 F. Supp. at 435. In a marketing ploy that suggested to the Second Circuit Court of Appeals "a calculated effort by defendant to escape liability for infringement" (*see id.* at 436-37), the defendant's "disclaimer" (like Defendant's "Our Version of" legend here) made prominent use of the plaintiff's mark, using much smaller type for the remainder of its "explanatory legend." *See id.* at 436 ("On the portion of the tab which is not visible to the consumer until the box is opened, in type half the size of the slogan itself, appears the explanatory legend 'Opium is a Registered Trademark Parfum and is not associated in any matter [sic] with Deborah International Beauty, Ltd.'"). Further, as here, the defendant conveniently failed to place its own company name on the front of its boxes. *See id.* at 437 ("The mark of OMNI's manufacturer, DEBORAH, appears on the back of the box and on the boxtop under the tab; neither mark is readily visible to the consumer when the product is viewed at eye

level in defendant's point-of-sale display."). The court concluded that the "defendant's commercial presentation of its product create[d] a likelihood that all the elements, taken together, [would] result in confusion as to the source and sponsorship of defendant's product." *See id.*

149.    The Court reaches the same conclusion here. Instead of expending the resources necessary to build its own brand identities, Defendant is taking the shortcut of appropriating the benefit of Plaintiffs' valuable brand recognition (and goodwill). The fair and nominative use defenses are unavailable, as a matter of law, to a defendant that, in the guise of comparative advertising, borrows indicia of origin going beyond a reference to the plaintiff's brand. In this case, Defendant is not making a fair or nominative use of Plaintiffs' Marks, nor is Defendant engaging in arguably *bona fide* comparative advertising. Thus, its fair use defense fails.

### 11.    Defendant Has Failed to Prove that Its Alleged Disclaimers Are Effective.

150.    An infringing defendant in this Circuit bears the burden of proving that its disclaimers are effective in alleviating potential confusion. *Charles of the Ritz*, 832 F.2d at 1324; *Home Box Office, Inc. v. Showtime/The Movie Channel Inc.*, 832 F.2d 1311, 1315 (2d Cir. 1987). This is a "heavy burden" that Defendant cannot meet. *See Clinique*, 945 F. Supp. at 556 (citing *Home Box Office*, 832 F.2d at 1315-16); *see also Charles of the Ritz*, 832 F.2d at 1318 (noting that the defendant, after being held to infringe, "failed to introduce empirical evidence that the disclaimer actually lessens consumer confusion as required to overcome such a previous finding").

151.    As "disclaimers," Defendant's legends suffer from numerous defects. First, Defendant's "Our Version of" legend is not properly viewed as a disclaimer because it does not disclaim anything; the words "Our Version of" are ambiguous, at best, on the question whether Defendant's fragrances are connected with Plaintiffs—particularly as Defendant's house mark is not well known and is totally absent from the front of its packaging. *See Home Box Office,* 832 F.2d at 1315 (finding the slogans at issue to be "on their face, ambiguous" because they could mean "either (1) that Showtime and HBO carry different programming and that consumers . . .

47

must subscribe to both . . . or (2) that Showtime and HBO have merged, are jointly marketing their services . . . or are engaged in some other type of cooperative production or marketing venture").

152.    As for Defendant's "not associated with" legend, as the Second Circuit Court of Appeals has observed more than once, "disclaimers are frequently not effective," and worse, are "generally ineffective" where (as here) they "employ brief negator words such as 'no' or 'not' . . . ." *Home Box Office*, 832 F.2d at 1316 (citing, *inter alia*, Jacob Jacoby & Robert Lloyd Raskoff, *Disclaimers as a Remedy for Trademark Infringement Litigation: More Trouble Than They Are Worth?*, 76 TRADEMARK REP. 35, 54 (1986)); *see also Charles of the Ritz*, 832 F.2d at 1324 (same).

153.    Most obviously, however, Defendant's choice of type sizes and typefaces in both of its legends emphasizes Plaintiffs' Marks at the expense of the supposedly disclamatory text. *See Home Box Office*, 832 F.2d at 1315. By deliberately using Plaintiffs' distinctive design marks as well as their word marks, Defendant's "not associated with" legends are pretexts for displaying counterfeit marks, not effective disclaimers. In fact, as both parties' surveys establish, Defendant's purported "disclaimers" are *increasing* confusion, not decreasing it, as Defendant is intentionally exploiting the "halo" of Plaintiffs' prestige brands.

154.    In sum, Plaintiffs' Marks clearly are entitled to protection because their trademarks are distinctive and their trade dresses are distinctive and nonfunctional; second, Defendant's use of Plaintiffs' Marks is highly likely to cause consumer confusion as to whether Defendant's Diamond Collection Fragrances are connected with Plaintiffs; and third, Defendant has acted in bad faith. Plaintiffs thus have established their claims of trademark and trade dress infringement and unfair competition under Sections 32(1) and 43(a) of the Lanham Act as well as their unfair competition claim under the common law of New York.

155.    Further, the Court holds that Defendant's use of "spurious mark[s]" that are "identical with, or substantially indistinguishable from, a registered mark" on its alternative ("knockoff") fragrance constitutes counterfeiting under section 32(1) of the Lanham Act. *See* 15

U.S.C. § 1114(1); 15 U.S.C. § 1127 ("counterfeit"); *Tiffany & Co.*, 127 F. Supp. 3d at 255

(where Costco advertised its solitaire diamond rings set with six prongs as "Tiffany" rings,

finding "Costco's use of the Tiffany mark . . . 'spurious' as a matter of law" and finding

counterfeiting as a matter of law).

156.     By using counterfeits of Plaintiffs' registered marks, including Plaintiffs'

distinctive typefaces, in an attempt to mislead consumers into believing that its products are

associated with Plaintiffs and their celebrity and designer brands, Defendant has engaged in

counterfeiting under section 32(1) and 35(b) of the Lanham Act.

## II.    DEFENDANT IS ENGAGING IN TRADEMARK DILUTION.

157.     Under Section 43(c) of the Lanham Act,

> the owner of a famous mark that is distinctive, inherently or through acquired
> distinctiveness, shall be entitled to an injunction against another person who, at
> any time after the owner's mark has become famous, commences use of a mark or
> trade name in commerce that is likely to cause dilution by blurring or dilution by
> tarnishment of the famous mark, regardless of the presence or absence of actual or
> likely confusion, of competition, or of actual economic injury.

15 U.S.C. § 1125(c)(1); *see also Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97,

105 (2d Cir. 2009); *Savin Corp. v. Savin Grp.*, 391 F.3d 439, 448 (2d Cir. 2004).

158.     To establish a claim for trademark dilution under Section 43(c) of the Lanham

Act, a plaintiff must prove that: "(1) its mark is famous; (2) the defendant's use of the mark is

made in commerce; (3) the defendant used the mark after the mark was famous; and (4) the

defendant's use of the mark is likely to dilute the quality of the mark by blurring or tarnishment."

*Estate of Ellington ex rel. Ellington v. Harbrew Imps. Ltd.*, 812 F. Supp. 2d 186, 193 (E.D.N.Y.

2011) (citing *Gap, Inc. v. G.A.P. Adventures Inc.*, No. 07 Civ. 9614 (AKH), 2011 WL 2946384,

at *16 (S.D.N.Y. Jun. 24, 2011). Plaintiffs claim that Defendant's use of the federally-registered

CALVIN KLEIN, VERA WANG, and LADY GAGA marks violates Section 43(c).

159.     Fame is not a requirement of the New York antidilution statute, N.Y. GEN. BUS.

LAW § 360-1. Thus, to succeed on a dilution claim under New York law, a plaintiff "must prove

(1) that the trademark is truly distinctive or has acquired secondary meaning, and (2) a likelihood

of dilution either as a result of 'blurring' or 'tarnishment.'" *Strange Music, Inc. v. Strange Music, Inc.,* 326 F. Supp. 2d 481, 496 (S.D.N.Y. 2004) (citation omitted). Plaintiffs claim that Defendant's use of all of Plaintiffs' Marks violates the New York antidilution statute.

160.    Plaintiffs easily can satisfy each of the foregoing elements, thus establishing their claims of dilution under both federal and state law.

### A.    Plaintiffs' Marks are Famous and Distinctive.

161.    The Lanham Act definition of "trademark" and "service mark" includes "any *name* . . . used by a person . . . to identify and distinguish his or her goods [or services] . . . from [the goods or services offered] by others and to indicate the source of the goods [or services], even if that source is unknown." 15 U.S.C. § 1127 (emphasis added). A mark is "famous," for federal dilution purposes, "if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." *Id.* at § 1125(c)(2)(A).

162.    Here, Defendant has conceded that Calvin Klein, Lady Gaga and Vera Wang are famous names. They also are famous trademarks, a term that, by definition, includes names. *See id.* at § 1127. The CALVIN KLEIN, VERA WANG, and LADY GAGA marks are widely recognized by the general consuming public. That is the very reason Defendant chose to use them. *See* FF ¶¶ 83-101; SF ¶ 27.

163.    In determining whether a mark is famous, courts consider "all relevant factors," including:

(i)     The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.

(ii)    The amount, volume, and geographic extent of sales of goods or services offered under the mark.

(iii)   The extent of actual recognition of the mark.

(iv)    Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

*Id.* at § 1125(c)(2)(A).

164.    The CALVIN KLEIN, VERA WANG, and LADY GAGA marks are registered
both for the original goods and services identified by those brands and for a variety of brand
extensions, including fragrances. *See, e.g.*, Pl. Exs. 3, 4, 20, 21, 27, 28 (Reg. No. 1,086,041 of
CALVIN KLEIN for clothing, Reg. No. 1,226,396 of CALVIN KLEIN for fragrances and
cosmetics, Reg. No. 1,797,058 of VERA WANG for clothing, Reg. No. 3,110,991 of VERA
WANG & Design for fragrances, Reg. No. 3,695,038 of LADY GAGA for entertainment
services, and Reg. No. 3,695,129 of LADY GAGA for clothing). *See also* Pl. Ex. 23 (App. Ser.
No. 85/115,004 to register LADY GAGA for fragrances, cosmetics, and numerous other goods
and services). Plaintiffs have introduced ample evidence of fame, including extensive sales of
branded goods and services, advertising and promotion, industry accolades, and unsolicited
publicity. FF ¶¶ 32-74. Plaintiffs' CALVIN KLEIN, VERA WANG, and LADY GAGA marks
are clearly famous as well as distinctive.

### B.    Defendant Used Plaintiffs' Marks In Commerce After Those Marks Became Famous.

165.    Calvin Klein and Vera Wang are famous fashion designers, and Lady Gaga is a
famous entertainer. SF ¶¶ 16-18. The CALVIN KLEIN, VERA WANG, and LADY GAGA
marks were already famous for other goods and services before they were used for fragrances.
FF ¶ 15. When their owners entered into fragrance licenses, they extended their already famous
brands into a new product category, supported by a huge investment to build consumer
awareness of their fragrance products. FF ¶¶ 34, 35, 44, 54, 55. Defendant subsequently mimicked
the licensed fragrances bearing these marks and applied the marks themselves to its fragrance
products. Defendant therefore commenced use of the CALVIN KLEIN, VERA WANG, and
LADY GAGA marks well after they had become famous.

### C.    Defendant's Use is Likely to Cause Dilution.

166.    The Trademark Dilution Revision Act of 2006, Pub. L. No. 109-312, 120 Stat.
1730 (Oct. 6, 2006) [hereinafter "TDRA"], the relevant portion of which is codified in section
43(c) of the Lanham Act, 15 U.S.C. § 1125(c), established a "likelihood of dilution" standard to

replace the "actual dilution" standard adopted by the United States Supreme Court in *Moseley v. V. Secret Catalogue, Inc.*, 537 U.S. 418, 433 (2003). *See Dan-Foam A/S v. Brand Named Beds LLC*, 500 F. Supp. 2d 296, 306-07 (S.D.N.Y. 2007). Thus, a plaintiff seeking to prove dilution need only prove that the defendant's use is *likely* to dilute the plaintiff's marks. *Id.*

167.    Section 43(c) of the Lanham Act recognizes two types of dilution:  blurring and tarnishment. "'[D]ilution by blurring' is [an] association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark." 15 U.S.C. § 1125(c)(2)(B). "'[D]ilution by tarnishment' is [an] association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark." *Id.* at § 1125(c)(2)(C).

168.    Similarly, a dilution claim under New York law can be founded upon a showing of either blurring or tarnishment. *Hormel Foods Corp. v. Jim Henson Prods., Inc.,* 73 F.3d 497, 506 (2d Cir. 1996); *Deere,* 41 F.3d at 42; *Clinique*, 945 F. Supp. at 561.

### 1.    Defendant Use is Likely to Blur Plaintiffs' Marks.

169.    The first type of dilution, dilution by blurring, refers to the gradual diminishment of a famous mark's "'ability . . . to clearly and unmistakably distinguish one source through unauthorized use." *Hormel*, 73 F.3d at 506 (alteration in original) (citation omitted). Such "dilution occurs when the unauthorized use of a famous mark reduces the public's perception that the mark signifies something unique, singular, or particular." H.R. REP. NO. 109-23, at 4 (2005), *reprinted in* 2006 U.S.C.C.A.N. 1091, 1092 (citation omitted). In *Horphag Research Ltd. v. Garcia*, 475 F.3d 1029 (9th Cir. 2007), for example, the defendant used the plaintiff's trademark, "Pycnogenol," in a classic "bait and switch" to attract purchasers to its website, claiming to "educate" them as to the similarities and differences between the parties' competitive products, but in fact using the mark to identify its own products as well as the plaintiff's. *Id.* at 1033. In affirming the district court's grant of summary judgment to the plaintiff on its trademark dilution claim, the Ninth Circuit Court of Appeals stated that "[t]he theory of dilution by blurring protects the benefits that flow from a sharp and distinct connection between one mark and one

52

product. Garcia has blurred the sharp connection between Horphag's product and the mark Pycnogenol." *Id.* at 1037 (internal citation omitted). Because the defendant had "'create[d] an improper association between a mark and a new product,'" the defendant was guilty of actual dilution,[4] and further, his "attempt to capitalize on the popularity of Horphag's product was not 'fair.'" *Id.* at 1037-38. *See also Pebble Beach,* 942 F. Supp. at 1567 ("In this case, plaintiffs have shown that they own strong, distinctive marks and that Tour 18 has made significant use of those marks to sell its own services to the public. It is because of Tour 18's use of those service marks that golfers will now think of Tour 18, and not necessarily plaintiffs, when they encounter the marks. The result is that Tour 18 has whittled away at the ability of these service marks to identify only plaintiffs' golfing services.") (finding dilution under Texas antidilution law).

170.    Where, as here, a defendant uses counterfeits and imitations of famous brand names on its own cheap products, the defendant's unauthorized use is likely to "gradual[ly] diminish[ those] famous mark[s'] acquired 'ability . . . to clearly and unmistakably distinguish one source,'" thus whittling away those brands' distinctiveness and value. *See Louis Vuitton Malletier, S.A. v. My Other Bag, Inc.*, 156 F. Supp. 3d 425, 432-33 (S.D.N.Y. 2016) (quoting *Hormel*, 73 F.3d at 506); *Visa Int'l Serv. Ass'n v. JSL Corp.*, 610 F.3d 1088, 1090 (9th Cir. 2010) ("[D]ilution by blurring . . . occurs when a mark previously associated with one product also becomes associated with a second" thus "weaken[ing] the mark's ability to evoke the first product in the minds of consumers. . . . Dilution occurs when consumers form new and different associations with the plaintiff's mark."); H.R. REP. NO. 109-23, at 4 (2005), *as reprinted in* 2006 U.S.C.C.A.N. 1091, 1092 ("[D]ilution occurs when the unauthorized use of a famous mark reduces the public's perception that the mark signifies something unique, singular, or particular."). This is dilution by blurring.

---

[4] The plaintiff was required to show actual dilution, instead of likely dilution, because the cause of action arose *after* the United States Supreme Court decided *Moseley v. V. Secret Catalogue, Inc.*, 537 U.S. 418 (2003) but *before* the effective date of the FTDA. *See id.* at 1032.

171.    In determining whether dilution by blurring is likely under Section 43(c) of the

Lanham Act, a court may consider "all relevant factors, including the following:

(i)     The degree of similarity between the mark or trade name and the famous mark.

(ii)    The degree of inherent or acquired distinctiveness of the famous mark.

(iii)   The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark.

(iv)    The degree of recognition of the famous mark.

(v)     Whether the user of the mark or trade name intended to create an association with the famous mark.

(vi)    Any actual association between the mark or trade name and the famous mark."

15 U.S.C. § 1125(c)(2)(B).

172.    Similarly, courts evaluate blurring claims under New York law by weighing:

"(1) similarity of the marks, (2) similarity of the products covered by the marks,

(3) sophistication of consumers, (4) predatory intent, (5) renown of the senior mark, and

(6) renown of the junior mark." *Deere,* 41 F.3d at 43 n.8 (citing *Mead Data,* 875 F.2d at 1035

(Sweet, J., concurring)).

173.    In this case, as set forth in detail above, the evidence clearly shows that:

(1) Plaintiffs' Marks are highly distinctive; (2) Plaintiffs are engaging in substantially exclusive

use of their marks; (3) Plaintiffs' Marks are truly renowned and widely recognized;

(4) Defendant is using the registered CALVIN KLEIN, VERA WANG, and LADY GAGA

marks, not merely variants of them, on one of the very same product lines offered by Plaintiffs;

(5) Defendant set out to create associations between its knockoffs and Plaintiffs' Marks, as

evidenced by its extensive copying of the source identifiers that differentiate Plaintiffs' licensed

fragrances in the marketplace; (6) consumers actually associate Defendant's knockoffs with

Plaintiffs, their Marks, and their Fragrances, giving Defendant the benefit of a halo effect to

which it is not entitled; and (7) Defendant targets consumers for whom English is a second

language.

174.    Plaintiffs therefore have established a strong case of likely dilution by blurring. *See Gucci*, 868 F. Supp. 2d at 253 (holding that the defendant's intentional use of "the Quattro G Pattern in brown/beige colorways" and the "GRG Stripe" were likely to cause dilution); *Clinique*, 945 F. Supp. at 563 (holding that the defendant's BASIQUE & B mark and dress were likely to dilute the plaintiff's CLINIQUE & C mark and dress).

### 2.    Defendant Use is Likely to Tarnish Plaintiffs' Marks.

175.    "The sine qua non of tarnishment is a finding that plaintiff's mark will suffer negative associations through defendant's use." *Hormel,* 73 F.3d at 507. As the Second Circuit Court of Appeals explained,

> "[t]arnishment" generally arises when the plaintiff's trademark is linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context likely to evoke unflattering thoughts about the owner's product. In such situations, the trademark's reputation and commercial value might be diminished because *the public will associate the lack of quality or lack of prestige in the defendant's goods with the plaintiff's unrelated goods*, or because the defendant's use reduces the trademark's reputation and standing in the eyes of consumers as a wholesome identifier of the owner's products or services.

*Deere*, 41 F.3d at 43 (emphasis added) (citations omitted); *see also Cartier*, 2000 WL 347171, at *6 ("[I]t is also likely that these sophisticated, brand conscious consumers will lose interest in the Cartier name as they see the number of inferior products in the market bearing the Cartier name grow.")

176.    In this case, as shown in detail above, Defendant's perfumes are markedly inferior to Plaintiffs' related and unrelated goods and services. Defendant's perfumes are made with synthetic oils to save money. They have a high concentration of water and alcohol, and so do not last as long as Plaintiffs' genuine fragrances. The packaging is cheap. The perfumes are sold at non-prestigious outlets like Dollar General and other outlets where Plaintiffs would not choose to place their prestige products. Of most concern, Defendant exercises no meaningful quality control, and its products present potential health and safety risks—including the presence of high levels of DEHP, a known carcinogen and endocrine disruptor. Defendant's products are "of shoddy quality" relative to Plaintiffs' products. *See Deere*, 41 F.3d at 43.

177.     Further, as shown in detail above, Defendant is embroiled in a high-profile criminal case involving the use of its fragrances to launder money for Latin American drug cartels. Defendant allegedly accepted the proceeds of drug sales in exchange for its alternative fragrances, which it shipped to Latin America for sale there. Certain of Defendants' alternative fragrances bear counterfeits of the Plaintiffs' registered marks, and the Court may properly infer from the invocation of the Fifth Amendment by Defendant's officers, directors and employees that Defendant's alternatives to Plaintiffs' Fragrances were among the fragrances used in this money laundering scheme.

178.     The Court therefore concludes that Defendant's use of Plaintiffs' Marks on an in connection with Defendant's inferior products is likely to harm the "reputation and commercial value" of Plaintiffs' Marks. *Id.* This is dilution by tarnishment.

**D.      Defendant Has No Defense to Plaintiffs' Claim of Dilution.**

179.     Section 43(c)(3) provides a list of conduct that "shall not be actionable as dilution by blurring or dilution by tarnishment," including

(A)     Any fair use, including a nominative or descriptive fair use, or facilitation of such fair use, of a famous mark by another person other than as a designation of source for the person's own goods or services, including use in connection with—

(i)     advertising or promotion that permits consumers to compare goods or services; or

(ii)     identifying and parodying, criticizing, or commenting upon the famous mark owner or the goods or services of the famous mark owner.

15 U.S.C. § 1125(c)(3)(A).

180.     Defendant is not entitled to any of these fair use defenses. First, and most obviously, Defendant is selling knockoff perfume; it is not parodying or criticizing Plaintiffs' Fragrances. *See Louis Vuitton Malletier*, 156 F. Supp. 3d at 435 (finding parody where "the well-known 'my other car ...' joke . . . . combined with the stylized, almost cartoonish renderings of Louis Vuitton's bags depicted on the totes—builds significant distance between MOB's inexpensive workhorse totes and the expensive handbags they are meant to evoke").

181.    Second, as set forth in detail in Paragraphs 135 through 149 above, Defendant is

not engaging in a "nominative or descriptive fair use," but instead is using Plaintiffs' Marks to

attract consumers' attention to and induce them to purchase its inferior products.

182.    Because Defendant cannot claim the benefit of Section 43(c)(3), it is engaging in

actionable dilution.

## III.    DEFENDANT IS ENGAGING IN FALSE ADVERTISING.

183.    The federal cause of action for false advertising is located in Section 43(a) of the

Lanham Act, which provides that:

> [a]ny person who, on or in connection with any goods or services, or any
> container for goods, uses in commerce any . . . false or misleading description of
> fact, or false or misleading representation of fact, which—
>
> . . . .
>
> (B)    in commercial advertising or promotion, misrepresents the nature,
> characteristics, qualities, or geographic origin of his or her or another
> person's goods, services, or commercial activities, shall be liable in a civil
> action by any person who believes that he or she is or is likely to be
> damaged by such act.

15 U.S.C. § 1125(a)(1).

184.    To establish a claim of false advertising, a plaintiff must prove the following

elements:  "a plaintiff must prove the following elements:  1) the defendant has made a false or

misleading statement; 2) the false or misleading statement has actually deceived or has the

capacity to deceive a substantial portion of the intended audience; 3) the deception is material in

that it is likely to influence purchasing decisions; 4) there is a likelihood of injury to plaintiff,

such as declining sales or loss of goodwill; and 5) the goods traveled in interstate commerce."

*Rexall Sundown, Inc. v. Perrigo Co.*, 651 F. Supp. 2d 9, 20 (E.D.N.Y. 2009). The fifth element is

undisputed here.

185.    Similarly, to establish a violation of section 349 of the New York General

Business Law, a plaintiff must prove, "first, that the challenged act or practice was consumer-

oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered

injury as a result of the deceptive act." *Medisim Ltd. v. BestMed LLC,* 910 F. Supp. 2d 591, 608

(S.D.N.Y. 2012) (quoting *Stutman v. Chemical Bank,* 95 N.Y.2d 24, 29 (2000)). Claims "are not cognizable under section[ ] 349 . . . unless there is a specific and substantial injury to the public interest over and above ordinary trademark infringement or dilution." *Coach, Inc. v. Horizon Trading USA Inc.,* 908 F. Supp. 2d 426, 435 (S.D.N.Y. 2012). "Injury or harm that satisfies this standard includes 'potential danger to the public health or safety.'" *Merck Eprova AG v. Brookstone Pharm., LLC*, 920 F. Supp. 2d 404, 425-26 (S.D.N.Y. 2013) (quoting *Gucci Am. v. Duty Free Apparel, Ltd.,* 277 F. Supp. 2d 269, 273 (S.D.N.Y. 2003). Finally, "Section 349 . . . allows recovery not only by consumers, but also by competitors if there is 'some harm to the public at large.'" *Boule v. Hutton*, 328 F.3d 84, 94 (2d Cir. 2003) (quoting *Securitron Magnalock Corp. v. Schnabolk,* 65 F.3d 256, 264 (2d Cir. 1995)).

### A.   Defendant Is Making False and Misleading Statements that Tend to Deceive Consumers.

186.   False or misleading statements on a product's packaging constitute "advertisements" for the purposes of a false advertising claim under Section 43(a). *See, e.g.*, *PPX Enters., Inc. v. Audiofidelity Enters., Inc.*, 818 F.2d 266, 272 (2d Cir. 1987) (where "Audiofidelity fraudulently represented that eight albums it marketed contained performances featuring Jimi Hendrix, when they did not," noting that "[t]he jury's finding makes clear that PPX's claim of injury arises from Audiofidelity's *misleading packaging of its products*, and therefore more appropriately can be characterized as a claim of false advertising under the Lanham Act . . . .") (emphasis added), *abrogated on other grounds by Hannex Corp. v. GMI, Inc.*, 140 F.3d 194, 206 n.9 (2d Cir. 1998); *Rexall Sundown, Inc. v. Perrigo Co.*, 707 F. Supp. 2d 357, 358 (E.D.N.Y. 2010) (claim involved "Perrigo's use of ['Compare to'] statements . . . on the packaging of the Perrigo products" which "Rexall claimed . . . implied that the Perrigo products either contain the same ingredients as Osteo Bi–Flex or have the same effectiveness as Osteo Bi–Flex").

187.   A claim of false advertising may proceed under one or both of the following theories:  "that the challenged advertisement is literally false, *i.e.,* false on its face"; or "that the

advertisement, while not literally false, is nevertheless likely to mislead or confuse consumers." *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 153 (2d Cir. 2007). Both theories also require a plaintiff to demonstrate that "'the false or misleading representation involved an inherent or material quality of the product.'" *Id.* at 153 n.3.

188.    If an advertising claim is literally false, "the court may enjoin the use of the claim without reference to the advertisement's impact on the buying public." *Tiffany (NJ) Inc. v. eBay, Inc.,* 600 F.3d 93, 112 (2d Cir. 2010) (quoting *McNeil–P.P.C., Inc. v. Bristol–Myers Squibb Co.,* 938 F.2d 1544, 1549 (2d Cir. 1991) (internal quotation marks omitted)). If, however, the claim is not literally false, "a plaintiff 'must demonstrate, by extrinsic evidence, that the challenged [advertisement] tend[s] to mislead or confuse consumers,'" that is, "'that a statistically significant part of the . . . audience holds the false belief allegedly communicated by the challenged advertisement.'" *Id.* at 112-13 (citations omitted).

189.    To determine whether an advertising claim is literally false, a court "must analyze the message conveyed in full context," *i.e.,* it "must consider the advertisement in its entirety and not . . . engage in disputatious dissection." *Id.* at 112 n.19 (citations omitted). If the words or images, considered in context, necessarily convey a false message, the advertisement is literally false and no extrinsic evidence of consumer confusion is required.

190.    In this case, Defendant's packaging contains the claim that each of Defendant's fragrances is "Our Version of" one of Plaintiffs' celebrity and designer fragrances. The Oxford Dictionaries define "version" as "[a] particular form of something differing in certain respects from an earlier form or other forms of the same type of thing." *See http://www.oxforddictionaries.com/us/definition/american_english/version* (last visited on January 4, 2017).

191.    The Court finds that the meaning of "version" is not so broad as to mean simply that the parties' products are both fragrances; *Star Wars* and *Star Trek* are both science fiction movies, but the latter is not a "version" of the former. By using the words "Our Version of," Defendant is fundamentally claiming an equivalence of essential characteristics, to wit:  that its

fragrances are "the same type of thing" as Plaintiffs' Fragrances—varying slightly, perhaps, but maintaining the same basic character in terms of quality and longevity of scent. Indeed, Defendant has stipulated that its "Our Version of" legend is "intended to invite consumers to compare Defendant's fragrance to the name brand fragrance mentioned in the legend." SF ¶ 27.

192.    In this case, there is no claim that Defendant has "'truthfully and faithfully copied the original'"; it concedes that it did not even try to do so. FF ¶¶ 183-87; *see JR Tobacco of Am., Inc. v. Davidoff of Geneva (CT), Inc.*, 957 F. Supp. 426, 434 (S.D.N.Y. 1997) (quoting *Société Comptoir de L'Industrie Cotonnière Établissements Boussac v. Alexander's Dep't Stores*, 299 F.2d 33, 35–36 (2d Cir. 1962)) (other citation omitted); *see also JR Tobacco*, 957 F. Supp. at 434-35 (finding literal falsity where, despite advertising claims to the contrary, defendant made no effort to duplicate the origin or taste of plaintiff's cigars). Defendant admits that its Diamond Collection Fragrances are substantially different from the Plaintiffs' Fragrances in quality, composition, and longevity of scent on the skin. FF ¶¶ 183-87. Defendant's Rule 30(b)(6) representative testified that it is "*not* offering a version of the original fragrance" and is "*not* trying to say that it [the Diamond Collection alternative designer fragrance] is a version of the original fragrance." FF ¶¶ 184, 213.

193.    Defendant's "Our Version of" language is much like a "compare to" claim, which courts have not hesitated to construe as claiming equivalence. "'Compare to' statements, depending on their wording and context, may convey more than a general invitation to compare and, instead, convey a specific assertion of measurable fact, such as the same ingredients or efficacy. Under such circumstances, the statements are actionable." *Rexall*, 651 F. Supp. 2d at 20; *see id.* at 22 (holding that the "compare to" statements, "when considered in context, could be understood as messages of equivalence as to formulation and efficacy of the products"); *Cartier*, 2000 WL 347171, at *4 & n.4 (holding "general claims of equivalence or similarity" to be both literally false and misleading where Deziner's disclaimers invited consumers to "compare" its sunglasses to Cartier's sunglasses in "price along with . . . style"); *see also Time Warner Cable*, 497 F.3d at 154 (affirming finding of literal falsity where the advertising line,

"settling for cable would be illogical" was properly construed to be a claim that "cable's HD picture [quality] . . . was materially inferior to DIRECTV's HD picture").

194.    Given the substantial differences between the parties' products, Defendant's claims of substantial equivalence are literally false, as Defendant's "Our Version of" language, taken in its entirety and considered in context, necessarily implies that Defendant's Diamond Collection Fragrances vary only insignificantly from Plaintiffs' Fragrances. *See JR Tobacco*, 957 F. Supp. at 434 (finding literal falsity where "JR . . . represented that it took aggressive measures to duplicate the original cigars photographed in its brochure with respect to origin, taste, size, shape and wrapper" but where "only efforts with respect to the duplication of the size, shape and wrapper color were made"); *Sherrell Perfumers, Inc. v. Revlon, Inc.*, 483 F. Supp. 188, 189, 194 (S.D.N.Y. 1980) (finding false advertising where defendant advertised "'Copy Cat Equivalent Fragrances,' which it claimed were "copies of the world's most famous Perfumes and Colognes," "equal to the originals," "superb copies," and "faithful copies," but that were not similar, such that "Sherrell was," at best, "attempting to create superb copies of Chanel essences, but had fallen short of achieving its goal").

195.    Even if the Court were to accept Defendant's contention that its "Our Version of" legend is not literally false because it is susceptible to more than one interpretation, that advertising claim is nevertheless likely to mislead or confuse consumers. Plaintiffs have introduced extrinsic evidence demonstrating that Defendant's claim tends both to mislead *and* to confuse consumers as to the qualities and characteristics of Defendant's Diamond Collection Fragrances and their equivalence to Plaintiffs' Fragrances. In the False Advertising Survey detailed in the Rappeport Report, which the Court finds both helpful and reliable, Dr. Rappeport tested the hypothesis that "[c]onsumers who see the 'Our version of' legend in context on Excell's packaging will construe that language to mean that the Excell product is either the same as or equivalent to the original branded fragrance referenced in the legend in terms of quantifiable characteristics," namely, formulation and longevity of scent (the "False Advertising Survey"). Pl. Ex. 161-1 at 2.

196.    In conducting that survey, Dr. Rappeport's interviewers gave participants the following instruction:  "I am going to show you a fragrance package that you may or may not have seen before. Please look at it as if you were thinking about buying it, but <u>please do not open it</u>. When you're done looking at it, I'm going to ask you some questions." *Id.* at 10. Following this instruction, respondents in the "test cell" were given the package for either Defendant's Possession or Serenity fragrance, while respondents in the "control cell" saw the control packages discussed in Paragraphs 91 and 92 above. *Id.* Respondents in the test cell were asked to focus on Defendant's "Our Version of" legend and asked, "What, if anything, does the phrase 'Our version of [Obsession / Eternity] by Calvin Klein' communicate to you?" *Id.*

197.    Respondents in both cells then were told: "I am now going to show you a package of [Obsession / Eternity] by Calvin Klein. Please look at it as if you were thinking about buying it, but <u>please do not open it</u>. When you're done looking at it, I'm going to ask you some questions." *Id.* Following this instruction, respondents who initially were shown a Possession package—either the actual package or the control—were shown a package of Calvin Klein's Obsession fragrance, while respondents who initially were shown a Serenity package were shown a package of Calvin Klein's Eternity fragrance. *Id.* Finally, respondents were asked the following series of questions:

2.    For the next few questions, I would like you to think about the <u>actual fragrance products</u> that are in these packages, not the packaging, and not the bottles. Although you aren't able to smell the two products, does the wording on these two products communicate or imply anything to you about whether these two fragrance products are the same or different?

4.    Although you may have already said this, does the wording on these two products communicate or imply anything to you about whether these two fragrance products have the same formula or different formulas?

6.    Although you may have already said this, does the wording on these two products communicate or imply anything to you about whether the scents of these two fragrance products last about the same amount of time when worn on the skin or different amounts of time?

*Id.* at 10-11.[5] Net of noise, 20% of respondents responded that they believed that Defendant's packaging communicated the message that Defendant's fragrances are substantially equivalent to Plaintiffs' Fragrances, and 5% believed that it communicated the message that Defendant is *affiliated* with Plaintiffs. *Id.* at 15-16.

198.    Given these percentages, Plaintiffs' survey easily qualifies as persuasive evidence of the implicit falsity of Defendant's advertising claim in this Circuit. *See The Procter & Gamble Co. v. Ultreo, Inc.,* 574 F. Supp. 2d 339, 345 (S.D.N.Y. 2008) ("[T]he success of a plaintiff's implied falsity claim usually turns on the persuasiveness of a consumer survey that shows that a substantial percentage of consumers are taking away the message that the plaintiff contends the advertising is conveying. *Cases have held that 20% constitutes a substantial percentage of consumers.*") (citation omitted) (emphasis added).

199.    Plaintiffs thus have proven that Defendant's "Our Version of" legend "has actually deceived or has the capacity to deceive a substantial portion of the intended audience . . . ." *Rexall*, 651 F. Supp. 2d at 20.

### B.    Defendant's False and Misleading Statements Are Material.

200.    "[I]n addition to proving falsity, the plaintiff must also show that the defendants 'misrepresented an "inherent quality or characteristic"' of the product." *National Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 855 (2d Cir. 1997) (citations omitted). This requirement is essentially one of materiality . . . ." *Id.* (citations omitted). A deception is "material" if it is "likely to influence purchasing decisions . . . ." *Id.* (citations omitted). In *National Basketball Ass'n v. Motorola, Inc.*, for example, the National Basketball Association argued that Motorola had engaged in false advertising when it claimed that its service provided "updated game information direct from each arena," when in fact its statistics were taken from television and radio broadcasts. *Id.* The Second Circuit Court of Appeals affirmed the district court finding that

---

[5] "For each question to which the respondents answered yes," "they were asked an open-ended follow-up question [*i.e.*, questions 3, 5, and 7] asking them to explain what the wording on the two products communicates or implies to them about that particular feature." *Id.* at 11.

the falsity was "nothing more than minutiae," and therefore immaterial, stating that "[w]hether the data is taken from broadcasts instead of being observed first-hand is, therefore, simply irrelevant" to consumers. *Id.*; *see also Pamlab, L.L.C. v. Macoven Pharm., L.L.C.*, 881 F. Supp. 2d 470 (S.D.N.Y. 2012) ("In the absence of a showing of materiality, a statement in advertising, even if false, would have no economic impact and could cause no injury.").

201.    Consumers obviously care about the quality and safety of the ingredients in fragrance products they apply to their skin as well as the longevity of the scent. In this case, Defendant's false and misleading claims—that the essential qualities and characteristics of its scents are equivalent to Plaintiffs'—clearly are "likely to influence purchasing decisions" and thus are material. *Apotex Inc. v. Acorda Therapeutics, Inc.*, No. 14–4353–cv, 2016 WL 2848911, at *8 (2d Cir. May 16, 2016) (citation omitted).

**C.    Plaintiffs Are Likely to Suffer Injury.**

202.    In this Circuit, "a false 'comparison to a specific competing product necessarily diminishes that product's value in the minds of the consumer . . . . [and] [a]ccordingly, no proof of likely injury is necessary." *Time Warner Cable*, 497 F.3d at 162; *see also Merck Eprova AG v. Gnosis S.p.A.*, 901 F. Supp. 2d 436, 451 (S.D.N.Y. 2012) ("[B]ecause Merck and Gnosis are competitors with respect to the folate products at issue, injury is presumed.").

203.    Further, Plaintiffs have demonstrated that they are likely to suffer injury because consumers may well purchase Defendant's products as a substitute for Plaintiffs' products, or may think less of Plaintiffs' products because they are disappointed with the quality or characteristics of Defendant's ostensibly equivalent products.

204.    Finally, Defendant's "not associated with" legends do not cure the false advertising statements in its "Our Version of" legends. *See JR Tobacco*, 957 F. Supp. at 437 (citations omitted). This is because

> [d]isclaiming any affiliation between the companies does little if anything to rectify a patently false claim of duplication. The falsehood asserted by [Plaintiffs] does not concern the corporate affiliation between [Plaintiffs] and [Defendant] or the true proprietor of the [Plaintiffs'] trademark[s], but rather the efforts taken to ensure the similarity of quality between the two rivals' products.

64

*See id.* at 438. "Therefore, [Defendant's] disclaimers do not effectively cure the literal falsehoods communicated" by its "not associated with" disclaimers. *See id.* This is particularly true where, as here, "a discount imitator of brand-name goods attempts to disabuse the unwary customer." *Id.* at 437 (quoting *Charles of the Ritz,* 832 F.2d at 1324) (other citation omitted).

205.   The Court therefore holds that where, as here, a seller uses the words "Our Version of" or similar language expressly or implicitly communicating to consumers that the qualities or characteristics of its own product are equivalent to those of another product, that claim constitutes a false or misleading statement under section 43(a) of the Lanham Act where, as here, the products are materially different.

206.   Because Defendant has communicated that the qualities and characteristics of its "alternative" fragrances are equivalent to those of the original fragrances they emulate through the use of its "Our Version of" legend, Plaintiffs have established their claims of false advertising under Section 43(a) of the Lanham Act.

207.   For the foregoing reasons, Plaintiffs have also established a violation of section 349 of the New York General Business Law.

## IV.   DEFENDANT HAS NOT PROVED ITS OTHER DEFENSES.

208.   In its Answer to the Amended Complaint ("Amended Answer"), Defendant asserts seven affirmative defenses:  failure to state a claim; laches; unclean hands; trademark misuse; statutes of limitations; "failure to mitigate . . . damages"; and fair use. ECF No. 71 at 10. In its original Answer and Affirmative Defenses (ECF No. 17), Defendant asserted the additional defenses of estoppel, acquiescence, abandonment, "prior use," "innocent use," functionality, and aesthetic functionality, but it withdrew those defenses in its Amended Answer.

209.   Defendant since has withdrawn its affirmative defenses of unclean hands and trademark misuse.

210.   As set forth in Paragraphs 135 through 149 above, Defendant's use is neither a nominative fair use nor a descriptive fair use. The Court addresses the balance of its remaining defenses below.

### A.    Defendant Cannot Prove Its Statutes of Limitations Defense.

211.    The Lanham Act does not include a statute of limitations for infringement, unfair competition, and false advertising claims brought under Sections 32(1) and 43(a), 15 U.S.C. §§ 1114(1), 1125(a) so in cases involving such claims, courts apply the most analogous statute of limitations under state law. Federal courts in New York apply Section 213(8) of the New York Civil Practice Law, which establishes a limitations period of six years in cases "based on fraud." *See* N.Y. CIV. PRAC. L. & R. § 213(8) (McKinney 2004); *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 191 (2d Cir. 1996) ("it is clear that both intent and fraud play an important role in all Lanham Act claims") (citing cases); *see also* 15 U.S.C. § 1127 ("The intent of this chapter is . . . to protect persons engaged in such [interstate] commerce against unfair competition; [and] to prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations of registered marks . . . .").

212.    The limitations period for unfair competition claims under the New York common law is six years as well. *See Greenlight Capital, Inc. v. GreenLight (Switzerland) S.A.*, No. 04 Civ. 3136(HB), 2005 WL 13682, at *7-8 (S.D.N.Y. Jan. 3, 2005) ("[C]ourts typically analyze the nature of [the] unfair competition claim to determine which statutory period applies. . . . Given that 'the standards for Section 43(a) claims of the Lanham Act and unfair competition claims under New York Law are almost indistinguishable,' it follows that Greenlight Capital's unfair competition claim is also subject to a six-year statute of limitations.") (quoting *Tri-Star Pictures, Inc. v. Unger,* 14 F. Supp. 2d 339, 363 (S.D.N.Y. 1998)).

213.    For dilution cases brought under section 43(c), 15 U.S.C. § 1125(c), courts in this Circuit apply a limitations period of three years. A three-year statute of limitations also applies to Plaintiffs' state law claims under the New York statutes governing dilution (N.Y. Gen. Bus. Law § 360-1), false advertising (*id.* at § 350), and unfair and deceptive trade practices (*id.* at § 349). *See Gristede's Foods, Inc. v. Unkechauge Nation*, 532 F. Supp. 2d 439, 452 (E.D.N.Y. 2007); *Charles Atlas, Ltd. v. DC Comics, Inc.*, 112 F. Supp. 2d 330, 334 (S.D.N.Y. 2000).

214.     Plaintiffs filed their Complaint in this case on September 4, 2015, less than six years from the date Defendant was first incorporated to do business on April 13, 2010 (FF ¶ 238), so Plaintiffs clearly filed suit within the statute of limitations for their infringement, unfair competition, and false advertising claims under Sections 32(1) and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114(1), 1125(a). Further, "as trademark infringement is a 'continuing wrong,' the statute of limitations defense only applies to bar monetary recovery beyond the statutory period, and does not limit the availability of injunctive relief." *Gucci,* 868 F. Supp. 2d at 246.

215.     The same is true of dilution claims in this Circuit. *See id.* at 257 (finding "[t]he statute of limitations defense . . . inapplicable" because "it does not affect the availability of injunctive relief in trademark cases" and "Gucci does not seek monetary relief outside of the statutory period"); *Fourth Toro Family Ltd. Partnership v. PV Bakery, Inc.*, 88 F. Supp. 2d 188, 196 (S.D.N.Y. 2000) (citing *Hester Indust., Inc. v. Tyson Foods, Inc.,* 94 Civ. 391, 1995 WL 113939 at *5 (N.D.N.Y. Jan. 30, 1995) (trademark infringement and dilution are continuing torts that "give rise to a fresh cause of action so long as the wrong persists")). Like the plaintiff in *Gucci*, Plaintiffs do not seek monetary relief on their federal dilution and state law claims outside of the statutory period.

216.     Defendant's statutes of limitations defense therefore fails.

**B.     Defendant Cannot Prove Its Laches Defense.**

217.     When a plaintiff files its lawsuit within the statutory period, a defendant seeking to establish laches must prove:  first, that "the [plaintiff] inexcusably delayed in bringing the claim"; and second, that "the defendant was prejudiced by the plaintiff's delay." *Gross v. Bare Escentuals Beauty*, 641 F. Supp. 2d 175, 196 (S.D.N.Y. 2008).

218.     As shown above, Plaintiffs filed suit within the statute of limitations for their infringement, unfair competition, and false advertising claims under Sections 32(1) and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114(1), 1125(a), and their unfair competition claims under the New York common law. Thus, given the "presumption against laches where the lawsuit was

initiated within the applicable statute of limitations," Defendant bears the heavy burden of proving both inexcusable delay and prejudice. *Gross*, 641 F. Supp. 2d at 196.

219.    Defendant cannot sustain this burden for multiple reasons:  First, Plaintiffs have not inexcusably delayed. As Professor McCarthy explained, "[l]aches is not measured from [D]efendant's first unpermitted use of the contested mark. Laches is measured from the date when there was an infringing use sufficient to require legal protest and possible lawsuit." 6 McCarthy § 31:19; *see also ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic & Sports Physical Therapy P.C.*, 314 F.3d 62, 68 (2d Cir. 2002) (imposing "no obligation to sue until the likelihood of confusion looms large and [the trademark owner's] right to protection has clearly ripened") (quotation marks and citation omitted). When it became obvious to Plaintiffs that Defendant's business practices posed a significant threat to their goodwill, Plaintiffs sought redress in court. *See* 6 McCarthy § 31:19 ("In most cases, [the law] requires legal action only when defendant's infringing acts significantly impact on plaintiff's good will and business reputation.").

220.    Second, as shown above, Defendant is an intentional infringer, and as "the Second Circuit [Court of Appeals] has made clear . . . regardless of the length of the senior user's delay, laches cannot be a defense to intentional infringement, as it is an equitable defense and the defendant asserting it must come to court with clean hands." *Gucci*, 868 F. Supp. 2d at 244 (citation omitted); *see id.* at 256 ("[E]quity will not give relief to an intentional infringer.").

221.    Finally, "equity requires that the prejudice be substantial before [this] defense[ ] can prevail," *id.*, and Defendant has not suffered any prejudice whatsoever, as it did not stop selling any of its infringing products even after this lawsuit was commenced. *See* FF ¶¶ 122-24, 238.

222.    Defendant's laches defense therefore fails.

### C. Defendant Cannot Prove Its Defense of Failure to Mitigate Damages, which the Law Does Not Recognize as a Defense to Plaintiffs' Lanham Act Claims.

223.    In this Circuit, there is no authority recognizing the failure to mitigate damages as a defense to claims under the Lanham Act. *See Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*, 12-CV-5354 (KAM) (RLM) & 13-CV-6397 (KAM) (RLM), 2016 WL 1273232, at *32 (E.D.N.Y. Mar. 31, 2016) ("Defendants fail to identify, and the court has not found, a Lanham Act case in this circuit where such a defense has been recognized."). Plaintiffs are not required to make settlement overtures to those violating their trademark rights before filing suit. Moreover, Plaintiffs seek disgorgement of Defendants' profits and are not pursuing a claim for damages. *See* JPO at 11-13.

224.    Defendant itself did not make reasonable efforts to mitigate its damages. It did not change its modus operandi in response to the numerous prior complaints it received from other brand owners and it continued to sell the fragrances at issue in this case well after the Complaint was filed. FF ¶¶ 122-24, 238. Defendant has only itself to blame for its failure to mitigate damages.

## V.  PLAINTIFFS ARE ENTITLED TO REMEDIES FOR DEFENDANT'S UNLAWFUL ACTS.

### A. Plaintiffs Are Entitled to Injunctive Relief.

225.    When a defendant infringes or dilutes a plaintiff's marks, "Defendant is not only trading on Plaintiff[s'] earned goodwill but is also taking from Plaintiff[s] the ability to control [their] reputation and the [goods] offered under [their] name[s] and mark[s]." *New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305 (S.D.N.Y. 2010); *see also id.* at 345 (finding that all of the factors in *Salinger v. Colting*, 607 F.3d 68 (2d Cir. 2010) favored injunctive relief). Thus,

> [a] permanent injunction is the usual and normal remedy once trademark infringement has been found in a final judgment. Consider the alternative. If a court were to permit the infringer to continue its infringing activities, the result would be a judicially imposed compulsory license given to an infringer. This would permit the likelihood of confusion to continue and deprive the consuming public of a truthful marketplace. Once it has been proven that confusion is likely, this means that customers will be likely to mistakenly attribute to plaintiff defects

or negative impressions they have of the infringer's goods or services. That means that the plaintiff's reputation (and the value of the trademark that symbolizes that good will) is at risk because it is in the hands of a stranger who has violated trademark law. Therefore, monetary relief in the future for injuries incurred as time goes by cannot be deemed an "adequate" remedy: the continuing injury to plaintiff's good will and reputation is "irreparable."

5 McCarthy § 30:1. Plaintiffs are entitled to a permanent injunction here.

226.    "Irreparable harm 'exists in a trademark case when the party seeking the injunction shows that it will lose control over the reputation of its trademark . . . ,' because loss of control over one's reputation is neither 'calculable nor precisely compensable.'" *New York City Triathlon*, 704 F. Supp. 2d at 343 (quoting *Power Test Petroleum Distribs., Inc. v. Calcu Gas, Inc.,* 754 F.2d 91, 95 (2d Cir. 1985)); *see also U.S. Polo Ass'n*, 800 F. Supp. 2d at 540 (citations omitted). In this case, if Defendant were allowed to continue using Plaintiffs' Marks, the reputation and goodwill cultivated by Plaintiffs' would be taken out of their hands.

227.    As the Second Circuit Court of Appeals observed in *Davidoff*:

"[o]ne of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark." In attaching its mark to its goods over time, a holder assures consumers that the goods conform to the mark holder's quality standards. Reputation for quality, whether good or bad, becomes associated with a mark in the minds of consumers. Many consumers are willing to pay more to buy goods bearing a mark which experience has taught the consumer represents an assurance of high quality.

571 F.3d at 243-44 (quoting *El Greco Leather Prods. Co. v. Shoe World, Inc.,* 806 F.2d 392, 395 (2d Cir. 1986)); *see also* 1 McCarthy § 2:4 ("An important purpose underlying trademark law is the protection of the trademark owner's investment in the quality of the mark and the quality of the goods or services the mark identifies.").

228.    This investment creates goodwill, which "can be defined as the intangible value of a business beyond the value of its physical assets." *See* 1 McCarthy § 2:19.

229.    Brand equity can be built or be diminished by associations indirectly transferred to the brand, whether by the brand owner or by third parties. FF ¶ 231. Thus, an association with Defendant's knockoff perfumes can do significant damage to Plaintiffs' brand equity and goodwill, as everything for which Defendant stands becomes associated with Plaintiffs' prestige

brands. *Id.* To quote Mr. Keegan, "everything that the discount channel represents is not the market that Calvin Klein is looking to enter . . . . If a consumer that is a likely purchaser of a Calvin Klein product saw what they thought was a Calvin Klein product in a discount channel, then, yes, I think that that would not be helpful to Calvin Klein." Keegan Dep. 216:14-217:25.

230.   Precisely "because loss of control over one's reputation is neither 'calculable nor precisely compensable,'" *New York City Triathlon*, 704 F. Supp. 2d at 343 (citation omitted), "remedies at law cannot adequately compensate Plaintiff[s] for [their] injuries." *U.S. Polo Ass'n*, 800 F. Supp. 2d at 541. *See also U.S. Polo Ass'n*, 800 F. Supp. 2d at 541 (citing *Nw. Nat'l Ins. Co. of Milwaukee, Wis. v. Alberts*, 937 F.2d 77, 80 (2d Cir. 1991) ("The irreparable injury requisite for the preliminary injunction overlaps with the absent lack of adequate remedy at law necessary to establish the equitable rights."); 5 MᴄCᴀʀᴛʜʏ § 30:2 ("If a defendant has been found to be committing acts which constitute trademark infringement, there seems little doubt that money damages are 'inadequate' to compensate plaintiff for continuing acts of defendant.").

231.   The balance of equities tips decidedly in Plaintiffs' favor:  Plaintiffs have invested hundreds of millions of dollars to advertise, promote, and protect the brands at issue, and have sold over $1 billion in fragrances bearing those brands—not to mention the other goods and services sold under the CALVIN KLEIN, VERA WANG, LADY GAGA, and JOOP! house marks. FF ¶¶ 38, 39, 49, 50, 63, 64. Defendant, by contrast, has not made any significant investment in its own brand, instead using *Plaintiffs' brands* to market its products. FF ¶¶ 96-111. Plaintiffs thus have significantly more to lose, absent an injunction, than Defendant stands to lose if an injunction is granted. *See U.S. Polo Ass'n*, 800 F. Supp. 2d at 541 (holding that the equities weighed in the plaintiff's favor, given the length of the plaintiff's use, the existence of the plaintiff's federal registrations, and "[t]he substantial likelihood of consumer confusion and potential loss to [the plaintiff] both in terms of sales and reputation").

232.   Further, the grant of an injunction here would not put Defendant out of business; it simply would require Defendant to invest the resources necessary to create and maintain its own, distinct brand identity or, alternatively, to go to market as an unbranded, functional

product. Defendant does not have to pursue a business model based upon freeriding on Plaintiffs'
and other brand owners' substantial investments in their fragrance brands.

233.    Finally, "[t]rademark law serves to protect both consumers from deception and
confusion over trade symbols *and* to protect the plaintiff's infringed trademark as property. Both
Congress and the Supreme Court in modern times have stressed that trademark has these two
goals." 1 MCCARTHY § 2:2. Thus, one overriding purpose of the Lanham Act is to "protect the
public so it may be confident that, in purchasing a product bearing a particular trade-mark which
it favorably knows, it will get the product which it asks for and wants to get." S. REP. NO. 1333,
79th Cong., 2d Sess., 3 (1946) (quoted in *Two Pesos*, 505 U.S. at 782 n.15 (Stevens,
concurring)); *see New York City Triathlon*, 704 F. Supp. 2d at 344 ("[T]he public has an interest
in not being deceived— in being assured that the mark it associates with a product is not attached
to goods of unknown origin and quality"); *Gucci*, 868 F. Supp. 2d at 255 ("the public interest
would be well-served by an injunction that eliminates the use of confusingly similar marks,
thereby enabling both brands to clearly communicate their core characteristics to the public").

234.    The public also has an interest in protecting marks from dilutive uses, which
unfairly exploit the "psychological function of symbols" and "the drawing power of a congenial
symbol" and thereby whittle away the public's ability to rely upon trademarks as source
identifiers guaranteeing a certain level of quality. *Mishawaka Rubber*, 316 U.S. at 205; *see Rolex
Watch U.S.A., Inc. v. Rolex Deli Corp.*, No. 11 cv. 9321(BSJ), 2012 WL 5177517, at *5
(S.D.N.Y. Oct. 18, 2012) (in dilution case, finding that "the public interest will best be served by
an injunction ensuring compliance with the Lanham Act and protecting Rolex Watch's legal
ownership of the ROLEX mark").

235.    In this case, because Plaintiffs have demonstrated a strong likelihood of consumer
confusion and dilution, and have proven that Defendant is engaging in false advertising, the
public interest clearly would be served by the issuance of an injunction.

236.    "This is especially true" in a case involving "personal beauty products," like this
one, because "a fragrance, serum, or lotion that contains an unlisted and/or dangerous ingredient

can create substantial health risks for the public. Placing another's mark on a knock-off deceives the public into believing that the product was subject to the mark holder's ordinary quality control procedures, when in fact it was not." *Hilton v. International Perfume Palace, Inc.*, No. 12–CV–5074 (JFB)(GRB), 2013 WL 5676582, at *13 (E.D.N.Y. Oct. 17, 2013); *see Davidoff*, 571 F.3d at 243-44 ("In attaching its mark to its goods over time, a holder assures consumers that the goods conform to the mark holder's quality standards. Reputation for quality, whether good or bad, becomes associated with a mark in the minds of consumers. Many consumers are willing to pay more to buy goods bearing a mark which experience has taught the consumer represents an assurance of high quality."). The issuance of "[a]n injunction here would help protect the public's interest in both legitimate and safe beauty products." *Id.*

237.    Where, as here, a permanent injunction is warranted, the Court has broad discretion to fashion an appropriate order, including an order requiring the defendant to deliver up for destruction the infringing products as well as "all labels, signs, prints, packages, wrappers, receptacles, and advertisements bearing the infringing mark." 5 McCarthy § 30:9 (citing cases); *see also* 15 U.S.C. § 1116(d)(1)(B) (providing for seizure orders in cases involving "counterfeit mark[s]" being used in connection with the goods for which a mark is registered). At bottom, "[a] district court must be permitted to fashion an 'injunction which will keep a proven infringer safely away from the perimeter of future infringement.'" *Versace v. Versace*, 213 Fed. App'x 34, 36 (2d Cir. 2007) (citation omitted). The Court will exercise its discretion to do so here.

**B.    Plaintiffs Are Entitled to Monetary Relief Based Upon Defendant's Profits.**

238.    Section 35(a) of the Lanham Act provides that when a plaintiff establishes a violation of "any right of the registrant of a [registered] mark," a violation of Section 43(a), or a willful violation of Section 43(c), "the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 17 U.S.C. § 1117(a).

239.    The Second Circuit Court of Appeals recently observed that a "profits award,

premised upon a theory of unjust enrichment, requires a showing of actual consumer

confusion—or at least proof of deceptive intent so as to raise the rebuttable presumption of

consumer confusion." *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 261 (2d Cir. 2014)

(citations omitted).

240.    In this case, Plaintiffs have adduced substantial evidence both of Defendant's bad

faith and actual confusion, and thus, per Section 35(a), Plaintiffs are entitled to an award of

Defendant's profits on sales of the accused fragrances.

241.    In proving Defendant's profits, Section 35(a) requires Plaintiffs "to prove

[D]efendant's sales only; [D]efendant must prove all elements of cost or deduction claimed." 15

U.S.C. § 1117(a). Plaintiffs have proven Defendant's total sales of the accused fragrances from

July, 2010 through April, 2016 in the amount of $6,573,840.43. FF ¶ 124; *see* Pl. Ex. 243

(Highly Confidential – AEO).

242.    To the extent that Defendant continued to sell Plaintiffs' products after that time

frame, Plaintiffs are entitled to an accounting of all such additional sales. *See* 5 McCarthy

§ 30:70 ("Generally, the accounting period should be co-extensive with the period of

infringement.").

243.    In ordinary cases of infringement, Section 35(a) gives the Court the discretion to

award "any sum above the amount found as actual damages, not exceeding three times such

amount" as well as "reasonable attorney fees" in "exceptional cases." 15 U.S.C. § 1117(a).

244.    In cases like this one, however, where a defendant is "intentionally using a mark

or designation, knowing such mark or designation is a counterfeit mark (as defined in section

1116(d) of this title), in connection with the sale, offering for sale, or distribution of goods or

services," Section 35(b) provides that "the court *shall*, unless the court finds extenuating

circumstances, enter judgment for three times such profits or damages, whichever amount is

greater, together with a reasonable attorney's fee . . . ." *Id.* at § 1117(b) (emphasis added).

Section 34(d) of the Lanham Act, *id.* at § 1116(d), in turn, defines "counterfeit mark" as "a

counterfeit of a mark that is registered on the principal register in the United States Patent and Trademark Office for such goods or services sold, offered for sale, or distributed [*e.g.*, fragrances] and that is in use, *whether or not the person against whom relief is sought knew such mark was so registered*." *Id.* at § 1116(d)(1)(B) (emphasis added); *see also id.* at § 1127 (defining a "counterfeit" as "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark").

245.   In other words, where (as here) a defendant:  (a) intentionally has used a mark; (b) that is substantially indistinguishable from the plaintiff's mark; (c) the plaintiff's mark is registered; and (d) the defendant is using the mark in connection with the goods listed in the plaintiff's registration, then Section 35(b) provides for *mandatory treble damages and attorney's fees*.

246.   Notably, to have been "intentionally using a mark or designation, knowing such mark or designation is a counterfeit mark," *id.* at § 1117(b), the defendant need only have knowledge that its mark is "counterfeit"—*i.e.*, that it is "identical with, or substantially indistinguishable from, a registered mark . . . ." *Id.* at § 1127. Under the plain language of the statute, the defendant does *not* need to have knowledge of the registration itself. *Id.* at §§ 1116(d)(1)(B), 1127.

247.   Congress enacted this remedy to "'deter those who might otherwise engage' in trademark counterfeiting by 'taking the profit out of this lawless behavior.'" *Louis Vuitton S.A. v. Spencer Handbags Corp.*, 597 F. Supp. 1186, 1193 (E.D.N.Y. 1984) (quoting S. REP. NO. 526, 98th Cong., 2d Sess. 6 (1984)); *see also id.* at 1193-94 ("To increase the deterrent effect, the treble damage award in Section 1117(b) is not designed to compensate plaintiffs but rather to punish defendants.")

248.   Defendant has affixed to its perfumes "spurious mark[s] which [are] identical with, or substantially indistinguishable from, [Plaintiffs'] registered mark[s]"—down to the distinctive typefaces in which Plaintiffs' trademarks appear. *See* 15 U.S.C. § 1127; *Tiffany & Co.*, 127 F. Supp. 3d at 255. Thus, Section 35(b) provides for *mandatory* trebling of Defendant's

profits and attorney's fees in this case. Plaintiffs also are entitled to the "costs of the action" as well as prejudgment interest. *See* 15 U.S.C. § 1117(a), (b).

    249.    For all of the above reasons, the Court shall order a permanent injunction. Plaintiffs shall submit a proposed form of order after the close of the evidence.

DATED: January 9, 2017              Respectfully submitted,

                        KILPATRICK TOWNSEND & STOCKTON LLP

                        By: */s/Lisa Pearson*

                        Lisa Pearson (LP 4916)
                        Robert Potter (RP 5757)
                        Olivia Harris (OH 1983)
                        1114 Avenue of the Americas
                        New York, New York 10036
                        Telephone: (212) 775-8700
                        Facsimile: (212) 775-8800
                        lpearson@kilpatricktownsend.com
                        rpotter@kilpatricktownsend.com
                        oharris@kilpatricktownsend.com

                        James W. Faris Jr. (admitted *pro hac vice*)
                        1100 Peachtree Street, Suite 2800
                        Atlanta, Georgia 30309
                        Telephone: (404) 815-6500
                        Facsimile: (404) 815-6555
                        jfaris@kilpatricktownsend.com

                        *Attorneys for Plaintiffs*