H3NHCOT1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

COTY INC., COTY B.V., CALVIN
KLEIN TRADEMARK TRUST, CALVIN
KLEIN, INC., CALVIN KLEIN
COSMETIC CORPORATION, VERA
WANG LICENSING LLC, V.E.W.,
LTD., and ATE MY HEART INC.,

                    Plaintiffs,

          v.                          15 CV 7029 (JMF)

EXCELL BRANDS, LLC,

                                      Trial

                    Defendant.

------------------------------x

                                      New York, N.Y.
                                      March 23, 2017
                                      9:05 a.m.

Before:

                    HON. JESSE M. FURMAN,

                                      District Judge

                         APPEARANCES

KILPATRICK TOWNSEND & STOCKTON LLP
        Attorneys for Plaintiffs
BY:  LISA PEARSON
        ROBERT N. POTTER
        JAMES W. FARIS
        ROBERTO GARCIA

BLANK ROME LLP
        Attorneys for Defendant
BY:  KENNETH L. BRESSLER
        SIMON J.K. MILLER

H3NHCOT1

1          (Case called)

2          THE COURT:  State your appearances, counsel.

3          MS. PEARSON:  Good morning, your Honor.  May it please

4     the court, I'm Lisa Pearson from Kilpatrick Townsend, counsel

5     for the plaintiffs.  With me, your Honor, at counsel table are

6     my colleagues, Robert Potter, James Faris, and Alberto Garcia.

7          THE COURT:  Good morning.

8          MR. BRESSLER:  Good morning, your Honor.  Kenneth

9     Bressler for defendants, or defendant.  I'm here with Simon

10    Miller.

11         THE COURT:  All right.  Good morning, and welcome to

12    trial.  Well, any housekeeping or other issues that you want to

13    raise?  And I don't know who's in the back.  Any witnesses

14    present in the courtroom?

15         MS. PEARSON:  Your Honor, our first witness, Joseph

16    Conklin, is in the courtroom.

17         THE COURT:  Should he be excluded?  I don't know what

18    we're going to discuss.

19         MS. PEARSON:  It was my understanding I was supposed

20    to call him to the stand, have him authenticate his witness

21    statement.

22         THE COURT:  No, no, obviously that time will come.

23         MS. PEARSON:  Right.

24         THE COURT:  The question is whether there are any

25    issues we need to discuss for which he should not be present.

H3NHCOT1

1           MS. PEARSON:  I don't know whether the Court wishes

2      the witness to be in the room to discuss evidentiary objections

3      to his witness statement and exhibits.

4           THE COURT:  I have no problem with him being present

5      for that, since it's his affidavit, but anything -- well, all

6      right.

7           Mr. Bressler.

8           MR. BRESSLER:  I don't anticipate anything, your

9      Honor.  If there is, we'll let the Court know.

10          THE COURT:  OK.  You had other issues you wanted to

11     raise?

12          MR. BRESSLER:  No, I was just going to hand up a

13     binder with our new exhibits, if I may.

14          THE COURT:  Sure.  Do you have a new exhibit list, or

15     did we already receive that?

16          MR. BRESSLER:  I don't know if it was sent to you

17     and --

18          THE COURT:  I don't think we have an exhibit list with

19     these exhibits on it.

20          MR. BRESSLER:  Well, I can give you the other side's

21     objections so it has everything on here.

22          THE COURT:  OK.

23          MR. BRESSLER:  It's in redline.

24          THE COURT:  All right.  Very good.  Anything else?

25          All right.  We'll get started in one second.  Let me

1     just say, as a preliminary matter, I'll rule on the objections

2     with respect to each witness in accordance with the process

3     that I described the other day.

4              Let me give you just some general comments.  A number

5     of the objections were relevance objections under Rule 402.

6     I'm not going to get hung up on relevance issues here, unless

7     things get -- unless cross goes down directions that I think

8     are not relevant or profitable.  It's a bench trial.  If the

9     paragraphs to which defendant has objected are not relevant,

10    I'm not going to rely on them.  If I do rely on them, then

11    they're relevant.  So unless, again, you delve into the issues

12    that I think are irrelevant to an excessive length on cross,

13    I'll tell you, I don't think this is relevant.  Let's move on.

14    I'm just not going to really get hung up on those issues.

15             Second, there were some objections to witnesses sort

16    of reference or discussion of legal issues.  In general, I

17    think those objections are well-taken, that is to say, the law

18    is my province, not the province of any witness, Mr. Conklin or

19    otherwise.  I'm not going to rely on those.  I'll just say that

20    those are generally sustained, and I will disregard any

21    witness' description of what the law is.

22             Third, there are, I think, a number of objections with

23    respect to sort of newspaper articles, printouts from the

24    Internet, that sort of thing, on hearsay grounds.  As I

25    understand it -- Ms. Pearson, correct me if I'm wrong -- those

1    items are not offered for the truth but just generally to

2    show -- for the fact that they exist and as evidence of

3    objective evidence of fame, and what have you.  Is that a fair

4    statement?

5          MS. PEARSON:  Yes, your Honor.  We gave you

6    representative newspaper articles, social media coverage, and

7    so forth, to prove the fame of the mark; and then some

8    highlights in that evidence, because it's voluminous, were

9    brought out in individual witness statements.

10         THE COURT:  All right.  Mr. Bressler, am I missing

11   something there?  To the extent that's the case, I think it's

12   proper.  I'm not going to rely on those for the truth of the

13   matter.

14         MR. BRESSLER:  There are one category of documents,

15   your Honor, that I believe are hearsay and should be excluded,

16   and those are documents from the Internet showing that

17   purportedly certain items are available to be purchased from

18   certain websites.  Number one, there's no evidence that they

19   actually were available, and often on websites things are not

20   available.  There's no evidence that they're not counterfeit

21   products.  There's no evidence about anything, and they're

22   being offered for the truth of the matter that the products are

23   being offered online.

24         THE COURT:  I think you can cross-examine on those

25   issues.  The fact that a witness found a listing for something

H3NHCOT1

1    and the listing itself is not hearsay.  Whether it proves what

2    they say and whether it actually is what it purports to be is a

3    different matter.

4            Next is -- or the last category is there were some

5    objections with respect to paragraphs concerning essentially

6    whether things would or did or were likely to cause customer

7    confusion, or the like.  In general, I think those are

8    well-founded, those objections, on the grounds that the

9    witnesses at issue here -- and I'm not talking about the expert

10   at the moment -- are not competent to be testifying about what

11   consumers do or do not believe, but I will address those

12   objections as we bring them up and deal with them.

13           All right.  Yes.

14       MS. PEARSON:  May I ask one question on that point,

15   your Honor?  In certain cases the witnesses are drawing an

16   inference from underlying facts that are known to them.  May we

17   elicit, when we put the witness on the stand, the underlying

18   facts and just omit the inference that they're drawing?

19       THE COURT:  I'll deal with that as it comes up rather

20   than answer in the abstract.

21       MS. PEARSON:  Thank you.

22       THE COURT:  With that, let's get to trial.  Sorry.

23   One last thing, just a housekeeping matter.  Because it's a

24   bench trial and no one will be using the jury room from our

25   side of things, you're welcome to have your witnesses stay in

1   there while they're waiting.  The only thing I would ask is

2   this door is alarmed right here, so please instruct them not to

3   use that door to come in and out of the courtroom, and you

4   yourselves should not use that door.  Instead, everybody should

5   go through the main hallway, and then there's a separate

6   entrance there.  But if you'd like to utilize that room while

7   folks are waiting, you're welcome to do so.

8            All right.  Please call your first witness.

9            MS. PEARSON:  We call to the stand Joseph J. Conklin,

10   senior vice president and global deputy general counsel of

11   plaintiff Coty Inc.

12            THE COURT:  All right.  Mr. Conklin, you may approach.

13    JOSEPH J. CONKLIN,

14        called as a witness by the Plaintiff,

15        having been duly sworn, testified as follows:

16            THE COURT:  You may proceed, Ms. Pearson.

17            MS. PEARSON:  Your Honor, may I approach the bench to

18   provide the witness with three exhibits, his witness statement,

19   Plaintiffs' Exhibit 1, and Plaintiffs' Exhibit 1*?

20            THE COURT:  You may.

21   DIRECT EXAMINATION

22   BY MS. PEARSON:

23   Q.  Mr. Conklin, can you please state your full name and your

24   title for the record.

25   A.  Yes.  My full name is Joseph Conklin.  My title is senior

vice president and global deputy general counsel for Coty Inc.

        THE COURT:  Mr. Conklin, you're going to need to keep your voice up so everybody can hear you.  Maybe move the microphone a little closer to you, please.

        Go ahead.

Q.  Mr. Conklin, did you prepare a direct testimony affidavit or declaration in this lawsuit?

A.  Yes, I did.

Q.  Could you please take a look at Plaintiffs' Exhibit No. 253 which I've placed before you.  Is that a copy of the direct testimony declaration that you submitted?

A.  Yes, it is.

Q.  Is there anything that requires updating or supplementation from your perspective in your declaration?

A.  Not that I believe, no.

Q.  Mr. Conklin, in your declaration in paragraph 5, you refer to Plaintiffs' Exhibit 1, which I have put before you.  Does Plaintiffs' Exhibit 1 depict each Coty fragrance product at issue besides the unauthorized alternative fragrance sold by the defendant?

        THE COURT:  Counsel, his affidavit says that, so why don't you proceed.

        MS. PEARSON:  OK.  The issue, your Honor, is simply that we created a more legible version of Plaintiffs' Exhibit No. 1, which is marked Plaintiffs' Exhibit No. 1*, and I wanted

H3NHCOT1                        Conklin - direct

1    Mr. Conklin to --

2            THE COURT:  All right.  Mr. Conklin, have you reviewed

3    Exhibit 1*?  Maybe we can even avoid -- Mr. Bressler, is there

4    any dispute that 1* is identical?

5            MR. BRESSLER:  Haven't seen it, your Honor.

6            MS. PEARSON:  It has been supplied to defendant.  It

7    simply provided more legible photographs of the products at

8    issue because we realize that Plaintiffs' Exhibit 1, the

9    quality of the photographs had deteriorated over time through

10   duplication.  They're not identical photographs, but they're

11   the identical products.

12           THE COURT:  I will tell you what.  Why don't we --

13   I'll take counsel's representation.  Mr. Bressler, you can

14   review it if you like, and if you have any problem --

15           MR. BRESSLER:  They gave it to Mr. Miller a minute

16   ago.

17           MS. PEARSON:  No, no, this is a document we supplied a

18   long time ago.

19           THE COURT:  Bottom line is I'll take your

20   representation at face value, assume this is identical to

21   Plaintiffs' Exhibit 1, and we'll use it on the theory that it's

22   a more usable version of Exhibit 1.

23           MS. PEARSON:  I appreciate that, your Honor.

24           THE COURT:  So you may proceed.  Let's cut to the

25   chase.

1            MS. PEARSON:  Your Honor, at this time I would like to

2     move for the admission of Mr. Conklin's direct testimony which

3     has been marked as Plaintiffs' Exhibit No. 253, as well as the

4     exhibits to which defendant has no objection that are

5     referenced in that testimony, which are Plaintiffs' Exhibits 1

6     through 31, 33 through 80, 155 through 60, and 174 through '75.

7            THE COURT:  That's it?

8            All right.  Mr. Bressler, let's start with the

9     exhibits.  Any objection to the exhibits?

10            MR. BRESSLER:  To the ones that Ms. Pearson just

11     recited, I assume those are ones we have no objection to.

12            THE COURT:  All right.  So they are admitted without

13     objection.

14            (Plaintiffs' Exhibits 1 through 31, 33 through 80, 155

15     through 160, 174 through 175 received in evidence)

16            THE COURT:  I've reviewed defendant's objections to

17     the affidavits.  Let me give you those rulings now.  There are

18     objections to paragraph 18, the second sentence and the last

19     sentence.  Those are overruled.

20            The objections to paragraphs 20, 21, 22, 23 in their

21     entirety, those are overruled as well.  Again, to the extent

22     that there's a relevance objection, I will either rely on such

23     things, in which case they are relevant, or not, in which case

24     you don't need to worry about it.

25            Paragraphs 25 and 29, Ms. Pearson, are you relying on

1   Rule 803(17) for those as well?  Is that the issue here?

2            MS. PEARSON:  The Nielsen data discussed in

3   paragraph 25 is the same information discussed in the Rotter

4   declaration, your Honor.

5            THE COURT:  All right.  So I'll reserve judgment on

6   that issue pending the briefing that will be submitted by

7   tomorrow.

8            What's the Rule 901 issue, Mr. Bressler?

9            MR. BRESSLER:  Authentication of the Nielsen data.

10           THE COURT:  I know what Rule 901 says.

11           MR. BRESSLER:  I understand.  But there's been no

12   foundation laid that this is authentic, that he has any

13   knowledge about these reports, that it's complete, anything

14   about it.  But we will be submitting our letter on Friday as

15   well.

16           THE COURT:  All right.  Well, the Rule 901 issue is a

17   slightly different one than you'll be briefing.

18           Ms. Pearson, if you want to elicit some testimony on

19   that to address whatever the 901 objection may be, I'll allow

20   you to do that on a limited basis in a moment.  Again,

21   otherwise, I reserve judgment on the 803(17) issue.  The

22   objection to paragraph 26 is overruled.

23           In accordance with my comments earlier, paragraph 29,

24   the second and last sentence, again, that's a 803(17) issue,

25   and I'll reserve judgment.

1          Paragraph 50 there's an objection to the paragraph --

2     the language beginning "which means that" through the end of

3     the paragraph, and that is legal conclusions and is sustained,

4     again for the reasons I stated earlier.  So those are my

5     rulings there.

6          Ms. Pearson, if you'd like to examine Mr. Conklin

7     briefly with respect to the foundation on the Nielsen data,

8     you're welcome to do that.

9     BY MS. PEARSON:

10    Q.  Mr. Conklin, could you direct your attention to

11    paragraph 25 of your direct testimony, please.

12    A.  OK.  I'm on paragraph 25.

13    Q.  In the second sentence, you reference highly confidential

14    data collected by Nielsen.  Do you see that?

15    A.  I do.

16    Q.  Did you personally examine the highly confidential data

17    collected by Nielsen that has been marked as Plaintiffs'

18    Exhibit 154-1?

19    A.  I cannot speak to the exhibit number without seeing the

20    document, but I did review an exhibit that was Nielsen data.

21    Q.  And on that document, did you observe that defendant's

22    Diamond Collection fragrances are sold at certain mass market

23    retailers on that printout?

24    A.  That is what the Nielsen data that I reviewed stated.

25    Q.  Can you identify the retailers selling Diamond Collection

1    fragrances that you observed on that list?

2              MR. BRESSLER:  Objection.

3              THE COURT:  Sustained.

4              Ms. Pearson, the issue is what the document is, how it

5    came to be, how he came to get it, how he knows what it is.

6    That's what authentication is about, not what the document

7    actually says.

8              MS. PEARSON:  Your Honor, the document has been

9    authenticated by Mr. Rotter.  We are not relying upon

10   Mr. Conklin to authenticate the document.

11             THE COURT:  Great.  So it's --

12             MS. PEARSON:  Mr. Conklin --

13             THE COURT:  So the Rule -- If I'm speaking, you have

14   to stop -- the Rule 901 objection is overruled subject to

15   connection.  If the connection is made, then there's no issue.

16   If it's not, then it will be sustained.

17             MS. PEARSON:  Thank you.  Thank you, your Honor.

18             THE COURT:  All right.  Cross-examination.

19             MS. PEARSON:  Your Honor, I believe that there are

20   some additional exhibits that are referenced in Mr. Conklin's

21   declaration as to which Mr. Bressler had evidentiary

22   objections, so I did not include them in the first batch of

23   noncontroversial exhibits that I moved to admit.  Would you

24   like me to move to admit the other ones?

25             THE COURT:  Yes, please.

1            MS. PEARSON:  Or would you like to address the

2       evidentiary objections?

3            All right.  I believe the first one to which

4       Mr. Bressler has objected is Plaintiffs' Exhibit 153.

5            THE COURT:  What paragraph is that referenced in?

6            MS. PEARSON:  Paragraph 41, your Honor.  It is the

7       Coty Inc. consumer complaint concerning Love Story.

8            THE COURT:  What's the objection, Mr. Bressler?

9            MR. BRESSLER:  I'll withdraw the objection and

10      cross-examine the witness on it.

11           THE COURT:  All right.  That exhibit is admitted.

12           (Plaintiffs' Exhibit 153 received in evidence)

13           THE COURT:  Next.

14           MS. PEARSON:  I believe that we have previously

15      addressed Plaintiffs' Exhibit 154, the Nielsen data.

16           THE COURT:  All right.  And I've reserved judgment on

17      that, so we can --

18           MS. PEARSON:  There was an objection to Plaintiffs'

19      Exhibit 163, printouts from the Amazon website of listings for

20      relevant fragrances.

21           THE COURT:  I think I've addressed that.  Those are

22      admitted merely for the fact that those listings appear on

23      Amazon.  Whether it proves what you think it proves is a

24      different matter.

25           MS. PEARSON:  I believe then that ruling applies to

1    Plaintiffs' Exhibits 163, 164, 165, 168, and I would move for

2    the admission of those exhibits.

3              THE COURT:  All right.  Any objection, Mr. Bressler,

4    in light of my ruling?

5              MR. BRESSLER:  Given your ruling, no objection, your

6    Honor.

7              THE COURT:  All right.  Those are admitted.

8              (Plaintiffs' Exhibits 163, 164, 165, and 168 received

9    in evidence)

10             THE COURT:  Next.

11             MS. PEARSON:  Similarly, your Honor, Plaintiffs'

12   Exhibit 232 is printouts of fragrances from the Dollar General

13   website.  235 is printouts from perfumeimpression.com showing

14   defendant's fragrance.  And 246 is selected customer lists and

15   sales by customer documents for plaintiffs' fragrances.

16             THE COURT:  Any objections to those, Mr. Bressler?

17             MR. BRESSLER:  Well, your Honor, to all of the

18   Internet printouts, to the extent they deal with products other

19   than the products at issue, I object based on relevance.

20             THE COURT:  All right.  That's overruled for the

21   reasons I've described.

22             (Plaintiffs' Exhibits 232, 235, and 246 received in

23   evidence)

24             THE COURT:  Next.

25             MR. BRESSLER:  OK.  236.

H3NHCOT1                           Conklin - cross

1                THE COURT:  236?

2                MR. BRESSLER:  I'm sorry.

3                MS. PEARSON:  246.

4                MR. BRESSLER:  I'm sorry.  246, I have no objection.

5                THE COURT:  All right.  Those are admitted.

6                MS. PEARSON:  Thank you, your Honor.

7                THE COURT:  That's it?

8                MS. PEARSON:  That's it, your Honor.

9                THE COURT:  Great.  All right.  Cross-examination.

10               Counsel, the witness indicated he would like some

11      water.  Maybe you can approach and give him some.

12               All right.  You may, proceed, Mr. Bressler.

13      CROSS-EXAMINATION

14      BY MR. BRESSLER:

15      Q.  Good morning, Mr. Conklin.

16      A.  Good morning, Mr. Bressler.

17      Q.  If you could, as the Court suggests, move the microphone

18      closer to you or you to it, that would be very much

19      appreciated.

20      A.  Is that better?

21      Q.  Very much so.  Thank you.

22               In 2005, Coty sent a cease and desist letter to a

23      company called MD Distributors; isn't that correct?

24      A.  Yes, I believe it is correct.

25      Q.  And that would be Exhibit BBB.

1          May I approach, your Honor?

2          THE COURT:  You may.

3          MR. BRESSLER:  Would you like a copy?

4          MS. PEARSON:  Thank you.

5   Q.  Is that a copy of the cease and desist letter sent to MD

6   Distributors?

7          MS. PEARSON:  Your Honor, I must object because on its

8   face the letter is a demand letter written by -- on behalf of

9   Zino Davidoff S.A.

10         MR. BRESSLER:  Your Honor, perhaps we can have

11  Ms. Pearson on the stand and testify.

12         THE COURT:  There's no question other than, Is that a

13  copy of the cease and desist letter?  I don't think that's

14  question is objectionable.  The witness may testify and answer.

15         Mr. Conklin, you may answer.

16  A.  I apologize, Mr. Bressler.  Could you repeat the question.

17  Q.  Is Exhibit BBB a copy of the cease and desist letter sent

18  to MD Distributors?

19  A.  Yes, it is.

20  Q.  You if look to the bcc page on the back of, I guess it's

21  the third page, it says that a copy was sent to Robert Cravens.

22  Who is Mr. Cravens?

23  A.  Mr. Cravens was an attorney at Coty.

24  Q.  He was your predecessor, was he not?

25  A.  He was -- he had a different title, but he had

1   responsibility for trademark matters at Coty prior to my

2   arrival.

3   Q.  And you had testified in your affidavit that Coty, or we,

4   had sued MD Distributors; correct?

5   A.  By Coty.

6   Q.  Coty was in charge of sending this cease and desist letter,

7   weren't they?

8   A.  I apologize, Mr. Bressler, but I don't know.  That was

9   before my time at the company, and I do not know if it was Coty

10  or it was Zino Davidoff who the letter purports to be on behalf

11  of.

12  Q.  This is a copy of the cease and desist, though?

13  A.  Yes, it reads like a cease and desist letter to me.

14          THE COURT:  Mr. Conklin, you were not there in 2005;

15  is that correct?

16          THE WITNESS:  That's correct.

17          THE COURT:  All right.  Thank you.

18  Q.  Were you designated as a corporate representative on behalf

19  of Coty to testify about enforcement efforts made by Coty to

20  protect its trademarks?

21  A.  I'm not certain of the exact designation in the 30(b)(6)

22  notice, but generally speaking, that would be correct.

23          MR. BRESSLER:  I move Exhibit BBB into evidence.

24          THE COURT:  Any objection?

25          MS. PEARSON:  I have a relevance objection, your

H3NHCOT1                    Conklin - cross

1   Honor, but I will abide by your ruling.

2            THE COURT:  All right.  It is admitted.

3            (Defendant's Exhibit BBB received in evidence)

4   BY MR. BRESSLER:

5   Q.  Now, this Exhibit BBB was sent to Coty -- I'm sorry, to MD

6   Distributors prior to the time that Coty or Zino Davidoff knew

7   the full extent of the infringement by MD Distributors; isn't

8   that true?

9   A.  I would assume that would be true, yes.

10  Q.  OK.  According to the complaint -- and I will show you a

11  copy of the complaint filed against MD distributor.  It's been

12  marked as Exhibit 156-1.

13           Your Honor, I have an extra copy with tabs to the

14  relevant pages if your Honor would like it --

15           THE COURT:  All right.

16           MR. BRESSLER:  -- to make it easier.  May I approach?

17           THE COURT:  You may.

18           THE WITNESS:  Thank you.

19           MR. BRESSLER:  Your Honor, Plaintiffs' Exhibit 156-1

20  has been admitted into evidence already.

21           THE COURT:  All right.  You may proceed.

22  BY MR. BRESSLER:

23  Q.  Now, according to the complaint, an investigator was sent

24  to MD Distributors' retail outlet in February 2006.  That's

25  paragraph 43.

1          THE COURT:  Is that a question?

2   Q.  Is that correct that the investigator was sent in 2006?

3          MS. PEARSON:  Objection, your Honor.

4          THE COURT:  Sustained.

5   A.  I don't know.

6   Q.  An investigator was sent to MD's retail outlet; correct?

7   A.  I don't know.

8          MS. PEARSON:  Objection, your Honor.

9          THE COURT:  He said he didn't know.  Let's proceed.

10  Go ahead.

11  Q.  According to the complaint which is admitted into evidence,

12  pictures of the infringing goods were taken by the investigator

13  and a sample was purchased; correct?

14  A.  Could I read it to try to find the relevant paragraph

15  because it's --

16  Q.  I'll represent it to you.

17         THE COURT:  Bottom line is the complaint is not

18  admissible for the truth, so I'm not going to rely on it for

19  the truth.  And since he wasn't there at the time of the

20  underlying events, I don't see any reason to examine him about

21  these things.  So --

22         MR. BRESSLER:  I think he was.

23  Q.  Were you at Coty at the time this complaint was filed?

24  A.  What is the date on the complaint?

25  Q.  It is September 2008.

1          Your Honor, the witness had introduced this in his

2     affidavit.

3          THE COURT:  I understand.  This is one of these areas

4     where I'm inclined to agree it's not actually relevant, so why

5     don't you move on.

6          MR. BRESSLER:  OK.

7     Q.  The item at issue in the MD case can be seen on the second

8     tab, can it not, GK One?

9     A.  If I may, excuse me one moment.

10    Q.  This is the alleged alternative, or knockoff, MD

11    Distributors was selling of Calvin Klein's CK One product, and

12    a better copy can be seen in the second tab.

13         MS. PEARSON:  I object to the form.

14         THE COURT:  Ms. Pearson, you can't mumble your

15    objections.  You have to speak up and into the microphone.

16         Sustained.

17         MS. PEARSON:  I object to the form.

18         THE COURT:  Sustained as to form.

19         MR. BRESSLER:  Your Honor --

20    Q.  Mr. Conklin, is Exhibit G to the complaint, the photograph

21    that's on the second and fourth tab, is that a copy -- a

22    photograph of the copy of the item which Zino Davidoff

23    complained MD Distributors was selling and that was infringing

24    the CK One product?

25    A.  Exhibit J, you said, correct, Mr. Bressler?

1   Q.  Excuse me?

2   A.  Exhibit J, you said?

3   Q.  The second tab is part of Exhibit G and then J, yes, you're

4   right.  The first tab is G; the second is J.

5   A.  Mr. Bressler, I was not involved in the drafting of this

6   complaint, so I'm not certain I can read the complaint and try

7   to cross-reference the language to the exhibit and speak to

8   what it says.  But if your question, which I believe it to be,

9   is what the complaint was at the time, I just do not know.

10  Q.  I will move on.

11          Your Honor, I'd like to show the witness Exhibit AAA.

12  May I approach, your Honor?

13          THE COURT:  You may.

14  Q.  Can you identify what Exhibit AAA is with the product at

15  Exhibit AAA?

16  A.  Yes, it appears to be CK One.

17  Q.  And this was the earlier version of the packaging from CK

18  One?

19  A.  I'm not sure what you mean by "earlier."

20  Q.  Well, CK One packaging has changed, hasn't it?  And you can

21  see it on Plaintiffs' Exhibit 41.

22  A.  Yes.

23  Q.  So Defendant's Exhibit AAA is the earlier packaging for CK

24  One; correct?

25  A.  Yes.

1   Q.  Now, the exhibit shown in the complaint in the second tab,

2   the item in the second tab looks very much like the product

3   that Calvin Klein was selling, the CK One product; right?

4   A.  I would agree with that.

5          MR. BRESSLER:  Now, I move Exhibit AAA into evidence.

6          THE COURT:  Any objection?

7          MS. PEARSON:  I don't know what it is, your Honor, but

8   if it's just being offered to show the old packaging, I don't

9   have a problem.

10         THE COURT:  All right.  Admitted.

11         (Defendant's Exhibit AAA received in evidence)

12  BY MR. BRESSLER:

13  Q.  In 2010, MD Distributors entered into a consent judgment

14  with Zino Davidoff; right?

15  A.  Yes.

16  Q.  And this is another document that you introduced into

17  evidence.

18         And it's been admitted, your Honor, 156-2.  May I

19  approach, your Honor?

20         THE COURT:  You may.

21  A.  Thank you.

22  Q.  156-2 is a copy of the consent judgment entered into with

23  MD Distributors; correct?

24  A.  Yes.

25  Q.  And what part did Coty play in this consent judgment?

```
 1    A.  I'm not sure what that means.

 2    Q.  Well, Ms. Pearson was handling the litigation; correct?

 3    A.  Yes.

 4    Q.  Was Ms. Pearson being paid for by Coty?

 5    A.  I'm not certain.  I was not involved in this case, so I'm

 6    not certain.

 7    Q.  Looking to the Exhibit 156-2, you see that -- well, Zino

 8    Davidoff and Calvin Klein Trademark Trust are -- their

 9    fragrances are distributed by Coty; right?

10    A.  That's correct.

11    Q.  And pursuant to the agreements that Coty has with Zino

12    Davidoff and Calvin Klein, litigation is generally brought or

13    controlled by Coty; correct?

14    A.  Not necessarily.

15    Q.  Do you know whether -- withdrawn.

16            Looking to this paragraph 1.18 of this agreement, this

17    agreement with MD Distributors at paragraph 1.18 says,

18    effectively says, that MD Distributors is permitted to

19    distribute product that bears the legend "our version of"

20    Calvin Klein's Obsession, for example, as long as the version

21    is not confusingly similar; correct?

22            MS. PEARSON:  Objection, your Honor.

23            THE COURT:  Overruled.

24    A.  No, I don't believe that is correct.

25    Q.  What does the agreement say, then?
```

H3NHCOT1                          Conklin - cross

1    A.  Well, shall I --

2              THE COURT:  Counsel, the agreement speaks for itself.

3    It's in evidence.  I'll take a look at it.

4              MR. BRESSLER:  OK.

5              THE COURT:  Next question.

6    Q.  Zino Davidoff and Calvin Klein said, were agreed with MD

7    Distributor, that if they used an "our version" phrase, it

8    would not be in contempt, it would not be a violation of this

9    agreement; correct?

10             MS. PEARSON:  Objection, your Honor.

11             THE COURT:  Overruled.

12             Ms. Pearson, you've got to speak up.

13   Q.  Paragraph 1.18.  1.18.

14   A.  I do not see anything in paragraph 1.18 that speaks to the

15   issue of contempt.

16             MR. BRESSLER:  I'll refer the Court to paragraphs

17   1.18, 1.19, and 3.2.

18   Q.  Mr. Conklin, you know that Wayne Hamerling was at MD

19   Distributors; right?

20   A.  That's what I've been informed.  But Mr. Bressler --

21   Q.  I'm sorry.  Just answer the question, please.

22             And you know that or you've been informed that

23   Mr. Hamerling was in charge of the alternatives division at MD

24   Distributors; right?

25   A.  I'm not certain of his exact role.  I know that he had a

1    role at MD Distributors, or I've been informed of that.

2    Q.  And you know that Excell was formed within a week of the

3    time this consent judgment was entered into?

4    A.  I've learned through this litigation that Excell started

5    shortly after this was entered, after this consent judgment was

6    entered into, yes.

7    Q.  And you know that Mr. Hamerling was the one who formed --

8    or one of the formers or founders of Excell; right?

9    A.  I know that now, yes.

10   Q.  Now I'd like to show you if you look at the tabbed exhibit

11   of Exhibit -- the complaint, which is Exhibit 156-1, and you

12   see what the product looks like that Mr. Hamerling was selling

13   under the name GK One, and I'd like you to compare that with --

14   may I approach, your Honor?

15            THE COURT:  You may.

16   Q.  -- the product that they are now selling or that they

17   changed to.

18            Your Honor, I have an extra copy for the Court to look

19   at.  The box is very informative.

20            MS. PEARSON:  I have to object to the lack of

21   foundation as to the product Mr. Hamerling was selling as GK

22   One.

23            THE COURT:  Sustained.

24   Q.  Well, we know, based upon the complaint admitted into

25   evidence, that this case, Exhibit 156-1, was brought based upon

1    a product that looked like Exhibit J in Exhibit 156-1; correct?

2    A.   Could I refresh myself with the complaint?

3    Q.   Yes.  It is the third tab.

4            THE COURT:  Mr. Conklin, do you have any firsthand

5    knowledge of the allegations in the complaint that you're

6    looking at, or is your knowledge based purely on reading it?

7            THE WITNESS:  Purely on reading it.

8            THE COURT:  All right.  Let's move on.

9            MR. BRESSLER:  Well, I'd like to -- your Honor, as the

10   witness is here on behalf of Calvin Klein, I'd like to compare

11   the product that is now being sold or that the witness -- the

12   changes that were made from what was at issue in 156-1 to what

13   is now being old.

14           THE COURT:  I think that's argument.  I don't think

15   you need to elicit it from the witness.  Go ahead.

16   Q.   Mr. Conklin, you know that after the lawsuit was settled

17   with MD Distributors, that Excell came out with a product

18   called OK New York; correct?  Would you like to see the

19   product?

20   A.   I would like to see the product, please.  Yes.

21   Q.   I'm sorry?

22           THE COURT:  He'd like to see it.

23           MR. BRESSLER:  May I approach?

24           THE COURT:  Could you make a record of what exhibit it

25   is.

1          MR. BRESSLER:  It is Exhibit 71.

2     A.  Yes, it's one of the products at issue in this case.

3     Q.  And that is the version of Plaintiffs' Exhibit 41.  May I

4     show you?

5          May I approach, your Honor?

6          THE COURT:  You may.

7     Q.  Is that correct?

8     A.  The question is, is this product the version of this

9     product?

10    Q.  Correct.

11    A.  Yes, it says, "Our version of CK One."

12    Q.  And you see that the name is different, OK New York for CK

13    One; correct?

14    A.  Correct.

15    Q.  And you see that the packaging is different.  One has a

16    skyline on it and lines around "OK"; correct?

17    A.  There are differences in the packaging.

18    Q.  And there's no lines or skyline on CK One, are there?

19    A.  There's no skyline on CK One, that's correct.

20    Q.  And you see on the top of the box, CK One has "Calvin

21    Klein" and OK New York says "Diamond Collection"?

22    A.  Correct.

23    Q.  And you see to the front of CK -- of OK New York, a

24    disclaimer that says, "Our version of CK One by Calvin Klein"?

25         MS. PEARSON:  Objection, your Honor, to "disclaimer."

1           THE COURT:  Overruled.

2     A.  I see the statement that says, "Our version of CK One."

3     Q.  And you see on the back another disclaimer -- or a

4     disclaimer that says, "OK New York is not associated with the

5     makers of CK One by Calvin Klein"?

6     A.  Yes, I see that statement on the back of the packaging.

7     Q.  Now, you know that Excell has been selling products since

8     at least 2012?

9     A.  Yes.

10    Q.  And from documents we've produced to you, you know that

11    they've been selling products since 2010?

12    A.  I do not recall any -- that I reviewed documents that

13    suggest 2010, but I certainly know that we are aware that they

14    were selling products in 2012.

15    Q.  Now, you never sent a cease and desist letter to Excell,

16    did you?

17    A.  We did not.

18    Q.  None of the plaintiffs in this case sent a cease and desist

19    letter to Excell, did they?

20    A.  Not that I'm aware of, no.

21    Q.  Now, you see that Excell's packaging for OK New York is

22    very different than the packaging for GK One that Mr. Hamerling

23    and MD Distributors were selling previously; right?

24    A.  I'd have to take a look at the GK One packaging.

25          MR. BRESSLER:  It is the -- your Honor, the second tab

1    on the complaint, Exhibit 156-1.  Your Honor, would you like a

2    copy?  I have an extra of the packaging for your Honor to look

3    at.

4              THE COURT:  Sure.

5              MR. BRESSLER:  May I approach?

6              THE COURT:  You may.

7              MR. BRESSLER:  These are marked from deposition

8    without the stickers.

9    A.  I believe the question was is the packaging very different?

10   I think it's different.  It's changed, for sure.  I don't know

11   to what degree I would use an adjective or adverb, but it

12   certainly changed.

13   Q.  Clearly, it's changed insofar as the name was changed;

14   right?

15   A.  GK was changed to OK.

16   Q.  And "One" was changed to "New York"?

17             MS. PEARSON:  Objection to the lack of foundation.

18             THE COURT:  Overruled.

19   A.  I'm not sure how we say they're changed when they're

20   different companies that are at issue, because I'm not sure you

21   can say one was changed to the other.  They're different

22   companies.  They're different products.  So one is with --

23   Q.  Mr. Conklin, can you answer the question?  Are they

24   different?

25             Let's rephrase it.  Is there a difference between the

1    packaging that Mr. Hammering put out at MD Distributors versus

2    the packaging he put out at Excell; right?

3              MS. PEARSON:  Objection.

4              THE COURT:  I think the exhibits speak for themselves,

5    so let's move on.

6    Q.  You already testified that no cease and desist letter was

7    sent.  How was Mr. Hamerling to know that the changes that he

8    made from the product that was -- he had out at MD Distributors

9    to the product he sold at Excell were not OK with you folks?

10             MS. PEARSON:  Objection, your Honor.  I can explain

11   the objection.  I just don't want to do anything in front of

12   the witness that offends the Court.  But there is a fundamental

13   lack of foundation in this line of questioning.

14             THE COURT:  Well, I'll allow the witness to answer if

15   he knows, so you may proceed.

16   A.  Can you repeat the question.

17   Q.  You didn't send cease and desist to Excell.  How was

18   Mr. Hamerling to know that the changes he made in the product

19   that they offered at MD to the product he offered at Excell,

20   the change in the name, the change in the packaging, the

21   addition of "our version of," the addition of disclaimers, the

22   addition of the skyline and the lines around the name, the

23   disclaimer on the back, how was he to know that was not enough

24   for you folks?

25             THE COURT:  Sustained as --

 1            MS. PEARSON:  Objection, your Honor.

 2            THE COURT:  Sustained as to form.

 3   Q.  Is there anything that you did --

 4   A.  Well, I can answer the question.  I think the question's

 5   still pending; correct?

 6            THE COURT:  No.

 7   Q.  No.

 8            Is there anything that Coty or any of the plaintiffs

 9   in this case did that would have allowed Excell to know and

10   Mr. Hamerling to know that the packaging for OK New York was

11   insufficient or objectionable prior to the time that you

12   brought suit?

13   A.  Yes.

14   Q.  What did you do to tell them?

15   A.  We sued him in MD Distributors case -- or I say him.  We

16   sued MD Distributors who you've represented he was a senior

17   executive with, and we sued him for his decoded GK product and

18   never entered into any type of an agreement that would have

19   authorized him to otherwise infringe our products.

20   Q.  Are you aware that in 2014 -- well, let me show you first

21   Exhibit 219 which has been admitted into evidence.

22            May I approach, your Honor?

23            THE COURT:  You may, although I don't have 219 in

24   evidence.

25            MR. BRESSLER:  There was no objection to it, your

1    Honor.  We were working on the basis that anything that's not

2    objected to is entered into evidence.

3              THE COURT:  Is that, in fact, how you ultimately

4    resolved things, Ms. Pearson?

5              MS. PEARSON:  Well, we have a stipulation to that

6    effect, but I don't have Exhibit 219.

7              MR. BRESSLER:  There you go.

8              THE COURT:  All right.  You may proceed, and I'll deem

9    219 admitted.  Over the course of the trial we'll make a record

10   as to what exhibits fall in that stipulation.  Over the course

11   of the trial, if you could just say Exhibit 219, which is one

12   of the exhibits subject to the parties' stipulation, and then

13   I'll admit it so there's no ambiguity, that would be helpful.

14             MR. BRESSLER:  Thank you, your Honor.

15             (Plaintiffs' Exhibit 219 received in evidence)

16             THE COURT:  All right.

17   BY MR. BRESSLER:

18   Q.  Exhibit 219 -- what's the firm of Fross Zelnick?

19   A.  It's a law firm in New York City.

20   Q.  And that's where Ms. Pearson used to work?

21   A.  You would have to ask her.

22   Q.  Does Coty use Fross Zelnick?

23   A.  We do not.  Actually, we work with a lot of firms.  I do

24   not believe that we are currently working with Fross Zelnick.

25   We may have from time to time on one matter or another, but I'm

1    not aware of working directly with anyone at Fross Zelnick.

2    Q.  Do you have -- if you look at paragraph 1.5 of Exhibit 219

3    and you compare that to the agreement with MD Distributor,

4    paragraph 1.18, you'll see that they are exactly verbatim the

5    same, and they both state:  "Our version shall refer to any

6    fragrance product that is not unlawful under the Lanham Act and

7    it bears marks, descriptions, or other indicia that make clear

8    that it's not a Davidoff fragrance product or Calvin Klein

9    fragrance product; that is, instead, a version of or

10   alternative to a Davidoff fragrance product or Calvin Klein

11   fragrance product.  Our version of fragrance products shall not

12   include decoded, counterfeit, and knockoff fragrance products

13   as defined herein."

14          Do you see that's the same in both agreements?

15          MS. PEARSON:  Objection.

16          THE COURT:  Overruled.

17          Just yes or no, are those the same?

18          THE WITNESS:  I'm just reading through the -- the

19   respective --

20          MS. PEARSON:  It's difficult for us to hear the

21   witness.

22          THE COURT:  It's difficult to hear everybody who is

23   not speaking loudly.  So a reminder, I feel like I'm a broken

24   record, but you have to speak loudly and into the microphone.

25          And, Mr. Conklin, please do the same.

1            THE WITNESS:  Thank you.

2            Well, the first sentence is the same.  It appears to

3    me that the second sentence is different.  When I say "the

4    same," I mean substituting the one product for the other in the

5    respective documents.

6    Q.  Do you know how Fross Zelnick -- how come Fross Zelnick

7    used the same language in --

8            THE COURT:  Sustained.

9    Q.  -- Exhibit 29?

10           And you know that in this exhibit which you folks have

11   put in on -- in paragraph 3.1(a), "Lacoste will not object to

12   Excell brands of our version fragrances," and it goes on.  So

13   you see that.  Were you aware of this?

14   A.  I'm sorry.  I don't think I follow the question.  Which

15   paragraph?

16   Q.  3.1.

17   A.  3.1 of which agreement?

18   Q.  (a) on the agreement which is 219.

19   A.  So the Lacoste agreement?

20   Q.  Correct.  See the Lacoste did not object to Excell's use of

21   the phrase "our version"; correct?

22   A.  I don't believe I can speak to this document without having

23   some time to review it, but that's not how I read it.

24           THE COURT:  Mr. Conklin, were you involved in the

25   drafting of this document in any way?

1          THE WITNESS:  No, it has nothing to do with Coty.

2          THE COURT:  What's the relationship, if any, between

3    Lacoste Alligator S.A. and Coty?

4    A.   Today there is no relationship because that brand was owned

5    by Proctor & Gamble's specialty beauty brands business.  We

6    acquired that business, including the Lacoste license, as of

7    October 1 of this year, so just a few months ago.  At this

8    point in time, there was no relationship between Coty and

9    Lacoste.

10         THE COURT:  All right.  So let's move on.

11         MR. BRESSLER:  Thank you, your Honor.

12   Q.   Now, in your affidavit you gave reasons why you didn't

13   bring suit against Excell earlier.  I'd like to take you

14   through them.  Firstly, you did learn of Excell in 2012;

15   correct?

16   A.   Correct.

17   Q.   And in 2012 you performed testing of at least two of Coty's

18   products; correct?

19   A.   Correct.

20   Q.   And those testings include chemical analysis; correct?

21   A.   Correct.

22   Q.   Yet you waited after doing those tests three years to bring

23   suit; correct?

24   A.   I'm not sure that was quite three years, but it was

25   two-plus years, yes.

1  Q.  In your affidavit you say that one of the things you're

2  worried about, that Coty's worried about, you do not want your

3  products to "be associated with inferior products that pose

4  potential health and safety risks to the public"; right?

5  A.  Correct.

6  Q.  And you also say that the Excell products diminish the

7  prestige and dilute the strength of your marks; right?

8  A.  Correct.

9  Q.  Why did you wait almost three years to sue them?  Why did

10  you -- I'll wait for that answer.  Why did you wait almost

11  three years?

12  A.  As I said in my declaration which you refer to, there are a

13  couple of reasons.  And, obviously, bringing a lawsuit like

14  this is quite expensive, so I needed to have some budget

15  approval.  There were a number of other factors as well.  At

16  some point in time we were hoping not to, frankly, bring a

17  lawsuit.  We saw that Excell was being sued by another party

18  that we hoped might resolve all matters related to the manner

19  in which they were infringing our products.  There were a

20  variety of reasons along those lines, but it was -- it is what

21  it is.  It was more than two years.

22  Q.  Let's go through the reasons.  Now, you say in your

23  affidavit you didn't know the extent of Excell's use; correct?

24  A.  Correct.

25  Q.  Now, in other cases you've sent investigators to alleged

H3NHCOT1                        Conklin - cross

1    infringers' locations in order to determine the extent of

2    infringement; correct?

3    A.  In some cases, yes, that's correct.

4    Q.  You didn't send an investigator to Excell, did you?

5    A.  I don't recall if we did.  I believe we used an

6    investigator to find out some of the products that were being

7    sold, and I believe that's how we came to test some of the

8    Excell products.

9    Q.  Did that investigator provide you any information in

10   writing?

11   A.  I don't recall if there was anything provided in writing or

12   if we just received some product.

13   Q.  When did you receive the product?

14   A.  It was late 2012.

15   Q.  And that's the product that you tested; correct?

16   A.  I believe so.

17   Q.  That investigator took pictures of the product that it

18   bought; right?

19   A.  I believe pictures were taken, yes.

20                 (Continued on next page)

21

22

23

24

25

H3NPCOT2                          Conklin - Cross

1    Q.  I'll show you Exhibit RR.

2           MR. BRESSLER:  May I approach, your Honor?

3           THE COURT:  You may.

4    A.  Thank you.

5    Q.  Can you tell us what Exhibit RR is?

6    A.  Okay.  Exhibit RR is a -- on Page 1, two receipts, one from

7    Strawberry stores and one from Jack's World, indicating the

8    purchase of novelty items and in the case of Jack's, cosmetics.

9    Q.  And these items that were purchased were the Excell

10   fragrances, correct?

11   A.  I believe so.

12          MR. BRESSLER:  I move Exhibit RR into evidence.

13          THE COURT:  Any objection?

14          MS. PEARSON:  No objection, your Honor.

15          THE COURT:  Admitted.

16          (Defendant's Exhibit RR received in evidence)

17   Q.  And the pictures on the back of RR are pictures that your

18   investigator took of Excell and other products at these

19   locations, correct?

20   A.  I believe so.

21   Q.  And the receipt shows from Strawberry there were at least

22   four items that were purchased, four Excell products, correct?

23          MS. PEARSON:  Objection, your Honor.

24          THE COURT:  Overruled.

25   A.  I don't know.

H3NPCOT2                        Conklin - Cross

1   Q.  Well, let's look at them.

2   A.  Looking at the summary here, it's hard to tell exactly what

3   they were.

4   Q.  Well, let's look to the numbers on the left-hand side.

5   A.  Okay.

6   Q.  The first three end with 5400, correct?

7   A.  Correct.

8   Q.  The first two or three?

9   A.  Three.

10  Q.  Next three end with 600?

11  A.  Correct.

12  Q.  The next three end with 500?

13  A.  Correct.

14  Q.  The next three end with 200?

15  A.  Correct.

16  Q.  And the next one is a different ending with 500, correct?

17  A.  Correct.

18  Q.  All right.  So you have five products there, right?

19          MS. PEARSON:  Objection.

20          THE COURT:  Overruled.

21  A.  Again, I cannot -- I do not know if those numbers

22  correspond to a particular product.  It would -- I'd be

23  speculating.

24  Q.  Do you recall how many products your investigator bought?

25  A.  I do not.

H3NPCOT2                         Conklin - Cross

1  Q.  And then on Jack's World, other fragrance products were

2  bought.  Excell products were brought, right?

3  A.  I believe so.

4  Q.  So --

5        THE COURT:  Can I interrupt for one second.  Do you

6  have a copy of RR?  The binder you gave me has a page that says

7  "Document intentionally removed."

8        MR. BRESSLER:  It's in the additional exhibits, your

9  Honor, but I have another copy to hand your Honor.

10        THE COURT:  Oh, I see.  Okay.  Thank you.

11  Q.  One of the products that your investigator purchased and

12  that you tested was Euphoria for women, right?

13        If you like, I can hand you a copy of the complaint in

14  this case and it will refresh your recollection.

15        MR. BRESSLER:  Your Honor, may I approach?

16        THE COURT:  I don't think he answered your prior

17  question; so --

18  Q.  Do you know the answer, if one of the products was Euphoria

19  for Women?

20  A.  I'm not certain.

21        MR. BRESSLER:  May I approach, your Honor?

22        THE COURT:  Now you may.

23  Q.  If you look to paragraph 38 of the complaint, it talks

24  about Euphoria fragrances for women?

25  A.  Yes.

H3NPCOT2                       Conklin – Cross

 1   Q.  And this complaint was filed in 2015, correct, if you look

 2   at the very top?

 3   A.  Correct.

 4   Q.  September 4th, 2015?

 5   A.  Correct.

 6   Q.  That was prior to the second set of testing that Coty

 7   performed on more of Excell's products?

 8   A.  I believe that's correct.

 9   Q.  All right.  So you folks had a copy of Euphoria for Women

10   in 2012, right?

11   A.  Yes, I believe it was.

12   Q.  From having a product, you knew where -- you knew who the

13   seller was, you knew that it was Excell, right?

14   A.  Yes.

15   Q.  And you knew their location, correct?

16   A.  I'm not certain if the packaging had the location or not.

17   Q.  I can show you a copy, if you like.

18   A.  Sure.

19           MR. BRESSLER:  Your Honor, may I approach?

20           THE COURT:  You may.

21   A.  Yes, it has an address.

22   Q.  But you didn't send an investigator to Excell's offices,

23   did you?

24   A.  No.

25   Q.  You didn't do anything, other than send the investigator to

1   Jackson, to Strawberry's, to find out the extent of Excell's

2   use, did you?

3   A.  I am not certain about that.  I'm not certain about what

4   else we did or did not through counsel, but in terms of on

5   direct activity through Coty, I do not recall any further

6   follow-up with Excell.

7   Q.  Now, you refer in your affidavit to Nielsen reports; do you

8   recall that?

9   A.  I do.

10  Q.  And you have access to Nielsen reports, in general?

11  A.  The company does.  I do not.

12  Q.  Did you check the Nielsen reports to see the extent of

13  Excell's sales in 2012?

14  A.  I did not, no.

15  Q.  Did anybody at Coty?

16  A.  I can't speak for anyone else, I'm sorry.

17  Q.  Well, you're in charge of trademark litigation, right?

18  A.  Yes.

19  Q.  Did you check the Nielsen reports for the extent of Coty

20  sales in 2013?

21  A.  I did not check the Nielsen reports.

22  Q.  Did you check the Nielsen reports to the extent of Coty

23  sales in 2014?

24  A.  Not at that time, no.

25  Q.  Did you check the Nielsen reports to determine the extent

1    of Coty sales at any time prior to the time you brought suit in

2    this case?

3    A.  Coty sales?

4    Q.  Excell sales.  Excuse me.

5    A.  I personally did not, no.

6    Q.  And you know of nobody at Coty who checked the Nielsen

7    reports for the extent of Excell sales prior to the time of

8    bringing suit?

9    A.  I'm sure that there were people who look at sales figures

10   along those lines and are familiar with pretty much trends

11   anyway, but I'm not aware of anyone specifically speaking to me

12   about Excell sales as depicted on Nielsen data.

13   Q.  Now, another reason you say that you didn't bring suit

14   earlier was that you were waiting for clarification, if you

15   needed to name the licensee, in whose name you bring the suit,

16   correct?

17   A.  Yes.

18   Q.  Now, you sent cease and desist letters, and you've had

19   Ms. Pearson send cease and desist letters in the name of

20   licensees?

21   A.  We have.

22           MS. PEARSON:  I object to the form.

23           THE COURT:  Overruled.

24   Q.  I will actually clarify.  You've had her send cease and

25   desist letters in the name of licensors?  I think I may have

 1   said licensees.

 2              MS. PEARSON:  Correct.

 3   Q.  My I apologies.

 4   A.  Yes.

 5   Q.  And you also acknowledge that determining who the proper

 6   party was was not necessary for the section 43(a) violation

 7   that you're alleging in this case, right?

 8   A.  Yes, but could I just clarify, though, because you make a

 9   good point?

10   Q.  No, you can clarify upon redirect.

11              Now, at times, Coty has joined with its licensors to

12   jointly sue alleged infringers, correct?

13   A.  I apologize, Mr. Bressler, could you just repeat that

14   question.

15   Q.  There have been times that Coty joins with its licensors to

16   jointly sue alleged infringers, correct?

17   A.  Correct.

18   Q.  Now, you could have sued, jointly sued Excell with Calvin

19   Klein, Vera Wang and Lady Gaga in 2012, right?

20   A.  Yes, we could have.

21   Q.  And you could have sent a cease and desist letter in one of

22   their names prior to the time you brought suit, right?

23   A.  With their consent, yes.

24   Q.  Now, you claim that you were waiting to hear what happened

25   in another litigation in which Excell was sued, correct?

```
 1    A.  Yes.

 2    Q.  And that would relate to Snooki?

 3    A.  Yes, Nicole Polizzi, I believe.

 4    Q.  I'm sorry, I cannot hear you.

 5    A.  Nicole Polizzi, yes.

 6    Q.  Known as Snooki?

 7    A.  Yes.

 8    Q.  Did you review the complaint in the Snooki case?

 9    A.  I did.

10    Q.  Did you talk to the lawyers for Snooki?

11    A.  I did not.

12    Q.  Are you aware of whether the Snooki case even involved

13    fragrances that had, on their face "our version of"?

14    A.  That's my recollection, but --

15    Q.  What's your recollection based upon?

16    A.  Having read the complaint, but again, that was now several

17    years ago.

18              MR. BRESSLER:  I refer the Court to the complaint in

19    the Snooki case, which is also admitted into evidence, and I

20    will get the number later.  It does not refer to "our version

21    of."

22    Q.  Now, you claim you also had to get executive committee

23    approval before bringing suit, correct?

24    A.  Yes.

25    Q.  Did you meet with the executive committee?
```

1    A.  I spoke with the executive committee members, yes.

2    Q.  And did you tell them what the claims were that you

3    intended to bring against Excell?

4              MS. PEARSON:  Objection, your Honor.  Mr. Conklin is

5    in-house counsel at Coty and --

6              THE COURT:  Sustained.  Ms. Pearson, you can't mumble.

7    Okay?  To create a record, for me to hear you, you need to

8    speak loudly, clearly and into the microphone.

9              MS. PEARSON:  Okay.

10             THE COURT:  Thank you.

11   BY MR. BRESSLER:

12   Q.  But you did discuss bringing suit and you obtained approval

13   from the executive committee, correct?

14   A.  Yes.

15   Q.  Now, after you sued Excell, are you aware that Excell's

16   lawyers were approached with a settlement, for settlement

17   purposes, to discuss changes to the packaging that would

18   satisfy Coty and the other plaintiffs?

19             MS. PEARSON:  Objection, your Honor.

20             THE COURT:  Sustained.

21   Q.  Is there a reason why Coty would not discuss changes to the

22   packaging with defendant?

23             THE COURT:  Let counsel finish the question, please.

24   Are you done now?

25             MR. BRESSLER:  I am, your Honor.

1           MS. PEARSON:  I object, your Honor.  The settlement

2    communications --

3           THE COURT:  Sustained.

4           MS. PEARSON:  -- in this case are covered --

5           THE COURT:  Sustained.

6           MR. BRESSLER:  Your Honor, settlements discussions are

7    inadmissible to prove liability, or lack thereof.

8           MS. PEARSON:  But there is a separate agreement

9    between counsel that settlement communications were not to be

10   used for any purpose in litigation.  I have it in writing from

11   Mr. Miller.

12          MR. BRESSLER:  I'm not aware of that, and I'm sure

13   that the settlement agreement said, would be subject to 403.

14   403 says that it's not to be admissible for the purpose of

15   proving liability or lack thereof.

16          MS. PEARSON:  It did not, your Honor.

17          THE COURT:  Hold on.  It's 408.

18          MR. BRESSLER:  408, sorry.

19          THE COURT:  Ms. Pearson indicated there was an

20   agreement between counsel separate and apart from whatever 408

21   may say.  If that's the case, then that's a different issue.

22          MS. PEARSON:  Correct.

23          MR. BRESSLER:  Your Honor, Mr. Miller reminds me that

24   this offer was made in open court.

25          MS. PEARSON:  Your Honor, I believe that Mr. Miller

1    has been impermissibly discussing settlement discussions in

2    this case quite a bit, but the fact of the matter is that

3    counsel have an agreement.  It's memorialized in writing that

4    settlement communications are not to be used for any purpose in

5    this litigation.  It goes beyond the scope of the federal rule

6    of evidence.

7              THE COURT:  All right.  Can I ask you a question,

8    Ms. Pearson.  If that's true, then I'm likely to agree with you

9    and sustain the objection.  I don't have that agreement.  It

10   hasn't been presented to me.  This issue wasn't raised with me.

11             Is there any harm in allowing the witness to answer

12   the question, and then if you submit the agreement to me and I

13   agree with you, I'll disregard all this testimony, or is there

14   a separate harm in --

15             MS. PEARSON:  I think it's prejudicial.  I don't think

16   it should be discussed.  If they're going to discuss it, then

17   we'll get into Coty's position in this.  I think it should be

18   off limits.  That was the agreement.

19             THE COURT:  It's not prejudicial if I decide that

20   you're right and it's not admissible because I will simply

21   disregard it.  Is there a harm in it coming out, separate and

22   apart from that?

23             MS. PEARSON:  I don't think it's a particularly

24   harmful fact, your Honor, but I object to opposing counsel

25   violating the agreement that we had with respect to settlement

1    communications.

2              THE COURT:  Do you have a copy of the agreement?

3              MS. PEARSON:  It is an e-mail exchange.  We can look

4    at it further.

5              THE COURT:  Great.  Well, until you present it to me,

6    I'll allow the questioning, and we can take up whether I can

7    and should rely on it later.  You may proceed.

8              MR. BRESSLER:  Your Honor, would you mind asking the

9    court reporter to read back the last question.

10             THE COURT:  I do.  You can restate the question, if

11   you like.

12   BY MR. BRESSLER:

13   Q.  Mr. Conklin, is there a reason why Coty would not engage in

14   discussions with Excell as to what packaging changes would

15   satisfy Coty?

16   A.  This is very difficult question to answer because it goes

17   to my internal discussions with my client that are the purview

18   of, you know, advice with respect to our legal position and

19   what we would find satisfactory as a resolution.  So is there a

20   reason there?  Yes, there are reasons.

21   Q.  What are those reasons?

22             THE COURT:  Sustained.

23   Q.  Mr. Conklin, one of the complaints you had about

24   Excell's -- or you have against Excell's products is the fact

25   that in the "in our version of" language, that Excell sometimes

1    uses the same font as Calvin Klein's and the other plaintiffs,

2    that they use, correct?

3    A.   Correct.

4    Q.   Are you aware that after this litigation was commenced,

5    Excell started changing the font so that it would be neutral,

6    not reflective of Calvin Klein's and the other plaintiffs'

7    font?

8    A.   I've not seen all of their updated artwork; so, no, I'm not

9    aware that that was done on a universal basis.

10   Q.   Have you seen any of them?

11   A.   Yes, I've seen some, but I actually don't recall a change

12   to the font.

13            MR. BRESSLER:  Your Honor, I would like to show the

14   witness Exhibit 227.  I found the Snooki complaint.

15            MS. PEARSON:  Your Honor, we have located the e-mail

16   correspondence in terms of the settlement agreement.

17            THE COURT:  Ms. Pearson, microphone, loud.

18            MS. PEARSON:  We have located the document, the e-mail

19   correspondence in which Mr. Miller confirmed that the

20   settlement discussions were not admissible for any purpose.  We

21   don't have a hard copy.  We just have the computer version.

22            THE COURT:  All right.  So you'll provide a hard copy

23   to me later.  I think we've moved on.  It's a non-issue at the

24   moment.

25            MR. BRESSLER:  May I approach the witness with

 1    Exhibit 227?

 2                THE COURT:  You may.

 3                MR. BRESSLER:  Which is also admitted into evidence

 4    pursuant to stipulation.

 5                THE COURT:  All right.  It is admitted pursuant to the

 6    stipulation.

 7                (Defendant's Exhibit 227 received in evidence)

 8    BY MR. BRESSLER:

 9    Q.  This is the -- let's call it the Snooki complaint, correct?

10    A.  Okay.

11    Q.  Well, you can look at the first page.  It says:  Snooki

12    against Excell Brands?

13    A.  I see that.

14    Q.  Is this the complaint in the case you were referring to

15    that you were waiting for a decision on?

16    A.  Yes, I believe so.

17    Q.  Is there anything in here that leads you to believe that

18    the Snooki case involved the use of "our version of" on the

19    packaging for the version of the Snooki fragrance?

20    A.  Were there any exhibits to the complaint?

21    Q.  This is all you folks produced.

22                THE COURT:  Mr. Bressler, you're not testifying.  Just

23    look at that exhibit.  Is there anything in there that --

24    A.  I do not see anything in the body of the complaint that

25    mentions "our version of," in looking at it quite quickly, I

1    might add.

2    Q.  The document will speak for itself.

3         Okay.  You're aware, are you not, that Excell has sold

4    approximately 4 million units of the products that you claim

5    infringe?

6    A.  I'm not familiar with the exact number, but that sounds

7    ballpark to me.

8         THE COURT:  What's the basis of your knowledge about

9    that?

10        THE WITNESS:  Looking at exhibits from the -- from my

11   counsel.

12        THE COURT:  All right.  As you probably know, you

13   really have to testify based on knowledge that you personally

14   have.  So knowledge that you gained in connection with

15   documents you reviewed in this litigation, you should make

16   clear if that's the only basis for your knowledge because then

17   you really shouldn't be testifying to it.

18        THE WITNESS:  That would be the only basis for my

19   knowledge, your Honor.

20        THE COURT:  All right.

21   BY MR. BRESSLER:

22   Q.  Now, the only --

23        MR. BRESSLER:  Excuse me, your Honor.  I knew I'd make

24   you laugh sometime during this trial.

25   Q.  The only instance of actual confusion that you folks had is

1   Exhibit 153, right?

2           THE COURT:  Mr. Bressler, why don't you wait until you

3   pick up your papers and your head is not in the jury box to ask

4   your next question.

5           MR. BRESSLER:  Thank you, your Honor.

6   Q.  The only evidence of actual confusion that you have is

7   Exhibit 153?

8           MR. BRESSLER:  May I approach, your Honor, and bring a

9   copy to the witness?

10          THE COURT:  You may.

11          MR. BRESSLER:  And this too is admitted by

12  stipulation.

13          THE COURT:  I think it's already in evidence.

14  BY MR. BRESSLER:

15  Q.  Is that correct?

16  A.  I'm not certain what else our counsel has submitted as

17  evidence of actual confusion, if anything.  This is certainly

18  one thing that we have submitted into evidence, but for

19  example, I also believe we have expert reports that go to the

20  same issue.

21  Q.  Putting aside the expert report, you have no actual

22  evidence of confusion other than Plaintiff's 153, do you?

23  A.  This is the only instance of consumer confusion that we

24  have produced with respect to people being actually confused.

25  Q.  Plaintiff's Exhibit 153 reflects some type of contact that

1   somebody at Coty had with a consumer, correct?

2   A.  Correct.

3   Q.  And that person was calling about something called Chloe

4   Love Story, correct?

5   A.  I don't know that that's what the person was calling about.

6   That would be the Coty product that was designated by our

7   customer service team.

8   Q.  And that is a product by Coty, Love Story?

9   A.  Yes, Chloe Love Story is the product by Coty.

10  Q.  And the verbatim from consumer is:  I bought a bottle of

11  Love Story.  I want to know if it's counterfeit.  Correct?

12  A.  Yes, as well as the statement:  The fragrance does not

13  last.  It's to complete the verbatim.

14  Q.  You don't have any basis for whether knowing this consumer

15  was talking about Love Story sold by Excell or Love Story sold

16  by Coty, do you?

17  A.  That's correct.  It's unclear.

18  Q.  In fact, you testified:  "We don't know what they're

19  talking about," right?

20  A.  Could you repeat that?

21  Q.  You testified at your deposition:  "We don't know what

22  they're talking about," correct?

23  A.  I do not have the transcript in front of me, but that would

24  not be a -- that is consistent with what -- how I would have

25  read this, yes.

1    Q.  And you admit this is ambiguous evidence, at best, correct?

2    A.  I'm not sure that I would call it ambiguous evidence.  I

3    think the statement is ambiguous.

4    Q.  Now, nobody -- despite all the social media that revolves

5    around fragrances, despite all the sales of Excell products,

6    nobody else -- you can't find one other instance where someone

7    is actually confused, can you?

8    A.  We've not produced any other evidence of individual

9    consumers being confused, that's correct.

10           MR. BRESSLER:  Your Honor, if I may take a second now

11   to fix up what I dropped.

12   Q.  Now, you know that our products are sold for 4.99, right?

13   A.  That's what I've been told by Excell, but I do not know

14   that that is what they're all sold at.  I know there was a

15   slightly different price point at Strawberry's and Jack's World

16   receipts.  If I could pull those back, I could confirm those

17   numbers, and I know that I have see them advertised online at

18   higher prices as well.

19   Q.  So the Jackson Strawberry show lower numbers than 4.99,

20   right?

21   A.  May I?

22   Q.  Sure.

23   A.  The Jack's World shows six cosmetics for 23.94; so I'm not

24   exactly sure of the math, but a little more than $4, roughly

25   $4, and slightly less than that at -- for some of the SKUs at

H3NPCOT2                              Conklin - Cross

1    Strawberry.  One is 4.99, the others appear to be 3.33 or 3.34.

2    Q.  And the products at issue that Coty sell, for example, CK

3    One sells for $49 to a $58 for the same size, 3.4 ounces,

4    right?

5    A.  I'm not an expert on the pricing model.  I think there are

6    better people to speak to that, but generally, the larger size

7    of the CK One bottle would sell at that price, but we also have

8    a one-ounce version, for example, one ounce that appears at a

9    much less price point.

10   Q.  Excell's products are all 3.4 ounces, correct?

11              MS. PEARSON:  Objection, your Honor.

12              THE COURT:  Sustained.

13   A.  I'm not sure.

14              MR. BRESSLER:  Well, your Honor, Exhibit WW, which has

15   been admitted pursuant to stipulation, is a price list of

16   plaintiff's products.  May I approach?

17              THE COURT:  Of plaintiff's products?

18              MR. BRESSLER:  Yes.

19              THE COURT:  Okay.  Is WW --

20              MR. BRESSLER:  It's all in the stipulation.  The facts

21   are the same.

22              THE COURT:  All right.  Is that correct, Ms. Pearson?

23              MS. PEARSON:  I think it's a summary document that

24   defendant prepared.

25              THE COURT:  Ms. Pearson, louder.

H3NPCOT2                          Conklin - Cross

```
 1              MS. PEARSON:  It's a summary document defendant
 2     prepared.
 3              THE COURT:  Okay.  Any objection?
 4              MS. PEARSON:  I can check back on my version of
 5     defendant's exhibit.  Okay.  We have no objection, your Honor.
 6              THE COURT:  All right.  Then it is admitted.
 7              (Defendant's Exhibit WW received in evidence)
 8     BY MR. BRESSLER:
 9     Q.  And so Exhibit WW shows, for example, Eternity for Women
10     sells, the 3.4 ounces, for 72 to $82, right?
11     A.  I'm not familiar with this exhibit.  Yes, that's what this
12     exhibit purports to show.  Whether or not that is the actual
13     product, actual price that our products are made available at
14     retail, I'm not certain.
15     Q.  Now, you acknowledge in your declaration that there's only
16     limited overlap between where Excell's products are sold, the
17     products at issue we're talking about, and the products at
18     issue sold by Coty, correct?
19     A.  Yes.
20     Q.  Now, your counsel sent a revised exhibit list last night to
21     us, which they indicated they would be supplying a summary of
22     overlap of customers, but we haven't received it yet.
23              Have you been able to figure out if there's any
24     overlap of customers for the products at issue in this case?
25              THE COURT:  Sustained as to form.  You're not
```

1    testifying.  Ask the question.  Don't describe interactions

2    between counsel.  Just ask a question.

3    Q.  Does Coty have any information where the original and

4    "version of" product are sold at the same location?

5    A.  Yes.

6    Q.  What?

7    A.  Well, I believe that it is from online reviews that I

8    personally did.  There are Coty products that are available at

9    places that were indicated, in the course of the discovery in

10   this case, to also sell -- to also be represented as being in

11   locations to buy Excell's products.

12   Q.  Are you aware of any brick and mortar stores where there

13   are any products of Coty, the original and version of the same

14   product sold at the same store?

15   A.  When you say brick and mortar, so are you excluding brick

16   and mortar retailers that sell products through the website?

17   Because there we saw overlap.

18   Q.  Forget website.  You walk into a store.  Tell me one store

19   where a consumer can go in and find a copy of OK New York by

20   Excell and CK One by Calvin Klein?

21   A.  I'm not familiar with all of the stores where Excell sells

22   their products.

23   Q.  Can you tell me --

24   A.  I can tell you that it's my understanding that in certain

25   secondary markets you can find both products.

1   Q.  Name one store.

2   A.  At flea markets, for example.

3   Q.  Name one flea market where you have seen, for example --

4   A.  No, I meant that as a -- it's a fair point.  I meant that

5   as a type of outlet where both product are found.  I've not

6   personally seen any.

7   Q.  Does Coty, in general, anybody from Coty, anybody from any

8   of the parties here -- and you're running this litigation,

9   correct?  You're in charge of this litigation, aren't you?

10  A.  Yes.

11  Q.  Do you have any evidence whatsoever of any original product

12  by Coty and the version of by Excell being sold at the same

13  location, other than online?

14  A.  Just online.

15  Q.  Okay.  Now, the ones you refer to online sales, now, you

16  acknowledge that most sales on Amazon and eBay are one-offs,

17  correct?

18  A.  On eBay, yes.

19  Q.  And you also acknowledge that when there are items offered

20  online, sometimes they may not really be there, correct?

21  A.  Yes.

22  Q.  Now, you also know that many of the products online that

23  purport to be Coty are, in fact, counterfeit, correct?

24  A.  There are certainly products that purport to be Coty online

25  that are counterfeit.  Many, as a percentage of something, is a

1    little bit harder to define.

2    Q.  You refer in your affidavit to seeing websites where

3    products are sold, Excell products are being sold, right?

4    A.  Offered for sale, yes.

5    Q.  Yes.  Did you ever buy any of those products?

6    A.  I did not.

7    Q.  Do you know for a fact that the product was actually there

8    and available for purchase?

9    A.  I clicked through to see how far I could get without

10   ordering.  So without having a physical product ordered and

11   delivered, the answer would be no, but I was able to get to

12   that point without saying the product was not available.

13              MR. BRESSLER:  Your Honor, based upon the witness'

14   testimony, I will move to exclude as hearsay, on relevance

15   grounds, all of the Internet website printouts that the witness

16   has put in claiming to offer products of Excell's for sale.

17              THE COURT:  All right.  Again, I already addressed

18   this.  You can go on.

19   Q.  Now, in your affidavit, you talk about Excell products

20   being offered for $25, marked down to 4.99; do you recall that?

21   A.  I do.

22   Q.  And you referred to Exhibit 229.

23              MR. BRESSLER:  May I approach, your Honor, and

24   present?

25              THE COURT:  You may how much longer do you have with

1   this witness, do you think?

2           MR. BRESSLER:  I would say 15.

3           THE COURT:  Okay.  Go ahead.

4           MR. BRESSLER:  Would you like a copy, your Honor?

5           THE COURT:  Yes, please.

6   BY MR. BRESSLER:

7   Q.  Now, referring to 229, you don't see any of the products at

8   issue in this case being offered, do you?

9   A.  No, I do not.  No, I do not.

10  Q.  And you didn't buy any of these products either?

11  A.  I did not.

12  Q.  And you say that there's deceptive advertising taking

13  place.  You're not saying that Excell is engaging in deceptive

14  advertising, are you?

15          MS. PEARSON:  Objection.

16          THE COURT:  Overruled, but because I couldn't hear the

17  objection and for other reasons.

18  Q.  Paragraph 31 of your affidavit says that there's deceptive

19  advertising and you refer to Exhibit 229.  My question is --

20  would you like to see your affidavit?

21          MS. PEARSON:  I would because this is not my

22  recollection of the exhibit.

23          MR. BRESSLER:  May I approach, your Honor?

24          THE COURT:  You may.

25  Q.  Showing you --

1    THE COURT:  I think he has his affidavit.

2    A.  I have it.

3    Q.  Look at paragraph 31, last sentence:  This deceptive

4    marketing practice suggested the perceived value of defendant's

5    product is significantly higher than it sales suggested retail

6    price, and referring to the sale of products at higher prices,

7    correct?  Or offering at higher prices and then marking it down

8    to a lower price, correct?

9    A.  Yes.

10   Q.  You're not saying that --

11        MS. PEARSON:  Your Honor --

12   Q.  -- that Excell --

13        MS. PEARSON:  Your Honor, the referenced exhibit,

14   though, is Exhibit 235 and not 229.

15        THE COURT:  Well, you'll have redirect.  Go ahead,

16   Mr. Bressler.

17   Q.  You're not saying that Excell is engaging in deceptive

18   advertising, are you, deceptive marketing?

19        MS. PEARSON:  I object to the form.  If it's limited

20   to this paragraph, fine.

21        THE COURT:  I think it is limited to this paragraph.

22   Go ahead.

23   A.  The point that I'm making is that --

24   Q.  Can you answer the question?  Are you suggesting that

25   Excell is somehow responsible for what you call the deceptive

1   advertising taking place on Plaintiff's Exhibit 235?

2   A.  Could I see 235, please.

3   Q.  You may.

4          MR. BRESSLER:  Your Honor, may I approach?

5          THE COURT:  You may.

6          MR. BRESSLER:  Would you like a copy, your Honor?

7          THE COURT:  No.  Thank you.

8   A.  So I believe my statement that having products listed as

9   $25 value --

10  Q.  Sir, I'm asking you a very simple question.  Are you

11  suggesting that Excell is responsible for what you call the

12  deceptive advertising taking place on Plaintiff's Exhibit 235?

13         THE COURT:  Just yes or no, is Excell responsible for

14  that, in your judgment?

15  A.  In my judgment, this website which looks like an initial

16  sponsored website, to me, okay it's my judgment --

17  Q.  This is a yes or no question.

18  A.  Yes.

19  Q.  How is Excell responsible for a website that's called

20  PerfumeImpression.com?  Let me withdraw it.

21         What evidence do you have that leads you to believe

22  that Excell is responsible for what you call deceptive

23  advertising that appears on Plaintiff's Exhibit 235?

24  A.  It's an exclusive listing of Excell products with

25  consistent market pricing across it, at $25 plus, and then

1    suggesting that it's available for a much less price; so that's

2    my impression of it.

3    Q.  But you have no evidence or fact that it's exclusive, do

4    you?

5    A.  No.

6    Q.  Okay.  And you have no evidence whatsoever that, in fact,

7    Excell has anything to do with this website, do you?

8    A.  I personally do not.

9    Q.  You don't even know whether Excell sells to this website,

10   do you?

11   A.  I do not know the manner in which this website gets their

12   products or its affiliation with Excell.

13   Q.  Referring to the markets in which Coty sells the products

14   at issue, I'd like to refer to stipulated fact 15, which was

15   entered into at the request of plaintiffs.  And I'm going to

16   read that to you, Mr. Conklin:

17            "The main rationale for segmenting heterogeneous

18   markets is that a company is better able to develop a

19   satisfying marketing mix for a relatively small portion of a

20   total market than to develop a mix that meets the needs of all

21   people."

22            It's a stipulated fact.  Coty, in selling the

23   products -- Would you like to see it?

24   A.  Yes, please.

25            MR. BRESSLER:  May I approach?

1              THE COURT:  Just ask your question, please.  The

2       stipulation is in evidence.

3       Q.  Coty, in selling the products at issue, is not seeking to

4       sell these products to every level of -- every person in the

5       country, are they?

6       A.  I think we'd love to sell to every person in the country.

7       Q.  You're not selling to every type of store in the country,

8       are you?

9       A.  I think we pretty much are, as a company, yes.

10      Q.  The products that are at issue in this case?

11      A.  Oh, that's a different question.  The products that are at

12      issue in this case, we're not selling to every single type of

13      store.

14      Q.  The products in this case are, for the most part, prestige

15      products, right?

16      A.  I'm not -- there are a variety of products at issue in this

17      case.  Some are higher end than others.

18      Q.  You don't sell these products at Dollar Stores, do you?

19      A.  I do not sell them.

20      Q.  Do you think that -- Having your product in Dollar Stores

21      tarnishes the brand, for example, of Calvin Klein, right?

22      A.  I defer to Calvin Klein on that question.

23      Q.  Now, you state and believe that if a consumer has a bad

24      experience and associates it with Calvin Klein, it will hurt

25      Calvin Klein's reputation, right?

1    A.   As an example of -- yes.

2    Q.   Calvin Klein or Vera Wang, right?

3    A.   Yes.

4    Q.   Now, that's a big if, isn't it, because you have no

5    examples of a consumer having had a bad experience with any

6    Excell product, have you?

7    A.   No.

8    Q.   Now, you when you say in paragraph 47 of your affidavit,

9    when there are knockoffs being sold at significantly discounted

10   prices, it makes the proprietary product less desirable because

11   it is no longer seen as a luxury item losing its cache or

12   exclusivity, right?

13   A.   Yes.

14   Q.   That's true of any knockoff, right?

15   A.   I don't know about any knockoffs.

16   Q.   Knockoffs other than just that are sold at significantly

17   discounted prices?

18   A.   Define knockoff in that context for me.

19   Q.   I'm using your language.

20   A.   Well, again, in the context that I was using it, a knockoff

21   would be the knockoffs in this case, a product that has a

22   highly similar trade dress, highly similar name, different

23   quality.  So under those circumstances, yes, I would view the

24   sale of the knockoff as having a negative impact on the

25   proprietary brand.

1   Q.  Your affidavit will speak for itself.  It does not appear

2   that's what you were saying.

3        You also say this is a factor in lost sales, but you

4   admit it's not a major factor, right?

5   A.  I don't believe it's a major factor, yes.  I'm sorry a

6   general -- the Excell products, yes.

7   Q.  Right.

8        MR. BRESSLER:  Your Honor, I'm almost finished.  Five

9   to seven minutes.

10        THE COURT:  All right.  And then we'll take a break.

11   Q.  Who wrote your trial affidavit?  Who wrote it?

12   A.  I worked on it with counsel.

13   Q.  You adopt everything in the affidavit as true?

14   A.  I'm sorry?

15   Q.  You adopt the affidavit?  Everything that's said in there

16   is correct?

17   A.  I do, except where I've said something where it's

18   qualified.

19   Q.  In paragraph 32 of your complaint -- I'm sorry, your

20   affidavit, you say that ethnic consumers are more likely to be

21   confused; do you see that?

22   A.  Yes.

23   Q.  What ethnic consumers are you referring to?

24   A.  I believe that's language from one of your witnesses, and I

25   was quoting back language from his declaration.

1  Q.  Do you think that one of -- can you point to the witness or

2  the Excell employee who said that ethnic consumers are more

3  likely to be confused?

4  A.  I believe it was Pfau or Ferullo, one of the two.

5  Q.  Did you actually see the testimony?

6  A.  I did.

7  Q.  And then you say:  Especially if English is the second

8  language.

9        What makes you think that English is a second language

10 for many of the purchasers of Excell's products?

11 A.  Well, because, again, the testimony from Mr. Pfau or

12 Ferullo was that many of the consumers were ethnic and not

13 necessarily -- I believe, and again I don't have the language

14 right in front of me, but my recollection was that English was

15 not the first language for several of the demographic targets.

16 Q.  And you've reviewed the proposed findings of fact in this

17 case?

18 A.  I'm not sure that I have.

19 Q.  Well, do you know that in there you propose to find the

20 following finding, 194, a significant percentage --

21        MS. PEARSON:  Objection.

22        THE COURT:  Sustained.

23 Q.  Do you believe that a significant percentage of the target

24 consumers of defendant's Diamond Collection fragrances have

25 only a high school education or less schooling?

H3NPCOT2                    Conklin - Cross

1    A.  I wouldn't know that.

2    Q.  Okay.  Now, let's refer to English as a second language.

3    Referring to the only testimony on point by Mr. Ferullo says as

4    follows, on Page 115, and I'm going to ask you whether this is

5    what you're relying on.

6              THE COURT:  Sustained.

7              MS. PEARSON:  Objection.

8              THE COURT:  Do you have any firsthand knowledge about

9    either who Excell targeted or the consumers who purchased

10   Excell products?

11             THE WITNESS:  I do not.

12             THE COURT:  All right.  Let's move on.

13   Q.  Who is Ralph Macchio?

14   A.  He is the chief scientific officer at Coty.

15   Q.  He's also a member of the executive committee?

16   A.  He is.

17   Q.  Okay.  And I would like to read in from his testimony.  He

18   said:

19   "Q.  Do you think that a consumer buying a $5 version of a

20   Calvin Klein product, for example" --

21             THE COURT:  Mr. Bressler, don't use this witness to

22   make legal argument.  All right?  Ask this witness about his

23   knowledge.  If you have legal argument concerning another

24   witness' testimony, I'll take it up separately when you've had

25   an opportunity to make it.

1              MR. BRESSLER:  Your Honor, I'm just reading in for the

2      record testimony that's been designated, and it's by an

3      executive member of the executive committee and can be used for

4      any purpose.

5              THE COURT:  That's fine.  But ask him a question.  I

6      don't want you referring to another witness' testimony.

7              I assume this is not the actor, The Karate Kid, Ralph

8      Macchio; is that correct?

9              MR. BRESSLER:  I believe that's correct.

10             THE COURT:  Okay.  That would make it more

11     interesting.

12     Q.  We can ask the witness.  Is this the same Mr. Macchio as

13     The Karate Kid?

14     A.  It is not.

15             THE COURT:  Oh.  If it was, I was going to make him

16     appear live.

17     Q.  Do you agree with Mr. Macchio's testimony as follows:

18     "Q.  Do you think that a consumer buying a $5 version of a

19     Calvin Klein product, for example, would be confused to believe

20     that it was the same as the $70 original product for purchase?

21     "A.  You would need to be careful --"

22             THE COURT:  Sustained.  Move on to the next line of

23     questioning, please.

24     Q.  Are you aware that Mr. Macchio testified that he didn't, as

25     a member of the executive committee, did not believe that there

H3NPCOT2                         Conklin - Cross

1    was a likelihood of confusion between Excell's products and

2    Calvin Klein's products due to their being sold at different

3    places?

4              MS. PEARSON:  Objection.

5              THE COURT:  Sustained.

6              MR. BRESSLER:  I have no further questions.

7              THE COURT:  Very good.  We'll take a ten-minute break,

8    and then continue with redirect.  Counsel to both sides, just

9    elicit facts and testimony from the witness.  All right?  Let's

10   not make legal arguments through the witness.  There's some of

11   it in the direct testimony.  There was a lot of it in the

12   cross.

13             You don't need to engage him about what other

14   witnesses said or don't say, or what evidence is or isn't in

15   the record.  You can make those arguments and, indeed, have

16   already made them exhaustively.  So let's make this a little

17   bit more efficient and just stick to the facts, ma'am, as they

18   say.  All right.  Let's resume in ten minutes.

19             (Recess)

20             (Continued on next page)

21

22

23

24

25

1          THE COURT:  We seem to be missing a witness and

2     Ms. Pearson, two relevant parties.

3          MR. POTTER:  Someone just went out to get them.  I

4     expect them to be here momentarily.

5          THE COURT:  You can be seated.

6          Mr. Conklin, please retake the stand.

7          Ms. Pearson, redirect.

8          You are still under oath.

9     REDIRECT EXAMINATION

10    BY MS. PEARSON:

11    Q.  Mr. Conklin, in the course of your testimony, Mr. Bressler

12    was questioning you about the reasons why you did not

13    immediately file a lawsuit.  And, in particular, he was

14    discussing the Section 43(a) standing issue.  You said that you

15    would like to clarify your answer.  Is there a clarification

16    that you would like to make?

17    A.  I think what I was trying to clarify at that point was to a

18    prior question about when we send out cease and desist letters,

19    that we do it as Coty.  But I just wanted to clarify that in

20    the situations with licensors, we also need our licensors on

21    board and inform them and involve them in the process.

22    Apologies.

23    Q.  With respect to the MD Distributors complaint that was

24    marked as Exhibit 156-1, you will recall that Mr. Bressler was

25    asking you a series of questions regarding the GK One product

1     that is shown in some of the attachments.  Do you know if the

2     GK One product is an alternative fragrance that was

3     manufactured by MD Distributors?

4             THE COURT:  I think we've established that he doesn't

5     have firsthand knowledge of the MD Distributors case.

6             Is that correct, Mr. Conklin?

7             THE WITNESS:  That's correct.

8             THE COURT:  Great.

9             MS. PEARSON:  Mr. Bressler's questioning, your Honor,

10    assumed that this was a fragrance that was manufactured by MD

11    Distributors by Wayne Hamerling in charge of that division.  I

12    objected to the lack of foundation.  I just want to clarify

13    that that point has not been established.

14            THE COURT:  Well, you have clarified that Mr. Conklin

15    has no firsthand knowledge of it whatsoever.  So I'm not

16    planning to rely on his testimony regarding it.  Go ahead.

17            MS. PEARSON:  All right.

18    Q.  Mr. Conklin, have you had occasion to review the consent

19    judgment in the MD Distributors case in connection with your

20    role in the legal department at Coty?

21    A.  Yes, I have.

22    Q.  And is it your understanding, sir, that the consent

23    judgment in the MD Distributors case which has been marked as

24    Plaintiffs' Exhibit 156-2 would permit MD Distributors to sell

25    the Excell products at issue in this case?

1          MR. BRESSLER:  Objection.

2          THE COURT:  Sustained.

3  Q.   Does the MD Distributors consent judgment permit the sale

4  of our version of products?

5          MR. BRESSLER:  Objection.

6          THE COURT:  Counsel, I don't think that the consent

7  judgment between MD Distributors, which is not a party in this

8  case, and another entity that, for that matter, is not a party

9  in this case has any relevance whatsoever.  I mean, whether the

10  sale of the "our version of" products in this case violate the

11  Lanham Act or New York law is a legal question that the fact

12  that there may have been a settlement between two other parties

13  in a totally different case has no bearing on.

14          MR. BRESSLER:  Would you like me to explain, your

15  Honor?

16          THE COURT:  Sure.

17          MR. BRESSLER:  One of the many issues here, since

18  Excell is already out of business, is was the conduct of Excell

19  so egregious to point towards the disgorgement of profits?  You

20  have Mr. Hamerling at MD --

21          THE COURT:  How does Mr. Conklin's testimony

22  concerning a case that he was not involved in the underlying

23  facts of have any relevance to that?

24          MR. BRESSLER:  That's fine, your Honor.

25          THE COURT:  Good.

1          MR. BRESSLER:  But the underlying issue is relevant.

2          THE COURT:  Fine.  You can make that argument when the

3    time comes, but I don't think eliciting testimony from

4    Mr. Conklin on this point is going to be relevant or helpful at

5    all.  Go ahead.

6          MS. PEARSON:  I have no further questions, your Honor.

7          THE COURT:  Great.  Mr. Conklin, you may step down.

8          THE WITNESS:  Thank you, your Honor.

9          THE COURT:  Ms. Pearson, please call your next

10   witness.

11         You can give those to counsel, please.

12         (Witness excused)

13         MR. POTTER:  Your Honor, we call Bobby Campbell to the

14   stand.

15         THE COURT:  Could you say that louder and into the

16   microphone.

17         MR. POTTER:  Your Honor, we call Robert Campbell to

18   the stand.  Ms. Pearson is getting him from the witness room

19   right now.

20    ROBERT CAMPBELL,

21        called as a witness by the Plaintiffs,

22        having been duly sworn, testified as follows:

23   DIRECT EXAMINATION

24   BY MR. POTTER:

25   Q.  Good morning, Mr. Campbell.  Could you please state your

1    job title for the record, please.

2    A.  I'm a manager for Lady Gaga and the general manager of Ate

3    My Heart, Inc.

4            THE COURT:  Could you just move up a little bit, and

5    if you could speak about a couple inches away from the

6    microphone so everybody in the courtroom can hear you, that

7    would be great.

8            THE WITNESS:  Yes, sir.

9            THE COURT:  Thank you.

10           MR. POTTER:  Your Honor, may I approach the witness

11   and present him with a copy of this exhibit?

12           THE COURT:  You may.

13           MR. POTTER:  Thank you.

14   Q.  Mr. Campbell, did you prepare a testimonial witness

15   statement in connection with this litigation?

16   A.  Yes.

17   Q.  And is the document that I have handed you a copy of that

18   witness statement?

19   A.  Yes.

20           MR. POTTER:  Your Honor, at this time we'd like to

21   note just a couple of changes to Mr. Campbell's witness

22   statement.

23           THE COURT:  Why don't we let Mr. Campbell, who is the

24   witness, testify to those.

25           MR. POTTER:  OK.

1          THE COURT:  Mr. Campbell, are you looking at

2     Plaintiffs' Exhibit 249?

3          THE WITNESS:  Yes, sir.

4          THE COURT:  Is that your affidavit?

5          THE WITNESS:  Yes.

6          THE COURT:  Did you review it before you signed it?

7          THE WITNESS:  Yes.

8          THE COURT:  Is there anything that you would like to

9     change or correct in the affidavit at this time?

10          THE WITNESS:  There is a thing I would like to

11     withdraw, which is -- I'll find it in a moment.

12          MR. POTTER:  Your Honor, as a point of clarification,

13     I apologize, I've handed the witness a copy of the exhibit that

14     has opposing counsel's objections in it, and I'd like to hand

15     him instead another copy, if that's all right.

16          THE COURT:  You may.

17          THE WITNESS:  Thank you.  This is not mine.  This is

18     Calvin Klein.

19          MR. POTTER:  I apologize.

20          THE WITNESS:  No problem.  Thank you.

21          MR. POTTER:  Thank you, your Honor.  I apologize for

22     that delay.

23          THE COURT:  All right.  Looking at that, Mr. Campbell,

24     is there anything that you need to change?  You said there was

25     something to withdraw.

1          THE WITNESS:  Yeah, I'm trying to find the paragraph.

2          MR. POTTER:  Your Honor, I might direct the witness to

3    the paragraph, and then he can tell you specifically what it is

4    to withdraw.

5          THE COURT:  All right.  Why don't you help us out.

6    What paragraph were you looking at?

7          MR. POTTER:  I'm looking at paragraph 24, your Honor,

8    on page 10.

9          THE WITNESS:  I would just like to withdraw the sales

10   figure about the number of bottles sold of the fragrance.  I

11   realize after signing this that that was inaccurate, and I want

12   to clarify that.

13         THE COURT:  In the first sentence of paragraph 24?

14         THE WITNESS:  The second sentence, "By February 2013,

15   less than six months after the launch," we can just withdraw

16   that sentence.

17         THE COURT:  The whole sentence?

18         THE WITNESS:  Yes, sir.

19         THE COURT:  All right.  So striking the second

20   sentence of paragraph 24.  Any other corrections or --

21         THE WITNESS:  No, sir.

22         MR. POTTER:  Your Honor, just as Ms. Pearson addressed

23   earlier with Mr. Conklin, he refers to Exhibit 1, we've

24   augmented it with Exhibit 1*.

25         THE COURT:  That's fine.  I think we can -- again,

1    assuming Mr. Bressler upon reviewing it didn't find any issues

2    with that, we'll just treat that as the same and a more legible

3    copy.

4           All right.  Are you offering Exhibit 249 and are there

5    any exhibits to offer in connection with it?

6           MR. POTTER:  Yes, your Honor.  I move for the

7    admission of Plaintiffs' Exhibit 249, Mr. Campbell's witness

8    statement, as well as the following exhibits that are within

9    it.  Now, some of them are subject to the parties' stipulation

10   because there's no objections, and others, there are

11   objections.  Would you prefer that I list them separately or

12   just in one group?

13          THE COURT:  Separately.  Give me the ones that there

14   are no objections to, we'll deal with those, and then we'll

15   take up the objections separately.

16          MR. POTTER:  Counsel can certainly let me know if I

17   missed anything, but I believe there are no objections and

18   deemed admitted are Plaintiffs' Exhibit 1*; 20; 21; 22; 46;

19   131-1; all of 133, that's parts 1 through 21; all of 134, parts

20   1 through 10; 135-2; 135-2; 137; 138, all parts, 1 through 19;

21   and Exhibit 141.

22          THE COURT:  Some of those are already in evidence, but

23   in any event, any objection, Mr. Bressler?

24          MR. BRESSLER:  No objection, your Honor.

25          THE COURT:  All right.  Those are admitted.

 1              (Plaintiffs' Exhibits 1*, 20, 21, 22, 46, 131-1, 133,

 2     134, 135-2, 135-2, 137, 138, 141, and 249 received in evidence)

 3              THE COURT:  Which are the ones to which there are

 4     objections?

 5              MR. POTTER:  I believe there are objections to

 6     Plaintiffs' Exhibits 132-2, 135-3, 135-4, 135-5, and 136.

 7              THE COURT:  All right.  First let me rule on the

 8     objections with respect to the affidavit, and then we can turn

 9     to the exhibits.

10              First, the objection to paragraph 14 is overruled.

11              Second, the objection to paragraph 24, that is, to the

12     last line of paragraph 24, is sustained.

13              The objection to paragraph 30, the -- sorry,

14     paragraph 29 is also sustained from "in light of" in the second

15     sentence through the end of the paragraph.

16              Paragraph 30, the objection to the first sentence is

17     sustained, and the objection to the last sentence is overruled.

18              And the objection to paragraph 31 is sustained, and

19     that is with respect to the language "if a consumer reads this

20     language" through the end of the paragraph.

21              All right.  Taking up the exhibits, I'm happy to

22     retrieve them if that's necessary.  Maybe you can just explain

23     what they are, and we can discuss.  What's the objections,

24     Mr. Bressler?

25              MR. BRESSLER:  Your Honor, I will -- in light of

H3NHCOT3                        Campbell - cross

1    previous objections, I will withdraw the objections to

2    Wikipedia pages, assuming they're not being offered for the

3    truth of the matter.

4           THE COURT:  I certainly don't intend to rely on

5    Wikipedia for the truth of anything, I will tell you that.

6           MR. BRESSLER:  Your Honor, you know you have your own

7    Wikipedia page?

8           THE COURT:  All the more reason why not to.

9           MR. BRESSLER:  OK.  So that's 132.

10          135-3, you'll have to excuse me.  There's quite a few

11   exhibits here, your Honor.  Facebook page I'll also, as long as

12   it's not for the truth of the matter, and I'm sure you won't

13   rely on it for that.  I'll withdraw 135-3, -4, and -5.  And

14   136, Wikipedia page again, withdrawn.

15          THE COURT:  All right.  So those are all admitted

16   subject to my comments earlier.

17          (Plaintiffs' Exhibits 132, 135-3, 135-4, 135-5, and

18   136 received in evidence)

19          THE COURT:  All right.  Cross-examination.

20   CROSS-EXAMINATION

21   BY MR. BRESSLER:

22   Q.  Good morning, Mr. Campbell.

23   A.  Good morning.

24          MR. POTTER:  Your Honor, may I offer the witness a

25   bottle of water?

```
 1              THE COURT:  Sure.
 2              MR. POTTER:  Thank you.
 3   Q.  Lady Gaga is pretty famous, isn't she?
 4   A.  Yes.
 5   Q.  She sang at the Super Bowl, didn't she?
 6   A.  Yes.
 7   Q.  She's up there with Michael Jordan, wouldn't you say?
 8   A.  In terms of fame?
 9   Q.  Yes.
10   A.  Sure.
11   Q.  OK.  People know her by the name Lady Gaga; right?
12   A.  Yes.
13   Q.  What's her real name?
14   A.  Stefani.
15   Q.  Nobody knows her by Stefani, do they?  Some people know her
16   as Stefani, but the public knows her as Lady Gaga; right?
17   A.  Yes.
18   Q.  They don't know her as Crazy Lady, do they?
19   A.  No.
20   Q.  Now, you testified, did you not, that Lady Gaga's fragrance
21   and Excell's fragrance, the version of it, smell similar, did
22   you not?
23   A.  I said they smelled similar, not quite the same, but I
24   could notice similarities.
25   Q.  Now, Lady Gaga's fragrance is an aspirational product or
```

1    brand that speaks to a feeling or a lifestyle that is of a

2    higher-end aesthetic or feeling; right?

3    A.  Yes, those are my words.

4    Q.  And you want it sold where prestige luxury brands are sold;

5    right?

6    A.  We have a tiered retail strategy that started with prestige

7    retailers, but you can buy the fragrance at drug stores, mass

8    merchants, and big box.  We created a strategy whereby we

9    sought to create a higher-end product that was accessible to

10   many people through different price points, different retail

11   outlets.  And part of her brand is being inclusive to all

12   people, so it's a product that speaks and feels of quality, but

13   it's accessible.  You can buy it for $15 at Duane Reade.

14   Q.  It's not sold at dollar stores, though, is it?

15   A.  It's not.

16   Q.  And the product at issue here, the size sells for -- a

17   1.7-ounce bottle sells for 49.99; right?

18   A.  Yes.

19   Q.  And a 3.4-ounce bottle is around $100; right?

20   A.  Correct.

21   Q.  Now, you testified that the scent is unique; correct?

22   A.  Yes.

23   Q.  It's not patented, is it?

24   A.  I'm not aware.

25   Q.  In order to design the bottle, you hired a famed fashion

1   photographer and designer; right?

2   A.  Yes.

3   Q.  The bottle is very pretty?

4   A.  Yes.

5   Q.  It can be displayed; right?

6   A.  Yes.

7   Q.  In fact, if you take the claw -- the top off and you turn

8   it upside down, you can rest the bottle on it; right?

9   A.  Yes.

10  Q.  And the purpose of that is to rest the bottle and display

11  it on a bureau; correct?

12  A.  Yes.

13  Q.  Let me show you the Crazy Lady product, which is admitted

14  into evidence as Plaintiffs' Exhibit 64.  I'd also like to show

15  you the Lady Gaga Fame, which is Plaintiffs' Exhibit 46.

16          May I approach?

17  A.  Yes.

18          THE COURT:  I'm the one who gets to decide that.

19          You may approach.

20          THE WITNESS:  I apologize.

21          MR. BRESSLER:  Far too much laughter going on, your

22  Honor.

23          THE COURT:  Better than tears.

24  Q.  I'm showing you the bottle from 64.  That's Crazy Lady;

25  correct?

1    A.  Yes.

2    Q.  Can you turn that upside down and rest it on the cap?

3    A.  Yeah.

4    Q.  The claws don't come off, do they?

5    A.  Nope.

6    Q.  And that is a oval-shaped bottle, is it not?

7    A.  Yes.

8    Q.  That's a little perilous.

9            And this is -- Exhibit 46 is roundish, different

10   shape?

11   A.  I'd say it's also an oval, but shapes are slightly

12   different.

13   Q.  And it rests inside the claws?

14   A.  Yes.

15   Q.  I'll leave them up there.

16           Now, you told Coty in 2012 that you were approached

17   and told about Crazy Lady by Excell; correct?

18   A.  Yes.

19   Q.  And you testified that a fan sent it to you, or sent you a

20   picture or some description of Excell's product, and said they

21   were afraid people might think it is authentic when it was not;

22   correct?

23   A.  Yes.

24   Q.  So the person who told you about it knew that the Excell

25   product that sold for 4.99 is not the same, is not by Lady

H3NHCOT3                     Campbell - cross

1    Gaga; right?

2              MR. POTTER:  Objection.

3              THE WITNESS:  Yes, it was a --

4              THE COURT:  Hold on, Mr. Campbell.  If counsel at the

5    front table says "objection," you have to wait.

6              THE WITNESS:  I didn't hear it.  Sorry.

7              THE COURT:  That's OK.

8              And Mr. Potter you need to make sure you're heard not

9    only by me but by the witness.

10             MR. POTTER:  Understood.

11             THE COURT:  All right.  Sustained.

12             MR. POTTER:  Thank you, your Honor.

13   BY MR. BRESSLER:

14   Q.  You testified, did you not, that the Excell version of Fame

15   that you considered to be the -- withdrawn.

16             You testified, did you not, that you consider or one

17   could consider the phrase "Our version of Lady Gaga's Fame" to

18   be a disclaimer?

19   A.  Are those my words in here?

20   Q.  In your deposition -- I'll first ask you, before you even

21   go there, do you consider the phrase "our version of Lady

22   Gaga's Fame" to be a disclaimer of sorts?

23   A.  I believe that it means that it's a -- I mean, I don't mean

24   to use the same word, but a version of.  So whether that's a

25   disclaimer or description, I'm not sure, but I believe it to

1   mean that they're in some ways connected.

2   Q.  You don't have any evidence of actual -- any consumer or

3   anybody actually thinking that Excell's product is connected

4   with Lady Gaga, do you?

5   A.  Only the speculation of the fan that you already mentioned

6   that thought that, you know, it was misleading to see a

7   fragrance listed similar to ours.

8           MR. BRESSLER:  I have no further questions.

9           THE COURT:  All right.  Redirect?

10          MR. POTTER:  No, your Honor.

11          THE COURT:  All right.  Mr. Campbell, thank you.  You

12  may step down.

13          THE WITNESS:  Thank you.

14          (Witness excused)

15          MR. BRESSLER:  Your Honor, may I go up and put the

16  bottles away?

17          THE COURT:  You may, and please do.  Next witness.

18          MR. POTTER:  Your Honor, the next witness will be

19  William Mitchell, and we are getting him now from the witness

20  room.

21          THE COURT:  Mr. Mitchell, if you want to come up here,

22  please, to the witness box.

23   WILLIAM MITCHELL,

24      called as a witness by the Plaintiffs,

25      having been duly sworn, testified as follows:

1   DIRECT EXAMINATION

2   BY MR. POTTER:

3   Q.  Good morning, Mr. Mitchell.  May I get you a bottle of

4   water, or are you OK?

5   A.  I'm fine.

6   Q.  Would you please state your job title and your employer for

7   the record, Mr. Mitchell.

8   A.  I'm executive vice president and chief operating officer of

9   Vera Wang.

10           MR. POTTER:  Your Honor, may I approach the witness

11  and present him with Exhibit 250?

12           THE COURT:  You may.

13           MR. POTTER:  Plaintiffs' Exhibit 250.  Thank you.

14           THE COURT:  Let's do this a little more quickly.

15  Mr. Mitchell, is Exhibit 250 an affidavit that you signed in

16  connection with this case?

17           THE WITNESS:  Yes.

18           THE COURT:  And before signing it, did you review it?

19           THE WITNESS:  Yes.

20           THE COURT:  Is there anything in the affidavit that

21  you would need to correct or change?

22           THE WITNESS:  No.

23           THE COURT:  All right.  Are you offering Exhibit 250?

24           MR. POTTER:  I am.

25           THE COURT:  Are there any exhibits that you want to

1    offer in connection with it?

2              MR. POTTER:  There are.

3              THE COURT:  Can you identify those to which there's no

4    objection first, please.

5              MR. POTTER:  Sure.  Those would be Plaintiffs'

6    Exhibits 27; 28; 29; 30; 82-1; 115-1; 115-3; all of 116, that's

7    parts 1 through 5; all of 122, that's parts 1 through 7; 125,

8    126; 127; and 131.

9              THE COURT:  All right.  Those are admitted.  I think

10   some of them were already as well.

11             (Plaintiffs' Exhibits 27, 28, 29, 30, 82-1, 115-1,

12   115-3, 116, 122, 125, 126, 127, and 131 received in evidence)

13             THE COURT:  Any as to which there is an objection?

14             MR. POTTER:  Yes, your Honor.  I believe those are

15   114, 115-2, 117-1, -2, -3, -4, 118, 119, 120, 121-1, -2, and

16   -3, 123, and 124-1 and 124-2 and 130.

17             THE COURT:  All right.  So let's first deal with the

18   affidavit objections.  There is an objection to paragraph 11.

19   That objection is overruled.

20             There's an objection to paragraph 13 from "our other

21   brand extensions" to the end of the paragraph.  That is

22   overruled.

23             There is an objection to the last portion of

24   paragraph 22.  To the extent that it's an objection to the

25   paragraph, it's overruled.  I'll address the exhibits

1    separately if that's the nature of the objection.

2            Same with the objection to paragraph 23, the last

3    sentence.

4            Same with the objection to paragraph 25, the last

5    sentence.

6            Paragraph 27, the last sentence, same ruling.

7            There's an objection to an exhibit in 28 that I will

8    address separately.

9            The objections to paragraphs 38 to 40 are sustained to

10   the extent that they refer to what customers might believe.

11           The objections to paragraphs 41 and 42 are overruled.

12           Let's talk about the exhibits.  Mr. Bressler, I don't

13   know if these are in the same category.  If they are, then

14   subject to my ruling earlier, any objection, and does that pare

15   it down?

16           MR. BRESSLER:  There are many that will be withdrawn

17   by the previous ruling.  So I don't miss anything, why don't

18   we, if you don't mind, go through them:

19           114 is OK.

20           115, OK.

21           117 in its entirety is OK.

22           118, OK.

23           119 is OK.

24           120 is OK.

25           121, same, OK.

1          123, Instagram, OK.

2          124, OK.

3          125, OK.

4          THE COURT:  I think 130 is the last one that was --

5          MR. BRESSLER:  130 is a retailer presentation which is

6   irrelevant.  This relates to consumers, not retailers.

7          THE COURT:  All right.  So it's a relevance objection?

8          MR. BRESSLER:  Yes.

9          THE COURT:  All right.  I'll take it and give it

10  whatever weight it deserves.  If it's relevant, that will be

11  zero, and if it is relevant, it's admissible.  So that is

12  overruled.

13          (Plaintiff's Exhibits 114, 115-2, 117-1, 117-2, 117-3,

14  117-4, 118, 119, 120, 121-1, 121-2, 121-3, 123, 124-1, 124-2,

15  and 130 received in evidence)

16          THE COURT:  You may proceed with cross-examination.

17  CROSS-EXAMINATION

18  BY MR. BRESSLER:

19  Q.  Good morning.

20  A.  Good morning.

21          THE COURT:  Mr. Mitchell, if you can just scoot up a

22  little bit.  If you're two or three inches away from the

23  microphone as I am, that's sort of the ideal distance.  Thank

24  you.

25  Q.  In paragraph 29 of your trial affidavit you talk about the

H3NHCOT3                    Mitchell - cross

1    different areas of distribution fragrances; correct?

2    A.  Correct.

3    Q.  You say the lowest tier includes drug stores or discount

4    chains like CVS, Walgreens, or Costco; correct?

5    A.  Currently, correct.

6    Q.  And that's the lowest tier that you, Vera Wang, will sell

7    their products; right?

8    A.  Not necessarily.

9    Q.  Well, that they do sell the products at issue?

10   A.  Currently.

11   Q.  And you know there's a level of distribution below a CVS,

12   Walgreens, or Costco; correct?

13   A.  Yes.

14   Q.  And that would include, for example, dollar stores which

15   you've described as a cheap, cheap Costco; correct?

16   A.  Correct.

17   Q.  You don't sell to dollar stores currently; right?

18   A.  Do not.

19   Q.  Now, the two bottles at issue here, the Princess bottle,

20   it's very unique; right?

21   A.  Yes, as far as we see it, yes.

22   Q.  And Vera Wang designed it; right?

23   A.  Yes.

24   Q.  And it's a bottle that Vera Wang hopes and believes people

25   buy and display on their bureau; correct?

1    A.  Sure.

2    Q.  Same thing with the Lovestruck bottle with the big flower

3    bouquet on the top?

4    A.  Sure.

5    Q.  It's eye-catching?

6    A.  Yes.

7    Q.  All right.  It's meant to spur sales; right?

8    A.  It's an element within it.  It's a part of it.

9    Q.  Now, you talk about damages in your declaration, and you

10   say there's lost sales that you attribute to Excell's products;

11   correct?

12   A.  I would attribute the potential for lost sales.  I can't

13   quantify actual lost sales.

14   Q.  Well --

15   A.  But anytime that somebody takes an item that's similar to

16   ours in any product category, it could hurt and hinder our own

17   sales.

18   Q.  Now, your sales have been down of both Princess and

19   Lovestruck; right?

20   A.  Yes.

21   Q.  And Princess is down because of a lack of support by

22   Macy's; right?

23   A.  It's a combination of things.  The Macy's is a function of

24   where we go and the direction of our business.  You know, Vera

25   starts off at a very high end, very luxury brand, and in time

1    we try to broaden that, that image, and broaden that

2    distribution.  So Macy's no longer carries a significant amount

3    of it, so we lose those sales.  So we go to other distribution

4    channels.

5    Q.  And you testified, did you not, that the sales are also

6    down because there's an inability of Kohl's to recapture the

7    lost sales from Macy's; right?

8    A.  Well, Kohl's is not nearly as large in fragrance as Macy's

9    is.  You know, Macy's is very -- it's a huge opportunity to

10   gain sales.  Kohl's doesn't have that opportunity.

11   Q.  Now, Lovestruck was an immediate success; right?

12   A.  I don't recall the actual results of Lovestruck early on.

13   You know, it's one of the -- one of our probably 12 different

14   fragrances that we've had, I'd say.

15   Q.  You testified, did you not, though, that you did not

16   consider Lovestruck to be a very successful or strong product?

17   A.  Not when you -- well, it's not nearly as successful as the

18   original Vera Wang or the Princess, which was extremely

19   successful.

20   Q.  Now, you testified that the reason it's not as successful

21   is it could be the big flowers or the scent; right?

22   A.  Multiple reasons.  It could be scent.  It could be

23   packaging.  It could be marketing.  It could be the retailers.

24   It could be anything.

25   Q.  You testified Excell's product almost certainly causes

H3NHCOT3                          Mitchell - cross

1   confusion in the marketplace; right?

2   A.   In the two products I've seen, I believe that that causes

3   confusion, yes.

4   Q.   But you have no evidence that anybody's ever thought that

5   Excell's product was actually a product by Vera Wang, do you?

6   A.   I have not done any test.

7   Q.   No one's ever complained to Vera Wang and/or anybody that

8   you know of saying Excell's product is not as good, and I

9   thought it was yours; right?

10   A.   Well, we -- we as --

11   Q.   It's a yes-or-no question.   Did anybody complain?

12   A.   Not to us directly.   That wouldn't come to us.

13   Q.   And you wouldn't know about it either?

14          MR. POTTER:   Objection.

15   A.   Well, we do know if Coty is informed of it.   They would

16   have to notify us.

17   Q.   Did Coty ever notify you?

18   A.   Only through the -- this process that I've learned that

19   they've identified, looked into it.   I don't have all the

20   specifics to it.

21   Q.   Now, you testified at paragraph 41 of your affidavit that

22   consumers could have a negative reaction to the store where the

23   products are sold, lessening the esteem for the Vera Wang

24   brand; right?

25   A.   If they think it's a Vera Wang product, sure.

 1   Q.  OK.  But you said -- in your deposition you testified that

 2   you would sell, Vera Wang would sell, to a dollar store if

 3   somebody approached them with a good opportunity; right?

 4   A.  Well, like any brand --

 5   Q.  It's a yes or no.  Would you?

 6   A.  I would sell -- I would sell to anybody to make money

 7   somehow, yes.

 8            MR. BRESSLER:  No further questions.

 9            THE COURT:  All right.  Redirect?

10            MR. POTTER:  Very briefly, your Honor.

11   REDIRECT EXAMINATION

12   BY MR. POTTER:

13   Q.  Mr. Mitchell, when Mr. Bressler was just asking you about

14   evidence of any actual confusion and whether anybody, I believe

15   the question was, has come to you or to Vera Wang or to anybody

16   else you know to say that Excell fragrances isn't as good, and

17   in any event, you wanted to give a broader answer and

18   Mr. Bressler cut you off.  If there's additional information

19   you'd like to provide to clarify your answer, you may.

20   A.  With respect to instances, again, there's many people

21   involved in the process.  I don't have any information other

22   than what you have shared with us that Coty has, you know, on

23   occasion been notified or given a call.  We -- we don't -- even

24   in all of our licenses we don't hear about all the complaints

25   that might go to the licensees, whether it's a business that we

1   have with Kohl's or whoever it may be.  Those complaints go

2   directly to the licensee, so I'd have to go to Coty and ask

3   them specifically for any of those.

4             THE COURT:  All right.  Question is have you received

5   any information from Coty or from a consumer with respect to

6   instances of actual confusion between the two products in this

7   case?

8             THE WITNESS:  Not from my day to day, I have not.

9             THE COURT:  All right.

10  Q.  Mr. Mitchell, you were also testifying under the

11  circumstances in which Vera Wang might put its products in a

12  dollar store.

13  A.  Yes.

14  Q.  Would you like to add a little bit more on that?

15            MR. BRESSLER:  Objection.

16            THE COURT:  Sustained.

17  Q.  Mr. Mitchell, under what circumstances might Vera Wang, if

18  at all, consider putting its fragrance products in a dollar

19  store?

20  A.  If there's an opportunity for the business and we feel it's

21  proper for the brand and we balance what we do for the brand

22  and what we've built over the years and if there's an

23  opportunity to do well in that distribution, we would consider

24  it and in most cases, if it's a good opportunity, do it.  Just

25  as we did with Walgreens and drug stores, we -- you know, we

1    weren't in those for a number of years, and now we've decided,

2    as we broaden our distribution, to go into those.

3          At the same time, being in a branded business for most

4    of my working life, understanding it, we also build a brand on

5    the high end.  So we have to do the things that drive the image

6    to balance wherever we may go.  So if we go to a drug store for

7    fragrance, we're going to want to have a high-end fragrance or

8    another aspect of our business in order to keep that balance;

9    otherwise, you'll eventually fade away.

10         So if somebody gave you the opportunity to go to a

11   dollar store and -- we would have to balance that with our

12   brand and with the right opportunity, why wouldn't we?

13   Everybody would want to make more money.

14         MR. POTTER:  Thank you, Mr. Mitchell.  No further

15   questions.

16         THE COURT:  All right.

17         MR. BRESSLER:  Your Honor, may I make a suggestion?

18   Things are moving very quickly, and I think that it's going to

19   be -- I probably have an hour, at most.

20         THE COURT:  Can we let Mr. Mitchell go?

21         MR. BRESSLER:  I'm sorry.  Yes.

22         THE COURT:  You may step down.  You're excused,

23   Mr. Mitchell.

24         (Witness excused)

25         MR. BRESSLER:  Given that I do have a little

1    restructuring of papers to do, see whether I can cut back on my

2    other ones, would it be OK to break at this point and resume

3    after 1:00?  We'll probably be done by 2:00 o'clock.

4                THE COURT:  Well, I have a commitment from 1:00 to

5    2:00, so we certainly can't resume at 1:00.

6                MR. BRESSLER:  2:00 o'clock?

7                THE COURT:  I think the witnesses are here, I assume.

8                MR. BRESSLER:  We'll proceed, your Honor.

9                THE COURT:  Very good.  I'm hoping we can even finish

10   by 1:00 on a -- try and adjust on the fly.

11               Next witness.

12               MR. BRESSLER:  Thank you.

13               THE COURT:  Mr. Potter, next witness.

14               MR. POTTER:  Your Honor, plaintiffs call Deirdre Miles

15   Graeter, and she's being retrieved from the witness room now.

16               Your Honor, while we have this momentary break, would

17   you like to just take the witness through the witness statement

18   authentication?

19               THE COURT:  Sure.

20               MR. POTTER:  Seems to be moving quickly.

21               MS. PEARSON:  You do it so well, your Honor.

22               MR. BRESSLER:  Your Honor, would you mind conducting

23   my cross as well?

24               MR. POTTER:  That I'd object to.

25               THE COURT:  Be careful what you wish for also.

1           MS. PEARSON:  I think we'll be really good and smooth

2      by the end of the trial.

3           THE COURT:  All right.  Ms. Miles-Graeter, if you

4      could come up here, please.

5           THE DEPUTY CLERK:  Please remain standing and raise

6      your right hand.

7       DEIRDRE MILES-GRAETER,

8           called as a witness by the Plaintiffs,

9           having been duly sworn, testified as follows:

10          THE COURT:  All right.  Ms. Miles-Graeter, if you

11     could just move up a little bit and move the microphone closer

12     to you as well.  If you're about two inches or so away from the

13     microphone, it is the ideal distance.

14          Ms. Potter, does Ms. Miles-Graeter have a copy of her

15     affidavit?

16          MR. POTTER:  May I approach, your Honor, and I'll

17     present her with one.

18          THE COURT:  You may.

19          THE WITNESS:  Yes, please.  Thank you.

20          THE COURT:  All right.  Ms. Miles-Graeter, do you have

21     a copy of Plaintiffs' Exhibit 248 there?

22          THE WITNESS:  Yes.

23          THE COURT:  Is that a copy of an affidavit you

24     prepared in connection with this case?

25          THE WITNESS:  Yes.

H3NHCOT3                          Mitchell - redirect

1          THE COURT:  Did you review it before you signed it?

2          THE WITNESS:  Yes.

3          THE COURT:  Is there anything that you would like to

4    change or correct in the affidavit at this time?

5          THE WITNESS:  No.

6          THE COURT:  All right.  Do you offer Plaintiffs'

7    Exhibit 248, Mr. Potter?

8          MR. POTTER:  I do, your Honor, just with a note that

9    this one also makes a reference to Plaintiffs' Exhibit 1 which

10   now is 1*.

11         THE COURT:  All right.  I think we can so stipulate

12   that for the rest of the trial as far as I'm concerned.

13         MR. POTTER:  Thank you.

14         THE COURT:  Are there exhibits to be offered in

15   connection with this?  And why don't we divide them into those

16   as to which there's no objection, those as to which there is.

17         MR. POTTER:  Certainly.  The exhibits for which there

18   is no objection are Plaintiffs' Exhibits 1 through 9; 11

19   through 19; 31; 33; 82-1; all of 85 parts 1 through 14; all of

20   86, parts 1 through 16; all of 88, parts 1 through 3; 89; all

21   of 90, parts 1 and 2; all of 91, parts 1 and 2; 93-1; 93-2;

22   93-4; 93-5; and 93-6; 95; 96-1; all of 98, that's parts 1

23   through 6; all of 99, parts 1 through 4; all of 100, parts 1

24   through 10; all of 102, parts 1 through 4; 103-2; 103-3; 103-4;

25   all of 105, that's parts 1 through 5; and all of 106, that's

1   parts 1 through 3.

2              THE COURT:  All right.  Mr. Bressler, any issues

3   there?

4              MR. BRESSLER:  I accept counsel's representation.

5              THE COURT:  All right.  Those are admitted without

6   objection.

7              (Plaintiffs' Exhibits 1 through 9, 11 through 19, 31,

8   33, 82-1, 85, 86, 88, 89, 90, 91, 93-1, 93-2, 93-4, 93-5, 93-6,

9   95, 96-1, 99, 100, 102, 103-2, 103-3, 103-4, 105, and 106

10  received in evidence)

11             THE COURT:  Are there other exhibits as to which there

12  is an objection?

13             MR. POTTER:  There are, your Honor.  Those are

14  Plaintiffs' Exhibits 84-1 and 84-2, 92-1, 93-3, 93-7, and 93-8,

15  96-2, and 96-3, 97, 101, 103-5, and 103-6, 104, and 107-1, -2,

16  and -3.

17             THE COURT:  All right.  Mr. Bressler, any of those

18  that we can withdraw in light of the earlier rulings and

19  discussions?

20             MR. BRESSLER:  84 -- mind, your Honor, I remain seated

21  so I can read?

22             THE COURT:  Sure.

23             MR. BRESSLER:  84-1 is OK.  84-2, OK.  92 and 93 are

24  all OK.  96 is OK.  97, relevance as to a press release, but I

25  assume you'll let it in so --

1          THE COURT:  Subject to my ruling earlier, admitted.

2     Go ahead.

3          MR. BRESSLER:  101, all OK.  I'm sorry.  Yes, 101's

4     OK.  103 is OK.  104, same, OK.  And 107, all OK.  No

5     objections.

6          THE COURT:  Great.  So they are all admitted.

7          (Plaintiff's Exhibits 84-1, 84-2, 92-1, 93-3, 93-7,

8     93-8, 96-2, 96-3, 97, 101, 103-5, 103-6, 104, 107-1, 107-2, and

9     107-3 received in evidence)

10         THE COURT:  Without objection.  Subject to my ruling

11    earlier.  All right.  Cross-examination.

12         MR. BRESSLER:  Does your Honor want to go through the

13    affidavit first, the objections contained therein?

14         THE COURT:  I did, didn't I?

15         MR. BRESSLER:  No.

16         THE COURT:  My apologies.  I thought I did, but

17    apparently, I got ahead of myself.

18         MR. POTTER:  Your Honor, I believe there may be

19    only --

20         THE COURT:  I got it.  Paragraph 45, the objection is

21    sustained.

22         Paragraph 48, the objection is overruled, but I will

23    not consider the first sentence of that paragraph for the

24    truth, just for the witness' understanding and state of mind.

25         You may proceed with cross.

1           MR. BRESSLER:  Thank you, your Honor.

2    CROSS-EXAMINATION

3    BY MR. BRESSLER:

4    Q.  Good morning.  Good morning.

5    A.  Good morning.

6    Q.  You have testified in your affidavit that the packaging for

7    the Calvin Klein products is unique and distinctive; correct?

8    A.  For each one, yes.

9    Q.  Now, you're aware that the CK One products have a

10   flask-shaped bottle; correct?

11   A.  I believe it's a bottle shaped with a screw-on cap.

12   Q.  And it's described as a flask-shaped bottle; right?

13   A.  I think some people do refer to it as a flask shape.

14   Q.  Let me show you Plaintiffs' Exhibit 90-2 which is admitted

15   into evidence pursuant to stipulation.

16           May I approach, your Honor?

17           THE COURT:  You may.

18           MR. BRESSLER:  Would your Honor like a copy as well?

19           THE COURT:  Sure.

20           MR. BRESSLER:  Thank you, your Honor.

21   Q.  I believe this is an article that you introduced through

22   your affidavit.

23   A.  I believe so.

24           THE COURT:  Is there a question?  She said, "I believe

25   so."

1              MR. BRESSLER:  Oh, I'm sorry.  I did not hear her.

2              THE COURT:  Ms. Miles-Graeter, just try to keep your

3    voice up and speak into the microphone, if you would.

4    Q.  Do you see in the page 2, number ten, Burberry Brit?

5    A.  Yes.

6    Q.  That bottle is flask-shaped as well, isn't it?

7    A.  I suppose you could refer to it as flask-shaped.

8    Q.  And if you refer to number six, Terre d'Hermes by Hermes?

9              THE COURT:  I think it's actually Hermes.

10             THE WITNESS:  Yes, that's perfect.

11             MR. BRESSLER:  It's not the first time I've

12   mispronounced French words.

13             THE COURT:  All right.  Question.

14   Q.  Do you see the bottle?  It's on the top of page 47.

15   A.  Yes.

16   Q.  And that has the look of a bottle within a bottle, like the

17   Eternity bottle; correct?

18   A.  I -- I just see a picture.  I don't know if I could say

19   that from just this picture.

20   Q.  OK.  The next page --

21             MR. POTTER:  Objection, your Honor.

22             THE COURT:  There's no question on the table, so

23   overruled.

24   Q.  The next page you have number three.  You go to the page,

25   and it shows that's a black bottle like Dark Obsession; right?

H3NHCOT3                        Miles-Graeter - cross

1            MR. POTTER:  Objection.

2            THE COURT:  Overruled.

3   A.  I don't know that I would say that.

4   Q.  Let me show you a series of documents or exhibits, DDD,

5   EEE, FFF, and GGG.

6            They are not admitted into evidence at this point,

7   Your Honor.  May I approach?

8            THE COURT:  You may.

9            MR. BRESSLER:  Would your Honor like a copy as well?

10           THE COURT:  I have one.

11           MR. BRESSLER:  You have it.  Yes.

12  Q.  You were aware, were you not, that Polo, if you look to

13  DDD, has various fragrances that use different flask-shaped

14  bottles; correct?

15  A.  I'm not familiar with the various Polo fragrances.

16  Q.  Are you familiar with any of them?

17  A.  I think I'm only -- I think I have a vague familiarity with

18  one of Romance.

19  Q.  Well, the bottles in DDD, those are flask-shaped bottles,

20  aren't they?

21  A.  I don't -- I would not refer to them as flask-shaped

22  bottles.

23  Q.  Well, let me show you a copy of CK One.

24           May I approach, your Honor?

25           THE COURT:  You may.

1   Q.  I'm sorry.  I recall that you don't want to have perfumes

2   close to you.

3   A.  I have allergies to some of them.  CK One is OK.

4   Q.  Looking at the CK One bottle --

5           THE COURT:  Can you make a record of what exhibit

6   you're using.

7           MR. BRESSLER:  I'm sorry, your Honor.  It is

8   Exhibit 41, which is admitted into evidence.

9   Q.  Similar in shape, is it not, to the red Polo bottle on

10  Exhibit DDD?

11          THE COURT:  Counsel, DDD is not in evidence.

12          MR. BRESSLER:  I'm sorry.  I move DDD into evidence.

13          MR. POTTER:  We object to its admission, your Honor.

14  There's been no foundation laid.

15          THE COURT:  Sustained.

16  Q.  Are you familiar with a product by a fragrance by Zegna?

17  A.  Zegna?

18  Q.  Z-e-g-n-a?

19          THE COURT:  She beat me to it.

20          THE WITNESS:  Sorry.

21          THE COURT:  That's OK.  Seems like Mr. Bressler's

22  limitations are not limited to French.

23          MR. BRESSLER:  I do English good.

24          THE COURT:  Point taken.  Go ahead.

25          MR. BRESSLER:  May I approach and show the bottle in

1    Exhibit EEE to the witness?

2              THE COURT:  You may approach.

3    Q.  Are you familiar with this item?

4    A.  No.

5    Q.  Would you agree that this item by Zegna is a flask-shaped

6    bottle?

7              THE COURT:  Sustained.

8    Q.  Now, you don't believe that a flask-shaped bottle for -- or

9    Calvin Klein doesn't believe that a flask-shaped bottle for

10   perfume is unique, do you?

11   A.  I don't -- I don't know what you mean by "a flask-shaped

12   bottle is unique."  A flask is a flask.  You know, there are a

13   variety of bottles.

14   Q.  Do you believe that the bottle shape for CK One is unique?

15   A.  Yes.

16   Q.  And have you done studies to determine what other --

17   A.  No.

18   Q.  -- bottles are out there that are similar?

19   A.  No.

20   Q.  Now, you've introduced in your affidavit various

21   advertisements for Calvin Klein products, and these are all

22   admitted into evidence.  And I'm going to show you

23   Exhibit 93-1, 93-3, 93-4, and 93-6.

24              May I approach, your Honor?

25              THE COURT:  You may.

1        MR. BRESSLER:  Would your Honor like a copy of these

2   particular exhibits?

3        THE COURT:  Sure, why not.

4   Q.  There are other exhibits that I will refer to that are in

5   that clip as we go.  Do you see 93-1?

6   A.  Yes.

7   Q.  And you see 93-3 and 93-4.  OK.  See those three, those are

8   examples you gave of advertisements for Obsession; correct?

9   A.  Yes.

10  Q.  And there's no bottle pictured in those advertisements, are

11  there?

12  A.  I don't see any.

13  Q.  So we have 93-1, -3, -4, and -6, no bottles.

14       Then there's 93-5, which is another advertisement you

15  introduced for Obsession?

16  A.  Yes.

17  Q.  That's a different bottle than the bottle at issue, isn't

18  it?

19  A.  Are you referring -- when you say "the bottle at issue" --

20  Q.  No, I'm sorry, the Obsession bottle at issue.  Would you

21  like me to get it for you?

22  A.  OK.

23       MR. BRESSLER:  Appears they have not been opened yet,

24  your Honor.

25  Q.  I'll hold it here in case the smell is problematic for you.

A.  Yeah, it's a little overpowering.  That's a different

bottle.

THE COURT:  All right.  That's a different bottle from

the bottle depicted in --

THE WITNESS:  In the ad.

MR. BRESSLER:  This is Exhibit 43.

THE COURT:  Thank you.

Q.  Then 91-1 and 92 -- 91-2 are the two third-party references

that you gave for Obsession; correct?

A.  I'm sorry, the two third-party?  I don't know what you're

referring to.

Q.  I'll refer you to your affidavit at paragraph 24.  Do you

see at the end of 24:  "Copies of select third-party media

references are collected in Plaintiffs' Exhibit 91"?

A.  Number 24?

Q.  The end of 24.  May I approach and show you?

THE COURT:  If you look at your affidavit,

Ms. Miles-Graeter.

THE WITNESS:  Yes, I found it.  I just wanted to see

the ads again.

OK.  And the question?

Q.  Those are the two third-party media references that you

cite for Obsession; correct?

A.  Yes.

Q.  And neither of them have the bottles for Obsession, do

H3NHCOT3                          Miles-Graeter - cross

1    they?

2    A.   Neither copy shows the bottle.

3            MR. BRESSLER:  I'm sorry, your Honor.  I cannot hear.

4    A.   Neither copy shows the bottle.

5            MR. BRESSLER:  May I approach, your Honor, with

6    Exhibits 98-1 and 98-2, both of which are admitted into

7    evidence?

8            THE COURT:  You may.

9            MR. BRESSLER:  Would you like me to take the bottle

10   away from you?

11   Q.   Those are two references you give for advertising for

12   Eternity; correct?

13   A.   Yes.

14   Q.   And neither of those have the Eternity bottle, do they?

15   A.   Correct.

16            (Continued on next page)

17

18

19

20

21

22

23

24

25

```
 1              THE COURT:  Ms. Miles-Graeter, just keep your voice
 2    up, if you can, please.
 3              THE WITNESS:  Okay.
 4              THE COURT:  Everybody in the courtroom needs to hear
 5    you.
 6    BY MR. BRESSLER:
 7    Q.  I'd like to show you Plaintiff's Exhibit 99-4, which has
 8    been admitted into evidence.
 9              MR. BRESSLER:  May I approach, your Honor?
10              THE COURT:  You may.
11    Q.  And if you look to Page 763, are you familiar with this?  I
12    believe you introduced it in paragraph 31.
13    A.  I believe I've seen it before.
14    Q.  Okay.  And when it talks about the CK One bottle, it talks
15    about how beautiful the bottle is, correct?
16    A.  The phrase used is, yes, minimally beautiful.
17    Q.  And Calvin Klein considers the CK One bottle to be almost a
18    collector's item, right?
19    A.  I wouldn't say that.
20    Q.  Well, it considers it a bottle that is attractive to
21    consumers?
22    A.  Yes.
23    Q.  A bottle that consumers would want to have, you know?
24    A.  A bottle?
25    Q.  The bottle.
```

1   A.  I don't know that.

2   Q.  Now, you recognize that some of the bottles at issues here,

3   some of Excell's versions of Calvin Klein's bottles, are not

4   confusingly similar to the original bottles, right?

5           THE COURT:  Sustained.

6   Q.  Calvin Klein's position, through your deposition testimony

7   as a corporate representative, is that the bottle for Euphrates

8   is not confusingly similar to the bottle for Euphoria; is that

9   not correct?

10  A.  I believe I was asked the question when I was shown a

11  picture of the Euphoria and the Euphrates, if I thought it was

12  confusingly similar.  One was clear; one was color.  I said no.

13          THE COURT:  Ms. Miles-Graeter, if you could scoot up

14  and be in front of the microphone.  I'm sorry to keep reminding

15  you, but it's hard to hear otherwise.

16          MR. BRESSLER:  I have no further questions, your

17  Honor.

18          THE COURT:  All right.  Redirect?

19          MR. POTTER:  No, your Honor.

20          THE COURT:  All right.  Ms. Miles-Graeter, you may

21  step down.

22          THE WITNESS:  Thank you, your Honor.

23          THE COURT:  Thank you.

24          (Witness excused)

25          THE COURT:  You can hand those documents to

1   Ms. Pearson, counsel at the front table.

2            The next witness, plaintiff?

3            MR. POTTER:  Your Honor, plaintiffs next call Lori

4   Singer.

5    LORI SINGER,

6        called as a witness by the Plaintiffs,

7        having been duly sworn, testified as follows:

8            THE DEPUTY CLERK:  Please have a seat.

9            THE WITNESS:  Thank you.

10           THE DEPUTY CLERK:  Please state and spell your full

11  name for the record.

12           THE WITNESS:  Lori Singer, L-o-r-i, S-i-n-g-e-r.

13           THE COURT:  All right.  Mr. Potter, would you like to

14  give her Plaintiff's Exhibit 251?

15           MR. POTTER:  Yes, your Honor.  Thank you.

16           THE COURT:  Ms. Singer, you have a copy of Plaintiff's

17  Exhibit 251 there; is that correct?

18           THE WITNESS:  I'm sorry, yes.

19           THE COURT:  All right.  Is that an affidavit you

20  prepared in connection with this case?

21           THE WITNESS:  Yes, it is.

22           THE COURT:  Did you review it before you signed it?

23           THE WITNESS:  I did.

24           THE COURT:  Sitting here today, is there anything that

25  you would like to change or correct in that affidavit?

1          THE WITNESS:  No.

2          THE COURT:  All right.

3          MR. POTTER:  Your Honor, I believe Ms. Singer's job

4    title may have changed since the execution of this.  She may

5    wish to correct that for the record.

6          THE COURT:  All right.  What is your job title today,

7    Ms. Singer?

8          THE WITNESS:  Group vice president of marketing, just

9    "for the designer fragrances" is not part of the title anymore.

10          THE COURT:  All right.  When did that change occur?

11          THE WITNESS:  November of 2016.

12          THE COURT:  All right.  Mr. Potter, are you offering

13    any exhibits pursuant to this affidavit?

14          MR. POTTER:  I am, your Honor, and we also certainly

15    move for admission of the affidavit itself.

16          THE COURT:  Understood.

17          MR. POTTER:  The exhibits to which there are no

18    objection are Plaintiff's Exhibits 127 and 131, and I believe

19    there are objections to Plaintiff's Exhibit 97, 108, 109, 112,

20    121, 129 and 130.

21          THE COURT:  All right.  Mr. Bressler, are those in the

22    same category or are there other issues there?

23          MR. BRESSLER:  97 is okay; 108, relevance; 109,

24    retailer presentation, also relevance.  Your Honor ruled

25    previously on that; so subject to that ruling.  112, retail

1    presentation as well.  121 I'll withdraw.  129, withdrawn.

2    130, retailer presentation, subject to the prior ruling.

3           THE COURT:  All right.  So they're all admitted

4    subject to my prior rulings.

5           (Plaintiffs' Exhibits 127, 131, 97, 108, 109, 112,

6    121, 129 and 130 received in evidence)

7           THE COURT:  With respect to the affidavit itself, all

8    objections are overruled except as follows.  I'll make a record

9    of what the other objections are in a moment.

10          Paragraph 40, the objection is sustained as to the

11   first sentence and the last sentence.

12          Paragraph 41, the objection is sustained as to the

13   last sentence.  And to be clear, that's the entirety of those

14   objections.

15          Paragraph 42, there's an objection to the entire

16   paragraph, but it is overruled as to the first sentence,

17   sustained as to the last and second sentence.

18          Let me make a record of the objections that were

19   overruled.  The following objections were overruled:  The

20   objection to the first sentence of paragraph 8; the objection

21   to paragraph 21; the objection to paragraph 22, the objection

22   as is to the entire paragraph except for the one sentence

23   starting "in this case;" the objection to paragraph 23, the

24   objections to paragraph 24; the objection to paragraph 26, the

25   sentence beginning "a May 9th, 2014, press release;" the

1   objection to paragraph 31; and the objection to paragraph 33;

2   the objections to the last two sentences of paragraph 34; the

3   objections to the last sentence of paragraph 37; the last

4   sentence of paragraph 38; and the last sentence of paragraph

5   39.  I've already ruled on 40 and 41 and 42; and the objection

6   to paragraph 43 is overruled as well.

7          All right.  Cross-examination.

8          MR. POTTER:  Just to be one hundred percent clear, the

9   images on the top of Page 13 in paragraph 33 seem to have a

10  separate -- it's tough to tell, the way it's demarcated.  I

11  just want to confirm that that was overruled as well, the 602.

12         THE COURT:  Yes, that was overruled.

13         MR. POTTER:  Thank you, your Honor.

14         THE COURT:  All right.  Cross-examination.

15  CROSS-EXAMINATION

16  BY MR. BRESSLER:

17  Q.  Good afternoon.

18  A.  Good afternoon.

19  Q.  I think you have to move a little bit forward, please.

20         THE COURT:  If you could stay about two inches away

21  from the microphone and make sure you speak loudly and clearly

22  so everybody could hear you, that would be very good.

23         THE WITNESS:  Sure.

24  BY MR. BRESSLER:

25  Q.  You recognize, Ms. Singer, that fragrances that sell for

1    4.99 are sold from different places than are sold from 60 to

2    $80?

3    A.  I'm sorry, could you repeat the question, please.

4              MR. POTTER:  Objection.

5    Q.  You recognize, do you not, that fragrances that sell for

6    4.99 are sold in different places than fragrances that are sold

7    for 60 to $80?

8              MR. POTTER:  Objection.

9              THE COURT:  Overruled.

10   A.  Not always.

11   Q.  Do you have any evidence of the fragrances sold by Excell

12   being sold in the same places as the fragrances sold by Calvin

13   Klein?

14   A.  I don't have any evidence, no.

15   Q.  Now, you testified that the name Euphoria was chosen as

16   providing a euphoric escape, right?

17   A.  That's one of the reasons, yes.

18   Q.  Now, you know that Euphrates is a river, right?

19   A.  Yes.

20   Q.  Does Euphrates give a sense of euphoric escape?

21   A.  I don't know.

22   Q.  Now, you testified in your affidavit that it's important

23   that the bottles be pleasing and attractive to consumers.  Why

24   is that?

25   A.  Many consumers use packaging as one of their points of

1  purchase, something that they're interested in.

2  Q.  And many consumers buy bottles of fragrance and display

3  them on their dressers, for example?

4  A.  Some do.

5  Q.  And you want those bottles -- Calvin Klein wants those

6  bottles to be pleasing so consumers do want to display them,

7  right?

8  A.  That's not why we want them to be pleasing or why Calvin

9  Klein wants them to be pleasing.

10 Q.  You want them to be pleasing to help sell?

11 A.  That's one of many factors.

12 Q.  Now, the Euphoria bottle is designed by a world-renowned

13 creative director and designer, right?

14 A.  Yes.

15 Q.  And consumers react very favorably to the bottle?

16 A.  Some consumers.

17 Q.  It's considered a beautiful bottle, isn't it?

18 A.  That's subjective.

19 Q.  Well, let me show you Exhibit 103-4, which was admitted

20 into evidence.

21         MR. BRESSLER:  Your Honor, may I approach?

22         THE COURT:  You may.

23         MR. BRESSLER:  Would your Honor like to have a copy,

24 and I'll get the other one?

25         THE COURT:  Yes, please.

1    Q.  This is the Euphoria bottle in Exhibit 103-4?

2    A.  Yes, it looks like it.

3    Q.  Okay.  Are you aware that the Euphoria bottle is considered

4    by many people to be a beautiful perfume bottle?

5    A.  From what I'm looking at from the author of this article.

6    Q.  Are you familiar with 103-4?

7    A.  No.

8    Q.  Are you familiar with any awards that the Euphoria bottle

9    has received, or accolades it's received, as being a beautiful

10   bottle?

11   A.  Not offhand.

12   Q.  Now, you testified, did you not, that you view the Excell

13   products that you saw as versions of the originals?

14   A.  I don't believe I said that.

15   Q.  Did you testify as follows:

16   "Q.  Do you think that the Excell products that you viewed are

17   versions of the Coty product that claim to be versions of it?

18   "A.  Do I?

19   "Q.  Yes.

20   "A.  View them?

21   "Q.  Yes.

22   "A.  As versions of Coty products?

23   "Q.  Right.

24   "A.  Yes."

25             Did you testify to that?

1   A.  If you're reading that from the testimony, yes, but I don't

2   think that's what I said.

3   Q.  Would you like to look at the testimony?

4   A.  Sure.

5          MR. BRESSLER:  Your Honor, may I approach?

6          THE COURT:  You may.

7   Q.  It's on Pages 114, line 17 to 115, 4.

8          THE COURT:  Is this marked as an exhibit or --

9          MR. BRESSLER:  The depositions are not, your Honor.

10         THE COURT:  Okay.  In an ideal world, they would be

11  for the record, but they're not.  You may look at the portions

12  that Mr. Bressler --

13         THE WITNESS:  This here that you've marked?

14         MR. BRESSLER:  Correct.

15         THE WITNESS:  Okay.

16         (Pause)

17  A.  The way I read this, I read it as I was clarifying your

18  question.  I see there are several steps of me asking questions

19  about what you were asking.

20  Q.  Did you have an opportunity to review this deposition

21  transcript?

22  A.  Yes.

23  Q.  Did you correct that portion of it or clarify it in any

24  way?

25  A.  No, because the way I read it is not how you're

1    interpreting it.

2    Q.  Do you -- withdrawn.

3              MR. BRESSLER:  I have no further questions.

4              THE COURT:  All right.

5              MR. BRESSLER:  Your Honor, do you have a copy of the

6    transcript?

7              THE COURT:  I don't believe I do.

8              MR. BRESSLER:  I have a book full of the transcripts

9    that I had meant to hand to your Honor, but since we didn't use

10   them, I did not.  But I shall hand that to you.  May I

11   approach, your Honor?

12             THE COURT:  You may.

13             MR. BRESSLER:  This says witness copies, but you're

14   welcome to it.

15             MR. POTTER:  Your Honor, I object to them handing up

16   deposition transcript and pages that he didn't use and weren't

17   part of their designations to which we've not reviewed or

18   offered counter-designations.

19             THE COURT:  He's just giving them to me.  I'm not

20   necessarily going to look at anything.  To the extent that

21   you're objecting to my being handed something, it's overruled.

22   Any redirect?

23             MR. POTTER:  No, your Honor.

24             THE COURT:  All right.  Ms. Singer, your work here is

25   done.  You may step down, and thank you.

1          (Witness excused)

2          THE COURT:  You can give that to counsel at the back

3     table, please.

4          Next witness.

5          MR. POTTER:  The next witness will be Ralph Massaro,

6     your Honor, and we're retrieving him now.

7          THE COURT:  Am I correct he's the last witness

8     testifying today?

9          MR. POTTER:  Unless we can get the Karate Kid in here,

10    yes.

11         THE COURT:  All right.

12     RALPH MASSARO,

13         called as a witness by the Plaintiffs,

14         having been duly sworn, testified as follows:

15         THE DEPUTY CLERK:  Please have a seat.  Please state

16    and spell your full name for the record.

17         THE WITNESS:  Ralph, R-a-l-p-h, Massaro, M, as in

18    Michael, -a-s-s-a-r-o.

19         THE COURT:  Do you want to approach, Mr. Potter, and

20    hand Mr. Massaro Plaintiff 254, please.

21         Mr. Massaro, you have in your hands, I think,

22    Plaintiff's Exhibit 254; is that correct?

23         THE WITNESS:  Yes, sir.

24         THE COURT:  Is that an affidavit that you prepared in

25    connection with this case?

1           THE WITNESS:  Yes, sir.

2           THE COURT:  Can you just move up a little closer to

3     the microphone, please, and if you're about two inches away

4     from the microphone and speak loudly, it will help make sure

5     everybody can hear you.

6           THE WITNESS:  Okay.

7           THE COURT:  Did you review the affidavit before you

8     signed it?

9           THE WITNESS:  Yes, I did.

10          THE COURT:  And is there anything that you need to

11    change or correct at this time?

12          THE WITNESS:  No.

13          THE COURT:  All right.  Are there any exhibits to be

14    offered in connection with the affidavit, Mr. Potter?

15          MR. POTTER:  Yes, your Honor.  There are two, both of

16    which are objected to.

17          THE COURT:  Go ahead.

18          MR. POTTER:  Plaintiff's Exhibits 152-1 and 152-4.

19          THE COURT:  All right.  So first, with respect to the

20    affidavit itself, all objections -- and I'll make a record of

21    what they are -- are overruled, subject to my ruling on the

22    motion in limine.  That is to say that I've reserved judgment

23    on the arguments made in the motion in limine.

24          The objections -- and some of these may be to exhibits

25    and not the paragraphs -- are to paragraph 5, the last

1   sentence; all of paragraph 6; all but the first sentence of

2   paragraph 7; paragraph 8; paragraph 9, all but the first

3   sentence; paragraphs 10, 11, 12, 13; and all of paragraph 14,

4   except for the last sentence.  So those objections are

5   overruled except insofar as I have reserved judgment on the

6   motion in limine, and I will continue to reserve judgment on

7   that.

8           With respect to the exhibits, Mr. Bressler, tell me

9   the issues there.

10          MR. BRESSLER:  152-1 has to do --

11          THE COURT:  Microphone.

12          MR. BRESSLER:  152-1 has to do with the European

13  Commission of Consumer Protection.  It's irrelevant for the

14  cases in the United States.  It's also hearsay.

15          152-4 is hearsay and irrelevant.

16          THE COURT:  All right.  I'm going to reserve judgment

17  on both of those.

18          MR. POTTER:  Your Honor, if I may, may I be heard

19  briefly --

20          THE COURT:  Briefly.

21          MR. POTTER:  -- on the hearsay and counter-argument on

22  that?  Neither of those, on the hearsay point, neither of those

23  are coming in for the truth of the matter asserted.

24          As Mr. Massaro's testimony makes clear, these are

25  publications based on which Coty chooses to adopt certain

1   quality control and safety standards.

2           THE COURT:  The hearsay objection is overruled.  I

3   will not consider them for the truth, merely for the fact that

4   they have them and rely on them.  Go ahead.

5           MR. POTTER:  Similarly, on the relevance objection.

6   They're relevant for that point.  They go to the quality

7   control standards that Coty seeks to establish that allegedly

8   are not met by defendant's fragrances, which allegedly causes

9   harm.

10          THE COURT:  All right.  I'll overrule the objection

11  and consider them for whatever weight they are worth.

12  Cross-examination.

13          MR. POTTER:  Thank you, your Honor.

14          Your Honor, may I speak to establish the witness' lack

15  of knowledge on the paragraphs of the affidavit that I objected

16  to on paragraphs -- based on rule 602?

17          THE COURT:  You may cross-examine.  You may ask any

18  question you like, and if I have an issue, I will say

19  sustained; if I don't, you may proceed.

20  CROSS-EXAMINATION

21  BY MR. BRESSLER:

22  Q.  Good afternoon.

23  A.  Good afternoon.

24  Q.  In your affidavit you discuss chemical testing of Excell's

25  products, correct?

1    A.  Correct.

2    Q.  Those products were tested not by you, but by a man,

3    Vinod -- I forget his last name.  What's his last name?

4    A.  Topiwala.

5    Q.  Mr. Topiwala is the one who did the actual testing, didn't

6    he?

7    A.  That's not correct.

8    Q.  Well, what did you do and what did Mr. Topiwala do?

9    A.  I did the initial screening and identification of the

10   components in the fragrances, and I assisted in the

11   quantification of the compound DEHP, diethylhexyl phthalate.

12   Q.  Did you testify that after doing the initial identification

13   of that chemical being present, that you handed it off to

14   Mr. Topiwala to determine the amount in there?

15   A.  We worked together on it.  The GC and the GCMS, these are

16   instruments that we use in the lab, do most of the work.  So we

17   basically load the vials onto the instrument and then compile

18   the data and then remove the vials.

19   Q.  And you were side by side with Mr. Topiwala while he was

20   doing this?

21   A.  Not the whole time, but majority of the time, yes.

22   Q.  Now, DEHP is not banned in the United States, is it?

23   A.  No, it is not.

24   Q.  And any DEHP you may have found is from the plastic, right?

25   A.  Most of the time, yes, that's correct.

1   Q.  Now, you don't expect a 4.99 version of -- or 4.99

2   fragrance to last as long as an expensive $60 fragrance, do

3   you?

4   A.  That's not -- I really can't answer that.  It depends on

5   the componentry in the fragrance.

6          THE COURT:  Mr. Massaro, if you could be about an inch

7   further from the microphone.  If you're too far, it also messes

8   things up.

9   Q.  Well, the essential oil is what causes the fragrance to

10  last longer, right?

11  A.  That's correct.

12  Q.  Okay.  And the essential oils costs money, right?

13  A.  Yes, they do.

14  Q.  And the essential oils are more expensive than using

15  another product such as water, right?

16  A.  Yes, but the price doesn't necessarily equate to long

17  lastingness.  You can have cheaper ingredients that can last

18  longer than more expensive ones.

19  Q.  But you didn't do any testing to see how long Excell's

20  products last, did you?

21  A.  No, we did not.

22  Q.  Okay.  Now, you testified in paragraph 7 of your affidavit

23  that Coty's products have -- or Excell's product, excuse me,

24  I'll rephrase.

25          You testified in paragraph 7 of your affidavit that

1   Excell's product have significantly higher water and alcohol

2   content than Coty's, correct?

3   A.  Correct.

4   Q.  Now, isn't it a fact, though, that Euphoria has more

5   alcohol than Euphrates?

6   A.  I would have to look at the data.  The level of ethanol is

7   not a concern unless it goes over a certain level.

8   Q.  Excuse me, sir, that wasn't the question.  The question is

9   which has more.  You testified in paragraph 7 that Excell's has

10  significantly higher water and alcohol content, and I'm testing

11  that assertion by you.  Okay?

12  A.  Yeah, that was a broad statement.

13  Q.  All right.  Let me show you the -- see if I can refresh

14  your recollection.

15          MR. BRESSLER:  May I approach and show the witness a

16  document to refresh his recollection, that has already been

17  ruled inadmissible?

18          THE COURT:  Inadmissible?

19          MR. BRESSLER:  It's inadmissible as evidence, but it

20  can be used to refresh.

21          THE COURT:  You can approach and show it to him and

22  make a record of what it is.

23          MR. BRESSLER:  It was marked as 152-5, and it was

24  ruled inadmissible as hearsay.  May I approach?

25          THE COURT:  You can refresh a recollection with

1   anything, whether it's admissible or not.

2              MR. BRESSLER:  Yes.

3   Q.  I'm handing you the report.

4              MR. BRESSLER:  Would you like a copy, your Honor?

5              THE COURT:  No, thank you.

6   BY MR. BRESSLER:

7   Q.  Why don't you turn to Page 4 of the report.  Do you see

8   there the amount of alcohol content for Euphoria?

9              THE COURT:  It's not in evidence.

10             MR. BRESSLER:  I understand.  I'm going to refresh his

11  recollection, your Honor.

12             THE COURT:  Thank you.

13  BY MR. BRESSLER:

14  Q.  Does Page 4 of this document, Exhibit 152-5, refresh your

15  recollection that --

16  A.  Yes.

17  Q.  Excuse me?

18  A.  Yes.

19  Q.  May I finish the question?

20             THE COURT:  Sure, yes.  Mr. Massaro, let him finish

21  his question before you answer so the nice lady down there can

22  take everything that each person in the room says.

23             Go ahead, Mr. Bressler.

24  Q.  Does Page 4 of Exhibit 152-5 refresh your recollection that

25  Coty's Euphoria has more alcohol than Excell's Euphoria?

1   A.  Yes.

2   Q.  And, in fact, does Euphoria have more alcohol than

3   Euphrates?

4   A.  Yes.

5   Q.  Now, do you recall whether Euphoria For Men has more

6   alcohol than Euphrates?

7   A.  No, I do not.

8   Q.  Will you turn to Page 6.  Does Page 6 of Exhibit 152-5

9   refresh your recollection as to whether Euphoria has more

10  alcohol content than Euphrates?

11  A.  Yes.

12  Q.  Does, in fact, Euphoria have more alcohol content than

13  Euphrates?

14  A.  Yes.

15  Q.  Do you recall whether OK Shock has more alcohol content

16  than -- I'm sorry.  Do you recall whether CK One Shock has more

17  alcohol content than OK Rock?

18  A.  No, I do not.

19  Q.  Would you refer to Page 10.  Does that refresh your

20  recollection as to whether CK One Shock For Her has more

21  alcohol than OK Rock For Her?

22  A.  Yes.

23  Q.  And, in fact, does CK One Shock have more alcohol than OK

24  Rock?

25  A.  Yes.

1   Q.  Do you recall whether CK One Shock For Him has more alcohol

2   than OK Rock For Him?

3   A.  No, I do not.

4   Q.  Can you turn to Page 12.  Does that refresh your

5   recollection as to whether CK One Shock has more alcohol than

6   OK Rock For Him?

7   A.  Yes.

8   Q.  And, in fact, does CK One Shock have higher alcohol content

9   than OK Rock?

10  A.  Yes, it does.

11  Q.  Do you recall whether Obsession has more alcohol than

12  Possession?

13  A.  No, I do not.

14  Q.  Please turn to Page 14.  Does that refresh your

15  recollection as to whether Obsession For Men has a higher

16  alcohol content than Possession For Men?

17  A.  Yes, it does.

18  Q.  And, in fact, does Obsession For Men have a higher alcohol

19  content than Possession?

20  A.  Yes.

21  Q.  Do you recall whether Dark Obsession has a higher alcohol

22  content than Possession Night?

23  A.  No, I do not.

24  Q.  Please turn to Page 16.  Does that refresh your

25  recollection as to whether, in fact, Dark Obsession has a

1   higher alcohol content than Possession Night?

2   A.  Yes.

3   Q.  And, in fact, does Dark Obsession have a higher alcohol

4   content than Possession Night?

5   A.  Yes, it does.

6   Q.  Do you recall whether Eternity For Men has a higher water

7   and alcohol content than Serenity For Men?

8   A.  No, I do not.

9   Q.  Please turn to Page 20.  Does that refresh your

10  recollection as to whether Eternity For Men has a higher water

11  and alcohol content than Serenity For Men?

12  A.  Yes.

13  Q.  Does, in fact, Eternity For Men have a higher alcohol and

14  water content than Serenity For Men?

15  A.  Yes.

16  Q.  Do you recall whether Eternity Aqua has a higher water

17  content than Serenity Aqua?

18  A.  No.

19  Q.  Please turn to Page 22.  Does that refresh your

20  recollection that, in fact, Eternity Aqua has a higher content

21  than Serenity Aqua?

22  A.  Yes.

23  Q.  And, in fact, does Eternity Aqua have a higher water

24  content than Serenity Aqua?

25  A.  Yes.

1   Q.  Do you recall whether CK IN2U For Her has a higher alcohol

2   content than 4U?

3   A.  No.

4   Q.  Please look to Page 24.  Does that refresh your

5   recollection that CK IN2U has a higher alcohol content than

6   Excell's 4U?

7   A.  Yes.

8   Q.  And, in fact, does CK IN2U have a higher alcohol content

9   than 4U?

10  A.  Yes.

11  Q.  Do you recall whether Vera Wang Princess has a higher

12  alcohol content than Inspiration?

13  A.  No.

14  Q.  Please turn to Page 26.  Does that refresh your

15  recollection as to whether Vera Wang Princess has a higher

16  alcohol content than Inspiration?

17  A.  Yes.

18  Q.  And, in fact, does Vera Wang Princess have a higher alcohol

19  content than Inspiration?

20  A.  Yes.

21  Q.  Do you recall whether Lady Gaga Fame has a higher alcohol

22  content than Crazy Lady?

23  A.  No.

24  Q.  Please turn to Page 30.  Does that refresh your

25  recollection that, in fact, Lady Gaga Fame has a higher alcohol

1    content than Crazy Lady?

2    A.   Yes.

3    Q.   In fact, it does?

4    A.   Yes.

5    Q.   Do you recall whether Joop! Homme -- I'm just wondering

6    whether I had a third language -- has a higher alcohol content

7    than Jump!?

8    A.   No.

9    Q.   Please turn to Page 32.  Does that refresh your

10   recollection that Joop! Homme has a higher alcohol content than

11   Jump!?

12   A.   Yes.

13   Q.   And, in fact, does Joop! have a higher alcohol content than

14   Jump!?

15   A.   Yes.

16          MR. BRESSLER:  I have no further questions.

17          THE COURT:  Redirect?

18   REDIRECT EXAMINATION

19   BY MR. POTTER:

20   Q.   Good afternoon, Mr. Massaro.

21   A.   Good afternoon.

22   Q.   I believe you testified when answering Mr. Bressler's

23   questions that the price of an essential oil is not necessarily

24   indicative of the duration of the fragrance that it may end up

25   in; is that correct?

 1    A.  That's correct.

 2    Q.  But in your witness statement, you say that the

 3    percentage -- I'm sorry.  You say that you personally observed,

 4    over the course of your career, that fragrances with more

 5    essential oils relative to their alcohol and water content,

 6    last longer on the skin; is that true?

 7    A.  That's true.

 8              MR. BRESSLER:  Objection, leading.

 9              THE COURT:  Sustained.

10    Q.  When it comes to oils, essential oils, Mr. Massaro, and as

11    they relate to the duration of a fragrance on your skin, what

12    are the critical elements?

13    A.  Well, basically --

14              MR. BRESSLER:  Objection, beyond the scope.

15              THE COURT:  Overruled.

16    A.  The higher the level of essential oil, the more likely it

17    is to last longer on your skin.

18    Q.  And do you recall whether Coty's fragrances contained

19    higher percentages of essential oil than the Excell fragrances

20    that you tested?

21    A.  Yes, I believe every single one did.

22    Q.  You discuss volatile organic core compounds in your witness

23    statement; is that correct?

24    A.  Yes.

25    Q.  And those are tied to the percentage of alcohol in a

1   fragrance?

2           MR. BRESSLER:  Objection.

3   A.  Yes.

4           THE COURT:  Sustained.

5   Q.  What are the components of a fragrance that contribute to

6   it's volatility as an organic compound?

7           MR. BRESSLER:  Objection.

8           THE COURT:  Basis?

9           MR. BRESSLER:  Beyond the scope.

10          THE COURT:  I'll allow it.  Overruled.

11  A.  Ethyl alcohol.

12  Q.  And is that the exclusive?

13  A.  Ethyl alcohol is restricted in the State of California and

14  in Canada.  If the VOC laws for fragrances that have less than

15  20 percent essential oil, the law states that there cannot be

16  any more than 75 percent of ethanol or ethyl alcohol.

17          MR. BRESSLER:  Objection, move to strike that portion

18  as being legal.

19          THE COURT:  All right.  Overruled, subject to what I

20  said earlier.

21          MR. POTTER:  No further questions.

22          THE COURT:  All right.  I assume nothing further,

23  Mr. Bressler?

24          MR. BRESSLER:  Correct.

25          THE COURT:  All right.  Thank you, Mr. Massaro.  You

1    may step down.

2                THE WITNESS:  Thank you.

3                (Witness excused)

4                THE COURT:  All right.  Counsel, I take it we're done

5    for the day?

6                MR. POTTER:  Just a couple of quick housekeeping

7    issues, your Honor.  The first is the parties are --

8                MR. BRESSLER:  Your Honor, I can't hear.

9                THE COURT:  Yes, microphone and loud, please,

10   Mr. Potter.

11               MR. POTTER:  The parties have prepared a witness

12   stipulation speaking to all the exhibits to which there's no

13   objection, and also three other factual stipulations to which

14   defendants have agreed.  With your permission, we can hand them

15   up, or we can submit it, however you's like.

16               THE COURT:  Why don't you just file them on ECF, make

17   it easier.

18               All right.  Any other housekeeping, as far as you're

19   concerned?

20               MS. PEARSON:  I think so, your Honor.  We submitted

21   four fact affidavits as to which the defendant has indicated

22   they do not need to cross-examine the witnesses.  So those were

23   Plaintiff's Exhibit 255, which the direct testimony of David

24   Rotter, which I know is the subject of the pending briefing.

25   But also we have Plaintiff's Exhibits 257, the direct testimony

1   of Olivia A. Harris; 258, the direct testimony of Michael J.

2   Baca; and 259, the direct testimony of James W. Faris.

3           The last three, your Honor, were authenticating

4   internet printouts.

5           THE COURT:  So you're offering those, and the exhibits

6   referenced therein at this time; is that correct?

7           MS. PEARSON:  Yes, your Honor.

8           THE COURT:  All right.  Mr. Bressler, any objection?

9           MR. BRESSLER:  No objection.

10          THE COURT:  All right.  Admitted.

11          (Plaintiff's Exhibits 255, 257, 258 and 259 received

12  in evidence)

13          THE COURT:  Anything else?

14          MS. PEARSON:  One comment that you made today, your

15  Honor, about the deposition excerpts.  We did provide the Court

16  with our designated deposition excerpts, but they weren't

17  marked as exhibits.  Do you wish us to mark them as exhibits?

18          THE COURT:  No, but as a general practice, I think if

19  you're showing something to a witness in court, it is

20  preferrable to have an exhibit number attached to it, but I

21  think we can do without as to the depositions, since I don't

22  think there will be any dispute as to what they are.

23          I had the ones you submitted.  I don't think I had

24  received anything from defendants on that score; although, if

25  I'm wrong about that --

1           MR. BRESSLER:  Yes, your Honor, you received

2   Mr. Macchio's.

3           THE COURT:  Macchio's, yes, not the Karate Kid.

4           All right.  So given that we got through all of the

5   fact witnesses today, pursuant to our discussion the other day,

6   I take it we're done for today.  We're not going to sit

7   tomorrow.  We'll pick up on Monday with the two experts, and

8   Mr. Pfau and Ferullo, correct?

9           MR. BRESSLER:  Correct, your Honor.

10          THE COURT:  And then Tuesday with Ms. Tuil-Torres and,

11  if necessary, Mr. Rotter; is that correct?

12          MR. BRESSLER:  Correct, your Honor.

13          THE COURT:  Am I missing anyone or anything?

14          In the meantime, defendant had until today to revise

15  Mr. Pfau's affidavit.

16          MR. MILLER:  That was sent last night, your Honor.

17          THE COURT:  All right.  You should probably send it to

18  me, as well, and if there are any issues on that, we'll take

19  them up on Monday, unless you're prepared to take them up now.

20  Although, mindful of the fact that I don't think I've seen it.

21          MS. PEARSON:  I wish I were more prepared to take them

22  up now; so I don't have to invest a whole lot of time working

23  on it over the weekend, but I got it late last night and I

24  haven't had a chance to review it, but I did notice one thing,

25  your Honor.

H3NPCOT4                      Massaro – Redirect

```
 1              So again, Mr. Pfau is using a formula to allocate line

 2     items in now the P and L statements, that was previously the

 3     financial statements.  It's a different formula than he used in

 4     the prior witness statement.  I never had a chance to examine

 5     any witness concerning their theory of costs and deductions.

 6     Mr. Pfau was never identified as a witness on this topic or was

 7     he made available for deposition on this topic.

 8              So you previously made a ruling with respect to

 9     Defendant's Exhibit XX, which is the one that purports to apply

10     a formula to the various overhead items, and I would like

11     clarification if that applies to the new formula that Mr. Pfau

12     is now putting forward.

13              THE COURT:  Well, to be clear, the gravamen of my

14     ruling with respect to XX was that it was a summary of

15     information taken from exhibits that I had ruled were not

16     admissible because they were not disclosed during discovery.

17              I don't know precisely what you're talking about here,

18     but to the extent that the affidavit includes testimony about

19     an exhibit that was turned over during discovery, I think it

20     would presumably be permissible, but I'm happy to take it up in

21     more specific fashion on Monday.  And I'll either hear the

22     testimony and then decide how to deal with it, or provide a

23     ruling on a more concrete basis after you've had a chance to

24     review it.  All right?

25              MS. PEARSON:  Thank you, your Honor.
```

1          THE COURT:  Your briefing with respect to the 803-17

2     is due tomorrow by noon.  I think that's the only thing

3     remaining that I'm expecting from you, but if there are other

4     issues, you certainly know where and how to find me.  You're

5     welcome to leave the shelves there, rather than schlepping them

6     out, only to schlep them back.  But I would ask that you box up

7     and remove the fragrances, please, less they do something to my

8     courtroom over the weekend.

9          I'll see you on Monday.  We'll pick up at 9:00 on

10     Monday and resume with the witnesses that we've discussed.

11          Anything else?  Ms. Pearson?

12          MR. BRESSLER:  I assume we may leave some boxes neatly

13     on the side?

14          THE COURT:  It's fine with me, as long as they are

15     very much out of the way.  I don't currently have anything

16     scheduled until we resume on Monday morning, but things happen

17     and we may need the courtroom; so make sure they're not in

18     anyone's way.

19          I have a copy of an exhibit of yours, Mr. Bressler,

20     which you may get after I step down.  Otherwise, I will see you

21     on Monday morning.  Have a pleasant weekend.  Thank you.

22          (Adjourned to 9:00 a.m. on March 27, 2017)

23

24

25

```
 1                      INDEX OF EXAMINATION
 2    Examination  of:                          Page
 3    JOSEPH J. CONKLIN
 4    Direct By Ms. Pearson  . . . . . . . . . . .  7
 5    Cross By Mr. Bressler  . . . . . . . . . . .16
 6    Redirect By Ms. Pearson  . . . . . . . . . .73
 7    ROBERT CAMPBELL
 8    Direct By Mr. Potter . . . . . . . . . . . .76
 9    Cross By Mr. Bressler  . . . . . . . . . . .82
10    WILLIAM MITCHELL
11    Direct By Mr. Potter . . . . . . . . . . . .89
12    Cross By Mr. Bressler  . . . . . . . . . . .92
13    Redirect By Mr. Potter . . . . . . . . . . .97
14    DEIRDRE MILES-GRAETER
15    Cross By Mr. Bressler  . . . . . . . . . . 105
16    LORI SINGER
17    Cross By Mr. Bressler  . . . . . . . . . . 118
18    RALPH MASSARO
19    Cross By Mr. Bressler  . . . . . . . . . . 127
20    Redirect By Mr. Potter . . . . . . . . . . 136
21                      PLAINTIFF EXHIBITS
22    Exhibit No.                            Received
23    1 through 31, 33 through 80, 155 through 160, 170 through 175
24    153  . . . . . . . . . . . . . . . . . . .14
25    163, 164, 165, and 168  . . . . . . . . . .15
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
1    232, 235, and 246   . . . . . . . . . . . . . .15

2    219   . . . . . . . . . . . . . . . . . . . . .33

3    1*, 20, 21, 22, 46, 131-1, 133, 134,  . . . . .81

4            135-2, 135-2, 137, 138, 141,

5            and 249

6    132, 135-3, 135-4, 135-5, and 136   . . . . . .82

7    27, 28, 29, 30, 82-1, 115-1, 115-3, . . . . . .90

8            116, 122, 125, 126, 127, and

9            131

10   114, 115-2, 117-1, 117-2, 117-3, 117-4, . . . .92

11           118, 119, 120, 121-1, 121-2,

12           121-3, 123, 124-1, 124-2, and

13           130

14   1 through 9, 11 through 19, 31, 33, . . . . . 103

15           82-1, 85, 86, 88, 89, 90, 91,

16           93-1, 93-2, 93-4, 93-5, 93-6,

17           95, 96-1, 99, 100, 102, 103-2,

18           103-3, 103-4, 105, and 106

19   84-1, 84-2, 92-1, 93-3, 93-7, 93-8, . . . . . 104

20           96-2, 96-3, 97, 101, 103-5,

21           103-6, 104, 107-1, 107-2, and

22           107-3

23   127, 131, 97, 108, 109, 112, 121, 129 . . . . 117

24           and 130

25
```

1    255, 257, 258 and 259   . . . . . . . . . . . 140

2                          DEFENDANT EXHIBITS

3    Exhibit No.                                Received

4    BBB   . . . . . . . . . . . . . . . . . . .19

5    AAA   . . . . . . . . . . . . . . . . . . .23

6    RR    . . . . . . . . . . . . . . . . . . .39

7    227   . . . . . . . . . . . . . . . . . . .52

8    WW    . . . . . . . . . . . . . . . . . . .58

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25