H3SHCOTF

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    COTY INC., COTY B.V., CALVIN
     KLEIN TRADEMARK TRUST, CALVIN
4    KLEIN, INC., CALVIN KLEIN
     COSMETIC CORPORATION, VERA
5    WANG LICENSING LLC, V.E.W.,
     LTD., and ATE MY HEART INC.,
6
                  Plaintiffs,
7
              v.                          15 CV 7029 (JMF)
8
9    EXCELL BRANDS, LLC,
                                          Trial
10
                  Defendant.
11
     ------------------------------x
12                                        New York, N.Y.
                                          March 28, 2017
13                                        9:05 a.m.

14   Before:

15                   HON. JESSE M. FURMAN,

16                                        District Judge

17                        APPEARANCES

18   KILPATRICK TOWNSEND & STOCKTON LLP
          Attorneys for Plaintiffs
19   BY:  LISA PEARSON
          ROBERT N. POTTER
20        JAMES W. FARIS

21   BLANK ROME LLP
          Attorneys for Defendant
22   BY:  KENNETH L. BRESSLER
          SIMON J.K. MILLER
23

24

25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

H3SHCOTF

1          (Trial resumed)

2          THE COURT:  Good morning.  Is Mr. Pfau present?  You

3    can take the witness stand.

4          Anything to discuss before we pick up where we left

5    off?

6          MR. POTTER:  Good morning, your Honor.  Yes, just a

7    few housekeeping issues, if I may.  The first is the parties

8    have entered a stipulation as to the admission of certain

9    additional exhibits --

10         THE COURT:  Mr. Potter, keep your voice up, please.

11         MR. POTTER:  -- just a few moments ago.  If I may, I'd

12   like to read that into the record, and opposing counsel can

13   correct me if I'm not entirely correct.

14         As I understand it, defendant will stipulate to the

15   admission of Plaintiffs' Exhibits 265, parts 1 through 3; 267,

16   parts 1 and 2; and 270, parts 1 and 2.  And plaintiffs will

17   stipulate to the admission of Defendant's Exhibits DDD, EEE,

18   FFF, and GGG.  And, of course, the stipulation is to

19   admissibility only.  The parties reserve all other arguments.

20         THE COURT:  All right.  Mr. Bressler; is that correct?

21         MR. BRESSLER:  Yes, your Honor.

22         THE COURT:  All right.  Very good.  Those are

23   admitted.

24         (Plaintiffs' Exhibits 265, 267, and 270 received in

25   evidence)

H3SHCOTF

1          (Defendant's Exhibits DDD, EEE, FFF, and GGG received

2     in evidence)

3          MR. POTTER:  Your Honor, if I may, one more -- I know

4     that you've got under consideration the admissions of

5     Plaintiffs' Exhibits 263 and 264 that we discussed yesterday

6     regarding Mr. Bronsnick and the Virginia board proceedings.

7          THE COURT:  Yes.

8          MR. POTTER:  I just, if I may, wanted to note a couple

9     of quick legal authorities that relate to that.  First as to

10     264 and the plea agreement, and this was not mentioned

11     yesterday and I apologize, but that comes in under hearsay

12     exception 803(22) which does not require exclusion of evidence

13     of a final judgment of conviction entered after a trial or

14     guilty plea for a crime punishable by imprisonment for more

15     than one year to prove any fact essential to the judgment.  And

16     regarding --

17          THE COURT:  Hold up.  The plea agreement is not the

18     judgment of conviction.

19          MR. POTTER:  Pardon me?

20          THE COURT:  The plea agreement is not the judgment of

21     conviction.

22          MR. POTTER:  I understand.

23          THE COURT:  OK.  Next.

24          MR. POTTER:  Then regarding Exhibit 264, which were

25     the -- I'm sorry, 263.  I was just discussing 264.  This is

H3SHCOTF

1    263.   There is a case from the Eastern District of Virginia.

2    That's *Marks v. Supreme Court of Virginia*, 1995 WL 879685 (E.D.

3    V.a. 1995), that says in footnote 3 that findings of the

4    Virginia State Bar are admissible under the hearsay exception

5    803(8) because Virginia Code Section 54.1-3910 notes that the

6    Virginia State Bar is an administrative agency with the power

7    to conduct investigations and make findings.

8          There's two other relevant Second Circuit cases I

9    would just like to note.  First is *Cortes v. MTA New York City*

10   *Transit*.   That's 802 F.3d 226 (2d Cir. 2015).   The relevant

11   cite is at page 232.   And also *Henry v. Daytop Village*, 42 F.3d

12   89.   That's Second Circuit 1994.

13         THE COURT:  All right.

14         MR. POTTER:  And in connection with one of the

15   exhibits that just came in as part of the stip, I would just

16   like to offer some brief explanation as to those documents if

17   the Court would allow.

18         THE COURT:  Well, you're not a witness, but --

19         MR. POTTER:  No, but it would just be factual

20   explanation surrounding the documents and why they're being

21   introduced.

22         THE COURT:  But, again, you're not a witness, so --

23         MR. POTTER:  I would speak to the purpose that we are

24   introducing them, and that's all.

25         THE COURT:  All right.  Well, go ahead.  I'm certainly

H3SHCOTF

1    not going to consider any facts that you share with respect to

2    those exhibits, but if you have some need you think to explain

3    their relevance, then I'll give you brief --

4            MR. POTTER:  They go to what the documents are.

5            MR. BRESSLER:  I think they're self-explanatory, your

6    Honor.  Arguably, we're trying get done before lunch here.

7            THE COURT:  Briefly, Mr. Potter, go ahead.

8            MR. POTTER:  265-1, your Honor, is a printout from the

9    domain tools website taken August 20, 2016 showing the whois

10   record on that date.  I'm sorry.  It was not taken on that

11   date, but it shows the whois record for that date for

12   miragebrands.com, and it shows that it was registered by Luis

13   Rodriguez, former employee of Excell.

14           265-2 is a record of the -- a business entity status

15   report for Mirage Brands LLC taken from the New Jersey business

16   records service website, and it shows that the registered agent

17   is Diane Hamerling, formerly of Excell.

18           265-3 are printouts from the ASD Market Week website

19   showing the vendor directory for the 2017 ASD Market Week trade

20   show that just occurred recently at which Mirage Brands was a

21   vendor offering fragrances, alternative fragrances, of a very

22   familiar type.

23           THE COURT:  OK.

24           MR. POTTER:  Thank you, your Honor.  I appreciate

25   that.

```
 1              THE COURT:  Any other housekeeping matters from the

 2    other side?

 3              MR. BRESSLER:  Your Honor, when we get the transcript,

 4    we'll read the cases, and if you don't mind, if we feel

 5    necessary, respond in a letter.

 6              THE COURT:  I can't assure you you'll have enough time

 7    to do that, but we'll discuss that later.

 8              MR. BRESSLER:  Thank you.

 9              THE COURT:  All right.  Let's continue with

10    cross-examination.  Mr. Pfau, you remain under oath.

11              MS. PEARSON:  May I approach, your Honor, to provide

12    the witness and Court with the exhibit binders?

13              THE COURT:  Sure.  May I ask you, for scheduling

14    purposes, does the parties' stipulation of those exhibits

15    obviate the need to call Ms. Harris as a witness?

16              MS. PEARSON:  That's correct, your Honor.  Also, we

17    have been in touch with Mr. Rotter, and I believe he is

18    scheduled to arrive at 9:30.

19              THE COURT:  All right.  Very good.  You may proceed.

20     ANDREW PFAU, resumed

21    CROSS-EXAMINATION (Cont'd)

22    BY MS. PEARSON:

23    Q.  Mr. Pfau, may I offer you a bottle of water?

24    A.  No, thank you.  Not yet.  No, thank you.

25    Q.  All right.  You let me know if you need one.
```

1           In paragraph 2 of your trial affidavit, you state that

2      you have been an owner and member of Excell Brands LLC since

3      2010.  Who are the other owners and members?

4      A.   Full names?

5      Q.   Yes, sir.

6      A.   Wayne Hamerling, Warren Bronsnick, Bernard Rosenblum,

7      Andrew Rosenblum, Jeff Krulewich, and myself, Andrew Pfau.

8      Q.   And have all of those people been owners of the company

9      throughout the whole period of time you have?

10     A.   Yes.

11     Q.   Are all of those gentlemen also on the board of Excell?

12     A.   Yes.

13     Q.   Are there any other members of the board of Excell?

14     A.   No.

15     Q.   Do all of the owners of Excell have the same percentage

16     interest in the company?

17     A.   No.

18     Q.   Do you know the percentage interests of the owners roughly?

19     A.   Yes.

20     Q.   What are they?

21     A.   Wayne Hamerling -- I'll start with the largest

22     percentage and then the smaller.  I'll start the larger to the

23     smaller.  Wayne Hamerling, 25 percent; Jeff Krulewich,

24     25 percent, and then the other remaining four own 12

25     1/2 percent each.  Wayne Hamerling and Jeff Krulewich own

1   25 percent each, that's half.  The other four members each own

2   12.5 percent.

3   Q.  Has that been true throughout the period of time that you

4   have been an owner of the company?

5   A.  Yes.

6   Q.  Has the composition of the board changed in any respect

7   since you have been with the company?

8   A.  No.

9   Q.  And all of those people are currently on the board; is that

10  correct?

11  A.  Yes.

12  Q.  You said that since the end of 2016, Excell has ceased

13  operations and is in the process of winding down.  What

14  happened at the end of 2016?

15  A.  It's a broad question.  What do you mean by "what

16  happened"?  I need -- I'm not sure what you mean by "what

17  happened."

18  Q.  Well, first of all, when did Excell cease operations?

19  A.  I think the last inventory was sold in early December.  So

20  it has not conducted any sales activity since then.

21  Q.  I'm sorry, sir.  It's so hard to hear you, and it's not

22  your fault.  It's just the acoustics in the courtroom.

23  A.  Since early December the company has not -- has no

24  inventory, has not sold anything, has not conducted any

25  business other than winding down operations, things like

1  getting out of copier releases, getting out of its office

2  leases, paying off bills.  It has not conducted any operational

3  business other than winding down.

4  Q.  So when did Excell stop selling the fragrances at issue?

5  A.  It -- it sold off its inventory and had nothing left to

6  sell by the first week of December.

7  Q.  By the first week?

8  A.  Something like that.  By and large, the inventory was gone

9  in November.  Most -- 90-whatever-something percent of the

10  inventory was gone by November.  There might have been some

11  stray whatever lines that we couldn't get rid of, but almost

12  everything was gone in November.

13  Q.  When did Excell stop buying the Diamond Collection

14  fragrances at issue from its supplier?

15  A.  It was a long lead time, so I think purchases probably

16  stopped in August.

17          THE COURT:  Can you explain what caused the company to

18  cease operations?

19          THE WITNESS:  Having six different personalities

20  working together with different opinions and different goals is

21  not easy, and the members were not able to communicate enough

22  to function as a unit to operate a business going forward.  Too

23  much.

24          THE COURT:  What impact, if any, did the lawsuit have

25  on the decision to cease operations?

1          THE WITNESS:  None.  It really didn't have any.  It
2     would have happened regardless.
3          THE COURT:  Is the plan to dissolve or is there any
4     intention --
5          THE WITNESS:  Absolutely.  Absolutely.
6          THE COURT:  So there's no plan to resume operations or
7     continue manufacturing the products at issue in this case?
8          THE WITNESS:  Correct.  This team is not working
9     together.  They're not speaking together.  We're not working
10    together.  I'm looking for closure.  There's no ongoing
11    operation.
12         THE COURT:  OK.
13    BY MS. PEARSON:
14    Q.  So does Excell still occupy the same business premises it
15    formerly occupied?
16    A.  No.
17    Q.  What was the location of Excell's business premises?
18    A.  The address -- there was only one office location.  It was
19    in Princeton, New Jersey, 3 Independence Way, Princeton, New
20    Jersey.  We negotiated a lease settlement with the landlord to
21    get out of the lease.
22    Q.  And is anybody occupying the business premises that are
23    being leased by Excell?
24    A.  The landlord took back the space.  I don't know.  I think
25    new tenants are moving in April 1, I believe, but the landlord

1    took back the space.

2    Q.   Does Excell also have a warehouse or more than one

3    warehouse?

4    A.   The company never owned a warehouse.  It used a public

5    storage facility, public warehouse, and it had no inventory

6    left.  So it's out of its -- it's out of the public warehouse.

7    There's no reason to be in there.  There's nothing to store.

8    Q.   How did Excell dispose of its inventory when the decision

9    was made to discontinue selling the fragrances at issue?

10   A.   In the normal course of business.  The goods were sold as

11   normally they would be for the most part, except maybe the

12   remaining, well, unsellable stuff.  The goods were sold in the

13   normal course of business at regular prices in the strong

14   season, which is the fall.

15   Q.   I couldn't hear the last part of your response, sir.

16   A.   The goods were sold in the normal course of business at

17   regular prices in the strong season of the fall.

18   Q.   In the what season?

19   A.   Fall, autumn.

20   Q.   They stopped --

21           THE COURT:  In the strong season, the fall.  I don't

22   know why you're having such trouble hearing.  I'm having no

23   trouble.

24           MS. PEARSON:  I'm sorry.  It may be my hearing is not

25   as good as the Court's.

1    Q.  So what happened to Excell's accounts receivable?

2    A.  They're still being -- still a work in process.  Still

3    trying to collect on its receivables.  It's mostly collected,

4    but once you stop selling, people stop paying.  So there are

5    still receivables that may or may not be collected.

6    Q.  At any point in time, did any of the directors have office

7    space at Excell's office?

8    A.  No.

9    Q.  Did any of the directors use Excell's warehouse for other

10   lines of business?

11   A.  One partner is an owner in another business, and that

12   business had also used one of the same public warehouses for

13   storage.

14   Q.  Who was that?

15   A.  Jeff Krulewich.

16   Q.  And what was his other line of business?

17   A.  I don't know.  I don't know.  It's not my business.  I

18   don't know.

19   Q.  Is Wayne Hamerling still the president of Excell?

20   A.  We haven't changed anything till dissolution.  So I guess

21   I'm going to say yes.

22   Q.  He's still a director; correct?

23   A.  Well, I believe everyone is still a director.

24   Q.  Does Excell currently have any other officers or employees?

25   A.  No.

1   Q.  When did Luis Rodriguez leave?

2   A.  I'm going to say -- I don't know the exact date.  I'm going

3   to say August.

4   Q.  When in August?

5   A.  I don't know.

6   Q.  Does he live in North Brunswick, New Jersey?

7   A.  I don't know.

8   Q.  What is he doing now?

9   A.  I don't know.

10          MR. MILLER:  Objection.  Relevance.

11          THE WITNESS:  I don't know.

12          THE COURT:  Overruled.

13  Q.  You don't know, sir?

14  A.  No.

15  Q.  Diane Hamerling was an employee of Excell; correct?

16  A.  Yes.

17  Q.  And she is also the wife of Wayne Hamerling, is she not?

18  A.  Yes.

19  Q.  What was her position at Excell?

20  A.  She was sort of like assistant controller.  She was never

21  controller.  There was a controller.  She was sort of assistant

22  to the controller.

23  Q.  Is she still with the company?

24  A.  There are no employees of the company.

25  Q.  What is she doing now?

H3SHCOT1                         Pfau - Cross

```
1    A.  I don't know.
2    Q.  By the way, what was Luis Rodriguez's position with the
3    company?
4    A.  Salesman.  Salesman.
5    Q.  Did he handle any particular kinds of sales?
6    A.  Primarily, I think, wholesale accounts.
7    Q.  Did each of the salesmen at Excell have different
8    commission arrangements with the company?
9    A.  Most were similar, but not all.  So there were more senior
10   people and newer people.  So the more senior ones got a higher
11   percentage.  Structure was the same, but some of the more
12   senior salespeople got a larger percentage than the more junior
13   people.
14            THE COURT:  Ms. Pearson, you did not list Mr. Pfau as
15   a witness of your own in the joint pretrial order; correct?
16            MS. PEARSON:  That is correct, your Honor.
17            THE COURT:  Can you tell me why we don't have a scope
18   issue with respect to these questions?
19            MS. PEARSON:  Your Honor, it ties in to the direct
20   statement with respect to cessation of the operations of
21   Excell.  And also, your Honor, I will connect up at some of
22   these other points such as commissions with respect to the
23   financial statements.
24            THE COURT:  All right.  I'll allow it.
25   BY MS. PEARSON:
```

1  Q.  Do you know whether Diane or Wayne Hamerling currently have

2  any affiliation with any other fragrance company?

3  A.  I have no knowledge.  I'm not involved with the company.  I

4  have my own full-time business that I run.

5  Q.  Do you know whether Diane and Wayne Hamerling still source

6  fragrance products from either Excell's Indian suppliers, Hertz

7  or Trance.

8           MR. MILLER:  Objection.  Relevance and outside the

9  scope.

10          THE COURT:  Overruled.

11          THE WITNESS:  I should answer?

12          THE COURT:  You should answer.

13  A.  I have no knowledge.

14  Q.  Who is Alfredo Castaneda?

15  A.  She was another salesperson.

16  Q.  Is he currently with the company?

17  A.  There are no employees at the company.

18  Q.  And do you know what he is doing now?

19  A.  I do not.

20  Q.  Have you ever heard of a company named Mirage Brands?

21  A.  No.

22  Q.  As a owner and director of Excell, you are aware, are you

23  not, in 2015 the U.S. government initiated criminal proceedings

24  against a number of defendant's key principals and employees,

25  including Wayne Hamerling, Diane Hamerling, Warren Bronsnick,

1   Bernie Rosenblum, Luis Rodriguez, and Alfredo Castaneda?

2               MR. MILLER:  Objection.  This is outside the scope,

3   and it's also the subject of a motion in limine.

4               MS. PEARSON:  Your Honor, I will connect it up.

5               THE COURT:  All right.  I'll allow it.  Overruled.

6   A.  What was the beginning of the question?

7   Q.  As an owner and director of Excell, you are aware that the

8   U.S. government initiated those criminal proceedings?

9   A.  Yes.

10  Q.  You are aware, are you not, that the U.S. government

11  asserted that they laundered money through Excell Brands for

12  drug cartels in Latin America including Mexico?

13              MR. MILLER:  Objection, your Honor.

14              THE COURT:  Overruled.

15              THE WITNESS:  I'm aware of the assertions.  I'm aware

16  of the assertions.

17              THE COURT:  Did those criminal charges play any role

18  in the decision to dissolve the business?

19              THE WITNESS:  Yes.

20  Q.  Now, of those defendants, Wayne Hamerling, Warren

21  Bronsnick, and Bernard Rosenblum were all owners and directors

22  of the company; correct?

23  A.  I said that already, yes.

24  Q.  They are still owners and directors of the company;

25  correct?

H3SHCOT1                         Pfau - Cross

1    A.  Yes.

2    Q.  And collectively they own more than 50 percent of the

3    company; right?

4    A.  You said Wayne?

5    Q.  Warren Bronsnick and Bernard Rosenblum.

6    A.  Collectively they own exactly 50 percent.

7    Q.  Did you review the deposition on written questions of

8    Warren Bronsnick in this lawsuit?

9    A.  I don't believe so.

10   Q.  The board of Excell is aware that Mr. Bronsnick has entered

11   a guilty plea; right?

12   A.  You're asking if I'm aware or if they're aware?  I'm going

13   to guess they're aware.

14   Q.  You can only testify on your personal knowledge, sir.  I'm

15   not asking anything --

16   A.  I wasn't in the room.  I don't know.

17   Q.  Is the board of Excell aware that Bronsnick has already

18   pleaded guilty to a one-count information charging him with

19   conspiring with others to structure financial transactions to

20   evade the filing of currency transaction reports?

21   A.  I personally --

22              MR. MILLER:  Objection.

23              THE COURT:  Sustained.  I think this is well beyond

24   the scope.  Let's move on, please.

25   Q.  Do you know whether the proceeds from any transactions

1   involved in the alleged money laundering scheme reflected in

2   Excell's financial books and records such as DX -- Defendant's

3   Exhibit B and NN through RR, the documents that you discussed

4   in your trial affidavit?

5            MR. MILLER:  Objection to the form.

6            THE COURT:  Sustained.

7            THE WITNESS:  I shouldn't answer?

8            THE COURT:  You should not answer.  If I say

9   "sustained," you don't answer.

10  Q.  What knowledge or information do you have, if any, as to

11  how defendant's financial books and records were used in the

12  alleged money laundering conspiracy?

13           MR. MILLER:  Same objection.

14           THE COURT:  Sustained.

15  Q.  Was there also a civil action brought by the U.S.

16  government against the bank accounts of Excell?

17  A.  Yes.

18  Q.  What was the nature of that proceeding?

19  A.  The government alleged, as you stated, potential criminal

20  activity, so the company had its physical bank accounts seized

21  by the government.

22  Q.  I believe you should have a document in your binder marked

23  as Plaintiffs' Exhibit 170, which, for the record, is the

24  verified complaint for forfeiture in rem.  And if you would be

25  so kind as to turn to paragraph 11, the government alleged, did

```
 1   it not, that from at least October 2012 until at least
 2   January 15, 2015, the executives and employees of Excell Brands
 3   and their coconspirators laundered narcotics proceeds through
 4   Excell Brands' bank accounts?
 5             MR. MILLER:  Your Honor, I'm going to object to this.
 6   This is beyond the scope.  This document's in evidence, and
 7   this witness is not a party to this.
 8             THE COURT:  Sustained.
 9   Q.  Do you know the current status, sir, of the in rem
10   proceedings?
11             MR. MILLER:  Objection.
12             THE COURT:  Sustained.
13   Q.  Has the board of Excell done anything in response the
14   allegations in the criminal complaints or the in rem
15   proceedings?
16             MR. MILLER:  Objection.
17             THE COURT:  Sustained.
18             Ms. Pearson, well beyond the scope.  Let's move on,
19   please.
20   Q.  Has Excell incurred any legal fees or other expenses in
21   connection with the criminal and in rem proceedings?
22   A.  The company has spent money on its own civil forfeiture
23   matters, and the company has also indemnified certain
24   non-charged partner parties who had to expend legal fees also
25   on their civil forfeitures.
```

1    Q.  Has Excell Brands performed any independent investigation

2    or audit into those allegations?

3              MR. MILLER:  Objection.

4              THE COURT:  Sustained.

5    Q.  Did Excell Brands incur any legal fees or other costs or

6    expenses in connection with any independent investigation or

7    audit of those lawsuits?

8    A.  The company did to verify that the charges were not true.

9    The company did hire independent firms to investigate the

10   customers that we were selling to, to verify that none of them

11   were involved in illegal activity.  And as far as I know, all

12   those reports came back that every customer that we were

13   selling to was a legitimate operator buying goods and selling

14   goods, and so we were given clearance that every customer we

15   were selling to was a legitimate operator.

16   Q.  When did Excell incur those legal fees and expenses or

17   were -- strike that.

18              When did Excell incur those fees and expenses?

19   A.  The first three or four -- within the first three or four

20   months after the government complaint.  So I would say February

21   of -- what year was it?  The three or four months that preceded

22   the forfeiture -- not preceded, came after the civil

23   forfeiture.

24   Q.  Based on the document that has been marked as Plaintiffs'

25   Exhibit No. 170, at the top of the page there's an indication

1   that the verified complaint for forfeiture in rem was filed on

2   June 11, 2015.  Does that refresh your recollection as to when

3   Excell incurred those costs and expenses?

4   A.   That's when they filed that document, but the seizure was

5   in January of that year.  So the seizure was much earlier, and

6   the investigation was before June.  We hired internal companies

7   to actually go out and go to those various countries and -- and

8   vouch that those are real companies and legitimate operators.

9   Q.   Did you --

10  A.   The company did not want to have problems, so the company

11  hired firms to do research to vouch and vet that these

12  customers are real.

13  Q.   And what kind of firm did it hire?

14  A.   Multiple firms.  Different countries.  Multiple firms, but

15  they are firms that will physically inspect the location, do

16  research into the government records and documents.  And we

17  were given clearance that every customer was a legitimate

18  operator.  I did not want to be involved in any activity that

19  was not legal, and that was a point to me that our customers

20  were vetted.

21  Q.   Were the firms law firms or some other type of firm?

22  A.   I think the law firms may have hired them, but I don't

23  think they were law firms.

24  Q.   Were the expenses that Excell incurred in connection with

25  that investigation accounted for in Excell's financial books

1   and records?

2   A.  A lot of those companies wanted to continue to buy our

3   product, so they actually agreed that they would pay the

4   investigation fees on their end.  So for the most part, we did

5   not pay those costs.

6   Q.  To the extent that there were fees and expenses that were

7   not absorbed by the customers, are those fees and expenses

8   reflected in Excell's financial books and records?

9   A.  Anything the company paid is reflected in those company's

10  books.

11  Q.  And would they appear under the line item "Professional

12  Fees" in your profit and loss statements?

13  A.  I'd have to check.  Likely, but not necessarily.  I don't

14  think it was a big number.  I don't think it was -- wasn't ten

15  or $20,000.

16  Q.  Now, in your declaration you rely upon a document that's

17  been marked as Defendant's Exhibit B, and you can find that in

18  the front of your binder.  The defendant's exhibits appear

19  before the plaintiff's exhibits.

20          Is this the document that you reference in your

21  affidavit?

22  A.  Yes.

23          THE COURT:  All right.  Just going back, you said that

24  the fees paid were was not a big number.  How big do you think

25  that number was?

1           THE WITNESS:  Ten or 20,000.

2   Q.  Did you prepare Exhibit B?

3   A.  No, I did not.

4   Q.  Are you the keeper of Defendant's Exhibit B?

5   A.  No, I am not.

6   Q.  Did you supervise the preparation of Defendant's Exhibit B?

7   A.  No, I did not.

8   Q.  Let me ask you, sir, you also rely in your declaration on

9   certain profit and loss statements.  Did you prepare any of

10  those profit and loss statements?

11  A.  No, I did not.

12  Q.  Are you the keeper of any of those profit and loss

13  statements?

14  A.  No, I am not.

15  Q.  Did you supervise the preparation of any of those profit

16  and loss statements?

17  A.  I don't know if "supervise" is right word.  I was involved

18  with the accounting firm and the in-house accounting people in

19  seeing the numbers and -- and I know that they're accurate.

20  Q.  You know what?

21  A.  I know that they're accurate.  I can't -- I don't know if

22  you want me to say it.  Accounting is a process.  When you see

23  a financial statement at the end of the year, that's when you

24  stop counting, and that's the way the numbers are at that

25  point.  But throughout the year, it's an accumulation process,

H3SHCOT1                       Pfau - Cross

1    and data is accumulating.  Sales are accumulating.  Expenses

2    are accumulating.  The ending result, the ending financial, is

3    when you stopped counting for the year.

4          I saw the monthly reports.  I saw the data as it was

5    accumulating, so I'm very confident that those numbers in '13,

6    '14, and '15 are -- that those numbers -- I saw them grow week

7    by week, month by month, and I'm comfortable that they're true

8    and correct.

9    Q.  Did you make the entries on which the accumulated data was

10   based?

11   A.  No, I did not.

12   Q.  Did you observe people making the entries on which the

13   accumulated data was based?

14   A.  No, I did not.

15   Q.  Now, what is Exhibit B, Defendant's Exhibit B?

16   A.  So the software that the company uses is called QuickBooks.

17   And QuickBooks has the ability to take the data that is

18   accumulating historically, open-ended.  You can use -- it can

19   take that data and it can sort it, analyze it, report it any

20   way you choose to see it.  This is a report by the system, no

21   individual.  The system has pulled every single sale that's

22   been booked ever, and it's tracking every sale by product line.

23   It's internally accumulated by the system itself.

24   Q.  You made a reference to product line.  What do you mean?

25   A.  This report which is many pages long, every single item in

H3SHCOT1                          Pfau - Cross

1    that report is a particular product item, either a size or a --

2    each one is an individual product.

3    Q.  Did Excell offer lines of product other than the Diamond

4    Collection?

5    A.  Yes.

6    Q.  Did it offer a line called the Ruby Collection?

7    A.  Yes.

8    Q.  And what was the average retail price of fragrances in the

9    Ruby Collection?

10   A.  Per unit?  You don't mean cumulative; you mean per unit?

11   Q.  Per unit.

12   A.  Ruby was meant to appeal to the absolute lowest-cost buyer.

13   So it was meant to retail for 99 cents.  So it was sold at

14   40-something cents.

15   Q.  And did Excell --

16   A.  Very limited.  Very limited.  We only produced it for a

17   couple of customers that wanted it.

18   Q.  Did Excell offer for sale a line called the Emerald

19   Collection?

20   A.  For a time period, yes.

21   Q.  What was the average unit sales price of the Emerald

22   Collection?

23   A.  I think one of the reasons why it didn't sell, it was

24   priced higher than the Diamond Collection by a few dollars.

25   Q.  And we noticed that in Exhibit B there are a group of

1   products that have the prefix QP.  Can I direct you to this

2   page?  For example, if you look at page 152.

3            MR. MILLER:  One five two?

4            MS. PEARSON:  Yes.

5            MR. MILLER:  Thank you.

6   Q.  You'll see there that there are some fragrances that have

7   the prefix QP, Anna, Anna, Blue Light, Classic Blue, Dark

8   Night, etc.  Do you see those?

9   A.  I see them.

10  Q.  You do or do not?

11  A.  I see them.

12  Q.  What is the prefix QP?  What does that stand for?

13  A.  I'm not sure.  Very -- some stood for Diamond Collection or

14  Ruby or if it was a gift set.  I'm not sure what QP stands for.

15  There's not many of them, and I'm not sure what it is.

16  Q.  Do you know whether the products in the QP line reflected

17  in Exhibit B were sold for a lower sales price than the Diamond

18  Collection?

19  A.  As you can see, this report is 150 pages, so there's

20  clearly, over the six years, thousands of product lines.  I

21  don't know each one, and I don't have any direct knowledge of

22  which item that particular QP was.

23  Q.  OK.  But if you look at the column that says "Average

24  Price," does that refer to the average sales price?

25  A.  That's average sales price, yes.

H3SHCOT1                        Pfau - Cross

1   Q.  And the average sales price of the items in the QP line was

2   $1.25; correct?

3   A.  Yes.

4   Q.  If you move down on the document, you'll see that there are

5   a bunch of references to RC.  Do you see that?

6   A.  Yes.

7   Q.  Are those the Ruby Collection products you previously

8   referred to?

9   A.  Yes.

10  Q.  Are you aware of a line of products with the abbreviation

11  CH?

12          MR. MILLER:  Your Honor, I'd like to interpose an

13  objection to the extent that this is inquiring into products

14  which are not at issue in this case.

15          MS. PEARSON:  Your Honor, it's relevant to the

16  computation of costs and deductions.

17          THE COURT:  All right.  Well, I'll allow it in the

18  hopes that you will shortly connect it up to that.

19  A.  What page?

20  Q.  I believe it's on page 69 of the document.

21  A.  I'm not sure what CH is.

22  Q.  So, for example, some of the product names are Apple

23  Delight, Companion, and so forth.  Do you see those?

24  A.  That's not CH.  Apple Delight says DC, Diamond Collection.

25  Q.  On page 69 of the document, I see a reference to CH Apple

1   Delight, W 3.4 SP.  Do you see that?

2   A.  I see it.

3   Q.  And then do you see a series of other references to CH

4   products?

5   A.  I do.

6   Q.  Does 3.4 refer to the size of the unit?

7   A.  Yes.

8   Q.  And that's 3.4 ounces; correct?

9   A.  Correct.

10  Q.  What was the average retail price of products in the CH

11  line in the time period covered by this page, January through

12  December 2014?

13  A.  Less than the Diamond Collection.  So they're in the 1.20s.

14  The average price is in the 1.20s, $1.20-something.

15  Q.  Have you ever done a computation, sir, of the average sales

16  price of the products at issue, the Diamond Collection products

17  at issue?

18  A.  The report, the system generates it automatically.  The

19  data is there in the report.  We don't have to do anything to

20  see it.  You can just print the report, and it's there already.

21  It's tracking it.  It's tracking the average selling price for

22  every line, any line, and that's what that report is showing.

23  Q.  So is DC the prefix used for the Diamond Collection?

24  A.  Correct.

25  Q.  And if we look at the average price column on Defendant's

1   Exhibit B, that will tell us the average price per each of the

2   products that is listed there, right, the average sales price?

3   A.  Correct.

4           THE COURT:  And the sales price is the price that

5   Excell sold it to a customer?

6           THE WITNESS:  Correct.  Correct.

7   Q.  Now, there's a column on Defendant's Exhibit B that says,

8   "ABG COGS."  Does that mean average cost of goods sold?

9   A.  Yes.

10  Q.  And does --

11  A.  I think that's just tracking the physical unit, the product

12  cost without any other -- just if we bought it for 90 cents a

13  bottle, it's -- the cost was just the bottle, no other costs.

14  So it's not factoring in any other cost associated, just the

15  cost for the item before shipping it, landing it, packing it,

16  selling it, whatever.

17  Q.  All right.  Well, if you could do me a favor and flip to

18  Defendant's Exhibit RRR, which is the Excell profit and loss

19  statement for January through December 2015.  You'll see that

20  there is, first, an entry for ordinary income and expense, and

21  then there's an entry for costs of goods sold.  And under Cost

22  of Goods Sold, there are a number of different items; correct?

23  A.  Correct.

24  Q.  Does the reference to cost of goods sold on Defendant's

25  Exhibit B reflect all of the different subitems under Cost of

 1   Goods Sold --

 2   A.  No.

 3   Q.  -- on Defendant's Exhibit RR?

 4   A.  No.  I believe that that report you -- the earlier report

 5   that shows an average cost per unit is purely the line that

 6   says, "Cost of goods sold."  It's not pulling in all the other

 7   related costs.

 8   Q.  How did Excell compute average cost of goods sold for

 9   purposes of Defendant's Exhibit B?

10   A.  From the company's books.  The company's accounting system

11   is tracking every purchase by unit.  So the software knows

12   exactly what we paid per unit.  The cost of goods sold is just

13   an accumulation of every single purchase order which is in the

14   system by item.  So the system knows what we paid for every

15   single item because it's accumulating that data.

16   Q.  Somebody has to enter that information?

17   A.  Somebody has to enter each purchase order as it comes in,

18   and those numbers automatically then are flowing through the

19   report.

20   Q.  And who entered that information?

21   A.  The in-house accounting personnel.  The in-house accounting

22   personnel.  Two or three different people that would enter

23   that.

24   Q.  If you could turn to Defendant's Exhibit KKK.  That

25   document is captioned "Defendant's Relevant Sales July 2010

H3SHCOT1                        Pfau - Cross

1    through April 2016."  Did you prepare that document?

2    A.  I did not.

3    Q.  Who prepared it?

4    A.  I'm guessing counsel.

5    Q.  Does this document include gift sets?

6    A.  Yes, because I see -- yes.

7    Q.  And does it include minis?

8    A.  Yes.

9    Q.  So it includes sizes other than the 3.4-ounce products such

10   as those -- I need a walking mic to do this -- such as those on

11   the table closest to the witness stand, correct, the shelving

12   unit?

13   A.  What's the question?

14   Q.  I'm looking at Plaintiffs' Exhibit No. 62, which is a

15   product called B4U our version of CK In2U by Calvin Klein?

16   A.  Yes.

17   Q.  And is that a 3.4-ounce Diamond Collection product?

18   A.  Yes, yes.

19   Q.  Is that a standard size for certain Diamond Collection

20   products?

21   A.  I believe it's an industry standard size, yes.

22   Q.  Can you see Plaintiffs' Exhibit No. 68 from there?

23   A.  Yes.

24   Q.  Is Plaintiffs' Exhibit No. 68 an example of a Diamond

25   Collection gift set?

1    A.  Yes.

2    Q.  Can you see Plaintiffs' Exhibit No. 70 from there?

3    A.  Yes.

4    Q.  Is Plaintiffs' Exhibit No. 70 an example of a caddy with

5    minis in it?

6    A.  Yes.

7    Q.  And do you know the size of the minis?

8    A.  No.  Either half ounce or one ounce.  I'm not sure.

9    Q.  And Excell had minis of some of the brands at issue; right?

10   It had, for example, OK New York minis?

11   A.  I don't know.  Offhand, I don't know which ones.  We didn't

12   make too many minis sets, minis.  I don't know which ones it

13   was.

14   Q.  Do you see on Defendant's Exhibit B under Calvin Klein MC

15   Mini OK New York M 15 ml?

16   A.  Yes.

17   Q.  And is that a mini of Excell's version of CK One?

18   A.  Yes.

19   Q.  For the purposes of your computation of Excell's costs and

20   deductions, are you using Exhibit KKK to show the costs Excell

21   directly incurred to manufacture and sell the products at

22   issue?

23            MR. MILLER:  Objection.

24            THE COURT:  Overruled.

25   A.  The KKK report is only showing the -- that one line item in

1    the income statement, cost of goods sold.  That's just the

2    product.  It's not counting how it got to the warehouse, how it

3    got -- it's strictly the cost that was paid from the supplier.

4    Doesn't include any other costs.

5    Q.  So in the gross revenue when we go down to the bottom of

6    the page and it says, "Total:  $6,573,840.43," that is the

7    gross revenue for defendant's sales of the allegedly infringing

8    products in this case, is it not?

9    A.  Correct.

10   Q.  And the next page is just a breakdown by year of that

11   information; correct?

12   A.  Correct.

13   Q.  Does the breakdown by year show that the total quantity

14   sold of fragrances at issue in 2010 was roughly 28,700 units?

15   A.  Units, yes, yes.

16   Q.  And by January through December 2014, Excell's sales had

17   grown dramatically, had they not?

18   A.  Yes.  But also, 2010, the company only existed a few

19   months.  In 2010, the company was only in business a few

20   months.

21   Q.  All right.  In 2014, Excell sold over a million units;

22   correct?

23   A.  Correct.

24   Q.  Turning to Defendant's Exhibit No. NNN, the profit and loss

25   statement for January through December 2010, were you at the

H3SHCOT1                          Pfau - Cross

1    company at the time this profit and loss statement was

2    prepared?

3    A.  This physical one, no.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.  Did you have any involvement in this particular profit and

2    loss statement?

3    A.  No.

4    Q.  You did not create this report, did you?

5    A.  No.

6    Q.  Did you review this report at the time?

7    A.  At the time the original was created, I reviewed it.  This

8    is not the way it looked five or six years ago when it was

9    being created.

10   Q.  Does the version of this document that existed at that time

11   still exist?

12   A.  It has to, yes.  I don't have it, but yes, it has to exist.

13          MS. PEARSON:  I would note for the record that that

14   document has not been produced in discovery.

15   Q.  This document shows that you had $17,739,566.72 of net

16   income in January through December of 2010; does it not?

17   A.  Yes, it does.  It needs explanation.  The explain --

18   Q.  No, that's okay.  Please just answer my questions.

19          So I think you say in footnote one of your report that

20   you concluded that this P and L is unreliable?

21   A.  In my affidavit, I stated that '13, '14 and '15 is correct

22   and that the earlier years are not.  I can explain why, but

23   they're not.

24   Q.  This particular exhibit, Defendant's Exhibit NNN, that one

25   is unreliable, right?

1    A.  For 2010, correct.

2    Q.  And so you just tossed it out, in terms of making your

3    computations in the case?

4                MR. MILLER:  Objection.

5    Q.  Yes or no, did you rely on Exhibit NNN in calculating the

6    percentage that you would like the Court to apply to all of

7    your expenses?

8    A.  Yes.  NNN is only that one page?

9    Q.  Defendant's Exhibit NNN --

10   A.  No, no.

11   Q.  -- OOO and PPP.

12                I'm sorry.  Let me look at your declaration with you,

13   and I think we can do this more efficiently.  So in the first

14   footnote in your declaration, footnote one on Page 2, you say

15   that the profit and loss statements for 2010, 2011 and 2012 do

16   not reflect an accurate representation of the expenses the

17   company incurred for those years.  Accordingly, I have not

18   relied on them; is that correct?

19   A.  Correct.

20   Q.  So let's go back to Defendant's Exhibit No. NNN.  That one,

21   you just tossed out, right?

22   A.  Yes.

23   Q.  Exhibit OOO, you just tossed that one out?

24                MR. MILLER:  Objection to the form.

25                THE COURT:  Sustained.

1   Q.  You did not rely on the unreliable information in the

2   profit and loss statement for January through December 2011,

3   which is marked as Defendant's Exhibit OOO?

4   A.  Correct.

5   Q.  And you did not rely upon the inaccurate information that

6   is in Defendant's Exhibit PPP for January through

7   December 2013?

8   A.  No, for '13 I did.  '13 I'm relying on.

9   Q.  Oh, I know what the problem is.  I'm sorry.

10          If you go back to Defendant's Exhibit OOO, the profit

11  and loss statement for January through December 2011 appears on

12  the first page of the document, correct, on Defendant's

13  Exhibit OOO?

14  A.  You're asking me if OOO, first page, is 2011 income

15  statement?

16  Q.  I'm just trying to identify what Defendant's Exhibit OOO

17  contains.  The first page is the profit and loss for January

18  through December 2011?

19  A.  Correct.

20  Q.  Right?  And then if you turn to the second page, does that

21  same exhibit also include the profit and loss statement for

22  January through December 2012?

23  A.  Right.

24  Q.  And you did not rely upon the profit and loss statement for

25  either of those years either because they were unable, in your

1   view, correct?

2   A.  Correct.

3   Q.  Now, if we turn to Defendant's Exhibit PPP, that is the

4   first profit and loss statement that you deemed reliable?

5   A.  Correct.

6   Q.  And under the expense item, there are three big categories

7   of expenses, correct?

8   A.  Correct.

9   Q.  What are those categories?

10  A.  They're actually standard in accounting.  It's the costs of

11  goods sold, then there's the general and administrative

12  expenses, and then the selling expenses.

13  Q.  Okay.  So under the column -- I'm sorry.

14       Under the line items for expense that fall below the

15  gross profit line; do you see that?

16  A.  Which line are you referring to?

17  Q.  Okay.  If you go about a third of the way down the page,

18  there is a line item for gross profit, and beneath that there

19  is a section of the profit and loss that's devoted to expenses,

20  correct?

21  A.  Correct.

22  Q.  So you group some expenses under general and administrative

23  expenses?

24  A.  Correct.

25  Q.  And then you have another group of expenses that you call

1  selling expenses?

2  A.  Correct.

3  Q.  And is there any other big bucket of expenses?

4  A.  In this particular year there's an other item at the

5  bottom.

6  Q.  There is what?

7  A.  On this, for '13, there was another expense shown at the

8  bottom.  Outside of costs of goods sold, outside of general

9  administrative, and outside of selling, there's one more

10  expense.

11  Q.  And what is that?

12  A.  Director's fees.

13  Q.  And you're looking at Page 3 of the document?

14  A.  Correct.

15  Q.  And that's under other income/expense?

16  A.  Correct.

17  Q.  Now, did you make any effort to allocate the particular

18  line items of expenses reflected in the profit and loss

19  statements, for the years you deemed them reliable, to the

20  manufacture and sale of the allegedly infringing products in

21  this case?

22  A.  No, no.

23  Q.  So, for example, if we look at the first page of

24  Defendant's Exhibit PPP, the profit and loss statement for

25  2013, there is a bad debt expense line item.  What relation, if

H3SPCOT2                              Pfau - Cross

1   any, does that have to the products at issue?

2   A.  I wouldn't know.  You'd have to study every customer that

3   didn't pay their bill and what they bought, and I don't know

4   the breakdown.

5   Q.  Okay.  Is the same true -- what relation does the -- strike

6   that.

7           What relation does the line item bank service charges

8   have to the manufacture and sale of the products at issue?

9   A.  These bank charges, every time the company made a purchase

10  overseas, they had to pay a bank fee to make the payment

11  overseas.  So every time the company makes a payment overseas,

12  the bank charges like a wiring fee, and so most of that money

13  represents the fees to make payments to our supplier.

14  Q.  Did you make any attempt to allocate those bank service

15  charges to the sales of the infringing products here, the

16  allegedly infringing --

17  A.  No.

18  Q.  -- product here?

19  A.  No.

20  Q.  How about donations, do the donations have any relation to

21  the products at issue?

22  A.  No.

23  Q.  Do the gifts?

24  A.  The gifts are made to people that buy or sell from us; so

25  there is some connection.  Those are gifts to customers who buy

H3SPCOT2                          Pfau - Cross

1   the products; so they're buying all products.  So there is an

2   association between the gifts and all product lines.

3   Q.  Okay.  Did you make any effort to allocate those gifts to

4   the products at issue?

5   A.  No.

6   Q.  So if I asked you the same question for each of the

7   individual line items under the costs of goods sold at the top

8   third of the page, would your answer also be that you made no

9   attempt to allocate each of those items to the particular

10  infringing products here?

11  A.  Correct.

12  Q.  If I went through every one of these line items under

13  expenses, would your answer be that you made no attempt to

14  allocate these individual line items to the infringing products

15  at issue?

16  A.  Every one of those expenses relates to all purchases.

17  They're not -- the warehouse doesn't charge us just for this

18  line or just for that line.  The warehouse charges for all of

19  the inventory that's there.  The shipping company charges for

20  all of the goods it's shipping; so there's no allocation line

21  by line.

22  Q.  Well, I think we established yesterday that you have line

23  items for legal fees for example, right?

24          THE COURT:  Counsel, can you identify which document

25  you're talking about?

1    Q.  If you turn to the second page of the Exhibit PPP, for

2    example, you see a line item for professional fees, legal fees,

3    $212,930.44?

4    A.  Yes.

5    Q.  And we established yesterday that that contains expenses

6    that were totally unrelated to the products at issue, right?

7              MR. MILLER:  Objection.

8              THE COURT:  Sustained.  Are those expenses on PPP

9    related to the products at issue in this case.

10   A.  You're speaking about only the legal fees?

11             THE COURT:  Yes.

12   A.  I would say the majority of it relates to that one

13   settlement -- that one lawsuit that we discussed yesterday.

14   Some of it is general corporate stuff, but the bulk of it is

15   related to the one settlement that we had.

16             THE COURT:  The Snooki --

17             THE WITNESS:  Yes.

18             THE COURT:  -- case?

19             THE WITNESS:  Yes.

20   BY MS. PEARSON:

21   Q.  Do you have personal knowledge about the factoring

22   agreements that Excell has had over the years?

23   A.  I did see them.  I may have forgotten some of the details,

24   but I did read them, yes.

25   Q.  Did Excell use a factor for every receivable?

1    A.  Excell used a factor for every receivable that was

2    factorable; so for every receivable that was factorable.

3    Q.  So some of them were not factorable?

4    A.  They factored everything, but they didn't land non-foreign

5    sales -- foreign receivables.

6    Q.  I couldn't hear you, sir.

7    A.  Yes, they factored all receivables.

8    Q.  Is the factor obligated to take every receivable?

9            MR. MILLER:  Objection to the form.

10           THE COURT:  Sustained.  Can you explain what you mean

11   by "factor" here?

12           THE WITNESS:  The company, as a means of borrowing to

13   operate its business and sustain its receivables and inventory,

14   would borrow from a lender who would lend on the value of the

15   receivables.  So they would lend, but they would only lend on

16   certain receivables that they felt comfortable with.  So they

17   didn't lend on your foreign receivables, but they did lend on

18   domestic receivables.

19   BY MS. PEARSON:

20   Q.  Do you know, personally, sir, that they lent on all

21   domestic receivables?

22   A.  They lent on all domestic receivables.  They lent on all

23   domestic receivables.

24   Q.  They did?  You have personal knowledge of that?

25   A.  I saw the agreements at the time.  I remember seeing our

1   borrowing line of credit and how they were calculating what the

2   borrower base was, and it was based on all domestic

3   receivables.

4   Q.  Can you explain what factor's fee, interest charge is?

5   A.  So they charged two ways, one is they charge an interest

6   rate on the outstanding loan balance every single day, pure

7   interest, and then one is a factor fee where they charge a

8   certain percentage of every sale that they factor.  So they're

9   getting two fees.

10  Q.  Are both of those included under factor's fees, interest

11  charged?

12  A.  Yes.

13  Q.  There's an entry for factor's fee, others, right?

14  A.  Yeah, so the interest is the interest, and the factor's fee

15  is the percentage of sales that they're charging as a fee.

16  Q.  I don't believe that was responsive to my question.

17          There's a line item, factor fees, other; yes or no?

18  A.  Yes.

19  Q.  On the second page of the exhibit PPP there's a line item

20  for officers' guaranteed payments.  Is that officer Wayne

21  Hamerling?

22  A.  Correct.

23  Q.  If we go down the page, there's a line item, is there not,

24  for gen, general and administrative expenses, other?  It's

25  about in the middle of the page.

1    A.  No. 3510?

2    Q.  Yes.

3    A.  Yes.

4    Q.  Are you aware that Mr. Ferullo has testified that Excell

5    has done no advertising for the products at issue?

6    A.  I'm not familiar what he testified to, but I would agree

7    with that.

8    Q.  Yes or no, did you have -- did your outside accountant have

9    an issue with how Excell was booking charge-backs and

10   credit-backs on its profit and loss statements?

11            MR. MILLER:  Objection to the form.

12   Q.  Yes or no?

13            THE COURT:  Hold on.  Sustained as to form.

14   Q.  Didn't your accounting firm question the charge-backs,

15   credit-backs shown on Page 2 of Exhibit PPP as an expense item;

16   yes or no?

17            MR. MILLER:  Same objection.

18            THE COURT:  Overruled.

19   A.  We had two different years.  Different years, different

20   accounting firms.  So, yes, they had different beliefs as to

21   how those charges should be recorded.  So the larger firm felt

22   that they should be netted from sales.

23   Q.  Turning to Defendant's Exhibit QQQ, which is the profit and

24   loss statement for January through December 2014.  What is the

25   total income that the profit and loss statement reports for

1   that year?

2   A.  4,035,468.

3   Q.  And if you turn back to Exhibit B, Defendant's Exhibit B,

4   on Page 165 -- just give me a second.  I think I misspoke.

5          Okay.  I was right.  On Page 165, is there a number

6   that shows your total income for the same period?

7   A.  Where are you referring?  Where are you?

8   Q.  Page 165 of Exhibit BB -- I'm sorry, just B.

9   A.  I'm not sure what you're referring to.

10  Q.  There's a number that I would like you to explain.  So

11  there is number total inventory and, for example, in 2014, the

12  amount is 33,000 -- I'm sorry, $33,009,614.92, correct?

13          MR. MILLER:  Objection.  You're reading inventory

14  numbers, not dollars.

15          MS. PEARSON:  I'm sorry?

16          THE COURT:  What's the objection, Mr. Miller?

17          MR. MILLER:  Misstates the exhibit.

18          MS. PEARSON:  What?

19          MR. MILLER:  She said dollars.  It's units.

20          THE COURT:  I understand.

21          MS. PEARSON:  I'm sorry.

22          MR. MILLER:  That's okay.

23  BY MS. PEARSON:

24  Q.  Can you just explain to me what the total inventory line

25  reflects?

1  A.  On Page 165?

2  Q.  Yes.

3  A.  This is a -- let me just think about it.  Those are

4  quantities.  The inventory line is a quantities line.

5          THE COURT:  Mr. Pfau, you can't speak to yourself when

6  you're testifying in court; so speak up and into the

7  microphone, please.

8  A.  So the second column going across it says total inventory

9  shows 33 million in dollars and 21 million in quantity.  So

10  21,871,219 is the unit it's showing.  33,009,614 is the

11  dollars, and the reason that number is higher than what's shown

12  on the P and L is that it's netting something.  It's probably

13  netting the charge-backs and allowances, I believe.  The P and

14  L must be netting some item.  It's the same data; so it's

15  something that it's netting out.

16  Q.  Do you know why the amounts are different on Defendant's

17  Exhibit B and Defendant's Exhibit QQQ, based on your personal

18  knowledge?

19  A.  My belief is that the report -- it's the same data in both

20  reports.

21  Q.  I'm not asking for your belief.  I'm asking do you know.

22  Do you know why Exhibit QQQ shows a different number for total

23  income than Exhibit --

24  A.  Without looking into it further, I can't tell you.

25  Q.  Looking at the line items on Exhibit QQQ, I see an expense

H3SPCOT2                          Pfau - Cross

1    item generically described as fees.  Do you see that, under

2    total equipment costs, office?

3    A.  I see that.

4    Q.  Under selling expenses on Page 2 of the profit and loss

5    statement for 2014, there is a line item under charge-backs and

6    credit-backs for miscellaneous; is there not?

7    A.  Not miscellaneous, no.

8               THE COURT:  Mr. Pfau, again, into the microphone.

9    A.  Miscellaneous isn't the credit.  Above it is a credit.

10   Q.  I couldn't hear you, sir.

11   A.  Miscellaneous is not a credit.  The one above it is a

12   credit.

13   Q.  Is there a line item for miscellaneous, an unexplained line

14   item for miscellaneous is my question?

15   A.  Is there one?  Yes.

16   Q.  Did Excell make any effort to allocate the particular

17   commission expenses associated with the sale of the allegedly

18   infringing products?

19   A.  No.

20   Q.  With respect to shipping charges, for example, would you

21   agree with me, Mr. Ferullo, that it -- shipping charges should

22   be about the same for each 3.4 ounce product that Excell

23   purchases and sells, regardless of the price at which Excell

24   sells the product?

25   A.  Yes.

H3SPCOT2                          Pfau - Cross

1   Q.  And would you agree with me that the cost of warehousing

2   products that are 3.4 ounces in size should be roughly the same

3   per unit?

4   A.  Yes.

5   Q.  Excell's profit and loss statements were reviewed by

6   outside accountants; were they not?

7   A.  Correct.

8   Q.  They were not audited by the outside accountants, were

9   they?

10  A.  Correct.

11  Q.  What's the difference between a review and an audit?

12  A.  An audit is the highest level of financial statement.  It

13  involves an accounting firm independently certifying and

14  confirming information.  So they're directly confirming the

15  information from external sources.

16       A review does not seek external data.  A review is

17  working from within the firm's books and records and using

18  analytical procedures to determine that the information is

19  truly correct.  Because there's a relationship between various

20  numbers on the balance sheet and income statement, so a review

21  is an analytical review to determine that everything appears to

22  be reasonably true and correct.

23  Q.  So in the case of Excell's profit and loss statements, the

24  outside accountants performed the lower-level review?

25  A.  It's the second highest level.  There's audit that's the

H3SPCOT2                        Pfau - Cross

1    highest level, then review, then compilation and then there's

2    one below compilation.

3    Q.  But they didn't do an audit?

4    A.  No.

5    Q.  They just did a review?

6    A.  Correct.

7    Q.  And in the course of their reviews, the accountants made

8    certain adjustments and revisions to Excell's final statement

9    of income and balance sheets; did they not?

10   A.  Correct.

11   Q.  So they moved certain items out of expenses?

12   A.  I don't know what the particular changes were, but it's

13   normal for an accounting firm to work with the client and make

14   the necessary corrections that they see.

15   Q.  Now, turning to Defendant's Exhibit SS, that's the document

16   entitled Defendant's Costs Associated with the Production of

17   Alternatives of Certain of Plaintiffs' Products at Issue in the

18   Complaint.

19            THE COURT:  I think you mean triple S.

20            MS. PEARSON:  I do mean triple S, your Honor.  I think

21   I'm afraid of the K documents.

22            THE COURT:  Actually, SS is worse in that regard.

23            MS. PEARSON:  All right.

24   BY MS. PEARSON:

25   Q.  So did you prepare Defendant's Exhibit SSS?

1    A.  No, I did not.

2    Q.  And who prepared it?

3    A.  Counsel.

4    Q.  This does not cover the unreliable profit and loss

5    statements showing your expenses for 2010 through 2012,

6    correct?

7    A.  Correct.

8    Q.  The products at issue were sold during that period, though,

9    right?

10   A.  You have the reports.  If it shows it, then yes.

11   Q.  Are the numbers on Defendant's Exhibit SSS pulled from the

12   profit and loss statements from 2013 through 2015?

13   A.  Yes.

14   Q.  You did not eliminate any expenses that were shown on the

15   profit and loss statements for those years in creating

16   Exhibit SSS, correct?

17   A.  Correct.

18   Q.  So you did not calculate which categories of overhead are

19   actually implicated in the production and sale of the products

20   at issue, did you?

21   A.  Of the production is already -- correct, correct.  Correct.

22   Q.  Now, this document purports to come up with a formula of

23   operating expenses as a percentage of gross profit; does it

24   not?

25            MR. MILLER:  Objection to the form.

1            THE COURT:  Overruled.

2   A.  I wouldn't call it a formula.  It's just the

3   mathematical -- it's just mathematical.  The sales give you the

4   gross profits, and then you have selling, administrative and

5   other, and using net income.  It's just a mathematical

6   presentation of the same data.  This is just reporting that the

7   operating expenses as a percentage to the gross profit over

8   those three years are relatively consistent at 62.6 percent.

9   Q.  And Excell is asking the Court to apply a percentage figure

10  to its gross profits in order to come up with a number that you

11  would like to use as a proxy for your actual costs and

12  expenses, correct?

13           THE COURT:  Sustained.

14  Q.  Why is 62.6 percent relevant, Mr. Pfau?

15           MR. MILLER:  Objection.

16           THE COURT:  Sustained as to form.

17           Mr. Pfau, what, if any, relevance do you think that

18  62.6 percent figure has to this case?

19           THE WITNESS:  It's showing you what the costs are to

20  sell the products.  That's the fairest measure of how to take

21  the company's overhead and apply it to all these products.  We

22  sell hundreds and hundreds of products.  This is the fairest

23  way to apply the overhead to each line.

24  BY MS. PEARSON:

25  Q.  Would you agree, Mr. Pfau, that the operating expenses, as

1    a percent of gross profit, varies from year to year?

2    A.  Numbers always have variance, but the variance is

3    relatively tight.

4    Q.  Well, was there a 9 percent difference between your

5    computation of operating expenses as a percent of gross profit

6    for 2014 and 2015?

7    A.  Yes.

8    Q.  When, in your original trial affidavit, you performed a

9    similar computation based upon the financial statements that

10   were reviewed by your accountant, the range was even greater;

11   was it not?

12   A.  I'm not sure.

13          MS. PEARSON:  I would like to show a document to the

14   witness, the Defendant's Exhibit XX.  That document has been

15   excluded from evidence; so I am merely showing it to him to

16   refresh his recollection.

17          May I approach, your Honor?

18          THE COURT:  You may.

19   Q.  Does seeing the document I have placed before you refresh

20   your recollection that the range of operating expenses, as a

21   percentage of gross profit for the years 2010 through 2015, was

22   greater than shown on Defendant's Exhibit SSS?

23   A.  Would you say that order again?  Which one?

24   Q.  On Defendant's Exhibit SSS we saw that in 2014 the

25   operating expenses, as a percentage of gross profits, was

1    59 percent, correct?

2    A.  Correct.

3    Q.  And in 2015 there was a 68 percent percentage figure,

4    right?

5    A.  Correct.

6    Q.  And so that's a 9 percent difference year to year, right?

7    A.  Correct.

8    Q.  When you performed your similar cost calculation on the

9    basis of the reviewed financial statements that have been

10   excluded from evidence, was that range between 56 percent and

11   65 percent?

12   A.  And 66, yes.

13   Q.  And was the weighted average that you came up with based

14   upon the reviewed financials lower than the 62.6 percent shown

15   on Defendant's Exhibit SSS; yes or no?

16   A.  Yes, yes.

17   Q.  Turning to Exhibit TTT, that is a document entitled Excell

18   Brands LLC Overhead Cost Per Product; is it not?

19   A.  Correct.

20   Q.  Did you prepare this document?

21   A.  I did not.

22   Q.  Who prepared it?

23   A.  Counsel, from the books and records.

24   Q.  I'm sorry, you said counsel?

25   A.  Counsel, from the books and records.

H3SPCOT2                        Pfau - Cross

Q.  And it's based on Exhibit B?

A.  Is that the exhibit?  It's based on KKK.

          THE COURT:  Mr. Pfau, you've testified about a few

different summary exhibits that you said were prepared by

counsel; is that right?

          THE WITNESS:  Yes.

          THE COURT:  In any of these cases, have you verified

that the numbers on these summaries match the numbers on the

underlying documents?

          THE WITNESS:  Yes.

          THE COURT:  You've done that?

          THE WITNESS:  So for instance, on the P and Ls, I

physically traced them to the company's financial statements to

match, to make sure it was the same data.

          THE COURT:  All right.  But, for example, with respect

to TTT, which counsel is asking you about now, have you

verified that those numbers come from other documents that

you've been testifying about?

          THE WITNESS:  Which one is, TTT?  Yes.

          THE COURT:  Yes.  You've verified that?

          THE WITNESS:  Yes, I verified the data on this TTT

exhibit to the report that it came from.

          THE COURT:  Which report is that, Exhibit B?

          (Pause)

          THE WITNESS:  TTT is a summary coming from another

 1   document, but I can't find which document it was.  All right.

 2   It's this document.  TTT is a summary coming out of KKK in

 3   terms of the units, quantities sold, the revenue, and KKK is

 4   coming out of another report, which I believe is B.  This is

 5   from B, yes.  So KKK and TTT are distilled data coming out of

 6   B.

 7                  THE COURT:  Okay.  Thank you.

 8   BY MS. PEARSON:

 9   Q.  All right.  So is it your understanding that Defendant's

10   Exhibit TTT covers the number of units sold for the products

11   listed under there for the period July 10th through April 2016?

12   A.  Yes.

13   Q.  And you said that the information was derived from

14   Defendant's Exhibit KKK, right?

15   A.  B, and Exhibit B.

16   Q.  All right.  So if we match up, for example, the first line

17   item, Calvin Klein, DC, which I understand is diamond

18   collection, Euphrates and 3.4 SP, does that correlate with the

19   first line item on Defendant's Exhibit TTT?

20   A.  You're asking if TTT compares to KKK?

21   Q.  Yes.  So just to see if I can speed it up.  The first line

22   item on --

23   A.  Yes.

24   Q.  -- KKK says that the quantity sold of Euphoria Men was

25   246,792 units.  And is that the units sold that you have

1    included on -- your counsel has included on Defendant's

2    Exhibit TTT?

3    A.  Yes.

4    Q.  And then similarly, on Defendant's Exhibit KKK, it says

5    that the gross revenue for the sale of the Euphrates Men was

6    $361,840.92.  Is that used for purposes of Defendant's

7    Exhibit TTT?

8    A.  Yes.

9    Q.  And that's the sales total on Defendant's Exhibit T?

10   A.  421 -- for Euphrates Women?  Which one are you on?

11   Q.  I'm just trying to match up the two --

12   A.  Yes.

13   Q.  -- documents because the columns -- the column on

14   Defendant's Exhibit TTT that says gross revenue, says for that

15   line item $361,840.92.

16          Did your counsel take that number and put it under the

17   different heading, sales total, on Defendant's Exhibit TTT?

18   A.  I'm trying to follow the question.  The 361,840.92 shown on

19   TTT is the same 361,840.92 shown on Exhibit KKK.

20   Q.  Okay.  On Exhibit KKK, it's called gross revenue, and on

21   Exhibit TTT it's called what?

22   A.  Sales total.

23   Q.  Exhibit TTT does not include, does it, the gift set we were

24   looking at on Exhibit KKK, OK New York, three-piece set?

25   A.  I do not see it.

H3SPCOT2                          Pfau - Cross

1   Q.   And it doesn't include minis?

2   A.   Correct.

3   Q.   So Defendant's Exhibit TTT does not include all of

4   defendant's relevant sales, does it?

5   A.   The two reports are not matching in total.

6   Q.   SSS has a column for each year labeled gross profit; does

7   it not?

8   A.   Yes.

9   Q.   It has no column labeled gross margin, does it?

10  A.   No.

11  Q.   Exhibit TTT states in a footnote, these figures are

12  calculated based on the 62.6 percent weighted average of the

13  percentage Excell's overhead and other expenses.  Do you know

14  what that means?

15  A.   This particular page is showing the sales by unit, and then

16  it's showing the cost of goods sold, and then it's applying

17  that 62.6 percent overhead to come up with a cost of overhead

18  per line.

19  Q.   And the 62.6 percent overhead is the computation that we

20  saw on Exhibit -- Defendant's Exhibit SSS, right?

21  A.   Yes, yes.

22  Q.   So you applied the average of the operating expenses as a

23  percentage of gross profit for a three-year period, 2013

24  through 2015, to the full period of time that Excell was

25  selling the allegedly infringing fragrances; did you not?

1   A.  Correct.

2   Q.  On this exhibit, instead of applying that percentage figure

3   to gross profit, you applied it to gross margin, correct?

4   A.  Say that again?

5   Q.  On Exhibit TTT you applied your 62.6 percent weighted

6   average to gross margin, correct?  Yes or no?

7   A.  Applied the 62 percent overhead factor to the gross profit,

8   correct.

9   Q.  No.  To gross margin, the column is labeled gross margin,

10  correct?

11  A.  Correct.

12  Q.  And gross margin is not the same as gross profit, is it?

13  A.  The way it's shown here, it is.  That gross margin is gross

14  profit.  Gross profit is the sales, less the cost of sales; so

15  that gross margin is the -- that math there is the gross

16  profit.

17  Q.  Where do the gross margin figures comes from?

18  A.  It's mathematical.  It's the total shown --

19  Q.  What is the underlying source of the gross margin figure?

20  A.  It's sales total shown, less total cost of goods shown is

21  the math between.  It's subtracting total cost of goods column

22  from the sales total column.

23  Q.  Where do the underlying figures come from?  Because this is

24  not a business record of Excell.

25              MR. MILLER:  Objection.

```
 1                  THE COURT:  Sustained.
 2   Q.  Where did the underlying figures come from for gross
 3   margin?
 4   A.  It's on that --
 5   Q.  They come from the profit and loss statements?
 6                  MR. MILLER:  Objection, Judge.  If she's going to ask
 7   a question, he should be able to answer it before she
 8   interrupts him.
 9                  THE COURT:  I think we've also covered this ground,
10   Ms. Pearson; so let's move on.  Are you close to wrapping up?
11                  MS. PEARSON:  I think I am, your Honor.  Just give me
12   one second.
13                  Thank you so much, Mr. Pfau.  May I offer you a bottle
14   of water now?
15                  THE WITNESS:  No.
16                  MS. PEARSON:  Thanks.
17                  THE COURT:  Meaning you have wrapped up?
18                  MS. PEARSON:  I have wrapped up, you will be happy to
19   know.
20                  THE COURT:  All right.  Let's take a break, and then
21   we'll resume with redirect and, hopefully, we can move through
22   what remains relatively quickly.  We'll see you in, let's say,
23   six or seven minutes.  Thank you.
24                  (Recess)
25
```

1          THE COURT:  Mr. Pfau, you remain under oath.  We will

2     continue with redirect.

3          MR. MILLER:  May I proceed, your Honor?

4          THE COURT:  You may.

5     REDIRECT EXAMINATION

6     BY MR. MILLER:

7     Q.  Mr. Pfau, on cross-examination counsel asked you about when

8     Excell sold its -- completed sale of its inventory.  You

9     answered in or about November of 2016.  Do you know when Excell

10    ceased purchasing items of the products specifically at issue

11    in this case?

12    A.  I do not.

13    Q.  On cross-examination, Mr. Pfau, you were shown two specific

14    products.  I just want to show you one of them, and that is

15    Plaintiffs' Exhibit No. 70.

16          Your Honor, may I approach?

17          THE COURT:  You may.

18    Q.  Mr. Pfau, looking at Exhibit 70 at the items in it as well

19    as the cradle itself, does the name of any one of the

20    plaintiffs itself appear?

21          MS. PEARSON:  I can stipulate that it does not.

22          THE COURT:  All right.  In any event, the exhibit

23    speaks for itself.  Next question.

24    Q.  OK.  Mr. Pfau, on cross-examination you were asked about

25    the 2010 P&L which appears at Exhibit NNN.  You testified, in

1    substance, that the document which is marked as NNN is not --

2    does not look the same as it did when it was created.  Could

3    you explain what you meant by that.

4    A.  QuickBooks is an open-ended software program that

5    creates -- there are reasons why a document that you look at

6    today six years later might look different.  One of the reasons

7    is that QuickBooks data starts to consume more and more space.

8    So to save on the space requirements, every once in a while

9    companies can do what they call condense the data where it

10   takes a lot of the data, squishes it all together so it's not

11   taking up all the file space.  2010, '11, and '12 got

12   condensed.  And once it gets condensed, the data, it's not

13   reliable, because the data got squished for space purposes so

14   it changes numbers.  That's one -- that's the main reason.

15   That's why you see a $17 million adjustment.  It's not a real

16   number.  It's the software just squishing everything together

17   to clean -- to clean itself.

18   Q.  Did you review the 2010, 2011, 2012, P&Ls at or about the

19   time they were created?

20   A.  Yes.

21        MS. PEARSON:  Your Honor, I object.  The documents

22   weren't produced in discovery in their original form.

23        MR. MILLER:  Your Honor, we're not seeking to

24   introduce them.  Just explaining the discrepancy.  He didn't

25   rely on them in any event.

1          THE COURT:  Very good.  The objection's overruled.

2     Q.  Did you do anything to confirm that this feature of

3     QuickBooks is what actually caused what you've described as the

4     discrepancies in the 2010, 2011, and 2012 P&Ls?

5     A.  As a user of the software and someone who had knowledge of

6     the numbers, I can see some of what it did, and I'm convinced

7     that it's the condensing feature.  Even labeled it as condensed

8     adjustment on there.  I'm convinced it's the squishing of the

9     data to save on the space that throws off the numbers.  I mean,

10    it's there.  If you look in the first year, it shows a

11    $17 million loss on a million dollars of sales.  That's just

12    not possible.  Those numbers are just not possible.

13    Q.  Now, on cross-examination you were asked whether as part of

14    your testimony here you made any effort to allocate specific

15    line items of expense to specific products at issue in this

16    case, and you testified that you did not do that.  Why did you

17    not try to allocate specific line items to specific products?

18    A.  I don't think there's a feasible way of doing it and

19    producing a fair result.  The books are not -- no company --

20    the company tracks its overhead.  It doesn't track its overhead

21    spread across 400 different product lines.  It's just not

22    feasible, and I don't think it produces a valid result.

23    Q.  Did you make any effort to allocate expenses generally to

24    the specific products at issue in this case?

25    A.  No.

1   Q.  You were asked specifically about one line item, and that

2   was officers guaranteed payments.  And you identify

3   Mr. Hamerling as the recipient of those payments.  For what

4   reason was Mr. Hamerling given guaranteed payments?

5   A.  It's the formality in a partnership of paying partners over

6   other partners.  That's his salary.  It's like salary because

7   we're structured as a partnership, the payments are called

8   guaranteed payments.  That's basically the basic compensation.

9   Q.  For what reason was Mr. Hamerling paid a base compensation

10  or salary?

11  A.  He ran the company day to day.

12  Q.  On cross-examination you were asked about the outside

13  accounting firm's review of the P&Ls and whether any

14  adjustments were made.  Based on that review -- and you

15  testified, excuse me, that certain adjustments were made to the

16  financial reporting.  Where did those adjustments appear?

17  A.  When an accounting firm makes adjustments, the client books

18  them.  They're in the books.  They're already embedded in the

19  books.

20  Q.  Turning your attention to Exhibit SSS, you described what

21  you did here, and there is referred to as a weighted average.

22  For what reason --

23             MS. PEARSON:  I object to the form.

24             THE COURT:  Sustained as to form.

25             Ms. Pearson, please use the microphone.

1   Q.  When the document refers to a weighted average, could you

2   explain what the weighted average is.

3   A.  Can I see the document?

4   Q.  Oh.  It's Exhibit 6.

5   A.  I don't have it.

6   Q.  Oh, sorry.

7               THE COURT:  You may approach.

8               MR. MILLER:  Oh, I apologize, Judge.  Sorry.

9               Your Honor, if I may, I'll reframe the question so

10  it's a little more pointed, if I may.

11              THE COURT:  Particularly since I don't think -- it

12  doesn't say weighted average.

13              THE WITNESS:  It does.  I found it in the net income.

14  Q.  SSS -- what does it mean, weighted average?  I'm asking

15  about the weighted part.

16  A.  What weighted normally means is that you're measuring

17  whatever you're measuring fairly against each component so that

18  the larger item gets a bigger, heavier weighting than the

19  smaller item.  So if -- it's proportional.  It's

20  proportionately done.

21  Q.  And in this case what's the effect of the weighting?

22              THE COURT:  Do you know what it refers to in this

23  document, yes or no?

24              THE WITNESS:  I have to think about it.  I'm not sure.

25              THE COURT:  All right.  Next.

H3SHCOT3                      Pfau - Redirect

1   Q.  Turn your attention to TTT, please.  You see on the bottom

2   right-hand corner of TTT there is a number next to "Total"?

3   See that?

4   A.  Yes.

5   Q.  What's that number?

6   A.  1,467,273.79.

7   Q.  What does that number reflect?

8   A.  That is the total overhead, the total -- that's applying

9   the 62.6 percent overhead factor to the gross profit realized

10  on those product lines.

11  Q.  Counsel pointed out that TTT does not include certain

12  products that were included on KKK, i.e., the gift sets and

13  minis.  Could you tell me what effect including the gift sets

14  and minis would have had on that total number at the bottom --

15          MS. PEARSON:  I object to the form.

16  Q.  -- if we added them in?

17          MS. PEARSON:  Object to the form.

18          THE COURT:  Do you understand the question?

19          THE WITNESS:  If I added it.  I believe I understand

20  the question.

21          THE COURT:  Talk into the microphone.

22          THE WITNESS:  It would add to the total sales.  It

23  would add to the total cost to the sold and add to the

24  overhead.

25  Q.  So what effect would it have on that million four number?

1    A.  It would be higher.

2              MR. MILLER:  Nothing further, your Honor.

3              THE COURT:  All right.  Anything, Ms. Pearson?

4              MS. PEARSON:  No, your Honor.  Thank you.

5              THE COURT:  All right.  Mr. Pfau, you may step down.

6              (Witness excused)

7              MR. POTTER:  Your Honor, Mr. Rotter's here, and

8    because he's likely to be very quick, I wonder if we might call

9    him now?

10             THE COURT:  Sure.

11             MR. BRESSLER:  I'm sorry?

12             MR. POTTER:  We're going to call Rotter now because

13   he's going be quick.

14             MR. BRESSLER:  Your Honor, we've had Mr. Ferullo

15   waiting for a day and a half.

16             THE COURT:  That's OK.  We'll deal with Mr. Rotter,

17   and then we'll deal with Mr. Ferullo.

18             MR. POTTER:  Thank you, your Honor.  Getting him from

19   the witness room, jury room.

20             THE COURT:  Mr. Bressler, my view is that cross will

21   be limited to the Nielsen reports.  So I'll allow you to cross

22   broadly as to the Nielsen reports, but it will only be as to

23   the Nielsen reports.  I think you've waived any right to

24   cross-examine beyond that by not including him on your

25   cross-examination list.

1              MR. POTTER:  Your Honor, I'm going to want to give

2    Mr. Rotter a few exhibits.

3              THE COURT:  All right.  You can approach and leave it

4    at the witness stand and take the other exhibit away, please.

5              MR. POTTER:  Very good.

6     DAVID ROTTER,

7         called as a witness by the Plaintiffs,

8         having been duly sworn, testified as follows:

9    DIRECT EXAMINATION

10   BY MR. POTTER:

11   Q.  Good morning, Mr. Rotter.  You've got there in front of you

12   what's been marked as Plaintiffs' Exhibit 255.  Is this the

13   written testimony that you submitted in this litigation?

14   A.  It is.

15   Q.  You've also got Plaintiffs' Exhibits 154-1, -2, and -3.  Do

16   you recognize these documents?

17   A.  I do.

18   Q.  Are these the three reports containing market research data

19   from the Nielsen company that you reference in your written

20   testimony?

21   A.  They are.

22   Q.  And as you testified in that written statement, this is

23   data that tracks consumer purchases based upon scans made at

24   the point of sale?

25   A.  Correct.

1  Q.  Does Coty use Nielsen market research data in its business?

2  A.  It does.

3  Q.  And in what way does Coty use that data?

4  A.  It uses the data to track the relative performance of its

5  products in the outlets where it sells its products relative to

6  competitors.

7  Q.  Do you know other companies that rely on Nielsen market

8  research data in connection with the sale of consumer goods?

9  A.  I do.

10  Q.  Can you name one?

11  A.  I have personal knowledge having worked for Unilever for

12  six years that they extensively used Nielsen to track the sales

13  of its products and competitive products in the marketplace

14  within the channels that it competes which were in grocery

15  stores, mass retail, and are just some examples.  I have

16  personal knowledge, of course, that Coty uses it.  I also have

17  personal knowledge that other companies within the beauty and

18  CPG industries use the same -- use Nielsen for the same

19  activities I mentioned.

20  Q.  Which companies are those?

21  A.  I know that P & G uses it.  I know that Loreal uses

22  Nielsen.  I know this because I have personally spoken with my

23  colleagues at Coty who have worked at P & G and one at Loreal

24  who have personally used Nielsen data at those companies.

25          MR. MILLER:  Objection.  Strike as hearsay.

 1          THE COURT:  Sustained.

 2   Q.  Mr. Rotter, how long did you work Unilever?

 3   A.  I worked there for six years.

 4   Q.  During what time period specifically?

 5   A.  From 2005 to 2011.

 6   Q.  What was your role there?

 7   A.  I was a finance manager there providing financial support

 8   for some foods categories.

 9   Q.  And did you personally use Nielsen market research data at

10   Unilever?

11   A.  I did.

12   Q.  All right.  And during the time working at Coty and at

13   Unilever, did you develop any understanding as to the extent to

14   which Nielsen market research data is used in the consumer

15   goods industry?

16   A.  I do.  The information -- I'll start at Unilever.  The

17   information at Unilever was used across the organization both

18   within the marketing teams, the inside sales teams, and within

19   finance to understand Unilever's products, how -- what their

20   sales were in the retail channels that they competed in and how

21   they were doing versus competitors.  We used that to gauge what

22   is commonly known as market share, and that was a key success

23   criteria to judge the success of your brands.  We also used and

24   I personally used Nielsen data to understand pricing in the

25   marketplace, both Unilever products and consumer -- and our

H3SHCOT3                       Rotter - Direct

competitors' products to understand what pricing strategies we

may implement in the market in order to succeed.

          In Coty I have personally seen presentations that have

made use of Nielsen data to understand Coty's performance,

fragrance performance, versus competitors and understand who

has the -- you know, within each market who has the -- who are

the relative market leaders and who are not.

Q.  During your time at Unilever and at Coty, was it your

understanding that those companies' competitors were similarly

using Nielsen market research data for these purposes?

A.  They would be.  This information is widely purchased.

Nielsen sells this information to a variety of companies.

          MR. MILLER:  Objection.  Lack of foundation.

          THE COURT:  Overruled.

Q.  Do you, Mr. Rotter, have an understanding that familiarity

with Nielsen data is a job requirement in any capacity in

connection with the consumer goods industry?

A.  Yes, I do.  One -- I'll give you two examples.  At Unilever

I personally observed almost every person in the marketing

teams pulling Nielsen information from Nielsen-provided

proprietary databases.  Secondly, I have observed job

descriptions.  Most recently, I observed a job description on

the Internet from Loreal advertising for a manager of business

insights specifically citing a requirement of -- Nielsen

analysis as a requirement for the position.

1   Q.  Mr. Rotter, are you aware that Nielsen market research data

2   is used in connection with reporting or articles related to the

3   consumer goods industry?

4   A.  Yes.  Oftentimes, I have read that when people try to cite

5   sales in particular channels, Nielsen is directly referenced as

6   measuring those sales for not only -- for a variety of

7   companies and a variety of channels.

8   Q.  Do you have any reason to believe that Nielsen market

9   research data is not objective or not reliable?

10  A.  No, not at all.

11          MR. POTTER:  Thank you, your Honor.  No further

12  questions.

13          THE COURT:  All right.  Are you offering Plaintiffs'

14  Exhibit 255; 154, parts 1, 2, and 3?

15          MR. POTTER:  Those are already in evidence.

16          THE COURT:  I don't think that they --

17          MR. POTTER:  They were admitted -- I'm sorry.  Yes, I

18  would like to offer now 154, 152 -- 154-1, 154-2, and 154-3.

19          THE COURT:  All right.  Any objections?

20          MR. MILLER:  Yes, your Honor.  May we voir dire the

21  witness on these documents?

22          THE COURT:  All right.  Well, why don't you just

23  cross-examine, and then --

24          MR. MILLER:  Thank you.

25          THE COURT:  -- to the extent that you continue to have

1    an objection at that point, I will rule on them.  Go ahead.

2    CROSS-EXAMINATION

3    BY MR. MILLER:

4    Q.  Mr. Rotter, good morning.

5    A.  Good morning.

6    Q.  If you could turn your attention to paragraph 2 of your

7    direct testimony, you refer to positions which you've held as

8    finance manager for "Mars, Unilever, Cooper Crouse-Hinds, and

9    Terumo"?

10   A.  Terumo.

11   Q.  Other than Unilever about which you've testified your role,

12   none of those other companies sold fragrances; is that right?

13   A.  Correct.

14   Q.  In paragraph 1 of the document, you testified that your

15   role as "category controller is to 'ensure proper governance

16   and control over the sales and marketing expenses for Coty's

17   fragrance category.'"

18            What do you mean by "proper governance and control"?

19            MR. POTTER:  Objection, your Honor.  This is beyond

20   the scope and has nothing to do with the Nielsen documents.

21            MR. MILLER:  Goes to the extent of his role at the

22   company and whether it involves Nielsen.

23            THE COURT:  Overruled.

24   A.  My role is to ensure that the -- that the marketing

25   expenses for the fragrance category are properly accrued and

1    accounted for.  My role is to make sure that forecasting of

2    those expenditures is done in a thorough and strategic manner.

3    And my role is to give financial guidance and counsel to the

4    marketing teams when they are looking to launch new products.

5    Q.  It's true, is it not, that your role does not include

6    strategic planning for Coty's fragrance category, does it?

7    A.  No, it does include strategic planning.

8    Q.  And that strategic planning relates to finances such as

9    pricing, etc., like that; right?

10   A.  Creating a three-year financial P&L which would include

11   pricing assumptions, all the way to revenue, to profit for many

12   fragrance brands.

13   Q.  So to the extent that you're involved with strategic

14   planning for the company, it relates to financial projections;

15   correct?

16   A.  Financial projections and business cases, launch P&Ls,

17   whether it's financially attractive to launch a new product.

18   Q.  If you could turn your attention, please, to -- well,

19   before we do that, I'm sorry, if you could turn your attention

20   to page 5 of your affidavit and specifically to paragraph 11.

21   In paragraph 11 you assert that "Coty subscribes to Nielsen's

22   proprietary market research for the fragrance industry."

23        On what basis does Coty make that subscription?  By

24   "what basis" I mean how frequently does Coty get this data?

25   A.  I believe it's updated on a routine basis.  They have -- I

 1   know that they have -- that they pay Nielsen to have access to

 2   how their sales are doing on their products as well as

 3   competitors in the channels that it competes in, of which one

 4   of the channels is the mass channel.

 5   Q.  How frequently does Coty get updated reports?

 6   A.  Other than -- I don't know the specific frequency.  It's

 7   routine.  It's pretty regular.

 8   Q.  Pretty regular like once a year?

 9   A.  No, more than that.  Certainly more than that.

10   Q.  OK.

11   A.  It's got to be -- it's at least monthly.

12   Q.  When Coty gets those reports monthly or however frequently

13   it is, in what form do they take?  How do they come?

14   A.  I don't have personal knowledge of that.  I have -- I do

15   know -- I can speak generally to it -- they have -- I've seen

16   and I've talked to colleagues.  They access a proprietary

17   database from Nielsen, and they can pull information on an ad

18   hoc basis however they wish.

19   Q.  But that's not something that you personally know about;

20   right?  You just know about that from other people?

21   A.  At Coty, that is correct.  I have personal knowledge of it

22   working at Unilever, which is a package goods company, and I

23   have actually personally seen the analysis similarly pulled

24   from the Nielsen -- from a Nielsen database.  I have actually

25   used the information myself at Unilever to actually do pricing

H3SHCOT3                          Rotter - Cross

1    work for the company and recommend price increases.

2    Q.  And you left Unilever's employ in 2011?

3    A.  Yes.

4    Q.  If you could turn your attention to Plaintiffs'

5    Exhibit 154-1, the front page of this document -- I'm sorry,

6    the second page of this document.  I'm sorry.

7    A.  Yes.

8    Q.  Waiting for the Court to get his.

9              THE COURT:  Go ahead.

10   Q.  The second page of this document refers to the Nielsen

11   company, but my question relates to the first page of the

12   document.  Is this first page of the document part of the

13   Nielsen report or something different?

14   A.  Yeah, it was prepared by another individual in the company,

15   but this is -- this would be as a result of the ad hoc.  When

16   you pull from Nielsen, you can pull it into an Excel

17   spreadsheet and manipulate the data however you wish.

18   Q.  So the first page of 151 -- sorry, 154-1 is not part of the

19   Nielsen report; correct?

20   A.  It is part of the Nielsen database, like I said.  You pull

21   it from a database.  It retrieves information, and then you can

22   manipulate it however you like.

23   Q.  So this is a -- the first page is a document which was

24   prepared by somebody at Coty drawing from data that --

25   A.  I believe -- I believe so.  I did not prepare this document

H3SHCOT3                              Rotter - Cross

1    personally.

2    Q.  Now, you testified that when you were at Unilever, you

3    worked in the area of food services; correct?

4    A.  I -- I worked in their food segment.

5    Q.  Food segment.  Food segment does not include fragrance,

6    does it?

7    A.  Absolutely not.

8    Q.  And you testified that you used the Nielsen data for market

9    share and pricing information; is that right?

10   A.  Yes.

11   Q.  By "market share" you mean data regarding the percentage of

12   the relevant market that in this case Unilever had in whatever

13   the segment was; correct?

14   A.  And its competitors, yes.

15   Q.  And its competitors, OK.

16           By "pricing" you mean the actual price that is the

17   prevailing price that is used for particular products in the

18   market; right?

19   A.  Yes.

20   Q.  Turning your attention to -- back to 154-1, and excluding

21   the first page, the balance of this document, is this the

22   entirety of the report or is there more or is this an excerpt?

23   A.  It looks to be a report showing market share for Excell

24   Brands in the mass channel.

25   Q.  So the question was whether or not this document is part of

1    one of the reports that you testified that Coty regularly

2    receives?

3    A.  It would be.  It would be -- it would come from that

4    Nielsen database.

5    Q.  Are you speculating or do you in fact know of personal

6    knowledge that this document was part of one of the reports

7    that Coty receives from Nielsen on a regular basis?

8          MR. POTTER:  Your Honor, objection to the extent that

9    he's mischaracterizing the testimony or testifying himself as

10   to how his data is obtained.

11         THE COURT:  I think the question is do you personally

12   know that this is derived from the data that Coty gets from the

13   Nielsen company.

14         MR. POTTER:  Well, he says from one of the reports.

15   My objection is to the form, your Honor.

16         THE COURT:  Well, do you have personal knowledge that

17   this comes from the data that Coty received from the Nielsen

18   company?

19         MR. MILLER:  Your Honor, if I may, that's actually not

20   the question.  I'm happy to have him answer that question, but

21   I was asking a slightly different one.

22         THE COURT:  Why don't you re-ask your question.

23         MR. MILLER:  Sure.

24   Q.  The question, sir, is looking at the document 154-1 and

25   excluding that first page which we talked about, just looking

H3SHCOT3                         Rotter - Cross

1    at the balance of the document, do you have personal knowledge

2    that these pages, this data, is part of one of the reports

3    which you testified Coty receives on a regular basis from

4    Nielsen?

5    A.  I know that our senior manager of business insights

6    prepared this document, and I reviewed this document.  And he

7    got this from Nielsen.  As I said, I did not personally prepare

8    this document.

9    Q.  So the entire -- am I right that the entirety of 154-1 is

10   not in fact a Nielsen report but is a document which was

11   prepared by staff at Coty?

12   A.  It is a Nielsen report.  It is derived from Nielsen.  The

13   manner in which it was -- the manner in which the report was

14   actually prepared, whether it was a specific report or whether

15   it was out of a database, I can only speculate, but ultimately,

16   the numbers are coming from Nielsen.

17   Q.  Sir, I'm just trying to clarify.  This document, this piece

18   of paper, was something that Coty prepared; isn't that right?

19   A.  Yes.

20   Q.  Not asking where the data came from right now.  I'm just

21   asking if this is a document that Coty prepared; right?

22   A.  Yes.

23   Q.  Turn your attention to 154-2.

24   A.  OK.

25   Q.  Am I right, sir, that this is a document that someone at

1    Coty prepared?

2    A.   That's correct.

3    Q.   And that someone was not you, I take it?

4    A.   Same person that I -- that's the same person I referenced

5    before.

6    Q.   OK.  Let me turn your attention to 154-3.

7    A.   Yep.

8    Q.   Am I right that this too is a document that someone at Coty

9    prepared?

10   A.   Yes, the same person also prepared this, and it is a -- to

11   my knowledge, it is again an extract from the database that

12   Nielsen -- that Coty pays Nielsen for access to the

13   information, market share information.

14   Q.   OK.  I apologize if you answered this.  Who is the person

15   who you said prepared this document?

16   A.   He's -- his name, first name's Matthew.  His last name

17   escapes me.  He's a senior manager of business insights here at

18   Coty.

19   Q.   A senior manager at business insights?

20   A.   Called business insights.

21   Q.   I see.  Who does he report to?

22   A.   I don't know.

23           THE COURT:  How do you know that he pulled the data?

24           THE WITNESS:  Because I saw emails from him and I

25   spoke to him personally over the phone.  I was copied on -- he

1    emailed me the information.  I spoke to him asking him about

2    the particulars of what -- of the document.

3            THE COURT:  In the course of your business at Coty, do

4    you and your colleagues, in other words, this is the sort of

5    data that you would rely on in making business determinations

6    as part of your regular course of business?

7            THE WITNESS:  Yes, sir, absolutely.

8            THE COURT:  When you rely on these things, I mean, how

9    do you get the data from the Nielsen reports in the ordinary

10   course of your business?

11           THE WITNESS:  Having not done it at Coty and relying

12   on my -- relying on my personal knowledge of seeing it done at

13   Unilever because I haven't seen it done at Coty, there is a

14   database.  I believe it's called Nielsen Answers, and I believe

15   it's on one of these reports as a source.  And you access that

16   database and you put in the criterion in which the information

17   you would like to retrieve from the database, and it spits it

18   out in a report.  You can manipulate it at that point, but

19   that's generally how many corporations access the information.

20   They get access to this database, and they pay for that

21   information, depending -- the access is -- depends on what they

22   want to buy.

23           MR. MILLER:  Your Honor, based on the testimony, we

24   continue our objection to this document.  We do not believe

25   that it meets the criteria for reliability or the exception to

 1   the hearsay rule under 803(17) as a market report first because

 2   it now appears that this is not a document originated from

 3   Nielsen as was represented to us, but in fact are documents

 4   prepared by Coty.  This witness has already testified that he

 5   does not have personal knowledge of the preparation of these

 6   documents.  And, finally, this witness has not demonstrated any

 7   personal knowledge that these documents prepared by Coty are in

 8   fact market reports which are relied on generally in the

 9   market; and, therefore, we continue our objection to the

10   admissibility of these documents.

11        THE COURT:  All right.  I don't know, Mr. Potter or

12   Ms. Pearson, if you can address just the point -- I think to

13   some extent the objection is not well-founded, and I would not

14   be prepared to sustain it; namely, I think the record and the

15   foundation is adequate that these are the kind of market -- or

16   that Nielsen reports are the kind of market data that are

17   generally relied upon in the sort of consumer goods marketing

18   industry, if you will, and I'm not persuaded that that isn't

19   adequate.

20        I'm also not persuaded that the fact that these

21   documents themselves were prepared by Coty has any significance

22   here in the sense that there's testimony that the data in the

23   documents was drawn from the reports, and if the reports and

24   the data in the reports are admissible under 803(17), I don't

25   think it matters what the selection basis or how the documents

1    themselves are created.

2          My problem is whether this witness has any personal

3    knowledge or can testify based on his personal knowledge and

4    excluding hearsay that that's actually the source of the data

5    in these reports.  That is to say, I'm not presented with a

6    witness who actually prepared these, who actually went into the

7    Nielsen database and drew this data.  He's basically testifying

8    to that solely, as I understand it, from the emails and

9    conversations he had with this other person.  So how is that an

10   adequate foundation to admit these?

11         MR. POTTER:  Your Honor, I'll just give a little bit

12   of background on these documents.  Initially, these were

13   documents that were produced in response to the Court order

14   that we provide Excell with information that Coty uses

15   concerning its market share.  The individual who pulled these

16   is in Paris.  That's where he resides.  When Mr. Rotter was put

17   up as a 30(b)(6) witness for Coty on this and other matters, he

18   familiarized himself with this and those other matters.  For

19   the purposes of this trial testimony, for the sake of

20   convenience and for the sake of not bringing in witnesses from

21   all over the country and the globe for bits and pieces of

22   testimony, we had Mr. Rotter introduce these documents as well.

23         THE COURT:  Is there an exception to the hearsay rule

24   that allows you to rely on the fact that somebody is not

25   conveniently located?

1      MR. POTTER:  No, your Honor, and I did not mean to

2   suggest that.  But I think that in this case there is

3   sufficient indicia of reliability that these are indeed Nielsen

4   documents, that they came from the Nielsen database to which

5   Mr. Rotter testified, and that they can come in for the

6   information contained therein.

7      THE COURT:  My question is what is the evidence that

8   they come from the database that he has generally laid a

9   foundation with respect to?  As I understand it, it's solely

10  the hearsay that he has repeated from this guy who apparently

11  is in Paris.

12     MR. POTTER:  And the documents speak for themselves,

13  your Honor.  To the extent they contain the Nielsen -- the

14  Nielsen logo, copyright information regarding Nielsen and other

15  indicia which is consistent with the way that data like this is

16  extracted.

17     THE COURT:  All right.  I'm going to sustain the

18  objection, not allow these into evidence.  And to the extent

19  that the affidavit describes the contents therein, which I

20  think it does at paragraphs 12 through 15, I'll strike that

21  portion of the affidavit.

22     Anything else?

23     MR. MILLER:  Your Honor, if I may, Mr. Conklin who

24  testified also included information regarding the Nielsen

25  report.  We would request that his testimony regarding it also

1    be stricken.

2            THE COURT:  That was admitted subject to connection.

3            MR. MILLER:  Right.

4            THE COURT:  I don't think the connection has been

5    made.

6            All right.  I should have asked, unless you have

7    redirect that you think can cure the problem that we've

8    discussed, but I take it, in the absence of this gentleman in

9    Paris, I don't think that's happening.

10           MR. POTTER:  Just give me one moment to confer with

11   Ms. Pearson.

12           No, your Honor.

13           THE COURT:  All right.  Mr. Rotter, you may step down.

14           (Witness excused)

15           MR. POTTER:  Mr. Rotter, would you mind handing me the

16   exhibits as you leave.  Thank you very much.

17           THE COURT:  We will proceed to the next and last

18   witness, Mr. Ferullo.

19           THE DEPUTY CLERK:  Please raise your right hand.

20    NICHOLAS FERULLO,

21       called as a witness by the Defendant,

22       having been duly sworn, testified as follows:

23   DIRECT EXAMINATION

24   BY MR. BRESSLER:

25   Q.  Good morning, Mr. Ferullo.

1          May I approach and hand the witness a copy of his

2    trial affidavit?

3          THE COURT:  You may.

4          MR. BRESSLER:  It's been marked as Exhibit HHHH.  Your

5    Honor, would you like a copy with the markings?

6          THE COURT:  Sure.

7    Q.  Mr. Ferullo, I have handed you Exhibit HHHH.

8          MS. PEARSON:  Can we have a marked copy, please?

9    Q.  Do you recognize the document?

10   A.  I do.

11   Q.  What is that?

12   A.  This is my trial affidavit.

13   Q.  Did you read it?

14   A.  I did.

15   Q.  And you signed it?

16   A.  I did.

17         MR. BRESSLER:  I offer Exhibit HHHH.

18         THE COURT:  All right.  Let me address the objections.

19   The bottom line is all the objections are overruled.  I think

20   the objections go to weight, and the remedy is

21   cross-examination.  They're not grounds for exclusion.  To that

22   end, there's an objection to paragraph 2, the second and third

23   sentences.  There's an objection to paragraph 3, the sentence

24   beginning "prestige fragrances" and the following sentence at

25   the very bottom echelon.  There's an objection to all of

1   paragraph 4, all of paragraph 7, and testimony concerning

2   Exhibits CC through II.  So those are overruled.

3               You may proceed with cross-examination.

4               (Defendant's Exhibit HHHH received in evidence)

5               MR. BRESSLER:  Your Honor, as to the --

6               THE COURT:  Excuse me.

7               MR. BRESSLER:  -- to read in the exhibits that are

8   admitted into evidence pursuant to stipulation.

9               THE COURT:  Go ahead.

10              MR. BRESSLER:  Exhibit C, CC through -- CC, DD, EE,

11  FF, GG, HH, II, and VV.

12              (Defendant's Exhibits C, CC, DD, EE, FF, GG, HH, II,

13  and VV received in evidence)

14              THE COURT:  All right.  They are admitted.

15              MR. BRESSLER:  Thank you, your Honor.

16              THE COURT:  Cross-examination.

17              Ms. Pearson, for my planning purposes, any estimate of

18  how long your cross will be?

19              MS. PEARSON:  I promise it will be a lot quicker than

20  the other cross-examinations, your Honor.

21              THE COURT:  I'll relieved to hear that.

22              MS. PEARSON:  I'm sorry.  I'm just not good at

23  estimating these.  I think it's under 45 minutes.

24              THE COURT:  All right.  Let's try to get this all done

25  before lunch.

1              MS. PEARSON:  Your Honor, as with the other witnesses,

2     we've prepared notebooks including the witness' trial

3     affidavit, exhibits I may reference, and deposition transcript

4     in case we need to refer to it.  May I approach --

5              THE COURT:  You may.

6              MS. PEARSON:  -- to provide copies to the witness and

7     the Court?

8              THE COURT:  You may.

9     CROSS-EXAMINATION

10    BY MS. PEARSON:

11    Q.  Good morning, Mr. Ferullo.

12    A.  Good morning.

13    Q.  By whom are you currently employed?

14    A.  I currently work for a company called Mirage Brands.

15    Q.  What is Mirage Brands?

16    A.  It is a company that distributes fragrance alternatives.

17    Q.  Does Warren -- strike that.

18              Does Wayne Hamerling have any involvement in Mirage

19    Brands?

20              MR. BRESSLER:  Objection, your Honor.

21              THE COURT:  Sustained.

22    Q.  What do you do for Mirage Brands?

23              MR. BRESSLER:  Objection.

24              THE COURT:  Overruled.

25              THE WITNESS:  I can answer?

1           THE COURT:  Yes.

2    A.  I handle the retail distribution sales for the United

3    States and Canada as well as a limited wholesale distribution

4    for Chicago, New York, Houston, Dallas, and Northern

5    California.

6    Q.  Do any persons other than yourself who formerly worked for

7    Excell Brands or currently work for Excell Brands also work for

8    Mirage?

9           MR. BRESSLER:  Objection.

10          THE COURT:  Overruled.  I'll allow it.

11   A.  Yes.

12   Q.  Who else?

13   A.  One of our administrative assistants.  Her name is Imee

14   Javier.  She works with us.  Our former assistant controller,

15   Diane Hamerling, is the president of the company.  Alfredo

16   Castaneda, who is a salesperson for export, two other

17   administrative assistants, and Wayne Hamerling has a limited

18   role as the sales rep to one of the retail stores called

19   Rainbow Shops.

20   Q.  When did you join Mirage Brands?

21   A.  December of 2016.

22   Q.  Was it already in existence at the time you joined?

23   A.  No.

24   Q.  You joined Excell in December 2013; correct?

25   A.  Yes.

1    Q.  And when did you stop working there?

2    A.  I resigned just prior to Thanksgiving of 2016.

3    Q.  I thought a good way to cover your employment history

4    quickly might be to look at Exhibit 232.  That's Plaintiffs'

5    Exhibit 232.  And defendant's exhibits appear before the

6    plaintiffs' exhibits in the binder.

7              MR. BRESSLER:  I'm sorry?

8              MR. POTTER:  242.

9              MR. BRESSLER:  242?

10             MS. PEARSON:  I said Plaintiffs' Exhibit 242.

11   Q.  Do you know what that document is, Mr. Ferullo?

12   A.  That's my LinkedIn.

13   Q.  And is it an accurate summary of your employment history at

14   least through the time you were at Excell Brands LLC?

15   A.  Yeah.  I haven't updated it since.

16             MS. PEARSON:  Your Honor, I would move the admission

17   of Plaintiffs' Exhibit No. 242.

18             MR. BRESSLER:  Objection.

19             THE COURT:  Sustained.

20   Q.  In your description of your position as director of North

21   American retail of Excell Brands LLC, you state that --

22             THE COURT:  Sustained.  It's not in evidence,

23   Ms. Pearson.

24   Q.  Is this a LinkedIn page that you have posted on the

25   LinkedIn site, Mr. Ferullo?

1   A.  It appears to be.  It looks like my LinkedIn page.  It's

2   outdated.  I have more connections than the ones that are

3   listed here, so --

4   Q.  On the LinkedIn site, did you describe your position as

5   director of North American retail at Excell Brands LLC?

6            MR. BRESSLER:  Objection.

7            THE COURT:  Sustained.

8   Q.  Did you oversee the distribution of Excell's in-house and

9   licensed brands to over 40,000 stores in the U.S. and Canada

10  while you were director of North American retail for Excell

11  Brands?

12  A.  Yes.

13  Q.  What licensed brands does Excell Brands have?

14  A.  Our major brand that we have is the Diamond Collection.  We

15  had intended on pursuing brands, but the company chose not to.

16  Q.  And from whom does Diamond Collection license -- I'm sorry.

17  From whom does Excell license Diamond Collection?

18            MR. BRESSLER:  Objection.  Relevance.

19            THE COURT:  Overruled.

20  A.  We own -- we own the brand.

21  Q.  So I ask you again, what licensed brands did you oversee

22  the distribution of?

23  A.  We didn't -- we didn't pursue any licenses from the time

24  that I was there.

25            MS. PEARSON:  Your Honor, I would move the admission

 1    of Plaintiffs' Exhibit No. 242.

 2              MR. BRESSLER:  Objection.

 3              THE COURT:  Sustained.  Move on, please.

 4    Q.  The company Excell Brands was already in existence at the

 5    time you joined, was it not?

 6    A.  Yes.

 7    Q.  And Diamond Collection fragrances were already an

 8    established line at the time that you joined in December 2013;

 9    correct?

10    A.  Yes.

11    Q.  So Excell had already established its business model at the

12    time you joined the company; correct?

13              MR. BRESSLER:  Objection.  Beyond the scope.

14              THE COURT:  Overruled.

15    A.  I would disagree with that.  Excell had just started to

16    enter into a lot of retailers, and I was brought in to expand

17    our retail distribution.  So there were a lot of distribution

18    that was not in place yet until I arrived.

19    Q.  But Excell had already established its use of "our version

20    of" legends and "not associated" legends at the time you

21    joined; correct?

22    A.  That is correct, yes.

23    Q.  And Excell had already established its relationship with

24    its suppliers in India at the time that you joined; correct?

25    A.  That is correct.

H3SHCOT3                          Ferullo - Direct

1    Q.  In terms of the direct communications from Excell to its

2    suppliers in India in terms of what Excell wanted the product

3    to look like, you were not personally involved in that, were

4    you?

5              MR. BRESSLER:  Objection.

6              THE COURT:  Can we get a time frame on that,

7    Ms. Pearson?

8    Q.  Were you personally involved in communicating to Excell's

9    supplier what Excell wanted its Diamond Collection products to

10   look like prior to December 2013?

11             MR. BRESSLER:  Objection.

12             THE COURT:  Overruled.

13   A.  Prior to December 2013, no.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1  Q.  After December of 2013, who was principally involved in the

2  communications between Excell Brands and its supplier as to

3  what it wanted its products to look like?

4           MR. BRESSLER:  Objection, beyond the scope.

5           THE COURT:  Overruled.

6  A.  It varied.  We would meet for marketing meetings, and one

7  of us would send over the notes of our marketing meetings to

8  our supplier.  It varied.

9  Q.  Do you recall testifying at your deposition that Wayne

10 Hamerling was most knowledgeable about the selection of names,

11 packaging design, formulation of fragrances and origin of the

12 legends "our version of" and "not associated with"?

13 A.  Yes.

14 Q.  Did you, personally, ever communicate with Excell's

15 suppliers about the selection of any names for diamond

16 collection fragrances?

17 A.  Yes.

18 Q.  Which ones?

19 A.  I don't recall off the top of my head.  I would have to see

20 a list of them and go through e-mail history over three years.

21 Q.  At your deposition, you testified, did you not, that you

22 have no personal knowledge as to where the language for the

23 "our version of" and "not associated" legends that appear on

24 diamond collection fragrances came from?

25 A.  I do not, no.

1   Q.  Similarly, it is true, is it not, that you have no personal

2   knowledge as to Excell's intent in adopting those legends

3   before you arrived?

4   A.  Our intent on using the language "our version of."

5   Q.  Do you know what Wayne Hamerling, or the other employees of

6   Excell, intended, based on your personal knowledge --

7   A.  I --

8   Q.  -- before you arrived at the company?

9   A.  I can't speak to anything prior to when I arrived at the

10  company.

11  Q.  So you have no personal knowledge as to Excell's intent in

12  adopting those legends before you arrived, correct?

13          MR. BRESSLER:  Objection, asked and answered.

14          THE COURT:  Sustained.

15  Q.  Could you please take a look at Plaintiffs' Exhibit 169 in

16  your notebook.

17          And, for the record, the form in which the document

18  was originally produced is -- bears the exhibit tag Plaintiffs'

19  Exhibit No. 169, but because it was difficult to read.  We

20  endeavored to just create a more legible version, which has

21  been marked as Plaintiffs' Exhibit No. 169 star.  Really, I

22  think the only thing it shows is that the grayed-out portion of

23  Plaintiffs' Exhibit No. 169 does not contain any text in it,

24  but you can work with either version that is easiest for you.

25          Do you know what Plaintiffs' Exhibit No. 169 is, sir?

1    A.  It looks to be a list of the Excell product names

2    corresponding to a Calvin Klein name next to it and information

3    about the year that it was first sold and the date that it was

4    first sold.

5              THE COURT:  Have you seen that document before?

6              THE WITNESS:  I believe I saw this at my deposition.

7    Q.  The witness was designated as a rule 30(b)(6) witness on

8    this document.

9              MR. BRESSLER:  Objection, your Honor.  Foundation.

10             THE COURT:  Sustained.  Go ahead.

11   Q.  Do you have personal knowledge of what the reference to

12   "discontinued" or "to be discontinued" means?

13             MR. BRESSLER:  Objection.

14             THE COURT:  Do you know who created this document or

15   what this document is?

16             THE WITNESS:  I don't know who created it.  I could

17   make a -- I could speak to the term discontinued.

18             THE COURT:  Do you know anything about where this

19   document came from or the data that --

20             THE WITNESS:  No.

21             THE COURT:  Okay.  So is it fair to say you would just

22   be either telling me what the word discontinued means in the

23   English language, or speculating as to what somebody used it to

24   mean in this document?

25             THE WITNESS:  I would speculate based on this

1    document.

2              THE COURT:  All right.  Don't do that.  Next line,

3    please.

4    BY MS. PEARSON:

5    Q.  What does it mean, Mr. Ferullo, for Excell to discontinue

6    an item?

7    A.  It means that we will no longer manufacture that item.

8    Q.  Thank you.  Do you know whether Excell's diamond collection

9    included versions of Beyonce fragrances?

10             MR. BRESSLER:  Objection, scope, relevance.

11             THE COURT:  Ms. Pearson, would you like to respond?

12             MS. PEARSON:  The relevance is that --

13             THE COURT:  Why don't you address the scope first.

14             MS. PEARSON:  I'm sorry?

15             THE COURT:  Scope first.

16             MS. PEARSON:  Well, the scope is with respect to

17    whether the diamond collection products compete or harm Coty.

18             THE COURT:  Okay.  But where in his affidavit does he

19    speak to that?  I'll allow it.  Go ahead.

20             MS. PEARSON:  I'm sorry, your Honor, if I misconstrued

21    the Court's rules, but it was my understanding that we would

22    have some latitude with the witnesses so that we would not need

23    to call witnesses back at a later date for rebuttal, and there

24    certainly has been testimony with respect to those topics by

25    other witnesses.

1              THE COURT:  Don't talk me out of overruling the

2    objection.

3              MS. PEARSON:  I won't.

4              MR. BRESSLER:  Your Honor, Mr. Ferullo was not on

5    their list of witnesses.

6              THE COURT:  I understand.

7              MS. PEARSON:  I feel badly that I am not following

8    your rules to the letter, sir.

9              THE COURT:  I think there's a distinction, just so you

10   understand, between someone you put on your witness list as a

11   witness that you are going to call, where then you would have

12   latitude to, obviously, engage in what you would normally do as

13   your direct examination.

14             I don't see why there would be any rebuttal here in

15   the sense that you -- I mean, you could have called him, and I

16   don't think there's anything unanticipated about this

17   testimony.

18             Having said that, I think it is within the scope of

19   what he has in his affidavit, in particular, for example,

20   paragraph 3; so you may proceed.

21   BY MS. PEARSON:

22   Q.  So the question is, did the diamond collection include

23   versions of other Coty fragrances, like Beyonce?

24   A.  They are not versions of the fragrance.  They are versions

25   of -- diamond collection's versions of fragrances, yes.

1   Q.  Okay.  So what is the distinction you're trying --

2   A.  It's very important to make the distinction.

3   Q.  What is the distinction?  I don't understand.

4   A.  If you're saying that is a version of the fragrance, it is

5   not a version of that fragrance.  It is diamond collection's

6   version of that fragrance, and I think if you get loose with

7   the language, it could be confusing.

8   Q.  Okay.  So did diamond collections sell diamond collections'

9   versions of other Coty fragrances, like Beyonce?

10  A.  Yes.

11  Q.  And Guess?

12  A.  Yes.

13  Q.  And Jovan?

14  A.  Yes.

15  Q.  And Nautica --

16  A.  Yes.

17  Q.  -- for example?  And are those Coty fragrances sold in a

18  lower tier of distribution than some of the prestige fragrances

19  at issue in this case?

20          MR. BRESSLER:  Objection.

21          THE COURT:  Overruled.

22  A.  They can, yes.

23  Q.  Have you personally seen Coty's mass market fragrances sold

24  in the same retail outlets where diamond collection products

25  are sold?

1            MR. BRESSLER:  Objection.

2            THE COURT:  Overruled.

3   A.  I have not seen the Coty fragrance next to the diamond

4   collection version of the same item in a retail chain, no.

5   Q.  But that wasn't the question.  Have you seen Coty's mass

6   market fragrances sold in the same retail outlets where diamond

7   collection products are sold?

8   A.  Yes.  I have seen Coty mass market products there.

9   Q.  Your point was they weren't arranged side by side, like the

10  fragrances we're displaying in the courthouse?

11  A.  No.  My point was the corresponding item that you had

12  mentioned next to the diamond collection, Coty has a wide range

13  of brands, and they may have some brands that we don't have of

14  the diamond collection adjacent to it.  It's really a sort of

15  wide umbrella that you're using in the language.

16  Q.  All right.  So is what you're saying that, in your

17  experience, you have not seen a diamond collection fragrance

18  beside the product that it purports to emulate?

19  A.  That it is the diamond collection version of, correct.

20  Q.  Defendant's Exhibit 6 is referenced in your trial

21  affidavit; is it not?  C, I'm sorry.  Defendant's Exhibit C, in

22  paragraph 9 you say:  Defendant's Trial Exhibit C is the true

23  and accurate copy of a complete list of Excell's customers, in

24  your affidavit?

25  A.  Yes.

1   Q.  Now, Excell does not sell directly to any consumers, does
2   it?
3   A.  No.
4   Q.  And Excell itself does not have, and has never had, any
5   retail outlets itself, correct?
6   A.  No.
7   Q.  Let me rephrase that because I think the answer may be
8   confusing.  Has Excell ever operated any retail outlets itself?
9   A.  No.
10  Q.  So Excell's offices and warehouses are not open to the
11  public?
12  A.  No.
13  Q.  Excell has never operated an e-commerce site, correct?
14  A.  No.
15  Q.  When I say "correct," perhaps it will be clearer if you
16  told me "correct" or "incorrect," but let me rephrase the
17  question.
18          Has Excell ever operated an e-commerce site?
19  A.  No.
20  Q.  When you say in paragraph 2 of your trial affidavit that
21  Excell's customers are low income and cannot afford to buy
22  plaintiffs' fragrances, you're not referring to the customers
23  listed on Defendant's Exhibit C, right?
24  A.  That is correct.  I am referring to the retailer's
25  customers.

1  Q.  So you're referring to the ultimate purchasers or consumers

2  of the product?

3  A.  Correct.

4  Q.  So when you say Excell customers are low income and cannot

5  afford to buy plaintiffs' fragrances, are you referring to

6  target purchasers of Excell's products, rather than actual

7  customers?

8  A.  We don't target their customers.  We target the retailers,

9  and the retailers have their customers that they work with.

10  Q.  Now, you were in charge of retail distribution; is that

11  correct?

12  A.  Yes.

13  Q.  Was there a distinction at Excell between retail customers

14  and wholesale customers?

15  A.  Yes, there is a distinction.

16  Q.  Can you explain what that means?

17  A.  So retail customers are retail chains, where they have a

18  distribution center that we ship to, and they have their brick

19  and mortar, traditional retail stores, like in a strip mall or

20  a standalone.

21       Wholesalers distribute to mom and pop stores that

22  don't have access to a distribution center, or don't need to

23  purchase the quantities large enough to buy from us directly.

24  Q.  Does Defendant's Exhibit C identify Ross stores as an

25  Excell customer?

H3SPCOT4                        Ferullo - Cross

1   A.  The parent company is Ross Stores of the chain dd's that we

2   sell.  We do not sell to Ross Stores directly.

3   Q.  I'm sorry?

4   A.  The parent company of the chain cited here is called Ross

5   Stores.  The chain that we sell to is dd's, which is a

6   subsidiary of Ross Stores, which is a lower retail customer.

7   Ross signs the checks.

8   Q.  So where it says Ross Stores, Inc. on the customer list, is

9   it your testimony that Ross Stores, Inc. is or is not an Excell

10  customer?

11          MR. BRESSLER:  Objection, asked and answered.

12  Q.  Is Ross Stores, Inc. an Excell customer?

13  A.  Yes, the parent company is the customer.  We do not ship to

14  Ross Stores.

15  Q.  Does Ross Stores operate the Ross Dress for Less stores?

16  A.  Yes.

17  Q.  Was Sears an Excell customer?

18  A.  We did not ship to Sears, the brick and mortar Sears store.

19  Sears holding company owns K-Mart.

20  Q.  Were diamond collection products sold at K-Mart?

21  A.  They were.

22  Q.  Do you believe that Defendant's Exhibit C is an accurate

23  list of all of the customers of Excell Brands?

24  A.  Yes.

25  Q.  There's a customer, Bealls Outlet, shown on Defendant's

1    Exhibit B.  What is Bealls Outlet?

2    A.   Bealls Outlet is a -- the lower retail echelon of Bealls,

3    which is sort similar to a Ross Stores.  They're mostly located

4    in Florida, North and South Carolina.

5    Q.   And you're saying that Bealls is like a Ross Stores?

6    A.   Yeah, Bealls --

7    Q.   Or the outlet?

8    A.   I want to make -- because Bealls Outlet and Bealls is not

9    the same.

10   Q.   Okay.  Which one is like Ross Stores?

11   A.   Bealls.

12   Q.   And is Bealls a department store?

13   A.   Yes.

14   Q.   And what is Bealls Outlet?

15   A.   Bealls Outlet is also a department store, but it is a lower

16   retail base customer.

17   Q.   Does Bealls Outlet sell merchandise that Bealls has not

18   been able to move?

19   A.   I don't know their exact sales.  They have a separate

20   buying team; so the buyers themselves purchase the merchandise.

21   They wouldn't buy it within the exact -- you know, the same

22   chain.

23   Q.   Have you ever visited Bealls Outlets?

24   A.   Yes, and their offices in Bradenton, Florida.

25   Q.   I'm sorry, I just couldn't hear?

H3SPCOT4                      Ferullo - Cross

1  A.  I visited the stores, as well as the offices in Bradenton,

2  Florida.

3  Q.  Does Bealls Outlet sell branded beauty products?

4  A.  They can.

5  Q.  Defendant's Exhibit C also lists A&E Stores.  What stores

6  are operated by A&E Stores?

7  A.  They used to have a Strawberry Stores.  In the last year,

8  they closed 97 percent of the stores.  There are three

9  remaining.

10  Q.  But for a long period of time, Strawberry Stores offered

11  diamond collection products, correct?

12  A.  They did, yes, but they are no longer in business.

13  Q.  During what period of time did Excell sell diamond

14  collection products through Strawberry?

15  A.  I don't know the first day that we shipped them, but we

16  shipped them through December of this year.

17  Q.  And Rainbow Apparel was a customer of Excell, correct?

18  A.  Yes.

19  Q.  Was MD Distributors a direct customer of Excell?

20  A.  MD --

21  Q.  You can look at the exhibit if you want.

22  A.  MD Distributors.  Yeah, if it's on this document, it would

23  be a --

24  Q.  I'm not trying to mislead you.

25  A.  Yes, I just want to make sure.  There's a lot of different

1  company names with different acronyms.  I just want to make

2  sure it's the right MD Distributors that I'm thinking of.

3          THE COURT:  Mr. Ferullo and Ms. Pearson, speak one at

4  a time.

5          And, Mr. Ferullo, I know it's hard when you're looking

6  at a document but you need to speak into the microphone and out

7  loud.

8          THE WITNESS:  Okay.

9          THE COURT:  Thanks.

10 A.  I don't see MD Distributors on this list.

11 Q.  Okay.  And to your knowledge, is this a complete list of

12 every active and inactive customer that Excell has ever had?

13 A.  Yes.

14 Q.  Turning to the listings on Page 2 of that exhibit, Beauty

15 Corner is an Excell customer, correct?

16 A.  Yes.

17 Q.  And Beauty Corner's address is 11290 Harry Hines Boulevard,

18 Suite B, Dallas, Texas, right?

19 A.  Yes.

20 Q.  Does Beauty Corner sell both genuine branded fragrance

21 products and Excell versions of those products?

22         MR. BRESSLER:  Objection, your Honor.

23         THE COURT:  Overruled.

24 A.  They do sell a lot of alternatives.  I was there last week,

25 actually, and limited branded product distribution.  It's not

1    an ideal marketplace for branded products.

2    Q.  Could you take a look at Plaintiffs' Exhibit No. 267-1.

3    Have you ever visited Beauty Corner, Inc.'s website?

4    A.  I have.

5    Q.  Does this appear to be a printout of pages from Beauty

6    Corner, Inc.'s website?

7              MR. BRESSLER:  Objection, foundation.

8              MS. PEARSON:  The document is in evidence.

9              THE COURT:  Overruled.  Just ask the question about

10   the exhibit, then.

11   Q.  Were you aware that Beauty Corner was selling diamond

12   collection products on its website?

13   A.  Yes.

14   Q.  And if you turn to the second page of this exhibit, the

15   Euphrates by Diamond Collection For Men is a diamond collection

16   product that Excell sold to Beauty Corner; is it not?

17   A.  Yes.

18   Q.  And what price does Beauty Corner offer Excell's products

19   for sale at?

20             MR. BRESSLER:  Objection.

21   Q.  If you know?

22             THE COURT:  If you know.  Don't base it on the

23   exhibit.

24   A.  I don't know exactly what it offers its price at.

25   Q.  Are you aware that Beauty Corner, Inc. also sells Euphoria

1   by Calvin Klein, for example?

2   A.  If he can get it, he would put it on his website, but I

3   don't think he has a continuous stock.  You -- I'd like to

4   clarify about the online presence.  They really don't -- this

5   is not their expertise.  This is like a ten-by-20 small shop in

6   a small strip center in Dallas.

7          He's not an online distributor; so if he has extra

8   stock, he may put it on the website.  So he doesn't

9   continuously keep this inventory.  So I can't answer

10  specifically if he also carries that item at any time.  He may

11  put it on his website to say he does carry it, but this is not

12  an e-commerce distributor.  I mean...

13  Q.  Does he have a store?

14  A.  Yes, he does.

15  Q.  And at the store, he offers both Euphrates and Euphoria

16  products, right?

17  A.  When I was there last week, I didn't see any of the branded

18  products there.  Most of his are in the alternative designer

19  fragrances.

20  Q.  And was Beauty Corner a retail or a wholesale customer?

21  A.  A wholesale customer.

22  Q.  Is Perfume Stop a direct customer of Excell?

23  A.  Yes.

24  Q.  And what was the address of the Perfume Stop that is a

25  customer of Excell, according to your customer list that has

1  been marked as Defendant's Exhibit C?

2  A.  So Perfume Stop may have had a different prefix to it; so

3  I'm trying to find it.  I don't know if it's under Perfume Stop

4  on this list.  Yup, okay.  I found it.  So the address is 11250

5  Harry Harding Boulevard, Suite No. 114, Dallas, Texas.

6  Q.  Are you aware that Perfume Stop operates a e-commerce site?

7  A.  He has a website, but I wouldn't call it an e-commerce

8  site.

9  Q.  Are you aware that Perfume Stop offers diamond collection

10  fragrances and branded fragrances on a website accessible on

11  the Internet?

12  A.  Yes, but he may not actually --

13  Q.  Can you just answer yes or no, please?

14  A.  Yes.

15  Q.  And if you turn to Plaintiffs' Exhibit 267-2, do you

16  recognize that document as printouts from the website of

17  Excell's customer Perfume Stop?

18  A.  Yes, this is his website.

19  Q.  Does Perfume Stop also operate a retail store at the

20  millennium shopping center in Dallas?

21  A.  Yeah, down the block from the other store, Beauty Corner.

22  Q.  And, for example, Perfume Stop offers for sale diamond

23  collection Euphrates; does it not?

24          MR. BRESSLER:  Objection, foundation.

25          THE COURT:  You may answer, if you know.

1   A.  According to his website, he's offering it for sale online.

2   Q.  Did Excell provide Perfume Stop with Euphrates by diamond

3   collection?

4   A.  We did, yes.  We did sell them.

5   Q.  And are you aware that Perfume Stop also sells branded

6   fragrance products including Calvin Klein products?

7   A.  He does have branded items, if he can get ahold of them.

8   He's not a regular distributor of branded fragrances.

9   Q.  At the store at the mall, have you visited that store?

10  A.  Perfume Stop?  Yeah, I was there last week.  It's a strip

11  center; it's not a mall.

12  Q.  Was Perfume Stop offering any diamond collection fragrances

13  for sale still?

14  A.  I walked through the warehouse.  He still had some items

15  left, but it was pretty limited.

16  Q.  And was it offering any branded fragrances when you

17  visited?

18  A.  I didn't see any branded fragrances in his warehouse, no.

19  He shies away from --

20  Q.  There's no question, sir.  Your counsel will have an

21  opportunity to ask you additional questions.

22          Was Perfume Stop a retail or a wholesale customer of

23  Excell?

24  A.  Wholesale.

25  Q.  Now, I believe that you also referenced in your declaration

1   some sales by customer, by year summaries.  So if you look at

2   Plaintiffs' Exhibit 1 -- let me just check.  I'm sorry.  I

3   don't mean to confuse you.

4           THE COURT:  Ms. Pearson, same instruction to you,

5   don't mumble, please.

6           MS. PEARSON:  Yes.

7   Q.  Okay.  Let me show you Plaintiffs' Exhibit No. 177, sir.

8   Do you recognize that document?

9   A.  Yes.

10  Q.  And do you know what it is?

11  A.  It's a sales-by-customer summary by year.

12  Q.  And do you know when Dollar General first became a customer

13  of Excell?

14  A.  I do.

15  Q.  When was that?

16  A.  It was in 2014 when we first started shipping them in

17  March.  I'd like to double-check.  Sorry, 2015 is when we first

18  started shipping them.

19  Q.  And how much diamond collection product did Excell sell

20  Dollar General in 2015?

21          MR. BRESSLER:  Objection, the document speaks for

22  itself.

23          THE COURT:  Is this document in evidence?

24          MS. PEARSON:  Yes, sir.

25          THE COURT:  All right.  If you're asking him just to

1  recite figures from here --

2          MS. PEARSON:  Well, I think these are total sales; so

3  I'm not sure if it is limited to the diamond collection or not.

4          THE COURT:  Ms. Pearson, don't swallow your sentences.

5  You've got to speak loudly and --

6          MS. PEARSON:  Your Honor, I don't know if the numbers

7  in this document are limited to diamond collection fragrances.

8  A.  They are.  $430,331.13 were sold to Dollar General in 2015.

9  Q.  And was anything sold to Dollar General in 2014?

10          MR. BRESSLER:  Objection, your Honor.  The document

11  speaks for itself.

12          THE COURT:  And asked and answered.

13          MS. PEARSON:  I don't believe it was, your Honor,

14  asked and answered.

15          THE COURT:  Well, he testified that it didn't become a

16  customer until 2015.

17          MS. PEARSON:  Okay.

18          THE COURT:  So that --

19          MS. PEARSON:  You heard it more clearly than I did.

20          THE COURT:  -- I think that I can infer that the

21  answer was zero for 2014.

22  BY MS. PEARSON:

23  Q.  All right.  Do you know when Family Dollar first became an

24  Excell customer?

25  A.  Family Dollar was in 2016, I believe, we shipped them.

 1   Q.  All right.  I believe that I did see Family --

 2   A.  Sorry, hold on.

 3   Q.  -- Dollar --

 4   A.  Family Dollar, we did meet in 2015, and we shipped them in

 5   2016.  We work on a calendar year with the buyers; so it's

 6   extensive.

 7   Q.  And to the extent that there were any earlier sales to

 8   either Family Dollar or Dollar General, they should be

 9   reflected on Excell sales by customer summaries, correct?

10   A.  Yes.

11   Q.  Now, Dollar General and Family Dollar were Excell retail

12   customers?

13   A.  Yes.

14   Q.  And in your witness statement, in paragraph 3, you

15   testified that Excell sold to distributors who, in turn,

16   distribute to mom and pop stores and flea markets, correct?

17   A.  Correct.

18   Q.  And those are what Excell would refer to as the wholesale

19   customers, not the retail customers?

20   A.  Correct.

21   Q.  So are Beauty Corner and Perfume Stop examples of the kind

22   of companies who are Excell's wholesale customers?

23            MR. BRESSLER:  Objection.

24            THE COURT:  Sustained.

25   Q.  You testified that Excell sold to distributors who, in

1    turn, distribute to mom and pop stores and flea markets,

2    correct?

3    A.  Yes.

4    Q.  And do you know who the distributors specifically sell to

5    in all cases?

6    A.  No, I do not.

7    Q.  If you look at Plaintiffs' Exhibit 241, for example, you'll

8    see that there is a site for Sam's Beauty, printouts from a

9    website for Sam's Beauty.  For example, the page of that

10   document that says Plaintiffs' 8024 at the bottom has a listing

11   for diamond collection B4U Eau De Parfum; do you see that?

12   A.  I do.

13   Q.  And is Sam's Beauty a retail customer of Excell's?

14   A.  No, it's not.

15   Q.  Is it a wholesale customer of Excell's?

16   A.  No.

17   Q.  Do you have any idea how Sam's Beauty came to list B4U on

18   its site?

19   A.  I have an idea that they probably purchased it from a

20   wholesaler.

21   Q.  Was Louis Rodriguez in charge of Excell's wholesale sales?

22   A.  Yes, until August of 2016.

23   Q.  When did Mr. Rodriguez leave Excell?

24          MR. BRESSLER:  Objection.

25          THE COURT:  Sustained.

H3SPCOT4                    Ferullo - Cross

1   Q.  So is the bottom line that Excell -- strike that.

2           Does Excell know the ultimate retail outlets for the

3   products it sells to wholesale customers in all cases?

4           MR. BRESSLER:  Objection, asked and answered.

5           THE COURT:  Overruled.

6   A.  In all cases, no.  We have an idea of where the product is

7   going, yes.

8   Q.  You are aware, sir, are you not, that Excell's products are

9   sold by many retail outlets other than its direct customers?

10  A.  Yes.

11  Q.  And, for example, they are offered on the Amazon.com

12  marketplace, right?

13  A.  Yes.

14  Q.  And they are offered on eBay, right?

15  A.  Yes.

16  Q.  Does Excell have its own Facebook page?

17  A.  No.

18  Q.  Could you take a look at Plaintiffs' Exhibit No. 184.  Do

19  you recognize the products being offered on Plaintiffs' Exhibit

20  184 as diamond collection fragrances?

21  A.  I can't see exactly what these are.  They look similar to

22  the diamond collection fragrances, but this is not our Facebook

23  page.

24  Q.  Okay.  On the last page of the exhibit, do you recognize,

25  for example, the 777 Sexy as a diamond collection product?

1           MR. BRESSLER:  Objection, foundation.

2           THE COURT:  Well, do you recognize that product as a

3    diamond collection product?

4           THE WITNESS:  Yeah.

5    BY MS. PEARSON:

6    Q.  Is this a Facebook page operated by Excell?

7           MR. BRESSLER:  Objection, asked and answered.

8           THE COURT:  Sustained.

9    Q.  Could you take a look at Plaintiffs' Exhibit No. 185,

10   another Facebook page.  Do you recognize the products on that

11   site, on that Facebook page as diamond collection fragrances,

12   to the extent that you can make out the pictures?

13   A.  These look like our fragrances, yes.

14   Q.  Could you take a look at Plaintiffs' Exhibit No. 168,

15   printouts from the Sears.com website.  Have you ever visited

16   the Sears.com website?

17   A.  I have not.

18          THE COURT:  Ms. Pearson, it's been almost an hour; so

19   if you could begin to wrap up, I'd appreciate it.

20          MS. PEARSON:  I'm trying to figure out a good way to

21   get you to the relevant page.

22          THE COURT:  It would help if you did that in advance

23   of trial.

24          MS. PEARSON:  I'm sorry.

25   BY MS. PEARSON:

```
 1   Q.  If you go to page -- the page that has on the bottom
 2   Plaintiff's 11358 and 359, do you recognize the names or the
 3   pictures shown on that page as Excell brands diamond collection
 4   product?
 5   A.  I really can't tell from these pictures.  It says diamond
 6   collection, but...
 7   Q.  I think you testified that Excell fragrances have been sold
 8   at K-Mart.  Have Excell fragrances also been sold at Wal-Mart?
 9   A.  No.
10   Q.  Do you mean that Excell itself has not sold directly to
11   Wal-Mart?
12   A.  That is correct.
13   Q.  Wal-Mart could have obtained Excell fragrances from another
14   source, though, correct?
15          MR. BRESSLER:  Objection.
16          THE COURT:  Overruled.
17   A.  It would be extraordinarily rare for them not to want to
18   work directly, from my own experience of Wal-Mart's buying
19   habits, with buyers who work directly with the manufacturers,
20   suppliers directly, not wholesalers.
21   Q.  Excell does not have any market research concerning where
22   its products are sold, does it?
23   A.  We do not.
24   Q.  And do you have any market research concerning the ultimate
25   consumers for your products?
```

1  A.  We do not, other than our own retail distribution and

2  wholesale distribution.

3  Q.  Do you have any market research concerning the income

4  levels of consumers who shop at Dollar General, for example?

5  A.  We do not do that research, no.

6  Q.  Do you have that kind of research for any group of

7  consumers who use diamond collection products?

8  A.  We do not do that research, no.

9  Q.  In paragraph 5 of your affidavit you said:  We look to

10  fragrances that our customer base would understand.  Do you see

11  that in your declaration?

12  A.  Yes.

13  Q.  What did you mean by your customer base would understand

14  the fragrance?

15  A.  So if it's a niche fragrance that doesn't have a wide

16  distribution and it is not well known, there's no sense in us

17  making the diamond collection version of that fragrance;

18  otherwise, the customer wouldn't know anything about what they

19  were getting in the box.

20  Q.  So in looking for a product to add to the diamond

21  collection line, you would look for a brand that was familiar

22  to your customer?

23  A.  Yes.

24  Q.  Correct?

25  A.  Yes.

1    Q.   Does Excell advertise or promote diamond collection

2    products?

3             MR. BRESSLER:   Objection.   It's been asked and

4    answered of other witnesses.   It is cumulative.

5             THE COURT:   Sustained.   I'm going to give you five

6    more minutes, Ms. Pearson.

7             MS. PEARSON:   All right.

8    Q.   Did Excell participate at ASD trade shows?

9    A.   Yes.

10   Q.   Did Mirage Brands recently participate at an ASD trade

11   show?

12            MR. BRESSLER:   Objection.

13            THE COURT:   Sustained.

14   Q.   Did Wayne Hamerling attend the ASD trade show?

15            MR. BRESSLER:   Objection.

16            THE COURT:   Sustained.

17            MS. PEARSON:   Your Honor, I think I understand what is

18   going to happen, but I would like to just make a record --

19            MR. BRESSLER:   Objection.

20   BY MS. PEARSON:

21   Q.   Do you know whether Louis Rodriguez registered the domain

22   name MirageBrands.com while he was still employed by Excell?

23            MR. BRESSLER:   Objection.

24            THE COURT:   Sustained.

25   Q.   Did Diane Hamerling form a new company, Mirage Brands, LLC,

H3SPCOT4                          Ferullo – Cross

```
 1  in November 2016?
 2            MR. BRESSLER:  Objection.
 3            THE COURT:  Sustained.
 4  Q.  Did Mirage Brands take a booth at the ASD trade show that
 5  occurred in 2017?
 6            MR. BRESSLER:  Objection.
 7            THE COURT:  Sustained.  Ms. Pearson, I think it's
 8  probably time to sit down, if that's all you have.
 9            MS. PEARSON:  I will take my guidance from the Court
10  and sit down.  Thank you, your Honor.
11            THE COURT:  Generally a good idea.  Mr. Bressler?
12            MR. BRESSLER:  I'll take guidance, too.  I would say I
13  have 20 minutes, but it's up to you, your Honor.
14            THE COURT:  All right.  Well, I'm not going to do 20
15  minutes now.  I will give you 20 minutes, but no more than 20
16  minutes when we return.  We'll return at 2:00 and then we'll
17  wrap this up.  Thank you.  See you then.
18            (Luncheon recess)
19
20
21
22
23
24
25
```

```
 1                          AFTERNOON SESSION

 2                               2:07 p.m.

 3            (In open court)

 4            THE COURT:  We'll continue with redirect.

 5            Mr. Ferullo, you remain under oath.

 6            You may proceed, Mr. Bressler.

 7    NICHOLAS FERULLO, resumed

 8    REDIRECT EXAMINATION

 9    BY MR. BRESSLER:

10    Q.  Good afternoon, Mr. Ferullo.  Do you spend time going

11    around to see customers?

12    A.  I do.

13    Q.  How much time do you spend?

14    A.  Pretty regularly.  I try and visit all of my customers

15    every month.

16    Q.  Have you ever seen any of the products at issue in this

17    case sold by Excell in a store with products sold by Calvin

18    Klein that are at issue here?

19            MS. PEARSON:  Beyond the scope, your Honor.

20            THE COURT:  Overruled.

21    A.  No, I have not.

22    Q.  Now, in response to questioning from Ms. Pearson, you said

23    you haven't done market research regarding your consumers.  Do

24    you have empirical knowledge as to who the ultimate consumers

25    of your products are?
```

1    A.  We do based on the retailers that we work with and the

2    wholesalers that we work with.

3    Q.  When you go to stores, do you see consumers?

4    A.  Yes.

5    Q.  How do you know the consumers are low income who can't

6    afford to buy plaintiffs' fragrances?

7    A.  The target customer of retailers is always low income for

8    the retailers that we work with based on the average retail

9    price of the items in the store or the price of the items that

10   they're offering there.  Plus, when I see people actually

11   interacting, especially at the wholesale customers, you can see

12   sometimes price being an issue at times.

13   Q.  Did Excell choose customers who are more easily confused?

14   A.  No.

15   Q.  Like to go through a few companies, a few stores, that you

16   were asked about.  You mentioned that you don't sell to or

17   didn't sell to Ross stores; right?

18   A.  That is correct.

19   Q.  How come?

20          MS. PEARSON:  Objection.

21          THE COURT:  If you're going to object, you've got to

22   do it loudly and into the microphone.

23          MS. PEARSON:  Objection.  It mischaracterizes the

24   testimony.

25          MR. BRESSLER:  All right.  I'll ask another way.

1    Q.  Did you sell to Ross stores?

2    A.  No.

3    Q.  How come?

4    A.  Ross stores does not sell our product because they have the

5    branded products there.

6    Q.  But on your list it said Ross stores.  Can you explain that

7    just to make sure it's clear to the Court.

8    A.  Sure.  Ross is the parent company of DD's, which is the

9    retailer that we sell.  So Ross is the one that actually pays

10   the bills and that we set up as our customer in the system.

11   Q.  Has Excell sold Diamond Collection to CVS?

12   A.  We have in the past.

13   Q.  How much?

14   A.  We sold them displays twice for holiday that were in and

15   out within four weeks, so once in 2012 and once in 2015, I

16   believe, and there was about 24 pieces each time for half of

17   the stores in their distribution.  So it was minimal.

18   Q.  Did you ever --

19        MS. PEARSON:  Objection as to time periods before the

20   witness was employed --

21        THE COURT:  Ms. Pearson, I don't know how many times I

22   can tell you I need to understand you, the reporter needs to

23   understand you, and if --

24        MS. PEARSON:  Objection as to 2012.

25        THE COURT:  And what's the basis for that objection?

1              MS. PEARSON:  The witness was not employed by the

2     company at the time.

3              THE COURT:  Were you there in 2012?

4              THE WITNESS:  I was not there, but I worked with the

5     buyers, so I had understanding of our sell-through from 2012 in

6     order to know we could sell them again in 2015.

7              THE COURT:  All right.  I'll take that for what it's

8     worth.  Go ahead.

9     BY MR. BRESSLER:

10    Q.  Has Excell ever sold any of the products at issue to CVS?

11    A.  Not that I believe.

12    Q.  I think you testified that Excell does not sell to Bealls.

13    It sells to Bealls Outlet?

14    A.  Yes.

15    Q.  And Bealls Outlet is what?

16    A.  Bealls Outlet is owned by Bees.  It is a lower retail

17    customer than Bealls.  Price point is lower than the price

18    point of items in Bealls Outlet.

19    Q.  And you mentioned you had some sales to Kmart.  Can you

20    tell me how much you sold to Kmart?

21    A.  Kmart, we sold on promotion and for holiday on a limited

22    basis in 2015.  We sold some displays, about 24 pieces a store,

23    and some gift sets for holiday and that was it.  It was not on

24    a continuing basis.  We actually chose not to work with the

25    retailer anymore after that.

H3SHCOT5                          Ferullo - Redirect

1   Q.  Now if you look to Exhibit 267-2, which is Perfume Stop, do

2   you have the exhibits in front of you or did they take --

3   A.  I think they took the larger binder.

4   Q.  I can show you mine, although I've highlighted it.  I don't

5   want to -- do you have yours?

6              MS. PEARSON:  We gave you a set.

7              MR. BRESSLER:  For the witness.

8              THE COURT:  I can give him mine if this speeds this

9   up.

10             MR. BRESSLER:  267, yes.  Judge, I'll be done in

11  minutes.

12             THE COURT:  All right.

13             MR. BRESSLER:  I thought you were going to give it to

14  him.

15             THE COURT:  I am.

16             THE WITNESS:  Thank you.

17  BY MR. BRESSLER:

18  Q.  You have 267-2 in front of you?

19  A.  Yes.

20  Q.  And if you go to the website, go to the third page.

21  A.  Yes.

22  Q.  It has Euphrates?

23  A.  Yes.

24  Q.  And what does it say on the bottom under "Price"?

25  A.  "This item is not associated with the name brand original."

1   Q.  Now, you said that Beauty Corner was not ideal for customer

2   for online sales.  Why?

3   A.  The item itself is too expensive to ship.  The shipping

4   cost of the item is more expensive than the item itself.

5   Q.  Well, you're talking about Excell's products?

6   A.  Excell's products.

7   Q.  How much does it cost to ship Excell's products

8   individually?

9   A.  Depending.  They're in Texas, so they're shipping to the

10   Northeast.  It could be seven, eight dollars.

11   Q.  Now, have you ever been -- I think you testified you were

12   at Perfume Stop and Beauty Corner?

13   A.  Yes, I was.

14   Q.  Can you describe Beauty Corner to us?

15   A.  Yes.  Beauty Corner is a wholesale fragrance store on Harry

16   Hines outside of Dallas.  It caters to a low-income customer,

17   people that, you know, are trying to get usually discount

18   fragrances.  Usually the amount to spend in the store is about

19   ten bucks.

20   Q.  What does the store look like?

21   A.  It's not the best area.  Bars on the doors.  You know, I

22   have to get buzzed in.  I had to knock on the door in order for

23   the magnetic door to open so I can actually get in.  Yeah, it's

24   not the best place.

25   Q.  Like to show you Exhibits DD, EE, FF, and GG.

1           Which are admitted into evidence, your Honor, by

2    stipulation.  May I approach?

3           THE COURT:  You may.

4    Q.  Can you tell us what DD is?

5    A.  DD is Polo Red by Ralph Lauren.

6    Q.  And if you flip the pages?

7    A.  This is Polo Black by Ralph Lauren, and another bottle of

8    Polo Black, Polo Blue, and Polo Green.

9    Q.  How would you describe the shape of these?

10   A.  The bottle looks to be like a rounded flask.

11   Q.  And are there other -- the next exhibit is?

12   A.  For EE?

13   Q.  Yes.  Also admitted into evidence.

14          MS. PEARSON:  Your Honor, objection.  This does appear

15   to be beyond the scope.

16          MR. BRESSLER:  Your Honor, he's a rebuttal witness,

17   and this is my last set of questions.  We'll be done.

18          THE COURT:  Sustained.

19          MR. BRESSLER:  OK.

20          THE COURT:  Are you done, then?

21          MR. BRESSLER:  The smile on your face.

22          THE COURT:  You said it was your last set of

23   questions.  I sustained the objection.

24          MR. BRESSLER:  I'd like to take my camera out and get

25   a picture and say:  This is what the judge looks like when I'm

1   taking examination.

2               No further questions.

3               THE COURT:  I think that's what the judge looks like

4   when you finish your examination.

5               Any recross, or are we done?

6               MS. PEARSON:  No.  Thank you, your Honor.

7               THE COURT:  All right.  Can I have my binder back?

8               THE WITNESS:  Sure.

9               THE COURT:  You may step down.  You're excused.

10              (Witness excused)

11              THE COURT:  All right.  Counsel, is that it?

12              MR. POTTER:  One small point, your Honor.  We have an

13  exhibit that's been marked as 271, which is a summary

14  demonstrative of the parties' overlapping channels of trade.

15  In light of your ruling on the Nielsen data and in light of

16  some of the testimony that's come out during the trial, that

17  exhibit needs to be amended to reflect what's actually in

18  evidence.  But what we would like to do is move for its

19  admission in sort of a placeholder capacity now just so that

20  it's of record, and then once we've corrected it to conform to

21  the evidence, we can submit that, certainly subject to any

22  objections from the other side.

23              THE COURT:  271?

24              MR. POTTER:  Yes, sir.  I have a copy here if you want

25  me just to hand it up.

1          THE COURT:  All right.  Tell you what, I think this

2     would basically be a demonstrative in any event, so why don't

3     you file something that conforms to the evidence in your view

4     by tomorrow, and I'll take it for what it's worth and consider

5     it in conjunction with the evidence that has come in.  But I

6     don't think it needs to be admitted as a separate exhibit, all

7     right.

8          MR. POTTER:  Thank you, your Honor.

9          THE COURT:  Anything else of that nature?

10          MR. BRESSLER:  Well, I can go on about how this is

11     inaccurate, your Honor, but the evidence will speak for itself.

12          THE COURT:  That it will.

13          All right.  So let's talk about the question of what,

14     if any, briefing would be helpful to me.  I think the short

15     answer is that I am inclined to have you -- and I don't want

16     you to read into this in any respects, but simply to preserve

17     my full range of options -- brief the issue of remedies in the

18     event that I find that plaintiffs have proved some of their

19     claims.

20          There are a few issues that I want to cover.  One is

21     the question of whether the request for injunctive relief is

22     moot in light of the testimony and evidence that Excell is

23     essentially no longer a going concern.  I know there's some

24     evidence, don't know how much and whether I can consider it for

25     the truth, with respect to that new entity Mirage, or whatever

1    it's called, but -- and, obviously, some evidence in the record

2    with respect to the MD Distributors case, but I guess the

3    question I have is whether there's any basis to grant

4    injunctive relief under the circumstances?

5         Second, more broadly -- or not more broadly, second is

6    just damages issues.  I think it would be helpful to get your

7    views on the implications and significance of the profit and

8    loss statements and the testimony from Mr. Pfau.  I would ask

9    you to address a few issues in that regard.  The threshold one

10   is whether and to what extent testimony and the exhibits are

11   things that I can and should consider.  Candidly, I have some

12   doubt whether the foundation, proper foundation, was in fact

13   ultimately laid under Rule 803(6) and whether they are

14   sufficiently reliable, whether there's any testimony concerning

15   how the data was -- the underlying data was created, and

16   whether it would satisfy the rule.  I'm not saying I will

17   ultimately come out that way, but I do think it's an issue and

18   think you should address it.  Now, assuming that I do consider

19   it, then it would be helpful to have your views on what

20   significance it has and how it factors into the analysis with

21   respect to calculation of profits and deductions for costs, and

22   the like.

23        Relatedly, you should address essentially whether

24   that's an all-or-nothing determination.  That is to say, if,

25   for example, there were certainly lines of cross-examination --

1    and, again, I don't want you to read too much into what I'm

2    asking you to do -- but there were lines of cross-examination

3    regarding costs that I think the argument was being made

4    through the questions that there were certain costs that

5    essentially were incorporated into the calculations that were

6    not properly allocable to the products at issue in this case.

7    Assuming I agree with that, what is the end result of that?  Do

8    I -- if it's not possible to disaggregate what things are

9    allocable and what things are not allocable, what does one do

10   with that if there is evidence that certain costs -- that there

11   are costs and in theory would be costs that could be deducted,

12   but the evidence might not be clear with respect to what costs

13   can and cannot.  So I guess, again, the question is whether the

14   defendant's burden on that score is essentially an

15   all-or-nothing one and is it possible to pinpoint or identify

16   with any precision what the relevant costs are, what

17   significance that has.  It would be helpful to just brief those

18   issues and, just more generally, sort of what your view is on

19   damages.

20            Let me ask you, Mr. Bressler, are you arguing laches?

21   I know it's certainly in the pretrial memoranda, but I have a

22   question if you are.

23            MR. BRESSLER:  Yes, your Honor.

24            THE COURT:  All right.  So my question is, in light of

25   the testimony this morning that Excell is no longer in

1    business, that it went out of business, and that its

2    dissolution has absolutely nothing to do with this case, how

3    could you actually show prejudice -- assuming I found there was

4    any delay in bringing suit, what's the prejudice to Excell?

5              MR. BRESSLER:  That they continued in -- not towards

6    the injunction, towards damages, your Honor.  That they waited

7    all this time while they kept on -- while they were selling

8    under the belief, having been based -- going back to MD, that

9    using "our version" was OK when nobody told them, "Hey, this is

10   not OK," with all the changes that were made by Hamerling at MD

11   to what he was selling here.

12             THE COURT:  What about the fact that, I think, if I

13   remember correctly, until December -- well, let me put it this

14   way:  The filing of the lawsuit didn't have any impact on

15   Excell's continuing sales in that regard.  It suggests that

16   they would have continued to sell regardless, no?

17             MR. BRESSLER:  Well, they would have changed.

18             THE COURT:  But they didn't change even upon filing of

19   the lawsuit here.

20             MR. BRESSLER:  They offered to change.  There would

21   not be discussions.  They sold out what they had, and they

22   didn't order anymore.

23             MS. PEARSON:  Your Honor, that is not a fair

24   characterization of the evidence.

25             THE COURT:  All right.  Well, that'll be for me to

1    decide.

2              All right.  Well, that's helpful.  I'm a little

3    skeptical.

4              MR. BRESSLER:  By the way, your Honor, it goes a

5    little more than that.  When you're talking about damages, it's

6    how egregious is the conduct?  How egregious can the conduct

7    have been if Hamerling goes and makes all those changes from

8    what he was saying, GK One to CK New York, all the changes and

9    kept on selling and got them sold?  And, by the way, if you

10   look at this packaging, I think there's a very strong case

11   there is no likelihood of confusion.  They can continue doing

12   something that is appropriate to do which they basically

13   blessed in MD and in which they were told in -- I know it's not

14   from them, but they see from other people that they're allowed

15   to keep on selling "our versions of."  So it's not such bad

16   egregious conduct, so it's not just laches; so it's looking to

17   the conduct of the defendant.

18             THE COURT:  Understood.  Speaking of the products, I

19   would like to keep those until I've resolved and issued my

20   decision.  I think it would be helpful to have the actual

21   packaging with me.  So if you guys could box those up and

22   provide them to me or my staff, that would be helpful.

23             MR. BRESSLER:  A suggestion, your Honor, since they

24   were next door to my office, all of them combined, and

25   Mr. Miller's office, keep them in a sealed place, all of them.

1              MS. PEARSON:  Your Honor, may I just make one basic

2      point, please, on this argument that Mr. Hamerling's line at MD

3      Distributors included GK One.  There is no foundation for that

4      whatsoever.  What I was objecting to during the testimony is

5      that MD Distributors sold a variety of different products, and

6      there's no proof that GK One is the product that was

7      manufactured by MD Distributors or was part of the alternative

8      line of fragrances that Wayne Hamerling himself supervised at

9      MD Distributors.  And you'd have to look at Mr. Hamerling's

10     deposition on the topic of his limited testimony that we were

11     allowed to get with respect to MD Distributors, but there's

12     nothing in there whatsoever about GK One at all.  There's no

13     testimony that Mr. Hamerling relied on the MD Distributors

14     consent agreement.  So there's a lack of foundation to tack any

15     laches argument back to the MD Distributors consent agreement

16     which was, in any event, not entered by all of the parties --

17     all of the plaintiffs here.

18              THE COURT:  All right.  I've heard enough on that

19     issue.  My last question for plaintiffs has to do with the

20     claims under Section 349 and 350 of the New York General

21     Business Law.  Correct me if I'm wrong, but those require proof

22     of injury if not to the plaintiff, then to -- well, I think it

23     requires proof of injury to the plaintiff, and it isn't

24     sufficient to show that the consuming public may have been

25     harmed.  Is that correct, and if so, is there evidence to

1   support those claims here?  And if not, are you pursuing them?

2          MS. PEARSON:  I'll take a closer look at it, your

3   Honor.  Certain sections of the New York law are really just

4   subsumed in the Lanham Act claim.  The one that's the

5   standalone New York claim that may provide some additional

6   relief is the New York dilution statute.

7          THE COURT:  Understood.  I'm not asking about that at

8   the moment, but I guess take a look at those and tell me if you

9   are pursuing them or not.  I think they are slightly different

10  than the Lanham Act analogue, and it might be that those

11  differences are material here, shall we say.

12         So let's talk about timing on briefs with respect to

13  damages.  I will tell you that we are already working on a

14  decision, and in that regard, I really don't want to give you a

15  whole lot of time because the longer it takes you, the less

16  fresh these matters will be in my mind.  So I'm inclined to

17  give you a week to submit briefs on damages.  Any objection?

18         MS. PEARSON:  We can work within that time frame, your

19  Honor.  There's one additional legal issue that I thought we

20  might be able to give you some helpful authority on with

21  respect to the survey evidence and, in particular, the control

22  used by Dr. Rappeport.

23         THE COURT:  Is there additional authority beyond what

24  you've cited in your pretrial memoranda and proposed findings

25  of fact and conclusions of law?

1          MS. PEARSON:  There may be, your Honor, but it just

2     seemed like an issue that came up on the cross of Dr. Rappeport

3     that the Court might use some legal authority on.

4          THE COURT:  Can you spell that out a little more?  I

5     think that ground is covered pretty substantially in your

6     pretrial submissions, so I'm just not sure how helpful it is,

7     unless you can spell something out for me.

8          MS. PEARSON:  OK.  Sitting here right now, I can't

9     cite a case to you, but I know that there is case law

10     concerning appropriate controls that I believe would

11     demonstrate that Dr. Rappeport used an appropriate control.

12          THE COURT:  All right.  I think that you've had an

13     opportunity to brief those issues.  I'm not sure that I need it

14     or it would be particularly helpful, so I'll decline that

15     invitation.

16          Anything from your end, Mr. Bressler?

17          MR. BRESSLER:  Your Honor, could we have till a week

18     from Friday?  I have crazy next -- till Wednesday.  If you

19     really need it, we'll do it, but --

20          THE COURT:  I'm afraid that I really need it.

21          MR. BRESSLER:  We'll get it to you on Wednesday.

22          THE COURT:  The problem is, and just to be candid, as

23     you know, the Passover holiday's the following week, and I'm

24     then -- not saying I'm not going to do any work over those two

25     weeks, but largely will be occupied with other matters, shall

1   we say, during that time.  So it will make it a lot easier for

2   me if I can get it before I leave and have an adequate amount

3   of time to think about it before these issues are no longer in

4   my head.

5           MR. BRESSLER:  Wednesday close of business?

6           THE COURT:  Yes.

7           MR. BRESSLER:  Thank you.

8           THE COURT:  Anything else?

9           MR. BRESSLER:  That's it.

10          THE COURT:  Well, if it's not abundantly clear, I will

11   reserve decision, and I will give you a ruling when I can, as

12   soon as I can.  And in the meantime, tomorrow you are to file

13   briefs on the Rule 26 issues raised with respect to

14   Dr. Rappeport's affidavit and then the additional briefing by

15   next Wednesday.

16          MR. BRESSLER:  Thank you, your Honor.  I just want to

17   thank you.  It's always a pleasure to be able to try a case,

18   and it was a pleasure trying it in front of your Honor.  It was

19   very nice and even.  Thank counsel for plaintiffs.

20          THE COURT:  All right.  I'll assume everybody thanks

21   everybody, and --

22          MR. POTTER:  Your Honor, one point.  First, it was our

23   great pleasure as well.  I just want to make clear.

24          Secondly, Mr. Bressler said that briefs would be due

25   next Wednesday close of business.  Does that mean 5:00 o'clock?

1    Does that mean midnight on ECF?

2              THE COURT:  Close of business is 5:00 o'clock, I

3    think, under any conventional standard definition of the term.

4              MR. POTTER:  I'm not familiar with those businesses,

5    but --

6              THE COURT:  Yes.

7              MR. POTTER:  -- I just wanted to be certain it was a

8    5:00 o'clock deadline.

9              THE COURT:  Yes.  It is a legal fiction perhaps, but

10   that is correct.

11             MR. POTTER:  Thank you, your Honor.

12             MR. BRESSLER:  What time briefs tomorrow, your Honor?

13             THE COURT:  Tomorrow you can have until midnight.

14   I'll give you that.  Or 11:59, to be precise.

15             Thank you.  Have a good day.  And, again, if you could

16   box those up, we will put them in a sealed space, but it would

17   be helpful to have them.

18             MR. BRESSLER:  Thank you.

19             THE COURT:  Thank you.

20             (Adjourned)

21

22

23

24

25

```
 1                    INDEX OF EXAMINATION

 2   Examination  of:                        Page

 3   ANDREW PFAU

 4   Cross By Ms. Pearson . . . . . . . . . . . 381

 5   Redirect By Mr. Miller . . . . . . . . . . 436

 6   DAVID ROTTER

 7   Direct By Mr. Potter . . . . . . . . . . . 443

 8   Cross By Mr. Miller  . . . . . . . . . . . 448

 9   NICHOLAS FERULLO

10   Direct By Mr. Bressler . . . . . . . . . . 460

11   Cross By Ms. Pearson . . . . . . . . . . . 463

12   Redirect By Mr. Bressler . . . . . . . . . 496

13                    PLAINTIFF EXHIBITS

14   Exhibit No.                           Received

15    265, 267, and 270   . . . . . . . . . . . 377

16                    DEFENDANT EXHIBITS

17   Exhibit No.                           Received

18    DDD, EEE, FFF, and GGG   . . . . . . . . . 377

19    HHHH   . . . . . . . . . . . . . . . . . 462

20    C, CC, DD, EE, FF, GG, HH, II, and VV  . . . 462

21

22

23

24

25
```