USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 09/18/2017

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X
:
COTY INC., et al., :
:
Plaintiffs, :
:
-v- :
:
EXCELL BRANDS, LLC, :
:
Defendant. :
:
-----------------------------------------------------------------------X

15-CV-7029 (JMF)

OPINION AND ORDER

JESSE M. FURMAN, United States District Judge:

Imitation may well be the sincerest form of flattery, but if taken too far it can also be

costly. Plaintiffs in this case — Coty, Inc., Coty B.V., Calvin Klein Trademark Trust, Calvin

Klein, Inc., Calvin Klein Cosmetic Corporation, Vera Wang Licensing LLC, V.E.W., Ltd., and

Ate My Heart Inc. (collectively, "Coty") — are the producers or distributors of high-quality

fragrances associated with well-known brands, including Calvin Klein, Vera Wang, and Lady

Gaga. Defendant, Excell Brands, LLC ("Excell"), seeking to capitalize on the success of Coty's

well-known fragrances, produced cheap "versions" of Coty's fragrances, with similar names (for

example, "Possession" for "Obsession") and nearly identical packaging. Compounding matters,

Excell prominently included on its packaging Coty's own marks, albeit under words to the effect

of "Our Version Of" in comparatively smaller text.

Embittered rather than flattered, Coty brought various intellectual property claims — for

trademark infringement and unfair competition, trademark dilution, and false advertising, under

federal and New York law — against Excell. In March 2017, the Court held a three-day bench

trial on Coty's claims and Excell's defenses, after which the parties submitted additional post-

trial materials.  In this Opinion and Order, the Court provides its findings of fact and conclusions

of law.  At bottom, the Court concludes that Excell's imitation crossed the line from flattery to

infringement, dilution, unfair competition, and false advertising — but did not cross the line far

enough to constitute counterfeiting within the meaning of federal law.  Further, the Court finds

that Coty is entitled to both injunctive relief and monetary relief — in the form of Excell's

profits — but not to enhanced monetary relief.  Finally, the Court concludes that the case is not

an "exceptional" one warranting attorney's fees and prejudgment interest.

## FINDINGS OF FACT

Based on the evidence and testimony presented at trial, the Court makes the following

findings of fact by way of background.  The Court includes additional factual findings in the

context of the legal analysis below.

### A.  Coty's Fragrances

Coty manufactures, distributes, and markets high-end fragrances and other beauty

products.  (Pls.' Ex. 252 ("Tuil-Torres Direct") ¶¶ 7, 10; Pls.' Ex. 82).  To the extent relevant

here, Coty is either the owner or the exclusive licensee of a fragrance portfolio that includes the

Calvin Klein, Vera Wang, Lady Gaga, and Joop! fragrance brands.  (Docket No. 91 ("Stipulated

Facts") ¶¶ 6, 8-10; Pls.' Ex. 253 ("Conklin Direct") ¶¶ 2, 11).  In total, there are twenty-one

specific fragrances at issue in this case, each of which is branded with a house mark (such as

Calvin Klein, Vera Wang, Lady Gaga, and Joop!), as well as a product mark (such as

ETERNITY, Lovestruck, and FAME) that distinguishes the fragrances sold under a particular

house mark.  (Conklin Direct ¶ 11).[1]  In addition to the house and product marks, each of Coty's

---

[1]     Specifically, Coty manufactures, distributes, and markets the following fragrances at
issue: Calvin Klein Eternity Women (Pls.' Ex. 34); Calvin Klein Eternity Men (Pls.' Ex. 35);

fragrances can be identified by its packaging features, or trade dress, which also serves to identify the source of the product. Collectively, the house mark, product mark, and trade dress indisputably serve as source identifiers for Coty's products.

Coty has invested — and continues to invest — a significant amount of time and money creating, branding, launching, and marketing each of the fragrances in its portfolio. (*See* Pls.' Ex. 251 ("Singer Direct") ¶¶ 4-29 (detailing the lengthy process for developing and launching a fragrance and its packaging)). For example, developing a fragrance's "juice" — the scented liquid applied to the skin — is a laborious process that involves sourcing the proper essential oils from fragrance houses and extensive laboratory testing. (*Id.* ¶¶ 15-16). In addition, development of a fragrance's packaging can be a multi-year process, as Coty tries to create new designs that will differentiate its fragrances from those of its competitors. (*Id.* ¶ 11). Once the fragrance and packaging are produced, Coty also engages in significant and expensive marketing and advertising campaigns for each of its fragrances. (*Id.* ¶¶ 18-24). For example, between 2002 and 2015, Coty spent over $658 million advertising and promoting its Calvin Klein fragrances, over $114 million advertising and promoting its Vera Wang fragrances, over $14 million advertising and promoting its Lady Gaga fragrances, and over $13 million advertising and promoting its Joop! fragrances. (Pls.' Ex. 78).

---

Calvin Klein Eternity Aqua (Pls.' Ex. 36); Calvin Klein Euphoria Women (Pls.' Ex. 38); Calvin Klein Euphoria Men (Pls.' Ex. 37); Calvin Klein Obsession Women (Pls.' Ex. 42); Calvin Klein Obsession Men (Pls.' Ex. 43); Calvin Klein Dark Obsession (Pls.' Ex. 44); CK One (Pls.' Ex. 41); CK One Shock Women (Pls.' Ex. 39); CK One Shock Men (Pls.' Ex. 40); CK IN2U Women (Pls.' Ex. 45); CK IN2U Men (Pls.' Ex. 52); Downtown Calvin Klein (Pls.' Ex. 50); CK One Summer (Pls.' Ex. 51); CK Be (Pls.' Ex. 53); Vera Wang Princess (Pls.' Ex. 48); Vera Wang Lovestruck (Pls.' Ex. 49); CKfree Blue (Pls.' Ex. 54); Lady Gaga Fame (Pls.' Ex. 46); and Joop! Homme (Pls.' Ex. 47).

As a result of these efforts, Coty's fragrances are some of the most popular and recognizable in the fragrance market. Between 2002 and 2015, Coty's net sales for its Calvin Klein fragrances totaled over $2.2 billion, for its Vera Wang products over $296 million, for its Lady Gaga products over $28 million, and for its Joop! line over $188 million. (Pls.' Ex. 78). Coty's products have also received significant media attention. (*See, e.g.*, Pls.' Exs. 100-5 through 100-9, 122, 138-3). Some of Coty's products are so successful that the company has produced "flankers" for the products — that is, new fragrances that share certain characteristics and branding with the original fragrance. (Singer Direct ¶¶ 30-32). For example, Coty has produced flankers for several of Calvin Klein's pillar fragrances: Dark Obsession (flanking Obsession), Eternity Aqua (flanking Eternity), CK One Shock (flanking CK One), and CK Free Blue (flanking CK Free). (*Id.*).

**B. Excell's Fragrances**

Excell's business model is, to put it mildly, a bit different. Until December 2016, Excell concededly manufactured and distributed knockoff fragrances. To the extent relevant here, one of its collections — designated the "Diamond Collection" — offered "versions" of Calvin Klein, Vera Wang, Lady Gaga, and Joop! fragrances. (Stipulated Facts ¶ 33). Excell did not receive authorization from Coty to sell any of its fragrances, and it has not paid Coty any royalties or other payments in connection with its sale of those fragrances. (*Id.* ¶¶ 29-30).

Excell explained the process by which it decided which branded fragrances to mimic for its Diamond Collection as follows: "First, it [sought] original fragrances with a high retail price to create a differential between the retail prices of its alternative fragrance and the original product. Second, it [sought] a product that [would] be understood by its customer base of 'lower income, sometimes ethnic customers.'" (*Id.* ¶ 38). After selecting a fragrance to emulate, Excell

then chose a product name for its alternative fragrance that would evoke the name of the original fragrance. (Ferullo Dep. 107 ("We choose names that are similar but different obviously from the original, we want to have the customer understand what they are buying.")). In creating the juice for its alternative fragrances, Excell did not make any meaningful effort to replicate the scent of Coty's products. Instead, using only their own noses and reviews of the original fragrances, Excell employees made broad recommendations to the company's supplier in India, which then manufactured the alternative fragrances and packaging. (Ferullo Dep. 228 ("If an item is citrusee or if it is sweet we want the version of to be citrusee or sweet.")). Excell often sent its suppliers the original fragrance (or a picture of the fragrance) it sought to emulate along with instructions on how to emulate it. (Ferullo Dep. 33-36; Pls.' Exs. 190, 198). Before a fragrance went into production, however, Excell typically reviewed, revised, and approved the bottle, box, and juice. (Ferullo Dep. 130-31, 134). Indeed, the company frequently made changes to the products so that the packaging of its knockoffs would more closely resemble Coty's original branded fragrances. (*See, e.g.*, Pls.' Exs. 190, 194; Stipulated Facts ¶ 28). Notwithstanding its involvement in the process, however, Excell had no first-hand knowledge of the chemical composition or ingredients of its products; nor did it have any meaningful quality assurance program. (Docket No. 65 at 6-7, 10; Ferullo Dep. 181 ("The salespeople will decide whether or not the product matches the design that we had discussed, if the box has a nice appearance to it, if the bottle looks great, if the juice smells good. That is it really.")).

Appendix A depicts the packaging of each Diamond Collection fragrance at issue in this case alongside the packaging of the Coty fragrance Excell sought to emulate. Significantly, on the front of each of its Diamond Collection fragrance boxes, Excell included a legend stating that

the fragrance was "Our Version Of" the relevant Coty product. (Stipulated Facts ¶ 20). For example, Excell's Serenity fragrance had the following legend on its front:



(Pl.'s Ex. 56). Relatedly, on the back of each Excell box appeared the words "Not Associated With The Makers Of," followed by reference to the relevant Coty product. (Stipulated Facts ¶ 39). Again, by way of example, the following is a picture of the text from the Serenity fragrance packaging:



(Pl.'s Ex. 56).  Significantly, in both legends, Excell replicated Coty's relevant house and product marks.  Moreover, Coty's marks were depicted more prominently than the other text. On the top of each box, in comparatively smaller lettering, Excell included its own brand name: Diamond Collection Luxurious Fragrances.  (*See id.*).

As a general matter, Excell did not advertise or market its products directly to consumers. (*See* Pls.' Ex. 174).  Instead, the company sold its Diamond Collection products primarily to traditional retailers and discount chains, such as Kmart, Dollar General, and Ross Stores. (Conklin Direct ¶¶ 25, 28).  Its products can also be purchased through online marketplaces, including Amazon and eBay.  (*Id.* ¶ 26).

## C.  Excell's Current Status

In 2015, several of Excell's principals and employees were indicted in the United States District Court for the District of New Jersey with money laundering and other offenses.  (*See* Pls.' Ex. 171 ("Criminal Complaint")).  The gravamen of the charges is that the defendants laundered money through Excell for the benefit of certain Latin American drug cartels.

(Bronsnick Dep. Resp. 73; Criminal Complaint).  One former Excell employee, Wayne Bronsnick, pleaded guilty.  (Bronsnick Dep. Resp. 121).  As of the trial in this matter, charges remained pending against, among others, Excell's President, Wayne Hamerling, and its Wholesale Sales Manager, Luis Rodriguez.  (*See* Criminal Complaint).  Not surprisingly, therefore, all three invoked their privilege against self-incrimination in these proceedings and refused to answer any substantive questions, either during discovery or at trial.  (*See, e.g.*, Bronsnick Dep. Resp. 37, 43; Rodriguez Dep. 29-53; Hamerling Dep. 40-45).

In part because of these criminal charges, Excell shut down its business operations and ceased selling its fragrances in December 2016.  (Tr. 383-84 (testimony of Andrew Pfau that, "[s]ince early December [Excell] has . . .  no inventory, has not sold anything, has not conducted any business other than winding down operations"); Tr. 391 (Pfau acknowledging that the criminal charges influenced the decision to shut down the company)).  It is allegedly now in the process of "winding down operations," although it has not yet fully dissolved.  (*Id.* at 383-84).  Notably, the company's decision to cease its business operations was entirely unrelated to the instant lawsuit.  (*Id.* at 384-85 (testimony of Pfau that "[the lawsuit] really didn't have any [impact on the decision to cease operations].  It would have happened regardless.")).

## CONCLUSIONS OF LAW

Coty presses three categories of claims against Excell.  First, Coty brings trademark infringement claims under both federal and New York law.  (Docket No. 92 ("Pls.' Mem.") 3-17).  Second, Coty alleges that Excell's use of its marks constitutes trademark dilution under both federal and New York law.  (*Id.* at 17-20).  And third, Coty contends that Excell's use of the "Our Version Of" Legend on its fragrance packaging gives rise to a false advertising claim under

8

federal and New York law. (*Id.* 20-23).[2] Excell, for its part, invokes the doctrine of nominative

fair use, and claims the affirmative defense of laches. (Docket No. 98 ("Def.'s Mem.") 14, 36).

Because the latter is Defendant's sole affirmative defense, the Court pauses briefly to address it

first. The Court then turns to Coty's claims, followed by a discussion of remedies.

## A.  Excell's Laches Defense

The basic elements of laches are well established: "(1) the plaintiff knew of the

defendant's misconduct; (2) the plaintiff inexcusably delayed in taking action; and (3) the

defendant was prejudiced by the delay." *Ikelionwu v. United States*, 150 F.3d 233, 237 (2d Cir.

1998). Applying those elements here, Excell's laches argument fails for three reasons. First, "it

is well established that laches is not a defense against injunctive relief when the defendant

intended the infringement." *Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 107

(2d Cir. 2000) (internal quotation marks omitted); *Victorinox AG v. B & F Sys., Inc.*, 114 F.

Supp. 3d 132, 136 (S.D.N.Y. 2015) ("[A] laches defense is not available to a defendant who

intentionally traded off the plaintiff's name and protected products." (internal quotation marks

and brackets omitted)). This "good-faith component of the laches doctrine is part of the

fundamental principle that he who comes into equity must come with clean hands." *Hermes*, 219

F.3d at 107 (internal quotation marks omitted). As discussed in more depth below, the Court

finds that Excell acted in bad faith and set out to intentionally infringe Coty's source identifiers.

(*See* Section B.2.e). It follows that laches is not available to Excell as a defense.

Second, and in any event, the Court finds that Coty did not unreasonably delay in seeking

to enforce its rights, as required for the laches defense. Significantly, Coty's lawsuit was

---

[2]      Coty also alleged violations of Section 349 and 350 of the New York General Business
Law in its Complaint, but it agreed not to pursue those claims. (Docket No. 143). Accordingly,
they are dismissed as withdrawn.

initiated on September 4, 2015, well within the applicable six-year statute of limitations.  (*See* Docket No. 1 ("Complaint"); Def.'s Mem. 4 (noting that Excell was founded in April 2010)).  Thus, "there is no presumption of laches and the burden remains on the defendant to prove the defense."  *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 191 (2d Cir. 1996); *see also Gross v. Bare Escentuals Beauty, Inc.*, 641 F. Supp. 2d 175, 196 (S.D.N.Y. 2008) ("Since there is no statute of limitation in the Lanham Act, courts apply the analogous statute of limitations from the forum state. . . .  New York's analogous state statute is the six-year statute of limitations for fraud." (citation omitted)); *cf. SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod., LLC*, 137 S. Ct. 954, 959 (2017) ("Laches . . . cannot be invoked to bar legal relief in the face of a statute of limitations enacted by Congress." (internal quotation marks and brackets omitted)).  Moreover, Coty had "no obligation to sue until the likelihood of confusion loom[ed] large and [its] right to protection [had] clearly ripened."  *ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic & Sports Physical Therapy P.C.*, 314 F.3d 62, 68 (2d Cir. 2002) (internal quotation marks omitted).  Here, Coty demonstrated that Excell's sales were relatively insignificant during its first few years of operation and that Excell's marketing efforts to its retailers were less focused on the Coty knockoffs during that time.  (Pls.' Exs.  244).  Put another way, Coty was not aware of the full scope of Excell's allegedly infringing conduct until later (and then reasonably delayed bringing suit in part to see how a related lawsuit, *Polizzi v. Excel Brands LLC*, 13-CV-6146 (S.D.N.Y.), proceeded.  (Conklin Direct ¶ 39).[3]  Accordingly, the Court finds that Coty did not unreasonably delay bringing suit.

---

[3]     For reasons that are not clear, Excell's name was spelled with only one "l" in the *Polizzi* case.  There is no dispute, however, that the parties are one and the same.

Finally, even if Excell could show unreasonable delay, it failed to produce evidence of prejudice. Prejudice "may be found where the junior user took affirmative steps to increase its use of the mark during and in reliance on the senior user's period of delay, and that unwinding those actions would require it to reorganize its business or reeducate the public as to its product if restrained from using the mark." *Gucci Am., Inc. v. Guess?, Inc.*, 868 F. Supp. 2d 207, 244 (S.D.N.Y. 2012) (internal quotation marks omitted); *see also Conopco*, 95 F.3d at 192 (noting that prejudice may be found "when a defendant has changed his position in a way that would not have occurred if the plaintiff had not delayed" (internal quotation marks omitted)). In this case, Excell did not "change its position" in any manner due to Coty's lawsuit. Indeed, by its own admission, the filing of the lawsuit had no effect on its operations. Excell continued to sell its knockoffs long after Plaintiffs filed suit. (Ferullo Dep. 79-80). And while it did cease producing the products at issue in December 2016, and is now in the processing of "winding down," those developments were due to the criminal charges in New Jersey and the breakdown of negotiations to be acquired by a third party; as Excell conceded, this lawsuit had nothing to do with them. (*See* Docket No. 81; Tr. 384-85 (testimony of Pfau noting that Coty's lawsuit had no effect on Excell's decision to shut down its operations)). Put simply, any conceivable prejudice was mooted when Excell decided, for reasons unrelated to this case, to cease its operations and stop using its brands.

**B. Trademark Infringement and Unfair Competition**

The Court turns, then, to Coty's trademark infringement claims under Sections 32(1) and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114(a), 1125(a), and its unfair competition claim under New York law. Section 32(1) of the Lanham Act prohibits the "use in commerce . . . of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any

goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a). Section 43(a) prohibits the "use[] in commerce [of] any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." 15 U.S.C. § 1125(a)(1)(a). In this case, Coty alleges that Excell violated these provisions and the New York law of unfair competition by misappropriating, for each fragrance involved, Coty's (1) house mark (*e.g.*, Calvin Klein); (2) its product mark (*e.g.*, OBSESSION); and (3) its trade dress, which "encompasses the design and appearance of the product together with all the elements making up the overall image that serves to identify the product presented to the consumer." *Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 999 (2d Cir. 1997). (Docket No. 105 ("Pls.' Resp. Mem.") 1).

Courts analyze claims under Sections 32(1) and 43(a) of the Lanham Act by applying a "familiar two-prong test." *Gucci*, 868 F. Supp. 2d at 237 (internal quotation marks omitted). Courts use the same standards to evaluate unfair competition claims under New York law, except that a plaintiff must prove "bad faith" in order to prevail under New York common law. *See, e.g.*, *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 538 (S.D.N.Y. 2011); *Twentieth Century Fox Film Corp. v. Marvel Enters., Inc.*, 155 F. Supp. 2d 1, 25 (S.D.N.Y. 2001). The first prong of the test asks "whether the plaintiff's mark is entitled to protection." *Gucci*, 868 F. Supp. 2d at 237 (internal quotation marks omitted). A mark is entitled to protection if it is either inherently distinctive or has acquired distinctiveness through

secondary meaning. *See, e.g., Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992). In the case of trade dress, the plaintiff must also demonstrate that the trade dress at issue is nonfunctional. *See Fun-Damental*, 111 F.3d at 999. Under the Lanham Act, an incontestable registration — defined as a mark that "has been in continuous use for five consecutive years" after the date of registration and is still being "use[d] in commerce" — is conclusive evidence of a plaintiff's exclusive right to use the specific mark or trade dress, unless the defendant can establish one of the statute's affirmative defenses (none of which, in light of the Court's decision above regarding laches, is relevant here). 15 U.S.C. § 1065; *see id.* § 1115(b). Meanwhile, registrations that are not incontestable are still "*prima facie* evidence of the validity of the registered mark and . . . of the registrant's exclusive right to use the registered mark," subject to defenses also not relevant here. *Id.* § 1115(a).

Absent federal registration, courts must assess where a particular mark or trade dress falls on Judge Friendly's ascending spectrum of distinctiveness: generic, descriptive, suggestive, and arbitrary or fanciful. *See Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976); *accord Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 871 (2d Cir. 1986). Suggestive and arbitrary or fanciful marks are considered inherently distinctive and protected, but a descriptive mark will "be protected only if it has acquired secondary meaning." *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1076 (2d Cir. 1993). Secondary meaning attaches to a mark when "the consuming public primarily associates the term with a particular source." *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1040 (2d Cir. 1992). In analyzing secondary meaning, courts generally consider six factors: "(1) the senior user's advertising and promotional expenses; (2) consumer studies linking the name to the source; (3) the senior user's sales success; (4) third-party uses and attempts to plagiarize the

mark; (5) length and exclusivity of the mark's use; and (6) unsolicited media coverage of the products at issue." *Mobileye, Inc. v. Picitup Corp.*, 928 F. Supp. 2d 759, 779 (S.D.N.Y. 2013) (internal quotation marks omitted).

The second prong of the infringement test asks whether the defendant's "use of the mark is likely to cause consumer confusion as to the origin or sponsorship of the defendant's goods." *Gucci*, 868 F. Supp. 2d at 237 (internal quotation marks omitted). Indeed, "[t]he crucial issue in an action for trademark infringement is whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Savin Corp. v. Savin Grp.*, 391 F.3d 439, 456 (2d Cir. 2004) (internal quotation marks and alterations omitted). Significantly, in addition to confusion arising at the point of sale, courts recognize, and Coty alleges, two other types of confusion: initial-interest and post-sale confusion. The former occurs when "potential consumers initially are attracted to the junior user's mark by virtue of its similarity to the senior user's mark, even though these consumers are not actually confused at the time of purchase." *Jordache Enters., Inc. v. Levi Strauss & Co.*, 841 F. Supp. 506, 514-15 (S.D.N.Y. 1993). That is, initial-interest confusion "creates initial customer interest, even if no final sale is completed as a result." *Clinique Labs., Inc. v. Dep Corp.*, 945 F. Supp. 547, 551 (S.D.N.Y. 1996); *accord Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 260 (2d Cir. 1987); *see also, e.g.*, *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons,* 365 F. Supp. 707, 717 (S.D.N.Y. 1973) (finding the value of Steinway's trademark to be harmed where potential purchasers of Steinway pianos were initially interested in Grotrian-Steinweg pianos because of the name), *aff'd* 523 F.2d 1331, 1342 (2d Cir. 1975). By contrast, post-sale confusion occurs (as its name suggests) after a sale is completed. *See, e.g.*, *Clinique,* 945 F. Supp. at 551. Post-sale confusion

may be present "when a manufacturer of knockoff goods offers consumers a cheap knockoff copy of the original manufacturer's more expensive product, thus allowing a buyer to acquire the prestige of owning what appears to be the more expensive product." *Hermes*, 219 F.3d at 108.

To determine whether there is a likelihood of confusion, courts in this Circuit have long applied the eight-factor balancing test first articulated by Judge Friendly in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961). The eight so-called *Polaroid* factors are: (1) the strength of the trademark; (2) the similarity of the marks; (3) the proximity of the products and their competitiveness with one another; (4) evidence that the senior user may "bridge the gap" by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) the respective quality of the products; and (8) the sophistication (or lack thereof) of consumers in the relevant market. *See Star Indus., Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 384 (2d Cir. 2005). Application of the *Polaroid* test is "not mechanical, but rather, focuses on the ultimate question of whether, looking at the products in their totality, consumers are likely to be confused." *Id.*

### 1. Protection of Coty's Source Identifiers

As an initial matter, Coty's source identifiers are plainly entitled to protection under the first prong of the infringement test. Notably, Excell concedes that — with one exception — all of "Plaintiff's marks are distinctive." (Def.'s Mem. 29). The one exception is the mark HOMME, a fragrance produced by Joop!, which, Excell argues, "means" men in French "and is descriptive." (Def.'s Mem. 6). But Coty does not allege infringement of the HOMME mark on its own; instead, it alleges impermissible use of the HOMME mark in conjunction with the house mark Joop! and the cologne's trade dress. Regardless, Excell's descriptiveness argument falls

short.  The Second Circuit has explained that "[a] term is suggestive" — and thus inherently

distinctive — "if it requires imagination, thought and perception to reach a conclusion as to the

nature of goods."  *Bernard v. Commerce Drug Co.*, 964 F.2d 1338, 1341 (2d Cir. 1992) (internal

quotation marks omitted).  By contrast, "[a] term is descriptive" — and thus not inherently

distinctive — "if it forthwith conveys an immediate idea of the ingredients, qualities or

characteristics of the goods."  *Id.* (internal quotation marks omitted)  The fact that HOMME is

French for "man" may or may not be known to the general consumer encountering the cologne,

but either way it does not convey "an immediate idea of the ingredients, qualities or

characteristics" of the fragrance at issue.  *Id.*  Instead, it "requires imagination, thought and

perception to reach [the] conclusion" that HOMME is not just a cologne, but a cologne targeting

men.  *French Transit, Ltd. v. Modern Coupon Sys., Inc.*, 818 F. Supp. 635, 637 (S.D.N.Y. 1993)

(finding suggestiveness when "there is no evidence in the record that the term 'LE CRYSTAL

NATUREL' conveys the character or quality of plaintiff's product to persons who have never

seen the product and who do not know what it is.  We believe that the average consumer who has

never heard of plaintiff's product would have to use his or her imagination to determine that LE

CRYSTAL NATUREL is a body deodorant.").  The Court therefore concludes that all of Coty's

marks qualify for trademark protection.

Even without Excell's concession as to the marks, Coty has established the

distinctiveness of both the marks and trade dresses it seeks to protect in this case.  Coty is

seeking to enforce its exclusive rights in twenty-eight registered trademarks and trade dresses,

twenty-one of which are the subject of incontestable registrations.[4]  Meanwhile, Coty's seven

---

[4]      Specifically, Coty's incontestable registrations are as follows: OBSESSION (Reg. No. 0,407,245), CALVIN KLEIN (Reg. No. 1,086,041), CALVIN KLEIN (Reg. No. 1,226,396),

registered trademarks that are not incontestable[5] are presumed to be distinctive and, given that

Excell does not present any evidence to rebut the presumption, are protected. *See, e.g.*, *Lois*

*Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 871 (2d Cir. 1986) ("[R]egistered

trademarks are presumed to be distinctive and should be afforded the utmost protection."). In

addition to these twenty-eight registered trademarks, Coty seeks to enforce its rights in two

unregistered marks and thirteen unregistered trade dresses. (Pls.' Mem. 5; Pls.' Ex. 1). The two

unregistered marks — LADY GAGA and LADY GAGA FAME — are descriptive marks that

have plainly achieved secondary meaning as they function as distinctive source identifiers for the

eponymous entertainer Lady Gaga and her fragrance line. That secondary meaning has attached

to the Lady Gaga marks is not — and cannot be — disputed. (Def.'s Mem. 6; *see also* Tr. 83

(testimony of Robert Campbell, manager for Lady Gaga, describing her fame)).

Finally, contrary to Excell's assertions, Coty's thirteen unregistered trade dresses also

satisfy the first prong of the infringement test. Courts assess a product's "trade dress

distinctiveness by looking at all its elements and considering the total impression the trade dress

gives to the observer." *Fun-Damental*, 111 F.3d at 1001. Because "the varieties of labels and

---

OBSESSION (Reg. No. 1,347,076), OBSESSION (Stylized) (Reg. No. 1,435,231), ETERNITY (Stylized) (Reg. No. 1,608,723), ETERNITY Bottle Design (Reg. No. 1,608,753), CK ONE (Stylized) (Reg. No. 1,946,318), CK ONE CALVIN KLEIN & Design (Reg. No. 1,969,912), CK (Stylized) (Reg. No. 2,064,064), CK (Stylized) (Reg. No. 2,234,623), CK FREE (Stylized) (Reg. No. 3,756,039); CK ONE (Reg. No. 3,916,700), EUPHORIA BLOSSOM (Reg. No. 3,455,523), EUPHORIA (Reg. No. 3,786,226), IN2U (Reg. No. 3,804,964), VERA WANG (Reg. No. 1,797,058), VERA WANG & Design (Reg. No. 3,110,991), VERA WANG PRINCESS (Reg. No. 3,184,309), LADY GAGA (Reg. No. 3,695,038), and LADY GAGA (Reg. No. 3,695,129). (Pls.' Exs. 3-10, 12-17, 19-21, 27-29, 33).

[5]    Coty's registered marks that are not yet incontestable are as follows: CK ONE SHOCK (Reg. No. 4,126,963), DARK OBSESSION (Reg. No. 4,426,346), LADY GAGA (Reg. No. 3,960,468), JOOP! (Reg. No. 4,520,669), JOOP! HOMME WILD (Reg. No. 4,682,626), VERA WANG LOVESTRUCK (Reg. No 4,032,409), and DOWNTOWN CALVIN KLEIN (Reg. No. 4,558,645). (Pls.' Exs. 11, 18, 22, 25, 26, 30, 31).

packaging available to wholesalers and manufacturers are virtually unlimited . . . . , a product's trade dress typically will be arbitrary or fanciful and meet the inherently distinctive requirement." *Id.* at 1000. Here, Coty's unregistered trade dresses all consist of original, detailed, and specific fragrance packaging combinations, and thus merit trade dress protection. For example, Coty seeks trade dress protection for its Calvin Klein ONE SHOCK fragrance, which combines (1) an opaque black bottle; (2) a black cap; (3) a CK mark displayed in standard Calvin Klein logo lettering in simple typeface on the center potion of both the bottle and the packaging; and (4) the SHOCK name displayed in uppercase letter in neon green graffiti typeface below the CK mark on both the bottle and packaging. (Pls.' Ex. 1, at 5; *see* Appendix A). Although some individual features of a given fragrance — indeed, of all the fragrances Coty seeks to protect — may be common in the fragrance industry, "the impression given by all of [the features] in combination" is plainly inherently distinctive. *Fun-Damental*, 111 F.3d at 1001.

In arguing otherwise, Excell contends that Coty's bottles constitute product design trade dress, not product packaging trade dress, and "are only protectable as trade dress upon a showing of acquired distinctiveness." (Def.'s Mem. 21). It further argues that Coty is unable to show that the color of its bottles has acquired secondary meaning. (*Id.*). But, in so arguing, Excell ignores the fact that, while any one "element of a trade dress individually might not be inherently distinctive, it is the combination of elements that should be the focus of the distinctiveness inquiry." *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc*., 58 F.3d 27, 32 (2d Cir. 1995); *cf. Versace v. Versace*, No. 01-CV-9645 (PKL) (THK), 2003 WL 22023946, at *9 (S.D.N.Y. Aug. 27, 2003) ("Dissection of the mark into its various components is not appropriate, as it is the impression which the mark as a whole creates on the average reasonably prudent buyer and not the parts thereof which is important." (internal quotation marks and brackets omitted)). More

fundamentally, Excell cites no support for its contention that Coty's fragrance bottles should be deemed product design. (Def.'s Mem. 21). *See Paddington Corp. v. Attiki Imps. & Dists., Inc.*, 996 F.2d 577, 584 (2d Cir. 1993) (finding the trade dress of an alcoholic beverage bottle inherently distinctive); *Clinique*, 945 F. Supp. at 559 (finding the trade dress of fragrance packaging inherently distinctive).[6] Instead, Coty's trade dresses are plainly product packaging in that they refer "to the manner in which [the fragrances are] 'dressed up' to go to market with a label, package, display card, and similar packaging elements." *Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1005 (2d Cir. 1997).

Finally, even if a showing of secondary meaning were required, Coty presented evidence of secondary meaning in the form of sales success, advertising expenditures, unsolicited media coverage showcasing its marks and trade dresses, consumer studies linking the names to the source, and Excell's conscious imitation of its marks and trade dress. (*See, e.g.*, Pls.' Ex. 255 ("Rotter Direct") ¶ 7 (testifying that Coty's advertising and promotional expenditures for fiscal years 2006 through 2015 totaled over $658 million and its net sales during that period totaled over $2.2 billion for Calvin Klein and CK fragrances in the United States); Pls.' Exs. 93-2, 93-7, 93-8, 121 (advertisements showcasing Coty's trade dresses); Pls.' Exs. 100-5 through 100-9, 122 (media coverage showcasing various trade dresses); Pls.' Ex. 85-5 (highlighting consumer studies that underscore Plaintiffs' brand recognition)). *See, e.g.*, *Clinique*, 945 F. Supp. at 559 (finding that a skin care product had acquired secondary meaning after concluding that, some,

---

[6]     Excell also implies that Coty's designs may be functional (Def.'s Mem. 21), which, if true, would preclude trade dress protection. *See, e.g.*, *Fun-Damental*, 111 F.3d at 999 ("[A]n otherwise inherently distinctive trade dress is entitled to protection only if it is also nonfunctional."). But Excell expressly withdrew its defense of functionality. (*Compare* Docket No. 71 ("Answer to Amended Compls."), *with* Docket No. 91 ("Joint Pretrial Order") 4 ("Defendant no longer asserts defenses based on . . . the doctrine of functionality.").

but not all, of these factors were present). Indeed, Excell's entire business model rests on the distinctiveness of Coty's trade dress; the only reason Excell mimics Coty's fragrances is because the latter's products are distinctively identifiable in the minds of consumers. *See N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 330 (S.D.N.Y. 2010) ("[I]ntentional copying is persuasive evidence of secondary meaning.").

## 2. Likelihood of Confusion

Thus, the Court turns to whether Excell's knockoffs are likely to cause consumer confusion under the *Polaroid* test. Strictly speaking, that analysis calls for consideration of each product and each mark individually. *See, e.g.*, *Gucci*, 868 F. Supp. 2d at 222 (noting that in analyzing infringement allegations, the court "must examine each mark in turn"). For purposes of many of the *Polaroid* factors, however, there is no meaningful difference among the relevant products and marks. Thus, for the sake of efficiency, the Court addresses the products and marks together where possible, as Excell itself does (*see, e.g.*, Def. Mem. 20-23) and other courts have done in similar circumstances. *See, e.g.*, *Gucci*, 868 F. Supp. 2d at 246 (analyzing the various marks in tandem where the *Polaroid* factors were "the same with respect to each mark"). Elsewhere, the Court considers Excell's arguments only with respect to the least infringing of the marks and products at issue, on the theory that if those arguments fall short as to those marks and products, it follows that they fall short as to the more infringing marks and products as well.

### a. Strength of Marks and Trade Dresses

The first *Polaroid* factor — the strength of Coty's marks and trade dresses — weighs heavily in Plaintiff's favor, substantially for the reasons discussed above in connection with the question of whether Coty's marks are entitled to protection. Coty's undisputed "commercial success" and sizeable "advertising expenditures" only "reinforce[] the strength" of its source

identifiers. *Charles of the Ritz Grp. Ltd. v. Quality King Distribs., Inc.*, 832 F.2d 1317, 1321 (2d Cir. 1987). In arguing otherwise, Excell asks the Court to consider each of the components of Coty's fragrances — that is, its house marks, product marks, bottles, and trade dresses — in isolation. (Def.'s Mem. 16-20). For example, Excell cites a nearly twenty-year-old decision, *Conopco, Inc. v. Cosmair, Inc.*, 49 F. Supp. 2d 242, 248 (S.D.N.Y. 1999), to contend that Coty's ETERNITY bottle, while being inherently distinctive, is a weak mark. (Def.'s Mem. 16-17). But these arguments miss the forest for the trees. The strength of Coty's ETERNITY mark alone may be on the weak end of the spectrum, but Coty claims that Excell not only misappropriated its bottle design, but also its house mark (Calvin Klein), its fragrance mark (ETERNITY), and other components of its trade dress. (Pls.' Ex. 1, at 12). Taken together, these features weigh more heavily in Coty's favor. *Jim Beam Brands Co. v. Beamish & Crawford Ltd.*, 937 F.2d 729, 735 (2d Cir. 1991) ("[I]n determining the similarity of marks in an infringement action, a court must examine the visual appearance of each mark in the context of its use."). Moreover, in the nearly eighteen years since the Court in *Conopco* found Coty's ETERNITY Bottle to be a weak mark, the mark has established significant secondary meaning. Between 2009 and 2015, for example, Coty's net sales of Calvin Klein ETERNITY were $322,997,895. (Pls.' Ex. 78).

Along the same lines, Excell disputes the strength of Coty's CK One trade dress, contending that, notwithstanding the incontestable registration, its "basic flask shape is common in the fragrance industry and not distinctive." (Def.'s Mem. 18). At trial, however, Excell provided no evidence to back up that claim. Even if it did, Excell's argument would fail as Coty, once again, is not claiming trademark protection for its bottle shape alone; instead, it is claiming trademark infringement for the various components of its trade dress and for Excell's use of its house and product marks. And "[b]ecause in the context of trade dress the whole can be greater

than, or at least different from, the sum of its parts, it is necessary to consider the combined articulated elements of [Coty's CK One] trade dress to determine whether as an ensemble they form a distinctive presentation to consumers." *Best Cellars, Inc. v. Wine Made Simple, Inc*., 320 F. Supp. 2d 60, 71 (S.D.N.Y. 2003). Here, the bottle's shape, in combination with the various other facets of its trade dress, establish Coty's CK One trade dress as distinctive.

### b. Similarity of Plaintiff's and Defendant's Marks

The second *Polaroid* factor — the similarity of Coty's and Excell's marks — also strongly favors Coty. Similarity is a holistic consideration that turns on the marks' sight, sound, and overall commercial impression under the totality of the circumstances. *See, e.g.*, *Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 538 (2d Cir. 2005). Instead of merely conducting a "[s]ide by side comparison," a court must assess "whether a consumer who is somewhat familiar with the plaintiff's mark would likely be confused when presented with defendant's mark alone." *Clinique,* 945 F. Supp. at 552. The same basic standard also applies for the trade dresses at issue. *Fun-Damental*, 111 F.3d at 1003.

In the Court's view, Coty has persuasively demonstrated that Excell's fragrances "blatantly cop[y]" its own in a number of ways. *Clinique*, 945 F. Supp. at 551 (finding similarity when the defendant "manufactured almost identical soap, toners, eye creams, and moisturizers, with only minuscule and insignificant changes in packaging and color"). To list just a few, Excell's products copy, with only slight differences, the names, typefaces, packaging, design, coloring, and bottle shapes of Coty's fragrances. (*See* Appendix A). To provide one illustrative example: Excell's SERENITY AQUA fragrance features a similar typeface, color, packaging, bottle shape, and, most obviously, name, to Coty's ETERNITY AQUA. (Pls.' Ex. 1, at 13). In addition, for each fragrance at issue here, Excell's packaging includes two exact replicas of

Coty's house mark (*e.g.*, Calvin Klein) and product mark (*e.g.*, ETERNITY AQUA) as part of the "Our Version Of" and "Not Associated With" legends. (*Id.*).

These similarities, which are present (albeit in slightly varying degrees) in each of Excell's fragrances at issue, are more than sufficient to "illustrate a pattern of resemblance" between the parties' products. *Bath & Body Works Brand Mgmt., Inc. v. Summit Entm't, LLC*, 7 F. Supp. 3d 385, 395 (S.D.N.Y. 2014). The Second Circuit's analysis of two competing alcohol brands in *Paddington*, 996 F.2d at 586, is instructive. In that case, the Court acknowledged differences in the brand name, bottle shape, label design, and cap design between the two brands, but ultimately concluded that the bottles and packaging of the two brands — specifically, their coloration, labels, and typeface — were "sufficiently similar in overall impression to suggest that they are made by the same manufacturer." *Id.* Here too, the fragrances' "lettering style, layout, and coloration, taken together, convey the same impression." *Id.*; *see also, e.g.*, *Clinique*, 945 F. Supp. at 560 ("The similarities of the products carry through to similarities in the boxes in which they are packaged."). Moreover, the similarities are no mere coincidence; by its own admission, Excell intentionally designed, manufactured, and marketed its fragrances for this effect. (*See, e.g.*, Pls.' Ex. 195 (Excell directing its manufacturer to develop a cap for its "version" of Vera Wang Lovestruck that was the same as the original product)).

To be sure, there is a range of differences between Coty's marks and trade dresses, on the one hand, and Excell's, on the other. (*See* Appendix A). At the less infringing end of what could be called the "similarity spectrum" are Excell's CITY GIRL and Love story fragrances, which are the least similar to their counterparts, Coty's DOWNTOWN and Lovestruck products. For example, although the names CITY GIRL and DOWNTOWN arguably evoke similar associations, the words do not sound in any way alike; the fragrances' packages also have

23

notable differences, as Excell's version includes a disco behind the CITY GIRL logo and what appears to be a skyline at the bottom of its box. (*Id.*). Similarly, Coty's Lovestruck contains a cap adorned with a purple floral bouquet while Excell's Love story contains a much more understated purple cap without any obvious floral design. (*Id.*). At the other end of the "similarity spectrum," Excell's OK ROCK and SERENITY fragrances are remarkably similar to their counterparts, Coty's CK SHOCK and ETERNITY, in both name and trade dress. (*See* Appendix A).

Notably, however, even the two fragrances at the less infringing end of the "similarity spectrum" contain significant similarities. For example, both Coty's DOWNTOWN and Excell's CITY GIRL are contained in squat, cylindrical bottles with rounded bottoms and flat metallic silver cylindrical caps; both contain clear glass through which a pink hue fragrance is visible; both display the fragrance name in all uppercase letters on the center portion of the fragrance bottle; and both are packaged in a bright pink outer carton. (*See id.*). Coty's Lovestruck and Excell's Love story have somewhat similar names and share a rectangular bottle with pink lettering; clear glass through which the purple hue of the fragrance is visible; a magenta outer carton; and the fragrance name displayed in sentence case on both the outer carton and fragrance bottle. (*See id.*). As with Excell's other products, the packaging for CITY GIRL and Love story also includes exact replicas of Coty's marks in their "disclaimers." In short, here, as in *Paddington,* viewing all of the relevant marks and trade dresses "as a whole" — and in tandem — leads to the conclusion that the allegedly infringing products are quite similar to their counterparts. *Id.*; *see also, e.g.*, *Brennan's, Inc. v. Brennans Rest., L.L.C.*, 360 F.3d 125, 133 (2d Cir. 2004) ("[W]hen evaluating the similarity of marks, courts consider the overall impression created by a mark. Each mark must be compared against the other as a whole; juxtaposing

fragments of each mark does not aid in deciding whether the compared marks are confusingly similar."); *Giorgio Beverly Hills, Inc. v. Revlon Consumer Prod. Corp.*, 869 F. Supp. 176, 182 (S.D.N.Y. 1994) (criticizing the plaintiff for "creat[ing] a false, fragmentary image" by arguing that the court should consider the house mark and the product mark separately in its analysis and noting that "fragrance[s] [do not] bear[] a unitary mark").

In rebuttal, Excell argues that the "Our Version Of" and "Not Associated With" disclaimers on each of the allegedly infringing fragrances makes it "clear" that the company's products are not associated with Coty. (Def.'s Mem. 12). Significantly, however, Coty's marks are significantly more prominent and accentuated on Excell's fragrances than both the supposedly disclamatory language ("Our Version Of" and "Not Associated With") and Excell's own marks. In similar circumstances, courts have held that disclaimers are not only ineffective, but actually cut against the allegedly infringing party. *See Cartier, Inc. v. Deziner Wholesale, L.L.C.*, No. 98-CV-4947 (RLC), 2000 WL 347171, at *4 (S.D.N.Y. Apr. 3, 2000) ("Courts have held that when a company packages its product in a wrapper that more centrally displays a competitor's name, or repeatedly mentions a competitor's name, with the effect of making its competitor's mark the most dominant feature on the package, such packaging is likely to confuse consumers about the product's origin or affiliation."); *see Charles of the Ritz Group Ltd. v. Quality King Distrib.,* 636 F. Supp. 433, 437 (S.D.N.Y. 1986) (Weinfeld, J.) ("The disclaimer on the lower portion of the tab, which . . . is hidden from view when the tab is in place, suggests a calculated effort by defendant to escape liability for infringement."); *Invicta Plastics Ltd. v. Mego Corp.,* 523 F. Supp. 619, 623 (S.D.N.Y. 1981) (analyzing the defendant's package with repeated references to the plaintiff's product and concluding that defendant "was deliberately seeking to use the goodwill plaintiff has acquired in its success with [plaintiff's product] to sell

its own product").  Based in part on evidence presented at trial — namely, Coty's expert's surveys, discussed in detail below — the Court reaches the same conclusion here.  Accordingly, the second *Polaroid* factor cuts heavily in Coty's favor.

c.  **Competitive Proximity of the Products and Bridging the Gap**

The third and fourth *Polaroid* factors — the proximity of the products and likelihood that the plaintiff will "bridge the gap" — weigh in Excell's favor, but not as heavily as it seems to believe.  (Def.'s Mem. 7).  To be sure, Coty's products are generally sold at higher-end retailers while Excell's are (or were) sold at discount stores, and the companies' products are generally offered at different price points.  (*Id.* 7-8).  Nevertheless, these differences have "little or no bearing on post-sale confusion as to the source of the goods."  *Clinique*, 945 F. Supp. at 554 ; *see also Gucci*, 868 F. Supp. 2d at 248 (S.D.N.Y. 2012) ("[I]n the post-sale context, the target selling market is of decreased importance, as the confusion that exists in the general viewing public is what matters.").  Indeed, the fact that Excell and Coty's products may be sold in different venues has no effect on the possibility that "a potential purchaser, knowing that the public is likely to be confused or deceived by the allegedly infringing product, will choose to purchase that product instead of a genuine one in order to gain the same prestige at a lower price."  *Gucci Am., Inc. v. Guess?, Inc*., 843 F. Supp. 2d 412, 418 (S.D.N.Y. 2012).

Additionally, although Excell is correct that Coty's fragrances are generally sold in more "upscale" establishments, Coty has presented evidence that the fragrance market is somewhat fluid and that there are retailers and fora — both brick-and-mortar and online — that have marketed both parties' fragrances, including K-mart, CVS, Amazon, and eBay.  (Conklin Direct ¶¶ 19, 25-26; Tuil-Torres Direct ¶¶ 31, 48 (noting that some of Coty's fragrances are sold at CVS and Kmart); Tr. 478 (testimony of Ferullo acknowledging Excell's products were sold at Kmart);

Pls.' Ex. 174 (listing CVS as a direct customer of Excell)). On top of that, Coty found that some of its fragrances were diverted and sold at CVS and Dollar General, both of which sell Excell products. (Conklin Direct ¶ 23, 28; Tr. 260 (testimony of Keegan noting that diverted goods can be found "anytime a manufacturer/distributor has an intended channel for a product and that product somehow ends up in a different channel.")). In the case of Dollar General, that is hardly surprising as discount stores often carry marked-down branded fragrances. (*See* Pls.' Ex. 232; Tr. 276 (testimony of Keegan noting that Dollar General carries branded fragrances)).

Meanwhile, Excell's reliance on the price differences between the parties' fragrances is misguided for various reasons. As an initial matter, Coty and Excell are not retailers, and thus do not control the ultimate prices of their products. (Rotter Direct ¶ 19; Ferullo Dep. 24). Additionally, any price difference between products, like the differences between marketplaces, has little or no bearing on the potential for post-sale confusion. Again, if anything, Excell's lower prices may increase the likelihood of consumers purchasing "the allegedly infringing product, on the grounds that they can obtain the same prestige for less money." *Gucci Am., Inc. v. Guess?, Inc.*, 831 F. Supp. 2d 723, 747 (S.D.N.Y. 2011). Excell's price-point contention is also largely immaterial to the "probability that potential purchasers would be misled into an initial interest in" its products due to their similarity to Coty's products. *Mobil*, 818 F.2d at 260. Indeed, most purchasers of fragrances in a retail setting are likely to view the packaging before checking the price label, which adds support to Coty's claim of initial-interest confusion. Finally, the price differences between the parties' products is not nearly as significant as Excell asserts. In 2016, for example, Coty recommended that retailers sell some of its flagship products for prices ranging from $12.50 to $72. (*See* Rotter Direct ¶ 18; Tuil-Torres Direct ¶¶ 10-12). Needless to say, the fact that the company marketed lower-priced fragrances blunts the force of

Excell's pricing arguments. *Cf. Charles of the Ritz*, 832 F.2d at 1322 (noting that "some question remains whether two distinct fragrance markets actually exist" and concluding that any "barrier between the two is sufficiently porous to allow [the senior user] passage with little difficulty"); *Toni & Guy (USA) Ltd. v. Nature's Therapy, Inc.*, No. 03-CV-2420 (RMB), 2006 WL 1153354, at *9 (S.D.N.Y. May 1, 2006) ("Plaintiff has presented *no* evidence that it is likely to bridge the gap . . . by selling lower-priced products that would compete more directly with Defendant's products . . . " (emphasis supplied) (internal quotation marks omitted)). In sum, although Excell demonstrated that a separation exists between the market and price points for its products and Coty's products, the separation is not quite as stark as Excell would have it. Thus, the third and fourth *Polaroid* factors — which look to the competitive proximity of the products and "whether the two companies are likely to compete directly in the same market," *Charles of the Ritz*, 832 F.2d at 1322 — favor Excell, but only slightly.

### d.  Actual Confusion

The fifth factor, whether there is evidence of actual consumer confusion, weighs in Coty's favor. For one thing, because "evidence of intentional copying gives rise to a presumption of actual confusion," the burden is on Excell to demonstrate a lack of confusion, which it failed to do. *Gucci*, 868 F. Supp. 2d at 240; *see Mobil*, 818 F.2d at 258 ("Intentional copying gives rise to a presumption of a likelihood of confusion."). For another, the record — namely, survey evidence submitted by *both* sides — supports a finding of actual confusion.

To evaluate the validity and reliability of a survey, a court should consider whether:

(1) the proper universe was examined and the representative sample was drawn from that universe; (2) the survey's methodology and execution were in accordance with generally accepted standards of objective procedure and statistics in the field of such surveys; (3) the questions were leading or suggestive; (4) the data gathered were accurately reported; and (5) persons conducting the survey were recognized experts.

*Gucci Am., Inc. v. Guess?, Inc.*, 831 F. Supp. 2d at 738. In general, surveys "demonstrating

confusion levels over 50% are almost always viewed by courts as persuasive evidence of likely

confusion"; in cases "[w]here other evidence is supportive, courts have found a likelihood of

confusion when survey results are between 10% and 20%." 6 McCarthy on Trademarks and

Unfair Competition § 32:188 (4th ed.) (citing cases); *see RJR Foods, Inc. v. White Rock Corp*.,

603 F.2d 1058, 1061 (2d Cir. 1979) (affirming the district court's reliance on the results of a

"consumer study showing a fifteen to twenty percent rate of product confusion"); *Procter &

Gamble Co. v. Ultreo, Inc.*, 574 F. Supp. 2d 339, 345 (S.D.N.Y. 2008) ("Cases have held that

20% constitutes a substantial percentage of consumers.").

Significantly, Excell's own survey evidence supports a finding of likely customer

confusion in this case. According to Mark Keegan, Excell's expert, 19.5% of respondents in an

Internet survey identified Calvin Klein as the source of Excell's POSSESSION fragrance, and

15.1% identified Calvin Klein as the source of Excell's SERENITY fragrance. (Keegan Direct

¶ 56).[7] On their face, those results are reasonably favorable to Coty. But there are several

reasons to believe that the actual likelihood of confusion is even higher. First, the universe of

participants in Keegan's survey was limited to people who had recently shopped at a discount

store, flea market, rummage sale, or bazaar. (*See* Tr. 273-74). But Excell's products are

marketed in a broader array of venues, including malls, department stores, pharmacies, and on

the Internet. Perhaps not coincidentally, the venues excluded from Keegan's survey are the types

of venues where potential purchasers of Coty's products are most likely to be found. Second, by

---

[7] The Court notes that Keegan's experience and qualifications have been questioned by other courts. *See Flushing Bank v. Green Dot Corp*., 138 F. Supp. 3d 561, 582 (S.D.N.Y. 2015) ("The Court does not find that Keegan's background in surveys is sufficiently deep or tested to provide a reliable basis for his criticisms."). To the extent that Keegan's opinions differed from the opinions of Coty's expert, that is another basis to credit the latter more heavily.

his own admission, Keegan's survey was unsuitable for measurement of initial-interest and post-sale confusion. (Tr. 339 (testimony of Keegan noting that his survey does not address initial-interest confusion and has "very little" relevance to post-sale confusion)). Third, the survey was flawed because it prompted respondents to focus on Excell's products in an unrealistic manner and setting. Most notably, Excell's boxes were displayed in a manner that allowed respondents to see all faces of the packaging at once. (*Id.* Ex. 3; Def.'s Ex. ZZ). Finally, Keegan made several coding errors — namely, by treating as "not confused" a number of respondents who were plainly confused as to whether Excell's fragrances were produced by Calvin Klein. (Pls.' Ex. 256 ("Rappeport Direct") ¶ 44 (identifying such responses including, "What a bargain for a Calvin Klein product"; "It's made by Calvin Klein, I like it"; and "Just the fact that it was made by Calvin Klein is worth the $4.99")).[8] After correcting for those errors and filtering out "noise," *see, e.g.*, 6 McCarthy on Trademarks and Unfair Competition § 32:187 (4th ed.) (explaining the concept of "noise"), Dr. Michael Rappeport, Coty's expert, concluded that 25% of the respondents in Keegan's survey actually identified Calvin Klein as the source of Excell's POSSESSION fragrance and that 20% identified Calvin Klein as the source of Excell's SERENITY fragrance. (Rappeport Direct ¶ 47). In short, Keegan's survey provides even stronger evidence of confusion than might appear even at first glance. *See Playtex Prods., LLC v. Munchkin, Inc.*, No. 14-CV-1308 (RJS), 2016 WL 1276450, at *4 (S.D.N.Y. Mar. 29, 2016).

---

[8] Excell argues that the Court should disregard Dr. Rappeport's testimony concerning the flaws in Keegan's study on the ground that it included opinions that were not in his expert report. (*See* Docket No. 140). In light of the fact that Dr. Rappeport's direct testimony was disclosed to Excell over a month and a half before he actually testified (*see* Docket No. 142, at 1), the Court concludes that any violation was harmless. *See* Fed. R. Civ. P. 37(c)(1) (providing that a party may not use information at trial if it failed to disclose the information as required by Rule 26, "unless the failure was substantially justified or harmless").

In any event, the Court concludes that the study conducted by Coty's expert, Dr. Rappeport, is more reliable than the study conducted by Keegan and firmly supports a finding of likely customer confusion.  Dr. Rappeport used the widely accepted *Eveready* survey format, *see, e.g.*, *Akiro LLC v. House of Cheatham, Inc*., 946 F. Supp. 2d 324, 339 (S.D.N.Y. 2013) (describing the *Eveready* survey format and noting that it "is generally accepted and represents the 'gold standard' for cases involving strong marks"), to conduct a consumer comparison survey comparing Calvin Klein's OBSESSION and ETERNITY packages to Excell's POSESSION and SERENITY packages in malls across the country.  (Rappeport Direct ¶¶ 11, 14, 20). Specifically, he examined a random selection of "people 18 years old and older who ha[d] purchased a fragrance product for themselves, or for someone else, in the past six months" and showed them versions of the Excell packages to determine if they were confused as to the source.  (Pls.' Ex. 161-1, at 3-4).  Notably, participants' responses were "unaided," in that neither the participants nor the interviewers were exposed as part of the survey to the genuine Calvin Klein OBSESSION or ETERNITY fragrances — or even to the name Calvin Klein.  (*See* Rappeport Direct ¶ 9).  After filtering out the "noise," Dr. Rappeport concluded that an average of 54% of the respondents misidentified the source of Excell's products as Calvin Klein.  (*Id.* ¶¶ 9, 30-33).

Excell advances several arguments to undermine the reliability of Dr. Rappeport's survey.  First, it contends that Dr. Rappeport erred by not excluding higher-end consumers to ensure that respondents were actual or potential purchasers of Excell's products.  (Def.'s Mem. 9-10).  That argument has some force.  Where, as here, a junior user is alleged to be selling its products as if they came from the senior user, "the relevant market consists of the consumers of the junior user's products."  *Sterling Drug, Inc. v. Bayer AG*, 14 F.3d 733, 741 (2d Cir. 1994).

As discussed above, however, Coty's and Excell's markets are not quite as discrete as Excell suggests. Moreover, it is not uncommon for higher-end fragrance companies, including Coty, to create less expensive versions of their products — sometimes called "flankers" — for sale at lower price points or in lower-end retail markets. (*See, e.g.*, Singer Direct ¶¶ 30-32) (discussing Coty's use of "flankers" and "limited editions" to supplement its existing brands)). *Cf. Lois Sportswear*, 799 F.2d at 874 ("Certainly a consumer observing [plaintiff's] striking stitching pattern on [defendants'] designer jeans might assume that [plaintiff] had chosen to enter that market segment using a subsidiary corporation, or that [plaintiff] had allowed [defendants'] designers to use [plaintiff's] trademark as a means of reaping some profits from the designer jeans fad without a full commitment to that market segment."). Accordingly, although Dr. Rappeport's failure to exclude higher-end consumers does affect the weight to be given to his survey results, it does not altogether strip them of probative value. *See, e.g.*, *Paco Sport, Ltd. v. Paco Rabanne Parfums*, 86 F. Supp. 2d 305, 322 (S.D.N.Y. 2000) ("The courts have held that to be probative on the issue of actual confusion, a survey must rely on responses of prospective purchasers of the products in question.").[9]

Next, Excell faults Dr. Rappeport for failing to provide respondents with relevant sales channel and price information about the products they were asked to examine. (Def.'s Mem. 11). Once again, however, there is some overlap in the relevant sales channels. Additionally,

---

[9] Excell's other attacks on Dr. Rappeport's sampling miss their mark. At trial, Keegan criticized Dr. Rappeport's study on the ground that it was "skew[ed]" in favor of "upscale" malls. (Tr. 292). But many of the malls where Dr. Rappeport conducted his survey housed discount stores of the sort where Excell's fragrances were sold. (See Pls.' Ex. 236 (highlighting the presence of discount stores in most of the malls where Dr. Rappeport surveyed respondents)). And while Excell questioned the decision to use the four census areas rather than the nine census divisions to control for geographic variation (*see* Tr. 193), Dr. Rappeport persuasively testified that the use of the census areas was sufficient here. (*See* Tr. 193-95).

sales channel and price information, while relevant to the proximity analysis above, is less relevant to the basic question courts ask under this prong of the *Polaroid* test: whether the defendant's product confuses consumers as to its source. *See Gucci*, 868 F. Supp. 2d at 240. (Notably, when asked at trial, Keegan was unable to cite a single survey, accepted by a court, that included information regarding pricing and sourcing. (Tr. 267).) And it is altogether irrelevant to Coty's claim that Excell's products cause initial-interest and post-sale confusion. With respect to "initial-interest" confusion, a consumer might believe, at first glance, that one of Excell's fragrances is associated with one of Coty's products, and "[m]otivated by this mistaken notion — [Coty's] goodwill — the consumer might then buy [Excell's fragrance] even after discovering his error." *Lois Sportswear*, 799 F.2d at 874. And "to the extent that distinct channels of trade between [the parties'] products exist, those channels have little or no bearing on post-sale confusion." *Clinique*, 945 F. Supp. at 554. *A fortiori*, the same would be true to the extent products are sold at different prices.

Finally, Excell contends that Dr. Rappeport's results are relevant only to the two fragrances that he included in his study, OBSESSION and ETERNITY. (Def.'s Mem. 11). No doubt, the surveys are more compelling with respect to the fragrances tested than they are with respect to the other fragrances at issue in this litigation. Additionally, the survey itself provides reason to believe that the levels of consumer confusion would vary among the fragrances. (*See* Tr. 211 (testimony of Dr. Rappeport noting the 22% difference in confusion levels between the two Excell products tested in his survey)). But Dr. Rappeport's results are still relevant, albeit in a more attenuated manner, to the other fragrances, given that they share "common and prominent features" with the tested fragrances. *adidas-Am., Inc. v. Payless Shoesource, Inc.*, 546 F. Supp. 2d 1029, 1045 (D. Or. 2008) ("Where actually surveyed products and subsequently accused

products share common and prominent features, a trademark infringement plaintiff need not create new likelihood of confusion surveys for each newly accused product."). Specifically, each of Excell's products, including those that were included in the survey, adhere a specific pattern: They and Coty's fragrances have similar trade dresses and names (if not in sound, then in association), and they include identical disclamatory legends that prominently feature Coty's house and fragrance marks. This is not by chance; as discussed above, they were all produced to mimic Coty's fragrances. Thus, the Court finds Dr. Rappeport's survey to be circumstantial evidence that each of Excell's fragrances at issue here is likely to cause at least some level of confusion as to source in the minds of fragrance shoppers.

To be sure, Coty did not present any "actual evidence" of confusion, which is typically "considered a very significant deficiency" for a product that has been on the market for several years. *Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC*, 221 F. Supp. 2d 410, 419 (S.D.N.Y. 2002) (internal quotation marks omitted).[10] But four considerations mitigate the significance of

---

[10]    Coty's Senior Vice President and Global Deputy General Counsel, Joseph Conklin, did attempt to offer one potential instance of actual confusion:

> By way of explanation, Coty has a fragrance named Love Story in its Chloé line, and Defendant also offers a Diamond Collection fragrance named Love Story, its version of Lovestruck by Vera Wang (which was one of the infringing fragrances at issue). Our consumer inquiry log quotes the following verbatim statement from the caller: "I bought a bottle of Love Story, I want to know if it is counterfeit? The fragrance does not last." While our Consumer Affairs representative assumed this was a call about our Chloé Love Story fragrance, the verbatim from the caller does not mention Chloé so the caller may have been complaining about Defendant's Love Story fragrance. We simply do not know.

(Conklin Direct ¶ 41). Putting aside hearsay issues, that is no evidence of actual confusion, given Coty's own uncertainty about the nature of the customer's confusion. Additionally, Chloé Love Story is not one of the fragrances at issue in this litigation.

that deficiency here.  First, Coty's ability to obtain evidence of actual confusion was limited because all of Excell's long-time employees invoked the Fifth Amendment in response to Coty's questioning on the matter.  (*See, e.g.*, Bronsnick Dep. Resp. 37, 43; Rodriguez Dep. 29-53; Hamerling Dep. 40-45).  That may or may not call for drawing an adverse inference against *Excell*, but it would certainly be unfair, under the circumstances, to hold the absence of evidence against *Coty*.  *See, e.g.*, *Louis Vuitton Malletier S.A. v. LY USA, Inc*., 676 F.3d 83, 98 (2d Cir. 2012) (noting that where a company's employees "assert[] the privilege against self-incrimination[, it] must bear the consequence of lack of evidence").  Second, Coty and Excell are manufacturers and distributors of fragrances, not retailers, and thus less likely to hear directly from a duped consumer.  (*See* Conklin Direct ¶ 42).  Third, common sense dictates that consumers are less likely to take the time to complain where, as here, the allegedly infringing product is relatively inexpensive.  And finally, the fact that both Coty's *and* Excell's surveys indicated a likelihood of confusion speaks volumes even in the absence of actual confusion evidence.  Accordingly, "the combination of visual inspection and empirical evidence suffices to find 'actual confusion' in this case."  *Charles of the Ritz*, 832 F.2d at 1322; *Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc.,* 830 F.2d 1217, 1227 (2d Cir. 1987) (not requiring evidence of actual confusion as a prerequisite to recovery); *Lois Sportswear*, 799 F.2d at 875 ("While the complete absence of actual confusion evidence after a significant period of competition may weigh in a defendant's favor, such an inference is unjustified in the instant case in view of the survey evidence, even with its methodological defects." (citation omitted)).

    **e.  Defendant's Intent/Bad Faith**

    The sixth *Polaroid* factor (and, as noted, an element of Coty's claim for unfair competition under New York law) is bad faith, which concerns "whether the defendant adopted

its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." *Lang v. Ret. Living Publ'g Co., Inc.,* 949 F.2d 576, 583 (2d Cir. 1991). In this case, the record is replete with evidence of bad faith. For one thing, Excell's business model involved little more than "capitalizing on plaintiff's reputation and goodwill." *Lang,* 949 F.2d at 583. Indeed, in determining which fragrances to emulate, Excell purposefully "looked to fragrances that [its] customer base would understand" — that is, fragrances with brands that had already been established in the marketplace. (Def.'s Ex. HHHH ("Ferullo Direct") ¶ 5). But Excell did not stop there; it then meticulously mimicked the external trappings of those fragrances and used Coty's protected marks on its packaging in a way that, even with the disclamatory language, could only have been calculated to capitalize on Coty's goodwill. Notably, all along, Excell knew that its business model was problematic. Indeed, the company adhered to its business model in the face of a slew of complaints from third-party brand owners, which also helps swing this factor in Coty's direction. (Def.'s Mem. 36-37; *see, e.g.*, Tr. 366 (testimony of Pfau noting a lawsuit brought by Nicole Polizzi, professionally known as "Snooki," against Excell in connection with its alternative to her fragrance); Bronsnick Dep. Resp. 105 (invoking the Fifth Amendment in response to a question regarding Victoria's Secret's demand that Excell cease production of allegedly infringing fragrances)).

On top of that, Excell adopted its business model shortly after MD Distributors, a company that used to employ various Excell employees, entered a Consent Judgment with Calvin Klein and other fragrance producers. (Def.'s Mem. 2). The Consent Judgment enjoined MD Distributors, and its "officers, agents, servants, representatives, [and] employees," from selling "Prohibited Product," a defined term that explicitly covered infringing alternatives to

Calvin Klein fragrances. (Pls.' Ex. 156-2, at Sections 1.19, 3.1). Only one week after the Consent Judgement was signed, Wayne Hamerling founded Excell. (Def.'s Mem. 2). Not surprisingly, Excell contends that the Consent Judgement cuts the other way, on the ground that Calvin Klein "effectively consented to the use of the 'Our Version' phrase to describe alternatives to their fragrances." (Def.'s Mem. 1). But that contention fails for at least three reasons. First, the MD Distributor case involved a different set of parties (except for Calvin Klein) and different fragrances. (Pls.' Ex. 156-2). Second, if that were not the case, Excell's products here would plainly qualify as "Prohibited Product[s]" within the meaning of the Consent Judgment.[11] And third, contrary to Excell's assertions, the Consent Judgment did not authorize MD Distributors — let alone non-parties such as Excell — to indiscriminately sell "Our Version Of" fragrances. Instead, it merely reserved the parties' rights with respect to fragrances containing the "Our Version Of" legend that are not "unlawful under the Lanham Act" and that are not "Counterfeit" or "Knock-Off" products. (*See* Pls.' Ex. 156-2, § 3.2).

In arguing against a finding of bad faith, Excell notes that "[t]here is a vast difference between the intent to compete by imitating the successful features of another's product and the intent to deceive purchasers as to the source of the product." (Def. Mem. 12 (internal quotation marks and brackets omitted)). That is undoubtedly true, but Excell's intent falls squarely in the latter category. The company's intent to deceive can be inferred from the remarkable similarities

---

[11]     Section 3.1 of the Consent Judgement expressly enjoined the sale of "Prohibited Product," a term defined in Paragraph 1.19 to include "Counterfeit" and "Knock-Off" fragrances. Paragraph 1.16 defined "Counterfeit" fragrances to include "any Fragrance Product bearing a spurious mark which is identical to, or substantially indistinguishable from, any of the . . . CALVIN KLEIN Marks."  Notably, Paragraph 1.16 also adopted the definition of "counterfeit" set forth in the Lanham Act, 15 U.S.C. § 1127.  Paragraph 1.17 defined a "Knock-Off" fragrance as "any Fragrance Product bearing marks that colorably imitate or are confusingly similar to . . . the CALVIN KLEIN Marks, or copy . . . Calvin Klein's . . . trade dress to a degree likely to cause confusion, or to cause mistake, or to deceive."

between the fragrances' trade dresses, the prominent use of Coty's legends on Excell's products, and the uncanny resemblance between the fragrance names chosen by Excell and Coty's products. Instead of "imitating the successful features of [Coty's] product," Excell imitates Coty's marks and trade dresses to confuse purchasers as to source and to sell its inferior quality fragrances. (*See* Section B.2.f). In any event, even without the formidable evidence of Excell's intent to deceive, an intent to copy "creates a presumption of an intent to deceive, unless there is evidence to the contrary." *Gucci*, 843 F. Supp. 2d at 419. "Where," as here, "the copier references the prior dress in establishing her design with the apparent aim of securing the customers of the other based on confusion, intentional copying may be found." *Paddington*, 996 F.2d at 587. Accordingly, the Court finds that Coty has proved bad faith on the part of Excell.

### f. Quality of Excell's Products

The seventh *Polaroid* factor — the quality of Excell's products — also indisputably favors Coty. By its own admission, Excell's products were designed to be sold at low prices and it thus uses cheaper ingredients in its fragrances. For example, Excell uses less expensive, synthetic oils, rather than the natural oils used in Coty's fragrances, and it employs less expensive packaging components than Coty does. (Ferullo Dep. 197-98, 227). *Cf. Zino Davidoff SA v. CVS Corp.*, No. 06-CV-15332 (KMK), 2007 WL 1933932, at *5 (S.D.N.Y. July 2, 2007) (approvingly citing the plaintiff's expert, who found that "imperfect packaging," among other deficiencies, is likely to "lower[ the fragrance producer's] brand equity"). Not surprisingly, therefore, Excell's fragrances do not smell the same as Coty's perfumes and colognes. (Pls. Ex.' 254 ("Massaro Direct") ¶ 7)).[12] Additionally, in contrast to Coty's

---

[12]     Excell moved in advance of trial to exclude the testimony of Ralph Massaro on the ground that Coty failed to comply with the disclosure requirements for expert testimony in Rule

fragrances, many of Excell's Diamond Collection products were found to contain DEHP, a

potential carcinogen. (Massaro Direct ¶ 9-10 (noting that twelve of the fifteen Excell fragrances

tested by Coty's Technical Perfumer contained more than 100 ppm of DEHP)). Notably, while

Coty spends significant time, energy, and money researching, testing, and crafting its fragrance

juices, Excell's process is cursory and largely outsourced to its suppliers in India. (Ferullo Dep.

180-81). The lack of any meaningful quality assurance program at Excell only underscores the

quality differential between the parties' products. (Hamerling Dep. 34 (invoking the Fifth

Amendment in response to a question regarding Excell's lack of quality controls for its

fragrances)). Accordingly, the Court finds that the "inferior quality" of Excell's goods could

"jeopardize[]" Coty's reputation. *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 398 (2d

Cir. 1995).

### g. Sophistication of Consumers

The eighth and final *Polaroid* factor is the "sophistication of the consumers and the

degree of care likely to [be] exercised in purchasing the product." *Tommy Hilfiger*, 221 F. Supp.

2d at 420. Excell rightly points out that "Plaintiff's goods are highly priced and sold in high

quality stores." (Def.'s Mem. 13). But while "[t]he substantial price" of Coty's fragrances

"requires buyers to exercise care before they part with their money," and while "such

sophistication generally militates against a finding of a likelihood of confusion," *Charles of the

Ritz*, 832 F.2d at 1323, "even sophisticated buyers are not always careful buyers, and their very

_____

26(a)(2) of the Federal Rules of Civil Procedure. (Docket No. 90). Upon review of the parties'
briefing, that motion is denied. To the extent that Massaro qualified as an expert witness, he was
a non-retained expert and Coty effectively satisfied its disclosures obligations under Rule
26(a)(2)(C). (*See* Docket No. 107, at 16-17). In the alternative, the Court finds that preclusion
would be an unduly harsh remedy given the pretrial disclosure of Massaro's direct testimony and
the absence of any identifiable prejudice. (*See id.* at 17-19).

awareness of status brand names and designs may make them more vulnerable to confusion,"
*Krueger Int'l v. Nightingale Inc.*, 915 F. Supp. 595, 611 (S.D.N.Y. 1996) (Sotomayor, J.).
Moreover, if the parties' products and marks are very similar, as they are here, "the
sophistication of buyers is less likely to prevent confusion." *Clinique*, 945 F. Supp. at 556.
Additionally, it could be argued that Excell's target demographic, "lower income, sometimes
ethnic customers" (Stipulated Facts ¶ 38), is likely to be less sophisticated about the differences
between and among fragrances and more easily confused upon seeing Excell's cheaper
knockoffs. *See, e.g.*, *Bath & Body Works Brand Mgmt., Inc. v. Summit Entm't, LLC*, 7 F. Supp.
3d 385, 398 (S.D.N.Y. 2014) ("Where the goods are inexpensive, the reasonably prudent buyer is
less likely to exercise careful consideration when making purchases."). Balancing these
considerations, the final *Polaroid* factor is a draw.

### h. Weighing the Factors

Considering all eight *Polaroid* factors and "looking at the products in their totality," the
Court concludes that consumers are likely to be confused by Excell's knockoff fragrances. *Star
Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 384 (2d Cir. 2005). To be sure, the *Polaroid* inquiry
is not a mere "mechanical counting exercise." *Bath & Body Works*, 7 F. Supp. 3d at 399. But
five of the eight factors weigh in Coty's favor. Moreover, while none of the factors strongly
favors Excell, several (namely, the first, second, fifth, sixth, and seventh factors) weigh heavily
in favor of Coty. That is not to say that each of Excell's fragrances produces the same level of
likely confusion. To the contrary, as detailed above, some fragrances look and sound more like
their counterparts than others. But the Court finds that even those fragrances on the less-
infringing side of the "similarity spectrum" are likely to result in a meaningful level of
confusion. And, of course, all of the fragrances contain Excell's supposedly disclamatory

legends ("Our Version Of" and "Not Associated With") with their overshadowing replicas of Coty's marks.

### 3. Nominative Fair Use

One final matter remains. Excell claims that its use of Coty's house and product marks is protected by the doctrine of "nominative fair use." (Def.'s Mem. 14).[13] Nominative fair use "involves [the defendant] using the mark at issue *as a mark* to specifically invoke the mark-holder's mark, rather than [using it] other than as a mark, to describe the alleged infringer's goods or services." *Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC*, 823 F.3d 153, 167 (2d Cir. 2016). Notably, the Second Circuit recently held that "nominative fair use is not an affirmative defense to a[ trademark] infringement claim." *Id.* at 168. Instead, recognizing that the *Polaroid* factors are a "bad fit" in nominative fair use cases, the Circuit held that a district court considering a claim of nominative fair should consider three factors in addition to the standard *Polaroid* factors, to wit:

> (1) whether the use of the plaintiff's mark is necessary to describe both the plaintiff's product or service and the defendant's product or service, that is, whether the product or service is not readily identifiable without use of the mark; (2) whether the defendant uses only so much of the plaintiff's mark as is necessary to identify the product or service; and (3) whether the defendant did anything that would, in conjunction with the mark, suggest sponsorship or endorsement by the plaintiff holder, that is, whether the defendant's conduct or language reflects the true or accurate relationship between plaintiff's and defendant's products or services.

*Id.*

---

[13]      Although not alleged by Excell here, there is another form of fair use — descriptive fair use — that "involves the principle that the public's right to use language and imagery for descriptive purposes is not defeated by the claims of a trademark owner to exclusivity." *Car-Freshner Corp. v. S.C. Johnson & Son, Inc*., 70 F.3d 267, 268 (2d Cir. 1995).

Applying those standards here, Excell's nominative fair use argument misses the mark. First, as noted above, the *Polaroid* factors are firmly on the side of Coty. Second, as the Court's discussion of the second *Polaroid* factor made clear, the manner in which Excell displays Coty's source identifiers belies its argument that it is merely using the marks to inform consumers that it is not the manufacturer of the original fragrance. Excell's fair use argument would be on firmer ground if it sold its fragrances in generic bottles and cartons, picked fragrance names that were unrelated to any of Coty's, included its disclaimers without prominently displaying Coty's typesetting or marks, and marketed its own brand on the packaging in a noticeable manner. But it did none of that. Instead, Excell sought to mirror Coty's fragrances' appearance in nearly every way possible, it chose product names that mimicked or evoked the names of Coty's fragrances, it prominently displayed Coty's house and fragrance marks under the guise of its "Our Version Of" and "Not Associated With" legends, and it hid its own brand name on top of the box where consumers were unlikely to see it. *Cf. Smith v. Chanel, Inc.*, 402 F.2d 562, 563 (9th Cir. 1968) (finding permissible fair use where the defendant reproduced Chanel's unpatented fragrance (which Chanel stipulated was an exact copy) and then used Chanel's mark (in addition to its own mark) solely to identify the copied fragrance). In so doing, Excell has impermissibly signaled a "relationship between [its own] and [Coty's]" fragrances that is non-existent. *Int'l Info.*, 823 F.3d at 168. Accordingly, its fair use argument fails.

*Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 102 (2d Cir. 2010), upon which Excell relies (Def. Mem. 7, 14-15, 32), is distinguishable. In that case, the Second Circuit confronted the question of whether eBay's use of Tiffany's mark on its website and in sponsored links was lawful. In finding permissible fair use, the Court emphasized that "eBay used the [Tiffany] mark to describe accurately the genuine Tiffany goods offered for sale on its website. And none of

eBay's uses of the mark suggested that Tiffany affiliated itself with eBay or endorsed the sale of its products through eBay's website." *Id.* at 103. Here, by contrast, Excell's use of Coty's marks and trade dresses invites confusion, at best, and implies direct affiliation, at worst. In the same vein, Excell cites *Neutrik AG v. Switchcraft, Inc.*, No. 99-CV-11931 (JSM), 2001 WL 286722, at *3 (S.D.N.Y. Mar. 23, 2001), for the proposition that "using another's trademark for the purpose of describing an aspect of a party's own product or to indicate that their product is a legitimate copy of another's is fair use." (Def. Mem. 14 (internal quotation marks omitted)). But, as discussed above, Excell did not merely use Coty's marks and trade dresses to describe its own fragrances. And Excell's products cannot be described as "legitimate cop[ies]" of Coty's fragrances. (Ferrullo Dep. 107 ("[Excell is] not offering a version of the original [fragrance].")). Accordingly, Excell's fair use argument fails and Coty prevails on its trademark infringement claims under both federal and New York law.

## C. Trademark Dilution

Next, the Court turns to Coty's trademark dilution claims under the Lanham Act, 15 U.S.C. § 1125(c), and New York General Business Law § 360-*l*. Coty alleges federal trademark dilution with respect to its registered Calvin Klein, Vera Wang, and Lady Gaga marks, and dilution under New York law for Excell's use of its remaining marks. (Pls.' Mem. 18). The Court will address the two types of trademark dilution — dilution by blurring and dilution by tarnishment — in turn.

### 1. Dilution by Blurring

Dilution by blurring refers to the gradual diminishment of a famous mark's acquired "ability to clearly and unmistakably distinguish one source through unauthorized use." *Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 506 (2d Cir. 1996) (internal quotation

marks and ellipses omitted); *see also Allied Maint. Corp. v. Allied Mech. Trades, Inc.*, 369 N.E.2d 1162, 1166 (N.Y. 1977) (observing that New York law protects against the "gradual whittling away of a firm's distinctive trade-mark or name"). Put differently, "dilution occurs when the unauthorized use of a famous mark reduces the public's perception that the mark signifies something unique, singular, or particular." H.R. Rep. No. 109-23, at 4 (2005), *as reprinted in* 2006 U.S.C.C.A.N. 1091, 1092; *see also Louis Vuitton*, 156 F. Supp. 3d at 433. Classic examples of dilution by blurring include "hypothetical anomalies as Dupont shoes, Buick aspirin tablets, Schlitz varnish, Kodak pianos, Bulova gowns, and so forth." *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 105 (2d Cir. 2009).

"Only a famous mark — one that is widely recognized by the national consuming public as a designation of source — is afforded protection against blurring under the Lanham Act." *Gucci*, 868 F. Supp. 2d at 241. "After a showing of fame is made," a plaintiff must then show the following to succeed on a dilution-by-blurring claim: "(1) that [the defendant] has been using the allegedly diluting designs in commerce; (2) that [the defendant's] use of those designs began after each of [the plaintiff's] marks became famous; and (3) [the defendant's] use is likely to cause dilution of the authentic [plaintiff's] mark by blurring." *Id.* New York law is similar, but does not require proof that the plaintiff's mark is famous, only that it is "truly distinctive or has acquired secondary meaning" and that there is a likelihood of dilution. *Strange Music, Inc. v. Strange Music, Inc.*, 326 F. Supp. 2d 481, 496 (S.D.N.Y. 2004).

In assessing whether dilution by blurring is likely to occur under federal law, a court "may consider all relevant factors," including the following six statutorily enumerated factors: (1) the degree of similarity between the mark or trade name and the famous mark; (2) the degree of inherent or acquired distinctiveness of the famous mark; (3) the extent to which the owner of

the famous mark is engaging in substantially exclusive use of the mark; (4) the degree of recognition of the famous mark; (5) whether the user of the mark or trade name intended to create an association with the famous mark; and (6) any actual association between the mark or trade name and the famous mark. *See* 15 U.S.C. § 1125(c)(2)(B). "The analysis, however, must ultimately focus on whether an association, arising from the similarity between the subject marks, impairs the distinctiveness of the famous mark — that is, the ability of the famous mark to serve as a unique identifier." *Louis Vuitton*, 156 F. Supp. 3d at 434 (internal quotation marks omitted). Under New York law, courts look to a similar set of factors: "(i) the similarity of the marks; (ii) the similarity of the products covered; (iii) the sophistication of the consumers; (iv) the existence of predatory intent; (v) the renown of the senior mark; and (vi) the renown of the junior mark." *N.Y. Stock Exch., Inc. v. N.Y., N.Y. Hotel, LLC*, 293 F.3d 550, 558 (2d Cir. 2002). But again, those factors are only guideposts: The ultimate question under New York law is whether there is a likelihood that the capacity of the senior owner's mark "to serve as a unique identifier of its source" will be diminished. *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 561 F. Supp. 2d 368, 393 (S.D.N.Y. 2008).

Applying the foregoing standards here, the Court concludes that Excell has diluted Coty's marks.[14] First, with respect to Coty's federal claims, there is no real dispute that Coty's Calvin

---

[14]    At first blush, the antidilution statute — the primary purpose of which "is to protect the owners of famous marks from . . . dilution . . . in an unrelated area of commerce," *TCPIP Holding Co. v. Haar Commc'ns, Inc.*, 244 F.3d 88, 95 (2d Cir. 2001) — is an awkward fit for Coty's claims, as both parties sell perfumes and colognes. *See* 4 McCarthy on Trademarks and Unfair Competition § 24:105 (4th ed.) ("The legal theory of antidilution was conceived to protect strong marks against a diluting use by a junior users in a product or service line far removed from that in which the famous mark appears . . . . Thus, using the antidilution law when the parties are selling their products in the same niche market sounds a dissonant and false note."). Nevertheless, the Second Circuit has made clear that "[w]hile the antidilution statutes aim at a different harm than the infringement statute and dilution undoubtedly can occur among non-

Klein, Vera Wang, and Lady Gaga marks are famous and distinctive. (*See* Def.'s Mem. 6 ("Excell does not contest that Calvin Klein and Vera Wang are two of the most influential and highly visible fashion houses in the world and that Lady Gaga is one of the most successful and highly visible entertainment and recording artists in the world." (internal quotation marks omitted))). Additionally, the federal statutory factors weigh in Coty's favor. For example, the first, second, and fourth factors — the similarity between the marks as well as the distinctiveness and degree of recognition of the plaintiff's mark — favor Coty, given that Excell is using nearly exact replicas of Coty's highly distinctive and recognizable marks on its packaging. The third factor also falls on Coty's side of the scale because, Excell's infringing products aside, there is no dispute that Coty has not engaged in substantially exclusive use of its marks. So too, the fifth factor swings strongly against Excell, as it deliberately sought to create an association with Coty's marks. (Def.'s Mem. 30 ("Excell chose its marks to create an association with Plaintiffs' marks.")). And lastly, the sixth factor is firmly in Coty's corner because Excell's products have no "actual association" with Coty's Calvin Klein, Vera Wang, and Lady Gaga marks.[15] Accordingly, Coty has demonstrated that Excell's "versions" of the Calvin Klein, Vera Wang, and Lady Gaga fragrances at issue here are likely to blur Coty's marks' "ability to clearly and unmistakably distinguish one source" as unique identifiers. *Hormel Foods*, 73 F.3d at 506 (internal quotation marks and ellipses omitted).

---

competing products, we see no reason why dilution cannot occur as well where the products are competing." *Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 219 (2d Cir. 1999), *abrogated on other grounds by Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418 (2003); *see also Louis Vuitton Malletier*, 561 F. Supp. 2d at 379 ("Dilution ordinarily applies where the parties do not operate in competitive or closely related product lines, but the FTDA 'on its face is capable of application to competitive situations.'").

[15]     Once again, Excell raises a fair use argument in response to Coty's dilution claims. (Def.'s Mem. 32-33). For the reasons stated above, however, it fails. *See* Section B.3.

Coty seeks protection for the remainder of its marks only under New York law, which merely requires that the marks be distinctive or have acquired secondary meaning. (Pls.' Mem. 18 n.21). As discussed above, *see supra* Section B.1, Coty's marks easily meet that standard (most concededly so). (*See* Def.'s Mem. 6, 29). And once again, the relevant factors favor Coty. Indeed, the "first five factors of the blurring test are similar to the *Polaroid* factors," which the Court has found to favor Coty. *Balady, Inc. v. Elhindi*, No. 14-CV-855 (SJ) (RER), 2014 WL 7342867, at *9 (E.D.N.Y. Dec. 23, 2014); *see, e.g.*, *N.Y. Stock Exch.*, 293 F.3d at 558 (listing the factors as follows: "(i) the similarity of the marks; (ii) the similarity of the products covered; (iii) the sophistication of the consumers; (iv) the existence of predatory intent; (v) the renown of the senior mark; and (vi) the renown of the junior mark."); *Tiffany*, 576 F. Supp. 2d at 523 (noting that because "New York's anti-dilution law is substantively similar" to federal law, claims under the two laws "may be analyzed together"). In fact, there is only one factor — the final one, "the renown of the junior mark" — that the Court has yet to analyze. *N.Y. Stock Exch.*, 293 F.3d at 558. In this case, it is undisputed that Excell's marks are obscure. Even Excell's own expert acknowledged that the company brand has no recognition and that the company conducts no marketing. (Def.'s Ex. FFF ("Keegan Direct") ¶ 15). Accordingly, Coty has established the elements necessary to prevail on its claims of trademark dilution under both federal and state law.

### 2. Dilution by Tarnishment

Under federal and New York law, a trademark owner can also pursue a claim of dilution by tarnishment. A claim of dilution by tarnishment "arises when the plaintiff's trademark is linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context likely to evoke unflattering thoughts about the owner's product." *Deere & Co. v. MTD Prods.,*

*Inc.*, 41 F.3d 39, 43 (2d Cir. 1994). "The sine qua non of tarnishment is a finding that plaintiff's

mark will suffer negative associations through defendant's use." *Hormel Foods*, 73 F.3d at 507.

Here, Excell uses inferior oils, employs cheaper packaging components, lacks any quality

assurance program, and produces fragrances with potentially harmful ingredients. (Ferullo Dep.

180-81, 197-98, 227; Massaro Direct ¶¶ 7, 9-10). Coty's marks are thus "linked to products of

shoddy quality," and the company has established a claim of dilution by tarnishment. *Cf. Tommy

Hilfiger*, 221 F. Supp. 2d at 422 (finding a lack of tarnishment when the plaintiff "submitted no

evidence on whether there is a disparity in quality between its own fragrance and the [infringing

product]"); *Clinique*, 945 F. Supp. at 555, 562 (finding no tarnishment or shoddiness when the

plaintiff did not "present[] evidence of the [defendant's] products' inferior quality").[16]

## D. False Advertising

Finally, Coty argues that Excell's "Our Version Of" legend constitutes false advertising.

(Pls.' Mem. 20). To establish a false advertising claim under Section 43(a) of the Lanham Act, a

plaintiff must prove five elements: "1) the defendant has made a false or misleading statement;

2) the false or misleading statement has actually deceived or has the capacity to deceive a

substantial portion of the intended audience; 3) the deception is material in that it is likely to

influence purchasing decisions; 4) there is a likelihood of injury to [the] plaintiff, such as

declining sales or loss of goodwill; and 5) the goods traveled in interstate commerce." *Johnson

& Johnson Vision Care, Inc. v. CIBA Vision Corp.*, 348 F. Supp. 2d 165, 177-78 (S.D.N.Y.

2004). A false advertising claim may be based on either of two theories: "that (1) the advertising

---

[16]     Coty arguably faces a risk of tarnishment as well because of the ongoing criminal case
against several Excell executives and employees in the District of New Jersey. (*See* Bronsnick
Dep. Resp. 73; Pls.' Ex. 171). That said, based on the existing record, there is no reason to
believe that the average consumer would know about the criminal charges, let alone link them to
Coty.

is literally false as a factual matter, or (2) although the advertisement is literally true, it is likely to deceive or confuse customers." *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 255 (2d Cir. 2014). In cases of literal falsity, "the court may enjoin the use of the claim without reference to the advertisement's impact on the buying public." *Tiffany*, 600 F.3d at 112. By contrast, in cases "where the statement at issue is not literally false, . . . a plaintiff must demonstrate, by extrinsic evidence, that the challenged commercials tend to mislead or confuse consumers, and must demonstrate that a statistically significant part of the commercial audience holds the false belief allegedly communicated by the challenged advertisement." *Id.* at 112-13 (internal quotation marks omitted).

Here, the Court need not decide whether the words "Our Version Of" are literally false, as Coty has established that they are "likely to deceive or confuse customers." *Merck*, 760 F.3d at 255. Although the words (considered on their own, without the more prominent Coty marks to which they are attached) indicate that Excell's and Coty's products have a different provenance, they also imply that the products are similar, if not equivalent. This duality — of both contrast and equivalence — is inherent in the term "version," which is defined as "a form, variant, species, or copy of a type or original." *Webster's Third New International Dictionary* 2545 (2002). But Excell indisputably does not produce fragrances of a similar quality to those of Coty; nor does it produce anything that could reasonably be called a "version" of Coty's products. (*See* Section B.2.f). Indeed, Excell's own Rule 30(b)(6) witness admitted as much. (Ferrullo Dep. 107 ("[Excell is] not offering a version of the original [fragrance].")). The only similarities between the two companies' products are the fact that they are fragrances and the uncanny and impermissible resemblances between Excell's bottles and packaging and Coty's. Viewing the words "Our Version Of" in context — that is, with the infringing house marks,

fragrance marks, and trade dress — only reinforces that they were intended to connote (a false) equivalency.  *See, e.g.*, *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 148 (2d Cir. 2007) (noting that an advertisement is false by necessary implication if "the words or images, considered in context, necessarily and unambiguously imply a false message"); *Nutrition & Fitness, Inc. v. Mark Nutritionals, Inc.*, 202 F. Supp. 2d 431, 436 (M.D.N.C. 2002) ("Additionally, the Court notes that Defendant alleges that Plaintiff's ["Compare to"] label uses Body Solutions' actual mark, trade dress and logo, which could further increase the potential for the statement to mislead.").

Coty has also produced "extrinsic evidence[] that the challenged [words] tend to mislead or confuse consumers."  *Tiffany*, 600 F.3d at 112-13.  Specifically, Dr. Rappeport conducted a second survey to test whether consumers viewing the "Our Version Of" legend on Excell's packaging were likely to construe it to mean that a product was the same as, or different from, its Coty counterpart with respect to formula and the longevity of scent.  (Rappeport Direct ¶¶ 34-35, Pls'. Ex. 161-1, at 2).  After filtering out "noise," Dr. Rappeport found that 20% of respondents believed the legend communicated the message that Excell's fragrances were substantially equivalent to Coty's Fragrances on both dimensions.  (Rappeport Direct ¶ 42).  That percentage "constitutes a substantial percentage of consumers."  *Playtex*, 2016 WL 1276450, at *4.

Once again, Excell protests that Dr. Rappeport's study is flawed, this time on the ground that the survey asked "closed-ended questions of whether the two fragrances were 'the same or different,' rather than giving respondents the option to indicate that the products were 'similar.'" (Def.'s Mem. 25).  But the questions in Dr. Rappeport's survey were not closed-ended in the traditional sense.  Instead, participants were asked a series of open-ended questions, including, "does the wording on these two products communicate or imply anything to you" about whether

certain qualities of the products "are the same or different?"  (Pls. Ex. 161-1, at 10-11).

Participants then responded using their own language — not just "the same" or "different" —

and explained what the wording communicated to them.  (Rappeport Direct ¶ 35).  Additionally,

although Excell is correct that "closed-ended questions" are generally disfavored, surveys crafted

to test comparative advertising claims sometimes call for a more defined option set.  *See, e.g.*,

*Procter & Gamble Pharm., Inc. v. Hoffmann-LaRoche Inc*., No. 06-CV-0034 (PAC), 2006 WL

2588002, at *22 (S.D.N.Y. Sept. 6, 2006) (finding that it was "not inappropriate for [Dr.

Rappeport] to formulate proper, closed-ended questions in order to assess whether [the

defendant's] TV ads communicated the messages [the plaintiff] complains of, *i.e*., messages that

concern secondary, complex, and implicitly comparative claims").[17]

Finally, Coty established the remaining three elements of a false advertising claim.  First,

consumers in the fragrance market undoubtedly care about the quality and longevity of their

perfume or cologne, so it is fair to say that Excell's "deception is material in that it is likely to

influence purchasing decisions."  *Johnson*, 348 F. Supp. 2d at 178.  Second, because "a false

comparison to a specific competing product necessarily diminishes that product's value in the

minds of the consumer," no proof of likely injury is necessary in cases of this sort.  *Time*

*Warner*, 497 F.3d at 162 (internal quotation marks omitted).  And third, there is and can be no

---

[17]     Notably, the survey conducted by Keegan, Excell's expert, was as "closed-ended" as Dr. Rappeport's study; it merely included a third option, "similar."  (Keegan Direct ¶ 59).  Separate and apart from that, the Court agrees with Dr. Rappeport that including "similar" does not add clarity, as the category is merely a logical subset of "different."  (Rappeport Direct ¶ 36).  In any event, given the significant differences between the companies' fragrances, Keegan's finding that "[a]pproximately two-thirds of consumers view[ed] the Excell and Calvin Klein products to be 'similar'" only strengthens the conclusion that Excell's legends are false.  (Keegan Direct ¶ 58).

dispute that the goods at issue traveled in interstate commerce.  *See Johnson*, 348 F. Supp. 2d at 178.  Accordingly, the Court finds that Excell has engaged in false advertising.

**E.  Relief**

Having found that Coty established various violations of its rights under federal and New York law, the Court turns to the question of relief.  Coty requests both injunctive and monetary relief.  With respect to the former, Coty seeks an injunction barring Excell and Excell's principals from resuming their infringing activities in the future.  (Docket No. 146 ("Pls.' Post-Trial Mem."), at 2)).  As to the latter, Coty asks for an accounting of Excell's profits pursuant to Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a); and enhanced monetary awards pursuant to Section 35(b) of the Lanham Act, 15 U.S.C. § 1117(b).  (Pls.' Post-Trial Mem. 11, 14-15).  Coty also seeks an award of interest, including pre-judgment interest, on the foregoing amounts; as well as recovery of its costs, including reasonable attorneys' fees and expenses, pursuant to 15 U.S.C. § 1117(a).  (Pls.' Post-Trial Mem. 16).  The Court will address each in turn.

**1.  Injunctive Relief**

It is well established that a plaintiff is entitled to a permanent injunction if it can demonstrate "(1) actual success on the merits and (2) irreparable harm."  *Gucci Am., Inc. v. Duty Free Apparel, Inc.*, 286 F. Supp. 2d 284, 290 (S.D.N.Y. 2003).  Once a plaintiff has established liability in a trademark case, courts consider four factors in determining whether injunctive relief is warranted: (1) the likelihood that the plaintiff will suffer irreparable harm in the absence of an injunction, (2) whether remedies at law (such as monetary damages) are adequate to compensate the plaintiff for that harm, (3) whether the balance of hardships tips in the plaintiff's favor, and (4) whether the public interest would be served by the issuance of an injunction.  *See Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010).  Irreparable harm is established "if there is any

likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Tiffany (NJ) LLC v. Dong*, No. 11-CV-2183 (GBD) (FM), 2013 WL 4046380, at *7 (S.D.N.Y. Aug. 9, 2013) (internal quotation marks omitted); *see also Malletier*, 426 F.3d at 537 ("In trademark disputes, a showing of likelihood of confusion establishes both a likelihood of success on the merits and irreparable harm." (internal quotation marks omitted)).  Injunctive relief must be "narrowly tailored to fit specific legal violations," *Patsy's Italian Rest., Inc. v. Banas*, 658 F.3d 254, 272 (2d Cir. 2011) (internal quotation marks omitted), but, pursuant to the Lanham Act, courts may grant injunctions "according to the principles of equity and upon such terms as the court may deem reasonable," 15 U.S.C. § 1116(a).

Here, Coty requests an order requiring Excell and "all those in active concert and participation with it" to "immediately and permanently cease (i) the import, export, manufacture, production, distribution, circulation, sale, offer for sale, advertisement, promotion or display of Plaintiffs' marks and trade dress, and confusingly similar variants thereof, on Defendant's products; (ii) making any false or misleading statements of fact concerning the source or qualities of Defendant's products; (iii) diluting and tarnishing Plaintiffs' marks; (iv) engaging in any other acts of trademark infringement, unfair competition, false advertising or dilution involving Plaintiffs' fragrances, marks and trade dress."  (Joint Pretrial Order 11).  Plaintiffs also request that the Court's order require Excell (1) within five business days, to provide copies of the order to all of its owners, directors, officers, and employees and confirm in writing to the Court that it has done so; (2) within five business days, to provide Coty with the true and correct last known addresses and other available contact information for all its present and former owners, directors, officers, employees, and suppliers (of the infringing products), to permit Coty

to provide them with actual notice of the order; (3) within fifteen business days, to deliver to Coty for destruction at Excell's "sole cost all signs, products, packaging, promotional material, advertising material, catalogs and any other item that bears, contains or incorporates" any of Coty's marks, "or any simulation, reproduction, counterfeit, copy, colorable imitation or confusingly similar variant thereof"; and (4) within five business days, to provide the Court and counsel for Coty with a full, accurate, and complete supplement to a spreadsheet (Defs.' Ex. B) purportedly showing Excell's sales data from July 2010 through April 2016, disclosing any and all additional sales of infringing products by item that are not reflected in that document. (Docket No. 146 ("App'x to Pls.' Post-trial Mem.") 3-4).

The Court concludes that Coty's requests are well founded. As an initial matter, Coty has demonstrated the likelihood that its reputation and brand will suffer irreparable harm in the absence of an injunction. Courts in this Circuit have found that, absent undue delay in bringing a claim, a "plaintiff who establishes that an infringer's use of its trademark creates a likelihood of consumer confusion generally is entitled to a presumption of irreparable injury." *Weight Watchers Int'l, Inc. v. Luigino's, Inc.*, 423 F.3d 137, 144 (2d Cir. 2005); *see also, e.g.*, *Dunkin' Donuts Franchised Rests. LLC v. Tim & Tab Donuts, Inc.*, No. 07-CV-3662 (KAM) (MDG), 2009 WL 2997382, at *8 (E.D.N.Y. Sept. 15, 2009) (providing that irreparable injury "is automatically satisfied by actual success on the merits, as irreparable harm is established by a showing of likelihood of confusion." (internal quotation marks and citation omitted)). For the reasons discussed above, therefore, Coty easily satisfies the first factor for obtaining injunctive relief. *U.S. Polo Ass'n*, 800 F. Supp. 2d at 541. The second factor — whether remedies at law

are adequate — also swings in Coty's favor, as money alone cannot make up for the company's unquantifiable "losses of reputation and goodwill and resulting loss of customers." *Id.*

Next, the balance of hardships tips forcefully in Coty's favor as Excell is no longer selling products from its Diamond Collection (or any products for that matter). (Tr. 383-84 (testimony of Pfau that, since December 2016, Excell "has . . . no inventory, has not sold anything, has not conducted any business other than winding down operations")). The equities also weigh in Coty's favor because it has spent millions of dollars marketing and selling its many iconic fragrances for decades while Excell has conducted no marketing, has no brand recognition, and only entered the fragrance market in 2010. (Keegan Direct ¶ 15 (Excell's expert acknowledging that the company conducts no marketing and consumers do not seek out its brand)). *See, e.g.*, *U.S. Polo Ass'n*, 800 F. Supp. 2d at 541 (finding the balance of hardships to tip in favor of the more established company after analyzing both companies' histories and market penetration). Finally, the public interest will plainly be served by issuing an injunction preventing Excell from engaging in deceptive and misleading misconduct that violates state unfair competition and trademark laws. *See, e.g.*, *N.Y.C. Triathlon*, 704 F. Supp. 2d at 344 ("[T]he public has an interest in not being deceived — in being assured that the mark it associates with a product is not attached to goods of unknown origin and quality.").

Excell's primary objection is that any injunctive relief would be moot given its cessation of "all operations." (Docket No. 147 ("Def.'s Post-Trial Mem.") 21). Coty's request is not moot, however, because Excell had not dissolved as of the time of trial — and there is no indication that it has dissolved since. (Tr. 383-84 (testimony of Pfau that Excell is in the process of "winding down operations")). Because Excell could simply resume operations directly or indirectly — and because its directors, officers, and employees have demonstrated such

tendencies in the past (*see* Def.'s Mem. 2) — Excell has not shown that it is "absolutely clear that [its] wrongful conduct will not recur." *Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*, No. 08-CV-0442 (DLC), 2016 WL 815205, at *14 (S.D.N.Y. Feb. 29, 2016); *cf. Beechwood Restorative Care Ctr. v. Thompson*, 494 F. Supp. 2d 181, 187 (W.D.N.Y. 2007) (finding mootness where a nursing home had closed and its state operating license had been revoked). Accordingly, Coty's request for injunctive relief is not moot.

Excell also argues that Coty has not met its burden of demonstrating that the "injunction could be enforceable against any nonparties." (Def.'s Post-Trial Mem. 22). But Rule 65(d)(2) of the Federal Rules of Civil Procedure provides, in relevant part, that an order granting injunctive relief binds the following persons who receive actual notice of it by personal service or otherwise: "(A) the parties; (B) the parties' officers, agents, servants, employees, and attorneys; and (C) other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B)." In order for a nonparty to be bound as part of an injunction, "that entity must either aid and abet the defendant or be legally identified with it." *Gojo Indus., Inc. v. Innovative Biodefense, Inc.*, No. 15-CV-2946 (PAC), 2015 WL 7019836, at *2 (S.D.N.Y. Nov. 12, 2015). Applying those principles here, Coty's request for injunctive relief is granted with respect to Excell and its "officers, agents, servants, employees . . . [and] other persons who are in active concert or participation" with them. Fed. R. Civ. P. 65(d)(2). The fact that Excell may soon be dissolved has no bearing on the scope of the injunction with respect to the other individuals and entities enjoined under Rule 65(d)(2).

## 1. Accounting of Profits

Section 35(a) of the Lanham Act provides that a plaintiff who has successfully established a trademark violation "shall be entitled, . . . subject to the principles of equity, to

recover . . . defendant's profits." 15 U.S.C. § 1117(a). The statute goes on to state that, "[i]n assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." *Id.* As the Second Circuit has explained: "Ordinarily, a plaintiff that has proved the amount of infringing sales would be entitled to that amount unless the defendant adequately proved the amount of costs to be deducted from it. This sequence of proof thus places the burden of proving costs on the party with the superior access to such information, namely the infringing defendant." *Am. Honda Motor Co. v. Two Wheel Corp.*, 918 F.2d 1060, 1063 (2d Cir. 1990). To ascertain whether "on the whole, the equities weigh in favor of an accounting" of defendant's profits, courts consider "(1) the degree of certainty that the defendant benefited from the unlawful conduct; (2) availability and adequacy of other remedies; (3) the role of a particular defendant in effectuating the infringement; (4) plaintiff's laches; and (5) plaintiff's unclean hands." *George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532, 1540 (2d Cir. 1992).[18] Here, all of these considerations favor Coty. In light of the likelihood-of-confusion analysis above, there is no doubt that Excell benefited from its unlawful conduct — indeed, its very business model depended on creating customer confusion and capitalizing on Coty's goodwill. Nor is there any doubt that Excell is directly responsible for the infringement. Additionally, as noted above, Excell's laches defense falls short, and there is no evidence suggesting that Coty has unclean hands. The Court therefore concludes that Coty has adequately demonstrated an entitlement to an award of profits pursuant to Section 1117(a).

---

[18] Courts in this District are split over whether a showing of bad faith is also required to obtain monetary relief for infringement, but there is agreement that it is required to obtain monetary relief for dilution. *See Beastie Boys v. Monster Energy Co.*, 983 F. Supp. 2d 354, 366-67 (S.D.N.Y. 2014) (collecting and comparing cases); *see also GMA Accessories, Inc. v. BOP, LLC*, 765 F. Supp. 2d 457, 468-70 (S.D.N.Y. 2011) (same). In any event, the Court has already found bad faith on the part of Excell.

Coty proved at trial that Excell's sales of the accused fragrances from July 2010 through April 2016 totaled $6,573,840.43. (*See* Tr. 408; Pls.' Ex. 243; Def.'s Ex. KKK). Because Excell continued to sell the infringing fragrances until at least December 2016, Coty also seeks — and the Court grants — an accounting of the company's profits for the period from April 2016 until it ultimately ceased operations. That leaves the question of whether Excell proved any costs or deductions. Excell claims that it is entitled to deductions for both the costs of goods sold (that is, direct costs) and an allocable percentage of its overhead expenses (that is, indirect costs). (Def.'s Post-Trial Mem. 20). Those claims are based on two categories of documents offered at trial: (1) a spreadsheet showing the company's total sales (infringing and non-infringing) by product from July 2010 to April 2016, which includes an expense column captioned as "COGS" (as in, "costs of goods sold") (Def.'s Ex. B ("COGS Spreadsheet")); and (2) the company's profit-and-loss statements for the years 2010 to 2015 (Def. Exs. NNN-RRR ("P&L Statements")). Excell argues that the documents are admissible as business records under Rule 803(6) of the Federal Rules of Evidence. (Def.'s Post-Trial Mem. 18-19). Coty, by contrast, argues that the documents are either inadmissible or, if admissible, unreliable proof of costs and deductions. (Pls.' Post-Trial Mem. 16). The Court agrees with Coty.

First, the Court declines to rely on Excell's unaudited P&L Statements as reliable proof of costs and deductions. Excell attempted to lay a foundation for the P&L Statements through Andrew Pfau, an Excell owner and board member, who testified that he had "reviewed each Profit & Loss statement at or about the time it was prepared." (Pfau Direct ¶ 5). Yet Pfau acknowledged that the Statements were later adjusted and revised when reviewed by outside accountants, and conceded that he had no idea "what the particular changes were." (Tr. 425). What is more, Pfau himself admitted that three of the six annual P&L Statements were inaccurate

and unreliable.  (Tr. 410-13; Pfau Direct ¶ 6, n.1).  And while he said that he was "comfortable" with the other three (Tr. 399), he "gave no testimony about the techniques used . . . or about the efforts at consistency between the various reports prepared."  *Ortho Pharm. Corp. v. Cosprophar, Inc.*, 828 F. Supp. 1114, 1120 (S.D.N.Y. 1993) (refusing to apply the business records exception because "the reliability of the exhibit cannot be measured" where the person testifying "had insufficient knowledge of the methods of preparation, the selectivity and [and the] methodology"), *aff'd* 32 F.3d 690 (2d Cir. 1994).  In light of these facts, the Court would be on firm ground excluding the P&L Statements altogether.  *See, e.g.*, *Saks Int'l, Inc. v. M/V "Export Champion,"* 817 F.2d 1011, 1013 (2d Cir. 1987) ("The principal precondition to admission of documents as business records . . .  is that [they] have sufficient indicia of trustworthiness to be considered reliable."); *Ortho Pharm. Corp.*, 828 F. Supp. at 1119 ("The hallmark of documents admitted under the business records exception is that they are trustworthy and reliable.").  But the Court need not decide that question because, even if the records were admissible, the Court would and does, for many of the same reasons, decline to credit them — and Pfau's testimony about them — as reliable or trustworthy proof of costs or deductions.

For similar reasons, the COGS Spreadsheet does not satisfy Excell's burden of proving costs and deductions.  Excell sought to use certain columns in the Spreadsheet to establish its direct costs, but Pfau — who, again, served as the sole foundational witness (Def.'s Post-Trial Mem. 14; Pfau Direct ¶ 4) — provided no detail as to what the columns were or how the figures within the columns were calculated.  *See, e.g.*, *Abascal v. Fleckenstein*, 820 F.3d 561, 566 (2d Cir. 2016) (finding that a report lacked trustworthiness in part because it "does not describe the methodology that was used").  Indeed, at trial, Pfau could only speculate when asked to explain the "AVG COGS" category on the COGS Spreadsheet.  (*See* Tr. 404 ("I think that's just tracking

the physical unit, the product cost without any other — just if we bought it for 90 cents a bottle, it's — the cost was just the bottle, no other costs.")).  That does not suffice to carry Excell's burden, as an infringing defendant may not prove deductible costs "by records showing only a vague, undifferentiated category" of expenses.  5 McCarthy on Trademarks and Unfair Competition § 30:66 (4th ed. 2017); *see also Audemars Piguet Holding S.A. v. Swiss Watch Int'l, Inc.*, 46 F. Supp. 3d 255, 292 (S.D.N.Y. 2014), *rev'd on other grounds*, No. 12-CV-5423 (LAP), 2015 WL 150756 (S.D.N.Y. Jan. 12, 2015) ("[B]esides asserting these costs, Defendants provided neither documentation nor analysis of how they were calculated, besides the Solar Time invoice summaries.  Without this information, Defendants have not proven direct costs under the Lanham Act, and it is not possible for the Court to conduct the two-step analysis required for overhead expenses." (citation omitted)).  Accordingly, Coty is "awarded all revenue" for the relevant time periods.  5 McCarthy § 30:66; *see also GTFM, Inc. v. Solid Clothing, Inc.,* 215 F. Supp. 2d 273, 304-05 (S.D.N.Y. 2002) (calculating profits without incorporating the defendant's alleged costs where "[defendant] has failed to prove with reliable evidence any other expenses").  That is, Coty is awarded Excell's sales of its infringing fragrances — $6,573,840.43 — plus the amount of Excell's sales since that date, to be determined through an accounting.

## 2.  Enhanced Monetary Awards

The Court turns, then, to Coty's argument that it is entitled to, or should be awarded, treble damages.  (Pls.' Post-Trial Mem. 11-13).  Where a defendant has "intentionally us[ed] a mark or designation, knowing such mark or designation is a counterfeit mark," Section 35(b) of the Lanham Act provides that "the court shall, unless the court finds extenuating circumstances, enter judgment for three times such profits or damages, whichever amount is greater, together with a reasonable attorney's fee."  15 U.S.C. § 1117(b); *see Sara Lee Corp. v. Bags of N.Y., Inc.*,

36 F. Supp. 2d 161, 165 (S.D.N.Y. 1999). A "counterfeit" mark is defined in the statute as a "spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127. The statute does not, in turn, define the terms "substantially indistinguishable" or "spurious." But courts in this Circuit have uniformly held that they require more than a mere similarity between the marks or a "colorable imitation." *Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F. Supp. 3d 485, 499 (S.D.N.Y. 2015) ("To be substantially indistinguishable, two marks must be 'nearly identical . . . with only minor differences which would not be apparent to an unwary observer.'"). That is, they "reflect the element of outright duplication absent from the colorable imitation" inquiry. *Fischer v. Forrest*, No. 14-CV-1304 (PAE) (AJP), 2017 WL 128705, at *12 (S.D.N.Y. Jan. 13, 2017) (internal quotation marks omitted); *see also Montres Rolex, S.A. v. Snyder*, 718 F.2d 524, 528 (2d Cir. 1983) (distinguishing those "marks which are merely infringements" and "those marks which not only infringe but in addition are such close copies that they amount to counterfeits"). Put another way, "[t]he essence of counterfeiting is that the use of the infringing mark 'seeks to trick the consumer into believing he or she is getting the genuine article, rather than a 'colorable imitation.'" *Gucci*, 868 F. Supp. 2d at 237). In determining whether one mark is a counterfeit of another, a court must not view them "in the abstract. Rather, the alleged counterfeit mark must be compared with the registered mark as it appears on actual merchandise to an average purchaser." *Excelled Sheepskin & Leather Coat Corp. v. Oregon Brewing Co.*, No. 12-CV-1416 (GBD) (RLE), 2015 WL 4468083, at *3 (S.D.N.Y. July 8, 2015) (internal quotation marks and citation omitted).

Applying those standards here, the Court concludes that Excell's infringing products do not rise to the level of "counterfeits" within the meaning of the Lanham Act. For one, despite the

similarities between the products, none of Excell's products used the *exact* same name as a Coty product; nor did they possess the same — or a "substantially indistinguishable" — combination of colors, designs, and shapes. *Colgate-Palmolive Co. v. J.M.D. All-Star Imp. & Exp. Inc.*, 486 F. Supp. 2d 286, 291 (S.D.N.Y. 2007) ("Taken together, it may fairly be said that the boxes are quite similar, but not that they are 'substantially indistinguishable.'"); *cf. Audemars Piguet Holding* 2015 WL 150756, at *2 (noting that while a part of the defendant's watch infringed on the plaintiffs' trademark, the two marks were not "substantially indistinguishable" because the bolts were "shaped differently" and the screws were "arrayed in a different pattern"). Additionally, although Excell did use Coty's own marks as part of its "Our Version Of" and "Not Associated With" disclaimers, the existence of those disclaimers and Excell's (admittedly less prominent) use of the Diamond Collection mark on its bottles "creates enough of a contextual difference that [Excell's fragrances] cannot be considered counterfeits of [Coty's]." *Tiffany & Co. v. Costco Wholesale Corp.*, 127 F. Supp. 3d 241, 255 (S.D.N.Y. 2015); *see, e.g.*, *Gibson Brands, Inc. v. John Hornby Skewes & Co.*, No. 14-CV-609 (DDP) (SSX), 2016 WL 7479317, at *7 (C.D. Cal. Dec. 29, 2016) (dismissing a counterfeit claim, but not an infringement claim, on the ground that the defendant's guitars were not "identical" to, or "substantially indistinguishable" from, the plaintiff's guitars, where, among other things, the defendants' brand name appeared on the back of the guitars). In short, although Excell certainly sought to capitalize on Coty's goodwill by creating customer confusion between the two companies' products, the Court cannot conclude that the company went so far as to try "to trick . . . consumer[s] into believing" they were actually buying Coty's fragrances. *Gucci*, 868 F.

Supp. 2d at 237.  Accordingly, Excell's fragrances are not "counterfeits" under the Lanham Act and Coty is not entitled to treble damages.[19]

### 3. Attorney's Fees, Other Costs, and Prejudgment Interest

The Lanham Act provides that a court may award reasonable attorney's fees and prejudgment interest to the prevailing party "in exceptional cases."  15 U.S.C. § 1117(a); *see Am. Honda Motor Co. v. Two Wheel Corp.*, 918 F.2d 1060, 1064 (2d Cir. 1990).  The Second Circuit has defined "exceptional cases" as ones involving fraud, bad faith, or willfulness.  *See Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 317 F.3d 209, 221 (2d Cir. 2003).  "The mere existence of a finding of bad faith, however, does not automatically entitle the prevailing party to attorneys' fees." *Gidatex, S.r.L. v. Campaniello Imps., Ltd.*, 82 F. Supp. 2d 136, 147 (S.D.N.Y. 2000). Indeed, "courts routinely decline to award attorneys' fees in cases involving willful

---

[19]     Coty does not appear to be seeking trebled profits pursuant to Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a), but to the extent that it does, the request is denied.  First, most courts have held that trebled *profits* (as opposed to trebled *damages*) are unavailable under Section 35(a).  *See BeautyBank, Inc. v. Harvey Prince LLP*, No. 10-CV-955 (DAB) (GWG), 2011 WL 671749, at *5 (S.D.N.Y. Feb. 24, 2011);  *see also, e.g.*, *U.S.A. Famous Original Ray's Licensing Corp. v. Tisi's Pizza & Pasta Inc.*, No. 09-CV-5517 (RMB) (AJP), 2009 WL 4351962, at *4 (S.D.N.Y. Dec. 1, 2009) ("Because § 1117(a) does not explicitly provide for trebling an award of defendant's profits, but only permits trebling of plaintiff's actual damages, courts cannot treble an award of defendant's profits." (internal quotation marks omitted)); *Thompson v. Haynes*, 305 F.3d 1369, 1380 (Fed. Cir. 2002) ("As for damages, the court may award up to three times actual damages, depending on the circumstances of the case.  As for profits, however, the court is not authorized to award up to three times the amount proved."); *but see Deering, Milliken & Co. v. Gilbert*, 269 F. 2d 191, 194 (2d Cir. 1959) (stating that Section 1117(a) permits a court, in its discretion, to "treble[] the defendant's profits").  Second, and in any event, even if trebled profits were available, the Court would exercise its discretion and decline to award Coty such profits here for the simple reason that it "has not presented any evidence" that the award of over $6 million in Excell's profits "is inadequate."  *U.S.A. Famous*, 2009 WL 4351962, at *5; *see, e.g.*, *Brown v. Party Poopers, Inc.*, No. 00-CV-4799 (JSM), 2001 WL 1380536, at *6 (S.D.N.Y. July 9, 2001) (finding, in a case where the defendant "failed to prove the amount of any elements of cost or deduction," that the "purposes of trebling have already been adequately served" by the award and thus declining to provide treble damages).

infringement." *Mister Softee, Inc. v. Boula Vending Inc.*, No. 10-CV-2390 (ARR) (JMA), 2011 WL 705139, at *1 (E.D.N.Y. Feb. 17, 2011)*; see also Lurzer GMBH v. Am. Showcase, Inc.*, 75 F. Supp. 2d 98, 102 (S.D.N.Y. 1998) ("Even in a case where, as here, the defendant engaged in willful deception, a court may decline to award [attorneys'] fees if there are other, mitigating factors."), *opinion clarified*, No. 97-CV-6576 (JSR), 1999 WL 111931 (S.D.N.Y. Mar. 4, 1999), *aff'd*, 201 F.3d 431 (2d Cir. 1999). The same is true for prejudgment interest: A finding of bad faith does not automatically lead to an award for the non-infringing party. *See Gidatex*, 82 F. Supp. 2d at 147 (refusing to award prejudgment interest after finding the case to not be "exceptional" and noting that plaintiff "has offered no reason why it requires additional compensation on th[e] award"). "The decision whether or not to award [attorney's] fees also rests within the broad discretion of the district judge." *George Basch*, 968 F.2d at 1543.

Exercising the "broad discretion" provided to district courts in this realm, the Court declines to award attorney's fees and prejudgment interest to Coty for several reasons. First, Excell's conduct before and during this litigation, while certainly not commendable, falls short of the "the sort of misconduct that supports an attorney fees award." *Sara Lee Corp.*, 36 F. Supp. 2d at 170 (noting that "the sort of misconduct that supports an attorney fees award includes not only willful infringement, but also willful defiance and protraction of judicial processes attempting to stop the illegalities"); *Patsy's Brand*, 317 F.3d at 222 ("[F]raudulent conduct in the course of conducting trademark litigation permits a finding that a case is 'exceptional' for purposes of an attorney's fee award under the Lanham Act."); *Leviton Mfg. Co. v. Fastmac Performance Upgrades, Inc.*, No. 13-CV-1629 (LGS) (SN), 2014 WL 2653116, at *9 (S.D.N.Y. Feb. 28, 2014) (finding that "willful infringement, knowing use of a counterfeit, and the default of the defendants justify an award of attorneys' fees"); *Scholastic, Inc. v.*

*Stouffer*, 221 F. Supp. 2d 425, 444 (S.D.N.Y. 2002) (awarding attorney's fees where the defendant created "fraudulent documents and testimony" in support of claims and defenses that had no reasonable basis in fact or law); *GTFM*, 215 F. Supp. 2d at 305-06 (noting that "[i]f defendant's bad faith alone were not sufficient to make this an exceptional case," then its other conduct, including "perjury during deposition and at trial" render the case "exceptional").[20]

Coty's request for attorney's fees and prejudgment interest is also undermined by "the absence of material evidence that [it] suffered any 'ascertainable damage.'" *Lurzer GMBH*, 75 F. Supp. 2d at 102 (S.D.N.Y. 1998),; *see also VIP Foods v. Vulcan Pet, Inc*., 675 F.2d 1106, 1107 (10th Cir. 1982) (affirming the district court's ruling that the case was not "exceptional" because, among other things, "plaintiff had suffered no ascertainable damage or loss of profits because of defendant's use of [its] mark"). For the reasons stated above, there is certainly reason to believe that Coty has been harmed by Excell's misconduct; but the fact is that, despite several years of competition with Excell's infringing products, Coty failed to produce demonstrable evidence of actual confusion. And finally, the Court concludes that attorney's fees and prejudgment interest are inappropriate because "the outcome" of the case "was by no means a foregone conclusion," *Simon & Schuster, Inc. v. Dove Audio, Inc.,* 970 F. Supp. 279, 302 (S.D.N.Y. 1997), especially when it came to those fragrances at the less infringing end of the "similarity spectrum" discussed above.

---

[20]     Granted, the Court imposed sanctions on Excell for failing to produce an adequately prepared witness for its Rule 30(b)(6) deposition. *See Coty Inc. v. Excell Brands, LLC*, No. 15-CV-7029 (JMF), 2016 WL 7187630 (S.D.N.Y. Dec. 9, 2016) (Docket No. 83). But the Court has already punished Excell for that misconduct, both by precluding the company from introducing evidence on certain issues and by requiring the company to reimburse Coty for its "reasonable expenses, including attorney's fees," caused by its failure to produce adequately prepared witnesses. *See id.* at *3. Requiring Excell to pay *all* of Coty's attorney's fees on the basis of that misconduct would, in the Court's view, be disproportionate.

In contrast to attorney's fees and prejudgment interest, a case need not be "extraordinary" for a prevailing party to recover "the costs of the action." 15 U.S.C. § 1117(a). Instead, a court may grant an award of costs subject to the "principles of equity." *Id.* In practice, courts in this district "generally award costs to prevailing parties in Lanham Act cases." *Gidatex,* 82 F. Supp. 2d at 150; *see also Tri–Star Pictures, Inc. v. Unger,* 42 F. Supp. 2d 296, 306 (S.D.N.Y. 1999) ("The Lanham Act also provides for the award of costs in all cases."). Accordingly, the Court concludes that Coty is entitled to recover its reasonable costs. *See Lyons P'ship, L.P. v. AAA Entm't, Inc.*, No. 98-CV-475 (MHD), 1999 WL 1095608, at *10 (S.D.N.Y. Dec. 3, 1999) (denying the plaintiff's request for attorneys' fees but granting its request for costs).

## CONCLUSION

Justice Frankurter once described trademark protection as "the law's recognition of the psychological function of symbols." *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co*., 316 U.S. 203, 205 (1942). That is, a trademark is more than a diffuse or meaningless representation; it is "a merchandising short-cut" meant "to impregnate the atmosphere of the market with the drawing power of a congenial symbol." *Id.* It is, in short, "something of value," and "[i]f another poaches upon the commercial magnetism of the symbol he has created, the owner can obtain legal redress." *Id.* For the reasons stated above, the Court concludes that Excell's knockoff fragrances "poach upon the commercial magnetism" of Coty's fragrances. More specifically, the Court finds that Coty has established its claims of trademark infringement, trademark dilution, and false advertising — under both New York and federal law — and is entitled to injunctive relief, an award of Excell's profits (including its profits for the period from April 2016 until the last infringing fragrances were sold, as to which Excell is to provide an accounting), and reimbursement of its reasonable costs.

The parties shall promptly meet and confer with respect to both Excell's accounting of its profits for the period from April 2016 until the last infringing fragrances were sold and Coty's reasonable costs. **No later than two weeks from the date of this Opinion and Order**, the parties shall submit a joint letter advising the Court of any disputes on either score and, in the case of a dispute, proposing a process to resolve it. **By the same date**, Coty shall submit a proposed judgment consistent with this Opinion and Order, including — among other things — the proposed terms of the injunction granted above. Excell shall have **one week from the submission of Coty's proposed judgment** to submit any objections in a letter brief, not to exceed three pages. The parties should advise the Court if there is any need for a conference.

The Clerk of Court is directed to terminate Docket Nos. 90 and 95.


      SO ORDERED.

Date:  September 18, 2017
       New York, New York
                                  JESSE M. FURMAN
                            United States District Judge

# Appendix A

**CALVIN KLEIN EUPHORIA (Women)**
**EXCELL'S EUPHRATES (Women)**









70

**CK ONE**
**EXCELL'S OK NEW YORK**

 

**CK ONE SHOCK (Women)**
**EXCELL'S OK ROCK (Women)**

 

**CK ONE SHOCK (Men)**
**EXCELL'S OK ROCK (Men)**



**CK ONE SUMMER**
**EXCELL'S OK HOT**





**CALVIN KLEIN OBSESSION (Men)**
**EXCELL'S POSSESSION (Men)**





 

**CALVIN KLEIN DARK OBSESSION (Men)**
**EXCELL'S POSSESSION NIGHT (Men)**

 



**CALVIN KLEIN ETERNITY (Women)**
**EXCELL'S SERENITY (Women)**





**CALVIN KLEIN ETERNITY (Men)**
**EXCELL'S SERENITY (Men)**




**CALVIN KLEIN ETERNITY AQUA (Men)**
**EXCELL'S SERENITY AQUA (Men)**

  

**CK IN2U (Women)**
**EXCELL'S BE4U (Women)**

   

| CK IN2U (Men) |
|:---:|
| **EXCELL'S OK4U (Men)** |

  

| CKFREE BLUE |
|:---:|
| **EXCELL'S OK BLUE** |

  

**DOWN TOWN CALVIN KLEIN**
**EXCELL'S CITY GIRL**



**VERA WANG PRINCESS**
**EXCELL'S INSPIRATION**

  

**VERA WANG LOVESTRUCK**
**EXCELL'S LOVE STORY**

 

**LADY GAGA FAME**
**EXCELL'S CRAZY LADY**

 

